UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

BANKERS INSURANCE COMPANY,                  )
BANKERS LIFE INSURANCE COMPANY,             )
FIRST COMMUNITY INSURANCE                   )
COMPANY, and BANKERS SPECIALTY              )
INSURANCE COMPANY, individually, and on     )
behalf of ALTERNATIVE LOAN TRUST            )    Case No. _____
2005-73CB; ALTERNATIVE LOAN TRUST           )
2005-J13; ALTERNATIVE LOAN TRUST            )
2006-6CB; ALTERNATIVE LOAN TRUST            )    **COMPLAINT**
2006-8T1; ALTERNATIVE LOAN TRUST            )
2007-21CB;; CWABS ASSET-BACKED              )
CERTIFICATES TRUST 2005-11; CWABS           )    **JURY TRIAL DEMANDED**
ASSET-BACKED CERTIFICATES TRUST             )
2005-12; CWABS ASSET-BACKED                 )
CERTIFICATES TRUST 2005-13; CWABS           )
ASSET-BACKED CERTIFICATES TRUST             )
2005-16; CWABS ASSET-BACKED                 )
CERTIFICATES TRUST 2006-11; and             )
CWMBS MORTGAGE PASS THROUGH                 )
TRUST 2005-21,                              )
                                            )
        Plaintiffs,                         )
                                            )
vs.                                         )
                                            )
COUNTRYWIDE FINANCIAL CORP.;                )
COUNTRYWIDE SECURITIES CORP.;               )
COUNTRYWIDE CAPITAL MARKETS, LLC,           )
COUNTRYWIDE HOME LOANS, INC.;               )
COUNTRYWIDE HOME LOANS                      )
SERVICING LP; CWMBS, INC.; CWALT,           )
INC.; CWABS, INC.; CWHEQ, INC.; BANK        )
OF AMERICA CORP.; BAC HOME LOANS            )
SERVICING, L.P.; NB HOLDINGS CORP.;         )
and THE BANK OF NEW YORK MELLON,            )
                                            )
        Defendants.                         )
_____/

## COMPLAINT

Plaintiffs, BANKERS INSURANCE COMPANY ("BIC"), BANKERS LIFE INSURANCE COMPANY ("BLIC"), FIRST COMMUNITY INSURANCE COMPANY ("FCIC"), and BANKERS SPECIALTY INSURANCE COMPANY ("BSIC") (collectively, "BANKERS"), individually, submit their Complaint against COUNTRYWIDE FINANCIAL CORPORATION ("Countrywide Financial"); COUNTRYWIDE SECURITIES CORPORATION ("Countrywide Securities"); COUNTRYWIDE CAPITAL MARKETS, LLC ("Countrywide Capital"); COUNTRYWIDE HOME LOANS, INC. ("Countrywide Home"); COUNTRYWIDE HOME LOANS SERVICING LP ("Countrywide Servicing"); CWMBS, INC. ("CWMBS"); CWALT, INC. ("CWALT"), CWABS, INC. ("CWABS"), CWHEQ, INC. ("CWHEQ") (collectively, "Countrywide," the "Company" or the "Countrywide Defendants"), and BANK OF AMERICA CORP. ("Bank of America"), BAC Home Loans Servicing, L.P. ("BAC Home"), NB HOLDINGS CORP. ("NB Holdings") (collectively, the "Bank of America Defendants," and together with the Countrywide Defendants, the "Defendants"); and on behalf of Alternative Loan Trust 2005-73CB, Alternative Loan Trust 2005-J13, Alternative Loan Trust 2006-6CB, Alternative Loan Trust 2006-8T1, Alternative Loan Trust 2007-21CB, CWABS Asset-Backed Certificates Trust 2005-11, CWABS Asset-Backed Certificates Trust 2005-12, CWABS Asset-Backed Certificates Trust 2005-13, CWABS Asset-Backed Certificates Trust 2005-16, CWABS Asset-Backed Certificates Trust 2006-11, and CWMBS Mortgage Pass-Through Trust 2005-21 (collectively, the "Trusts"), submit their Verified Certificateholder Derivative Complaint ("Derivative Complaint") against THE BANK OF NEW YORK MELLON ("BNYM"), and in support state:

## I.    SUMMARY OF THE ACTION

1.    This pleading is in effect two separate complaints.  The first part of (¶¶ 1–250) is a Complaint asserted by BANKERS, individually, against the Countrywide Defendants and the Bank of America Defendants in connection with the offering of the following Countrywide mortgage-backed securities ("MBS") purchased by BANKERS: Mortgage Pass-Through Certificates, Series 2005-73CB ("2005-73CB"), Mortgage Pass-Through Certificates, Series 2005-J13 ("2005-J13"), Mortgage Pass-Through Certificates, Series 2006-6CB ("2006-6CB"), Mortgage Pass-Through Certificates, Series 2006-8T1 ("2006-8T1"), Mortgage Pass-Through Certificates, Series 2007-21CB ("2007-21CB"), Mortgage Pass-Through Certificates, Series 2006-10 ("2006-10"), Mortgage Pass-Through Certificates, Series 2005-11 ("2005-11"), Mortgage Pass-Through Certificates, Series 2005-12 ("2005-12"), Mortgage Pass-Through Certificates, Series 2005-13 ("2005-13"), Mortgage Pass-Through Certificates, Series 2005-16 ("2005-16"), Mortgage Pass-Through Certificates, Series 2006-13 ("2006-13"), Mortgage Pass-Through Certificates, Series 2006-11 ("2006-11"), Mortgage Pass-Through Certificates, Series 2006-S8 ("2006-S8"), Mortgage Pass-Through Certificates, Series 2005-21 ("2005-21"), and Mortgage Pass-Through Certificates, Series 2006-15 ("2006-15") (the "Certificates").  Thus, any reference to "Defendants" in this first part of the Complaint excludes BNYM, unless explicitly stated otherwise.

2.    The second part (¶¶ 251-336) is a Derivative Complaint brought by BANKERS on behalf of the Trusts created to hold the Certificates against BNYM, as Trustee of the Trusts, for BNYM's inactions, which caused damages to the Trusts and, in turn, the Certificateholders of each Trust.[1]

---

[1] The Derivative Complaint is not brought on behalf of the trusts created to hold 2006-15, 2006-S8, 2006-10, or

3.     This action concerns a massive fraud perpetrated by Defendant, Countrywide Financial, and certain of its officers and affiliates against BANKERS who is an investor in MBS issued by Countrywide's subsidiaries.   BANKERS is an institutional investor that wanted conservative, low-risk investments, and thus, bought the aforesaid Countrywide MBS that were represented to be backed by mortgages issued pursuant to specific underwriting guidelines and rated investment-grade.

4.     In purchasing the Certificates, BANKERS relied on statements made in Prospectuses, Prospectus Supplements, and Pooling and Servicing Agreements that were prepared by the Countrywide Defendants.   BANKERS also relied on statements and reports made by Bloomberg, industry analysts, securities dealers and various credit rating agencies, all of which had relied on Countrywide Financial's officers' and directors' public statements.   The aforementioned documents and the Countrywide Defendants' statements made representations about the Countrywide Defendants' purportedly conservative mortgage underwriting standards, the appraisals of the mortgaged properties, adherence to prudent underwriting guidelines and careful credit analysis, the mortgages' loan-to-value ("LTV") ratios, and other facts that were material to BANKERS' investment decisions.   These representations by the Countrywide Defendants were reckless or knowingly false when made.   In reality, Countrywide was an enterprise driven by only one purpose — to originate and securitize as many mortgage loans as possible into MBS to generate profits for the Countrywide Defendants, without regard to the investors that relied on the critical, false information provided to them with respect to the related Certificates.

5.     The scope of the Countrywide Defendants' fraud is reflected by, among other

---

2006-13.  Thus, any reference to "Certificates" or "Trusts" in the Derivative Complaint expressly excludes the aforementioned Certificates and the trusts created to hold said Certificates.

things: (i) a securities fraud action brought by the United States Securities and Exchange Commission ("SEC") against three former senior executives of Countrywide Financial, in which the Court denied those defendants' motion for summary judgment and which then culminated in an historic settlement (the "SEC Action"); (ii) regulatory actions initiated by multiple state attorneys general which resulted in settlements worth over eight billion dollars; (iii) other fraud actions brought against the Countrywide Defendants by other MBS investors and insurers related to the same wrongdoing alleged herein, along with federal securities fraud claims brought against Countrywide for its misstatements to the investing public regarding Countrywide's mortgage loan underwriting standards; and (iv) the enormous number of defaults and foreclosures in the underlying mortgages supporting the MBS resulting in substantial damages to investors in Countrywide's MBS.

6.      In addition, BANKERS separately asserts a claim for common law negligent misrepresentation against the Countrywide Defendants, which expressly does not incorporate any claim of fraud or intentional misconduct.  Between 2005 and 2008 BANKERS purchased approximately twelve million dollars ($12,000,000) in Countrywide MBS in fifteen (15) Offerings issued pursuant to fifteen (15) separate sets of Prospectuses[2], Prospectus Supplements[3], and Pooling and Servicing Agreements[4] ("PSAs") (collectively, the "Offering

---

[2] Exhibit "1" (2005-73CB); Exhibit "2" (2005-J13); Exhibit "3" (2006-6CB); Exhibit "4" (2006-8T1); Exhibit "5" (2007-21CB); Exhibit "6" (2006-10); Exhibit "7" (2005-11); Exhibit "8" (2005-12); Exhibit "9" (2005-13); Exhibit "10" (2005-16); Exhibit "11" (2006-13); Exhibit "12" (2006-11), Exhibit "13" (2006-S8), Exhibit "14" (2005-21), and Exhibit "15" (2006-15).
[3] Exhibit "16" (2005-73CB); Exhibit "17" (2005-J13); Exhibit "18" (2006-6CB); Exhibit "19" (2006-8T1); Exhibit "20" (2007-21CB); Exhibit "21" (2006-10); Exhibit "22" (2005-11); Exhibit "23" (2005-12); Exhibit "24" (2005-13); Exhibit "25" (2005-16); Exhibit "26" (2006-13); Exhibit "27" (2006-11), Exhibit "28" (2006-S8), Exhibit "29" (2005-21), and Exhibit "30" (2006-15).
[4] Exhibit "31" (2005-73CB); Exhibit "32" (2005-J13); Exhibit "33" (2006-6CB); Exhibit "34" (2006-8T1); Exhibit "35" (2007-21CB); Exhibit "36" (2006-10); Exhibit "37" (2005-11); Exhibit "38" (2005-12); Exhibit "39" (2005-13); Exhibit "40" (2005-16); Exhibit "41" (2006-13); Exhibit "42" (2006-11), Exhibit "43" (2006-S8), Exhibit "44" (2005-21), and Exhibit "45" (2006-15).

Documents"[5]), all of which contained materially untrue statements and omissions.  BANKERS

purchased substantial portions of nineteen (19) separate tranches of the Certificates as follows:

| ENTITY | CERTIFICATE | PURCHASE DATE | FACE VALUE |
|--------|-------------|---------------|------------|
| BLIC | CWALT 2005-73CB 1A2 | 12/1/2005 | $  1,000,000 |
| BLIC | CWALT 2005-73CB 1A3 | 12/1/2005 | $  1,084,000 |
| BLIC | CWALT 2005-J13 1A4 | 11/22/2005 | $  1,000,000 |
| BBSC | CWALT 2005-J13 1A4 | 11/22/2005 | $     169,000 |
| BLIC | CWALT 2006-6CB 1A2 | 6/30/2008 | $     272,000 |
| BLIC | CWALT 2006-8T1 1A4 | 10/2/2007 | $     190,000 |
| BLIC | CWALT 2007-21CB 1A5 | 6/1/2008 | $     500,000 |
| BLIC | CWMBS 2006-10 1A3 | 4/19/2006 | $  1,000,000 |
| BLIC | CWABS 2005-11 AF3 | 4/17/2008 | $  1,470,000 |
| BLIC | CWABS 2005-12 2A4 | 3/3/2008 | $  1,200,000 |
| BIC | CWABS 2005-12 2A4 | 3/3/2008 | $     550,000 |
| FCIC | CWABS 2005-12 2A4 | 3/3/2008 | $     550,000 |
| BLIC | CWABS 2005-13 3AV4 | 7/16/2008 | $     814,320 |
| BLIC | CWABS 2005-16 2AF3 | 3/25/2008 | $     220,000 |
| BLIC | CWABS 2006-13 1AF5 | 4/11/2008 | $  1,000,000 |
| BLIC | CWABS 2006-11 1AF2 | 4/24/2008 | $  1,470,000 |
| BLIC | CWHEQ 2006-S8 A2 | 5/6/2008 | $     150,000 |
| BLIC | CWMBS 2005-21 A39 | 10/26/2006 | $     100,000 |
| BLIC | CWABS 2006-15 A6 | 7/8/2008 | $     420,000 |

7.     The Offering Documents for the Certificates at issue, which were relied upon by

BANKERS, represented, among other things, that: (i) the loans packaged into the Certificates

were underwritten pursuant to the Countrywide Defendants' specific loan origination guidelines;

(ii) Countrywide Home evaluated the prospective borrowers' credit standing and repayment

ability prior to approving any loan; (iii) when the Countrywide Defendants made an exception to

the stated underwriting guidelines, they did so only if "compensating factors" justifying the

exception were present; (iv) almost every mortgaged property received an independent appraisal

which conformed to acceptable standards and formed the basis of its loan-to-value ("LTV")

_____

[5] Some of the provisions contained within each respective Certificate's Offering Documents differ slightly, but are otherwise in substance and form substantially identical, and thus, for ease of reference BANKERS cites to the Prospectus (Exhibit "1"), the Prospectus Supplement (Exhibit "16"), and the Pooling and Servicing Agreement (Exhibit "31") for 2005-73CB when quoting said provisions throughout the Complaint.

ratio, an important metric to MBS investors; (v) the loans selected for securitization were chosen in a manner not intended to affect the interests of the Certificateholders adversely; (vi) the AAA or other investment-grade ratings assigned to the Certificates were accurate reflections of the Certificates' credit quality; and (vii) the Certificates' issuing trusts (the "Trusts") possessed good title to the underlying mortgage loans.  Each of these material representations was false when made, and Defendants knew or recklessly disregarded the falsity of these representations. BANKERS relied on the misrepresentations and suffered losses as a result.

8.     In June 2009, the SEC brought securities fraud and insider trading charges against Countrywide Financial's three most senior executives, Angelo Mozilo ("Mozilo"), Countrywide Financial's Chief Executive Officer, David Sambol ("Sambol"), Countrywide Financial's Chief Operating Officer, and Eric Sieracki ("Sieracki"), Countrywide Financial's Chief Financial Officer.  *See Securities and Exchange Commission v. Angelo Mozilo, et al.*, No. 2:09-cv-03994-JFW (MANx) (C.D. Cal. June 4, 2009) (the "SEC Action") at DE 1.  In denying Mozilo's, Sambol's, and Sieracki's Motions for Summary Judgment, the court in the SEC Action held that the SEC presented sufficient evidence from which a jury could conclude that Mozilo, Sambol, and Sieracki "were aware that Countrywide routinely ignored its underwriting guidelines and that Defendants understood the accompanying risks"; that "Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry"; that Mozilo "did not believe that Countrywide had prudently underwritten Pay-Option ARM [adjustable rate mortgage] loans, and that he shared his concerns regarding Pay Option ARM loans with Sambol and Sieracki," both of whom "acknowledged or agreed with those concerns"; and that Countrywide would grant an exception for any loan, no matter what the risk, as long as "the loan could be sold into the secondary

market." *See Mozilo*, 2010 WL 3656068, at *10, 16-18. On October 15, 2010, the SEC announced an historic settlement of the action against the three individuals. Mozilo agreed to pay a $22.5 million penalty, "the SEC's largest ever financial penalty against a public company's senior executive," and an additional $45 million in disgorgement of ill-gotten gains, for a total of $67.5 million. Sambol and Sieracki agreed to pay an additional $5.65 million in penalties and disgorgement.

9.      As a result of the SEC Action, numerous internal Countrywide documents have become available that evidence the falsity of the statements in the Certificates' Offering Documents and the Countrywide Defendants' knowledge or recklessness in making these false statements, and are quoted herein.

10.      Over a period of several years, the Countrywide Defendants employed a deceptive scheme whereby they constantly expanded Countrywide's share of the consumer market for mortgage loans, without regard for the Company's stated underwriting guidelines and through a wide variety of deceptive practices, in order to maximize its profits from the sale of those loans to the secondary market.

11.      As a result of the Countrywide Defendants' failure to follow their underwriting standards and guidelines set forth in the Certificates' Offering Documents, delinquencies and defaults in the loan pools underlying the Certificates have skyrocketed. As of May 2011, more than 37% of the mortgage loans underlying the Certificates are over 30 days delinquent, in foreclosure, bankruptcy, or repossession. This figure does not include the substantial losses suffered by BANKERS since the Certificates' issuance due to foreclosures and the removal of those mortgage loans from the current loan pool and current delinquency figures. The underlying loan performance and significant foreclosures have caused BANKERS' Certificates

to have their credit ratings significantly downgraded.

12.     At the time they were issued, all of the tranches of Certificates purchased by BANKERS were given investment-grade ratings, with all of the Certificates receiving the highest credit rating.  Today, all the tranches of Certificates purchased by BANKERS have been slashed not only to below investment-grade, but to junk bond status.  Accordingly, the tranches of Certificates are no longer marketable at or near the prices BANKERS paid for them, and BANKERS has suffered significant losses.

13.     BANKERS seeks compensatory and/or rescissionary damages against the Countrywide Defendants for fraud and negligent misrepresentation.

## II.     JURISDICTION AND VENUE

14.     This action seeks damages in excess of Seventy-Five Thousand ($75,000.00) Dollars and is within the monetary jurisdiction of this Court.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as there is diversity among the parties and the amount in controversy exceeds $75,000.00.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

17.     In connection with the acts alleged herein, the Countrywide Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

18.     BIC is a corporation organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business at 11101 Roosevelt Boulevard North, St. Petersburg, FL 33716.

19.    BLIC is a corporation organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business at 11101 Roosevelt Boulevard North, St. Petersburg, FL 33716.

20.    FCIC is a corporation organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business at 11101 Roosevelt Boulevard North, St. Petersburg, FL 33716.

21.    BSIC is a corporation organized and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business at 3636 South I10 Service Road, Suite 204, Metairie, LA 70001.

22.    Defendant Countrywide Financial was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.  As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

23.    Defendant Countrywide Home, a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California.  Countrywide Home originates and services residential home mortgage loans. Countrywide Home serves as the "Seller" of the mortgage loans comprising the collateral for each of the tranches of Certificates purchased by BANKERS, meaning that it played a central role in providing the pools of mortgage loans upon which the Certificates were based to the Trusts.  Countrywide Home was acquired by Bank of America on July 1, 2008, and is now doing

business as BAC Home, a division of Bank of America.

24. Defendant Countrywide Servicing, a wholly owned subsidiary of Countrywide Capital, which is in turn a wholly-owned subsidiary of Countrywide Financial, is a limited partnership organized under the laws of Texas with offices in Plano, Texas and Calabasas, California. Countrywide Servicing services residential home mortgage loans. Countrywide Servicing was acquired by Bank of America on July 1, 2008, and is now doing business as BAC Home. Countrywide Servicing is the "Master Servicer" (or the "Servicer") of every Certificate purchased by BANKERS.

25. Defendant Countrywide Securities, a wholly owned subsidiary of Countrywide Financial, is a California corporation with its principal place of business in Calabasas, California. Countrywide Securities is a registered broker-dealer and the underwriter for the subject Certificates. Countrywide Securities was acquired by Bank of America on July 1, 2008.

26. Defendant Countrywide Capital, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California. Countrywide Capital, now a subsidiary of Bank of America, operates through its two main wholly-owned subsidiaries, Defendant, Countrywide Securities, and Countrywide Servicing Exchange.

27. Defendant CWALT was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWALT served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWALT acted as Depositor and Issuer for 2005-J13, 2005-73CB, 2006-6CB, 2006-8T1, 2007-21CB.

28. Defendant CWMBS was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWMBS's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWMBS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWMBS acted as Depositor for 2005-21 and 2006-10.

29. Defendant CWABS was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWMBS's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWMBS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWABS acted as Depositor for 2005-11, 2005-12, 2005-13, 2005-16, 2006-11, 2006-13, and 2006-15.

30. Defendant CWHEQ was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial. CWHEQ's principal executive offices were located at 4500 Park Granada, Calabasas, California. CWHEQ served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191. CWHEQ acted as Depositor for 2006-S8.

31. Defendants CWALT, CWMBS, CWABS, and CWHEQ are collectively referred to herein as the "Depositor Defendants." The Depositor Defendants were controlled directly by Countrywide Financial, including by the appointment of Countrywide Financial executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by the Depositor Defendants and the Trusts were passed through to Countrywide

Financial and consolidated into Countrywide Financial's financial statements. Defendant Countrywide Financial, therefore, exercised actual day-to-day control over the Depositor Defendants.

32.     Defendant Bank of America is the successor to Defendant Countrywide. On July 1, 2008, Countrywide Financial Corporation completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial. The acquisition was an all-stock transaction. Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide. Bank of America is the successor-in-interest to the Countrywide Defendants and is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein.

33.     Defendant BAC Home is a limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, CA. BAC Home is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.

34.     Defendant NB Holdings is a Delaware corporation. NB Holdings is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home. On July 3, 2008, Defendant Countrywide Home completed the sale of substantially all of its assets to NB Holdings, a wholly-owned subsidiary of Bank of

America.

### III. FACTS RELEVANT TO BANKERS' COMMON LAW FRAUD CLAIMS

#### A. Countrywide Misrepresented Its Mortgage Loan Underwriting Guidelines

35. Countrywide was co-founded in 1969 by Mozilo and grew to become the largest mortgage lender in the United States by 2005. Countrywide originated, sold, and serviced both prime and subprime (which Countrywide's periodic filings referred to as "nonprime") mortgage loans. According to its 2004 10-K, 89% of Countrywide's loans were "prime", which Countrywide stated meant that these loans were "prime credit quality first-lien mortgage loans secured by single-family residences." According to its 2005 10-K, 90% of Countrywide's loans were "prime."

36. Prior to 2005, a substantial majority of the mortgage loans that Countrywide originated each year were traditional long-term, fixed-rate, first-lien and fully documented mortgage loans to prime borrowers. These so-called "conforming loan" mortgages met the guidelines for sale to the government-sponsored enterprises ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and were traditionally limited to mortgage loans no greater than $417,000 for a single family residence. Conforming loans, if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry, with the lowest rates of delinquency and default. During the period 2001-2003, more than 50% of Countrywide's loans were conforming loans. During 2001-2003, Countrywide originated $124 billion, $252 billion, and $435 billion in loans, respectively.

37. Mortgage loans that do not meet the GSEs' guidelines are known in the industry as "non-conforming loans." Countrywide's proportion of nonconforming loans significantly

increased in 2005. As discussed in detail below, however, Countrywide continued to represent that it complied with strict underwriting guidelines even while it underwrote increasing amounts of non-conforming loans. In July 2003, during a conference call with analysts, Mozilo announced that Countrywide's new goal was "to dominate the purchase market and to get [Countrywide's] overall market share to the ultimate thirty percent by 2006-2007." Starting no later than 2004, Countrywide began offering a broader array of products in an attempt to effectuate this goal and retain its title as top mortgage lender. Countrywide Home originated approximately $363 billion in mortgage loans in 2004, $499 billion in 2005, $468 billion in 2006, and $416 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006 respectively.

38.     As shown on Table 1, below, in terms of product mix, in 2004, only 37% of Countrywide's loan originations were prime conforming loans, and in 2005, only 32% were prime conforming loans, down from over 50% during earlier periods. At the same time, the percentage of non-conforming loans, including prime, subprime and home equity, had increased to over 50% of total loan originations. By 2006, its mix of business had changed even more, with only 31.9% of the dollar value of its originations conforming conventional loans, 45.2% nonconforming conventional loans, 8.7% subprime, and 10.2% home equity.

**Table 1**
**Countrywide Loan Production**
**Share of Dollar Value of Loans by Loan Type (2001-2007)[6]**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| **Traditional Loans** |  |  |  |  |  |  |  |
| Prime Conforming Loans | 61.7 | 59.2 | 53.9 | 37.1 | 32.0 | 31.9 | 52.1 |
| FHA/VA Loans | 11.4 | 7.6 | 5.6 | 3.6 | 2.1 | 2.8 | 5.4 |

---

[6] Countrywide 10-K reports: 2007, page 29; 2006 page 28; 2005, page 24; and 2004 page 21. All figures are shown as % of total value of Countrywide loan production.

15

| Traditional Sub-Total | 73.0 | 66.8 | 59.5 | 40.7 | 34.1 | 34.6 | 57.6 |
|---|---|---|---|---|---|---|---|
| **Non-traditional Loans** | | | | | | | |
| Prime Nonconforming Loans | 17.9 | 24.9 | 31.7 | 39.8 | 47.2 | 45.2 | 28.3 |
| Prime Home Equity Loans | 4.5 | 3.7 | 4.2 | 8.5 | 9.0 | 10.2 | 8.3 |
| Nonprime Mortgage Loans | 4.5 | 4.6 | 4.6 | 10.9 | 8.9 | 8.7 | 4.1 |
| Commercial Real Estate Loans | 0.0 | 0.0 | 0.0 | 0.1 | 0.8 | 1.2 | 1.8 |
| **Nontraditional Sub-Total** | **27.0** | **33.2** | **40.5** | **59.3** | **65.9** | **65.4** | **42.4** |
| **TOTAL** | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

39.     Despite taking on new risks to participate in the non-GSE MBS market, Countrywide continued to extol its underwriting standards, conveying to BANKERS and other interested parties that it was a successful, trustworthy company characterized by high professional standards.  Countrywide's Annual Reports for 2004, 2005, 2006, and 2007 stated that the company "establishe[d] standards for the determination of acceptable credit risks" and that it "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities."  The Annual Reports also promoted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help prevent fraud."  In its 2004 and 2005 10-Ks, for example, which were filed in March 2005 and 2006, respectively, Countrywide stated that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . we have a major focus on ensuring the quality of our mortgage loan production . . ."

40.     Countrywide claimed that its disciplined underwriting standards not only distinguished it from other lenders in the industry, but reflected enviable best practices.  For example, in a Fixed Income Investor Forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending: "[A]s an industry leader we served as a role model to others in terms of responsible lending. We take seriously the role of a

responsible lender for all of our constituencies . . . . *To help protect our bond holder customers, we engage in prudent underwriting guidelines.*" (emphasis added). At the same forum, Sambol stated that:

> We're extremely competitive in terms of our desire to win, and we have a particular focus on offense, which at the same time is supplemented by a strong defense as well, meaning that we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance . . . . *[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do.* (emphasis added).

41. Countrywide represented to BANKERS that these prudent underwriting guidelines were used in originating the loans packaged into the Certificates. According to the Prospectus Supplements for each Certificate purchased by BANKERS, Countrywide's high quality underwriting standards were applied to the underlying loans originated by Countrywide for each Offering, because "all" or some portion of the mortgage loans "will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards." As explained herein, these representations were false and misleading and omitted material facts because they directly contradicted the reality that Countrywide was knowingly originating an increasing number of poor-quality loans that did not comply with its stated underwriting guidelines, without the safeguards and standards that Countrywide described. BANKERS relied upon Countrywide's representation that it applied its "prudent underwriting guidelines" to the loans packaged into the Certificates, and was induced to purchase the Certificates by these and the Countrywide Defendants' other statements to its enormous financial detriment.

### B. The Securitization Process

42. The vast majority of the loans underwritten and originated by Countrywide were

resold to investors in the secondary market, through either whole loan sales or MBS securitizations.  Despite Countrywide's statement that it "ensure[d] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages," and unbeknownst to BANKERS, it became increasingly difficult for Countrywide to meet the market demand for MBS using its stated underwriting guidelines.  In order to originate more loans, Countrywide created and approved riskier loan products not only by implementing looser stated underwriting guidelines, but also by applying numerous exceptions to its already weakened standards.

43.     Mortgage loan securitizations were vital to Countrywide's financial success. Unlike major banking institutions that could hold significant assets on their balance sheets long term, Countrywide needed to engage in mortgage loan securitizations so that it could remove the mortgage loan assets and potential liabilities from its balance sheet.  Not only did Countrywide's securitizations and whole loan sales generate well over $1 billion in pre-tax earnings, but the sale of these loans transferred the risk of the borrowers' default from Countrywide's balance sheet to investors, including BANKERS.

44.     Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets.  Mortgage loan "pass-through" securities entitle the investor, such as BANKERS, to payments from pools of mortgage loans.  Although the structure and underlying collateral of each offering varies, the basic principle remains the same: when borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to investors.  Accordingly, the value of an MBS depends primarily on the underlying mortgage borrowers' ability to make principal and interest payments and, secondarily, on the adequacy of the collateral in the event of default.  If the loans underlying a Certificate suffer defaults and delinquencies in excess of the assumptions built into the payment structure, or the

underlying properties cannot be sold at sufficient value following default, investors suffer greater than expected losses.

45.     The first step in creating each of the Certificates was the acquisition by one of the four Depositor Defendants of an inventory of loans from the Seller, Countrywide Home, which either originated all of the underlying loans or combined loans it originated with loans acquired from other mortgage originators, in exchange for cash.   The Depositor Defendants then transferred, or deposited, the acquired pool of loans to the Trusts.

46.     The Depositor Defendants securitized the pool of loans in the Trusts so that the rights to the cash flows from the loans could be sold to investors.   The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."   Tranches consist of multiple series of related MBS offered as part of the same offering, each with a different level of risk and reward, including different levels of credit enhancement.[7]   As stated previously, BANKERS purchased nineteen (19) separate tranches of the Certificates.   One form of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be greater than the interest distributable on the securities and fees and expenses payable by the Trusts for that period; excess interest may be applied both to absorb any interest shortfalls and to pay principal on the securities to the extent needed to maintain the required level of overcollateralization.   This type of credit enhancement serves to protect the investor against loss to varying degrees.   Any losses on the underlying loans — whether due to default, delinquency, or otherwise — are generally applied in reverse order of seniority.

---

[7] The Deposit Defendants acquired primary mortgage guaranty insurance policies for loans that had LTVs in excess of 80 percent, which served as "credit enhancements" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers.

47.     Because tranches have different claims on the cash flow generated by the pool of mortgages, credit rating agencies assign different ratings to them and issuers can price them differently.   The most senior tranches of the Certificates received AAA credit ratings or their equivalent from one or more of the three leading rating agencies, which indicated the lowest risk and highest quality.   Junior (or subordinated) tranches — which were not purchased by BANKERS — usually obtained lower ratings and were less insulated from risk, but offered greater potential returns.[8]   For example, a pool of loans with an overall weighted-average coupon of 7% might be divided into multiple tranches where the lower-risk, higher-quality senior certificates are expected to yield less than 7% and are rated investment grade ("AAA," "AA," "A" or "BBB"), while the higher-risk, lower-quality subordinate certificates bear coupons that are higher than 7%.   Only if credit losses exceed the amount of the subordinate tranche balances will the senior tranches face credit losses, as the subordinate tranches will absorb initial losses.

48.     The credit rating agencies received the information about the mortgage loan pools for each securitization and about the structure of the securitization from the sponsor, Countrywide Home.   Countrywide worked closely with the rating agencies to structure the securitizations to ensure that each tranche of MBS received the desired rating.   Countrywide knew or recklessly disregarded that the information it provided to the rating agencies materially misrepresented and omitted the true facts about the credit quality of the mortgage pools and that the ratings therefore did not accurately reflect the credit risk of the MBS.

49.     As stated previously, the Certificates purchased by BANKERS had the highest credit rating of AAA the time of purchase.   A purchaser of AAA-rated residential MBS should

---

[8] Moody's highest investment rating is Aaa, Fitch Rating's highest investment rating is AAA, and Standard & Poor's highest rating is AAA.   These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.   Ratings of AA, A, and BBB are also investment-grade and represent high credit quality, upper-medium credit quality, and medium credit quality, respectively.   Any instrument rated lower than BBB is considered below investment-grade.

have virtually no risk of incurring loss, while a purchaser of other investment-grade Certificates should have only a minimal risk of loss.

50.    Credit ratings are intended to be comparable across different types of fixed income instruments.  In 1994, a Moody's executive stated that "no matter what types of instruments the ratings apply to, no matter where the issuer resides, and no matter what currency or market in which the security is issued, Moody's ratings are intended to have the same relative meanings in terms of expected credit loss."  Similarly, in a May 29, 2007 publication, Standard & Poor's ("S&P") stated: "Our ratings represent a uniform measure of credit quality globally and across all types of debt instruments.  In other words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an 'AAA' rated securitized issue."

51.    Once the tranches were established, the Trusts passed the securities back to the Depositor Defendants, who became the issuers of the Certificates.  The Depositor Defendants then passed the Certificates to Countrywide Securities and one or more other underwriters, who in turn offered the Certificates to investors in exchange for cash that was then passed back to the Depositor Defendants, minus any fees owed to the underwriters.  Following the sale of the Certificates, Countrywide Servicing was responsible for the collection of borrower payments, and the trustee for the Certificates participated in the subsequent distribution of those payments to investors at regular intervals in accordance with the Offering's structure.

52.    In contrast, in the traditional mortgage model, a mortgage originator originated loans to borrowers, held the loans to maturity, and therefore retained the credit default risk.  As such, under the traditional model, the mortgage originator had a financial incentive to ensure that: (i) the borrowers had the financial ability to repay the loans; and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and

interest if the borrowers defaulted on the loans.

53.    Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages.  When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payment of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of the collateral was not sufficient to repay the loan.  As a result of this "originate to hold" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

54.    With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to distribute" model, in which mortgage originators sold the mortgages and transferred credit risk to investors through the issuance and sale of MBS.  Securitization concurrently provided lenders like Countrywide with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality. However, the contractual terms of the securitization transactions and adherence to good business practices obligate mortgage originators to underwrite loans in accordance with their stated underwriting and origination policies and to obtain accurate appraisals of the mortgaged properties.

55.    During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits.  During that period, Countrywide made loans in accordance with its stated underwriting and appraisal standards.  In

the early 2000s, however, Countrywide began to systematically disregard its stated underwriting standards in an effort to originate an unprecedented number of loans for securitization.

      **C.**    **Countrywide Abandoned Its Underwriting Guidelines By Approving Extremely Risky Loans Through "Shadow Guidelines" And Other Undisclosed Exceptions**

     56.    Defendants made affirmative representations in the Offering Documents about Countrywide's underwriting guidelines, all of which were intended to induce BANKERS and other investors to invest in the Certificates.

     57.    For example, Countrywide represented in all the relevant Offering Documents, in sum and substance, that all or a portion of the underlying loans were "originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards" noting only that "[e]xceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (*See* Exhibit "16" at S-35). Countrywide also represented, in sum and substance, that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." (*See* Exhibit "16" at S-35). Countrywide also made representations and warranties that the selection of the underlying loans "was not made in a manner intended to affect the interests of the certificateholders adversely." (*See* Exhibit "16" at S-15). BANKERS relied on these representations about Countrywide's mortgage underwriting guidelines, which were critical to BANKERS decisions to purchase the Certificates.

     58.    Because its loan-origination guidelines were ostensibly designed to ensure that loans would perform over time, Countrywide knew that the rigorousness of its guidelines – and its adherence to those guidelines – would materially affect the risk of investing in the

Certificates.

59.    Throughout Countrywide's expansion, Mozilo consistently represented that Countrywide would not sacrifice its strict and disciplined underwriting standards. In a January 2004 phone call with analysts, Mozilo pledged that Countrywide's goal of achieving 30% market share would not compromise the Company's strict underwriting standards, stating that Countrywide would target the safest borrowers in the market in order to maintain its commitment to quality: "Going for 30% mortgage share here is totally unrelated to quality of loans we go after . . . . There will be no compromise in that as we grow market share. Nor is there a necessity to do that."

60.    Countrywide reassured investors that the Company's underwriting procedures and credit risk management remained highly rigorous in the following years. For example, in its 2004 10-K, filed with the SEC in March 15, 2005, and thereafter, Countrywide represented that:

> *[Countrywide] ensure[s] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards* . . . . [W]e have a major focus on ensuring the quality of our mortgage loan production and we make significant investments in personnel and technology in this regard. (emphasis added).

61.    During a March 15, 2005 conference call with analysts, Mozilo responded to a question about Countrywide's strategy dating back to 2003, for increasing market share by assuring Countrywide's constituents:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . . Is it achievable, absolutely . . . . But I will say this to you that *under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share*. (emphasis added).

62.    Other senior Countrywide officers reiterated that the Company had not strayed from its underwriting standards, and would not do so in the future. For example, in an April

24

2005 conference call with analysts, Eric Sieracki, Countrywide's CFO, responded to a question about whether Countrywide had changed its underwriting metrics, such as Fair Isaac Company ("FICO") credit scores, combined loan-to-value ratios ("CLTV"), and debt-to-income ratios ("DTI"): "I think we're going to remain you'll see us consistent with the first quarter and most of what we did in 2004. We don't see any change in our protocol relative to the quality of loans we'll be originating."

63.     As explained herein, at the time the Certificates were offered, Countrywide knew that its statements regarding its underwriting guidelines and credit risk management processes were false, and that it had no intention of abiding by its representations and warranties to investors.

64.     Under the direction of Mozilo and Sambol, Countrywide adopted a new corporate culture of writing as many mortgage loans as possible and at the highest interest rates and fees possible regardless of the creditworthiness or evident fraud of the borrower.  Once Mozilo and Sambol had determined that profit growth through securitization required accelerating loan origination, Countrywide motivated its loan officers and external brokers to drive up loan volume regardless of material deviations from stated underwriting guidelines.

65.     As stated above, documents produced in the aforementioned SEC Action including internal emails, committee notes, memos and deposition testimony were disclosed to the public during the litigation of Mozilo's, Sambol's, and Sieracki's unsuccessful motion for summary judgment in that action.  These materials provide detailed evidence of Countrywide's complete abandonment of its stated underwriting standards through its rampant use of "exceptions" to those guidelines.

66.     Between 2004 and 2008, the Countrywide Defendants falsely reassured

BANKERS and other MBS investors that Countrywide was primarily an originator and seller of high-quality mortgages, qualitatively different from its competitors who primarily engaged in riskier lending practices.   In fact, however, Countrywide's deteriorating underwriting practices enabled loan applications that reflected borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets and income), title defects, excessive DTI, inadequate FICO scores, and other material violations of guidelines.   These violations made Countrywide's related representations regarding its adherence to stated underwriting guidelines materially false and misleading because, in reality, Countrywide undertook an undisclosed and unprecedented loosening of its underwriting guidelines such that the exceptions became the standard without compensating factors.

67.   Although Countrywide disclosed that the underlying loan pool for each Certificate could contain loans originated pursuant to "exceptions" to the Company's stated underwriting guidelines if "compensating factors" existed, Countrywide neither disclosed what percentage of (or in many cases, whether any) securitized loans were actually approved pursuant to exceptions, nor did it define anywhere the types of exceptions that Countrywide employed generally in the loan pool, or specifically for each loan.   In fact, as confirmed by several senior executives at Countrywide, including executives directly involved in loan securitizations, Countrywide never disclosed in any of the relevant Offering Documents or in any other public filings the amount of loans it was underwriting on an exceptions basis for any loan product or division.

68.   According to Countrywide's Chief Risk Officer, John McMurray ("McMurray"), Countrywide's level of exceptions was higher than other mortgage lenders.   At a June 28, 2005 Credit Risk Committee meeting, senior executives including, Sieracki and McMurray, received a presentation informing the attendees that nonconforming exceptions loans accounted for a

staggering 40% of Countrywide's loan originations.  By June 2006, a Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option adjustable rate mortgages ("ARMs"), 37.3% of its subprime first liens, 25.3% of its subprime second liens, and 55.3% of its standalone home equity loans.  Despite this high level of exceptions, Countrywide assured investors that the level of exceptions was low.  According to Christopher Brendler, an analyst for Stifel Nicholas who covered Countrywide beginning in January 2006 and was deposed in the SEC Action, Countrywide repeatedly told investors during conference calls and at investor forums that the company's policy was to "keep our exceptions low."  Brendler also testified that a low exception rate for the industry would have been 5% to 10% of total loans, and most certainly not upwards of 25% to 55%, such as Countrywide actually had.

69.    Subsequent press reports and articles highlight the excessive focus on lending volume and failure to follow stated underwriting standards that existed throughout Countrywide during the time the Depositor Defendants were issuing Certificates with underlying Countrywide loans.  For example, in a February 2009 article entitled "25 People to Blame for the Financial Crisis," *TIME* magazine described how Mozilo's and Countrywide's focus on loan volume and the practice of offering mortgages to "practically any adult" ignored a borrower's "questionable ability to repay" those mortgage loans.  Thus, Countrywide steered borrowers to loans with higher interest rates and the most fees, resulting in greater delinquencies.

70.    Countrywide's deviation from its stated underwriting practices resulted in approval of loans in situations where loan applications lacked key documentation, such as a verification of borrower assets or income; included an invalid or incomplete appraisal; demonstrated fraud by the borrower on the face of the application; or reflected that any of

borrower income, FICO score, debt, DTI, or CLTV, failed to meet stated Countrywide guidelines, without any permissible exception.

71.     Two of Countrywide's widely used exceptions to its represented underwriting guidelines were the focus of the SEC Action, and exemplify the extreme undisclosed risks posed by such practices.  From the beginning of 2005, it was Countrywide's policy to "match" any product offered by any of its competitors, regardless of risk, making its composite "matching" guidelines, internally referred to as "shadow guidelines," the "most aggressive in the industry." Another of Countrywide's "exceptions" to its stated underwriting guidelines destroyed any remaining safeguards with respect to loans slated to be resold and securitized.  Knowing that it could unload the risk of borrower default by selling and securitizing the riskiest loans, Countrywide instituted a policy to accept any loan – regardless of the risk level or likelihood of default – as long as the loan could be resold for securitization, a policy that directly and adversely affected the interests of BANKERS and other investors in the Certificates.

    *1.*     ***Countrywide's "Matching" Strategy Ensured That Countrywide's Underwriting Guidelines Were The "Most Aggressive" Guidelines In The Market***

72.     One of the most egregious examples of Countrywide's use of exceptions was institutionalized in the Company's "matching strategy."

73.     When processing loan applications, Countrywide first applied its standard underwriting guidelines to all applications using an automated underwriting system known as "CLUES" (Countrywide Loan Underwriting Expert System).  To the public and the participants in the securitizations, including BANKERS, Countrywide extolled the integrity and consistency of its automated CLUES system.  Countrywide claimed that it made exceptions to CLUES only when specific and strong compensating factors were present.  This claim was false.  In fact, there

were three levels of exceptions, with a threshold for risk that surpassed that of any of Countrywide's competitors.

74.     First, if CLUES found problems with an application because it failed to meet one of the standard criteria, the application was sent to a loan officer for further consideration or manual underwriting in the "Exception Processing System" "because it busted one or more of the program guidelines or because of these red flags," according to McMurray.  If the loan officer could not rectify the problems and approve the loan in accordance with Countrywide's stated underwriting guidelines or some limited exceptions, the loan officer did not reject the application.  Rather, he or she would request an "exception" from the guidelines from more senior underwriters at Countrywide's loan Production Structured Loan Desk ("SLD"), otherwise known as "the exception desk."

75.     The Production SLD, the second level of exception review, granted exceptions, in large part, pursuant to Countrywide's "matching strategy."  From at least the beginning of 2005, Countrywide implemented a program which allowed loan officers to "match" the most aggressive product or policy of any loan origination competitor, including purely subprime lenders, even if that product or policy violated Countrywide's stated underwriting guidelines. Countrywide's liberal use of any competitor's "composite guideline" made the Company's loan origination practices "the most aggressive in the industry" according to Countrywide's own Chief Risk Officer.  Countrywide's matching strategy was not limited to either one single loan product or subprime loans.

76.     In 2005, 2006 and 2007, McMurray repeatedly expressed his concern over the potential impact of the "matching strategy."  In a lengthy exchange between McMurray and Sambol regarding the impact of guideline expansion request for subprime products that had been

considered in the first and second quarters of 2005, Sambol was warned that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas."  McMurray went on to note that the frontier had "high expected default rates and losses."

77.     Ten days later, on June 24, 2005, McMurray sent another email to Sambol, expressing his strong reservations regarding Countrywide's practice of matching the "outer boundaries" of any competitor's most aggressive mortgage loan offerings, a practice which he noted was a "critical component of [Countrywide's] corporate strategy."  McMurray explained that, because Countrywide mixed and matched the most aggressive guidelines from various lenders in the industry, Countrywide's "composite guides are likely among the most aggressive in the industry."  McMurray later testified in the SEC Action that the matching strategy at Countrywide was a "corporate principle and practice that had a profound effect on credit policy" at Countrywide.  The aggressiveness of these composite guidelines was never disclosed by Countrywide.

78.     McMurray explained why Countrywide's "matching strategy" ensured that Countrywide was the most aggressive originator in the market: "And so, . . . if you match one lender on – on one – one on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that of that two-step match would be more would be more aggressive than either one of those competitor reference points viewed in isolation."  McMurray repeatedly explained his view and the risks of the "matching strategy" to others within Countrywide, including Sambol, but these concerns were ignored.

79.     After being ignored for over one and a half years, McMurray restated his concerns

  
in a November 2, 2006 email that was forwarded to Sambol, in which McMurray explained that the matching strategy had caused Countrywide to cede its underwriting standards to the most aggressive lenders in the market.  Again, Sambol ignored these concerns and Countrywide continued to employ this strategy.

80.     Countrywide never disclosed to BANKERS or other investors that it had a matching strategy that caused the Company to cede its credit policy to the most aggressive lenders in the market.  Executives knew and kept it a secret that the quality of loans originated by Countrywide was deteriorating, and would continue to worsen.  Indeed, a February 11, 2007 email from McMurray to Sambol confirms that this strategy was not disclosed to anyone outside Countrywide when he warned: "I doubt this approach would play well with regulators, investors, ratings agencies etc.  To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines."  Information that Countrywide was actually the most aggressive lender in the industry would have been extremely material to BANKERS and other investors.  As Stifel Nicholas analyst Brendler testified in the SEC Action, disclosure of the "matching strategy" "would have been a very disturbing disclosure" because "to know that [Countrywide was] basically seeking out the most aggressive policies and underwriting guidelines of [its] competitors without consideration for other factors" meant that Countrywide was "essentially creating a worst of the worst."

**2.     *Countrywide's Secondary Markets Structured Loan Desk Abandoned All Underwriting Standards, Approving Any Loan, Regardless Of Its Credit Risk, As Long As The Loan Could Be Resold And Securitized***

81.     In an effort to maximize its ability to create more MBS, Countrywide implemented a third, even riskier tier of exceptions in early 2005 through which any loan application would be approved as long as it met a single criterion: that it could resold in the

secondary markets such that Countrywide could transfer all of the risk.  If it could, the loan would be approved, regardless of the fact that it did not meet Countrywide's underwriting guidelines or the most aggressive of any competitor's guidelines.

82.     When a loan application was rejected using both the "shadow" exceptions guidelines applied by the Production SLD, the application was sent to the Secondary Markets SLD, a desk set up specifically to approve last-ditch exceptions.  This way, Countrywide was able to price virtually any loan that it believed it could sell/securitize without losing money, even if other lenders could not or would not do the deal.

83.     In contrast to his public statements, Mozilo circulated an email in September 2004 expressing concern over the "clear deterioration in the credit quality of loans being originated over the past several years" and his opinion that "the trend is getting worse."  In reaction to the worsening trend, he stated that Countrywide should "seriously consider securitizing and selling (NIMS) [net interest margin securities] a substantial portion of our current and future subprime residuals even though the value in retaining such residuals 'appears' to be a better economic execution than a NIMS execution."

84.     Before July 2005, the Secondary Markets SLD approved any loan which it believed could be resold and securitized, as long as that loan was a 30-year fixed rate mortgage or an 80/20 ARM.[9]  This changed in the summer of 2005.  In a July 28, 2005 email sent by David Spector ("Spector"), Vice President and a board member of each Depositor Defendant, to Countrywide's Managing Directors and Secondary Markets senior executives, including Joshua Adler ("Adler"), another Depositor Defendant board member, Spector stated that, as a result of

---

[9] 80/20 ARMs, are also referred to as "piggyback" mortgages because two loans are taken out simultaneously for the same home, one for 80% of the mortgage and the other for the remaining 20% of the mortgage, the latter being sold at a higher interest rate because the buyer is putting out none of his own cash.

"increased demand from Production for exceptions on all products in general and on Pay Option loans in particular," he wanted to update them on "the changes we will be implementing going forward":

> As indicated in a previous note, when we first started the SLD, the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides. The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs. In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs. *While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and on Pay Option loans in particular.* In addition, Production has been expressing frustration that we were only offering major exceptions for 5/1 ARMs and 30-year fixed rates. *As such, to the widest extent possible, we are going to start allowing exceptions on all requests, regardless of loan program, for loans less than $3 million effective immediately.*
>
> The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. *We will assume securitization in all cases.*
>
> \* \* \*
>
> The methodology from a saleability point of view will also be similar to that used for 30-year fixed rates and 5-1 Hybrids. We will view the exception assuming securitization and will no longer take into account whole loan buyers. In the past, this has caused some exceptions to be declined for Ratios, Balances and LTV/CLTV combinations. *Provided we can sell all of the credit risk (i.e. not be forced to retain a first loss place due to a 80% LTV, 60 Back-end ratios $3 million loan) we will approve the loan as a salable loan.* Finally, we will not be reviewing loans from an underwriting point of view but will rather be relying on Production to make certain that the loan [sic] meet all other underwriting Guideline and well [sic] have been reviewed for compliance acceptability and fraud.
>
> (emphasis added).

85.     Adler, a Depositor Defendant board member and Secondary Markets Managing Director, confirmed in an SEC Action deposition that the Secondary Markets SLD did not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

Q:      Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?

A:      We did.

Q:      To your knowledge, was there a process by which such loans were approved?

* * *

A:      There generally was, yes.

Q:      And what is your understanding of that process?

A:      Well, I was -- I was at the tail end of that process. ***There was -we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will. And then there was this third tier which would come to me.*** But essentially there were -- the tiering of guidelines related to the kind of the exception process. And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines. ***And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.***

* * *

Q:      ***Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?***

A:      ***That was the only criteria that we followed.***

(emphasis added).

### 3.      *The Risky Use Of Exceptions Was Well Known Within Countrywide But Was Concealed From BANKERS And Other Investors In The Certificates*

86.     Countrywide's internal documents and its employees' admissions provide evidence that, under management's direction, approval of "exceptions" was the rule – regardless of the risk associated with the loan – and in contravention of (i) its own policy that exceptions

34

could be considered and approved only in moderation, and (ii) the Countrywide Defendants' public statements about Countrywide's underwriting standards.

87.     A June 28, 2005, a Countrywide Credit Risk Committee presentation revealed to senior executives that many loans approved pursuant to exceptions breached significant underwriting guidelines.  The presentation also informed the committee that exceptions-based loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines.

88.     In fact, a significant majority of the loans originated at Countrywide involved significant variations from the underwriting standards that necessitated a signoff by management. Further, given that management was paid based, at least in part, on the volume of loans originated, management pressured underwriters to approve as many loans as possible, often pushing loans through that had originally been declined.

89.     Former Countrywide loan officer, Kourosh Partow, told an interviewer for *Dateline NBC* that under Countywide's Exception Processing System "[i]f you had a pulse, we gave you a loan."

90.     Mozilo was acutely aware of the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines.  For example, in early 2006, HSBC Bank USA, N.A. ("HSBC") exercised its contractual rights and forced Countrywide to "buy-back" many of the subprime 80-20 loans that it had purchased from Countrywide.  Many of the HSBC "kick-outs" of defaulted loans were due to the fact that many of the underlying loans had been originated outside of Countrywide's underwriting guidelines.  Following the HSBC incident, on April 13, 2006, Mozilo sent an e-mail to Sieracki and Sambol, stating that he had "personally observed a serious lack of compliance within our origination system as it relates to

documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan. In my conversations with Sambol he calls the 100% sub prime seconds as the 'milk' of the business. Frankly I consider that product line to be the poison of ours."

91.    At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol, Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had DTI, LTV, or FICO scores outside Countrywide's underwriting guidelines.

92.    On May 29, 2007, Sambol attended a Credit Risk Committee Meeting, during which he was informed that even as Countrywide had been purportedly tightening guidelines, loans continued to be originated outside guidelines primarily via the SLD, over which Sambol expressed concern about the quality of SLD reporting and lack of control around the processes it utilized.

93.    Countrywide undertook a deliberate practice of routinely making new exceptions to and expanding its underwriting guidelines, yet did not disclose the exceptions and expansion of the guidelines in order to retain its existing share of the mortgage origination market.  This lack of disclosure continued even in the face of Countrywide discovering that borrower misrepresentation, speculation, and fraud was increasing at a rampant rate.

94.    Beginning in 2004, Countrywide's management encouraged more and more loans to be processed through the Exception Processing System ("EPS") and Countrywide routinely approved loans through the EPS in violation of its underwriting guidelines.

95.    Countrywide regularly approved stated income or reduced-documentation loans for applicants Countrywide had previously rejected under its full-documentation loan program.

In fact, Countrywide's loan officers would assist applicants in switching from full-documentation loans to reduced-documentation loans.

96.     Countrywide executives knew that risky loans that were routed out of the normal underwriting process (because they violated underwriting standards) were regularly being approved, even when they had been previously declined.

97.     Loan applications that should never have been approved were constantly kicked further up the corporate ladder until they reached a level where they would be approved by those driven solely by corporate profits and greed.

**D.      The Countrywide Defendants Knew That Countrywide's Stated Income Loan Products, Including "Prime" Pay-Option ARM Loans, Were Not Prudently Underwritten And Were Likely To Suffer Significant Defaults And Deficiencies, But Concealed These Facts From BANKERS And Other Investors In The Certificates**

98.     Countrywide's fraudulent loan originations did not end with its abandonment of its stated underwriting guidelines.  Countrywide normally approved loans in which a borrower's income and/or assets were not verified.   Such loans were called "limited" or "reduced" documentation loans, and a large subset of those loans were called "stated income" loans.  It is now clear that Countrywide covertly inflated the stated income of borrowers on loan applications for the loans that fueled its securitizations.  These fraudulent practices materially affected every Certificate purchased by BANKERS.

99.     Many of these inflated incomes were in the loan files of Pay-Option ARMs, a loan product that was ostensibly a "prime" or near prime product. Countrywide represented to BANKERS that a large percentage of the underlying loans originated by Countrywide Home and contained within the Certificates were "prime," or "conventional," indicating that these loans were of high credit quality.  Included within this "prime" category of loans were Pay-Option ARMs.   Pay-Option ARMs are adjustable rate mortgages which provide borrowers with the

37

option of fully-amortizing, interest-only, or "negative amortizing" payments.[10]   Pay-Option ARMs increased from approximately 6% of loan production by year-end 2004 to approximately 19% by year-end 2005.

100.   In its 10-K for 2005, Countrywide assured the public that its Pay-Option loan portfolio had "a relatively high initial loan quality," and that it "only originate[d] pay-option loans to borrowers who [could] qualify at the loan's fully-indexed interest rates."   Pay-Option ARMs comprised a significant percentage of the Certificates' underlying loans.

101.   The Countrywide Defendants repeatedly assured BANKERS and other investors that Pay-Option ARMs were prudently underwritten and of high quality, by representing that there was no loosening of underwriting standards with regard to pay option loans, that origination activities were such that, the consumer is underwritten at the fully adjusted rate of the mortgage, that Countrywide viewed the product as a sound investment for the Company and management tool for customers, and that the performance profile of Pay-Option ARMs were well understood because of its history.   In fact, Countrywide's 2006 Form 10-K stated that "[w]e believe we have prudently underwritten" Pay-Option ARMs.

102.   Contrary to the Countrywide Defendant's above statements, the Countrywide Defendants knew that a large percentage of these Pay-Option ARMs were originated based on the borrowers' stated income, meaning that the borrowers provided no documentation proving their income.   Despite touting the security of the Pay-Option ARMs products in public, Mozilo raised resounding alarms within Countrywide regarding the Company's risky reliance on stated income and reduced documentation for these loans, but concealed his concerns from BANKERS

---

[10] The tranches purchased by BANKERS did not contain any Pay Option loans; however, such loans were contained within the mortgage pools collateralizing tranches subordinate to BANKERS, which significantly increased the risk of loss to more senior Certificateholders, such as BANKERS.

and other investors.  For example, on April 4, 2006, in an internal email to Sambol regarding Pay-Option ARM loans, Mozilo stated, "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies."  Shortly thereafter, on May 19, 2006, Mozilo wrote an email to Sambol and Sieracki, which stated, "I believe that the payoptions continue to present a long term problem unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."  On June 1, 2006, Mozilo advised Sambol in an email that he had become aware that the Pay-Option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process.  Thus, it is apparent, that contrary to Countrywide's positive representations to investors, Countrywide could not assess the real risk of holding these loans on its balance sheet.

103.    Countrywide's Quality Control group performed a "4506 Audit" for the 10-month period ended on April 30, 2006, comparing the stated income from a borrower's loan application to the income reported by that borrower to the Internal Revenue Service, and concluded that one-third of the Pay-Option loans held for investment at Countrywide had income that was overstated by 50% or more.  This audit report was distributed to Countrywide's management and was discussed at an April 24, 2006 Credit Risk Management Committee meeting.  Countrywide's Credit Risk Officer, Clifford Rossi, testified before the SEC that the "vast majority" of the income discrepancies revealed in the 4506 Audit were the result of fraud and misrepresentation.

104.    The results of the 4506 Audit were widely known within Countrywide, having been reported to the Credit Risk Committee, Countrywide's Chief Risk Officer, and Sambol, then head of loan production.  Sambol also shared the results of the audit with Mozilo, as reflected in

a June 1, 2006 email from Mozilo, in which he wrote:

> In a discussion with both Stan [Kurland] and Dave [Sambol] it came to my attention that *the majority of pay options being originated by us, both wholesale and retail are based upon stated income. There is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records*.  (emphasis added).

105.   Countrywide did not reveal in either the Offering Documents or in other public disclosures the number or proportion of Pay-Option ARMs that were based on stated income. Moreover, although Countrywide did disclose the percentage of loans that were approved based on reduced documentation, including stated income, it did not disclose the results of the 4506 Audit demonstrating that a large percentage of the stated income information was misstated.  In fact, Countrywide did not obtain independent verification of income for borrowers who applied for these loans, which constituted a significant percentage of the total number of mortgage loans within the Certificates.

106.   Even worse, Countrywide's internal risk assessors knew that in a substantial number of its stated-income loans borrowers overstated their income, yet disregarded this and other signs of fraud in order to increase Countrywide's market share.

107.   Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application.  Loan officers who learned that a loan application submitted under the full documentation program was unlikely to be approved "flipped" the application for consideration under a reduced documentation application program.  In addition, loan officers coached applicants on the level of employment income needed to qualify for a mortgage loan, and then accepted revised loan applications containing inflated reported incomes.  The loan officers then submitted the revised loan applications under a reduced documentation program for consideration by the SLD in Plano, Texas and Calabasas, California, often without knowledge of

the applicant.

108.    For example, Audrey Sweet of Maple Heights, Ohio, a victim of Countrywide's predatory lending practices, told a similar story of falsified loan documents in her testimony before the Joint Economic Committee of Congress on July 25, 2007.  In reference to reviewing her loan application after her loan had closed, Ms. Sweet stated:

> I began to look over my home loan documents and discovered several things I had apparently overlooked until then.  First, was that my gross monthly income was recorded as $726 dollars more than it actually was. Second, I have two sets of loan documents, one that was created 10 days before we closed and one that was created the day of closing. The closing date document lists my assets as $9,400 in the bank. The final item I noticed was that the tax amount listed on the appraisal report was $1981.34, which comes to about $165.00 per month but Countrywide listed $100 as the tax amount.

109.    Cases of inflated borrower income, as described above, are not isolated incidents, but rather the product of Countrywide's corporate culture.

110.    Countrywide's no documentation loan process lacked independent verification and was openly abused, and Countrywide was fully aware that there were borrower misrepresentations being made in connection with stated income and stated asset loans.

111.    Countrywide supervisors often stood by and watched as loan officers repeatedly entered fictitious income figures into Countrywide's system until it approved borrowers for loans.  In addition, Countrywide loan officers advised potential borrowers to significantly increase their salaries when completing their loan applications.

112.    Countrywide systematically departed from the underwriting standards it professed to use for originating residential loans.  Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrowers were able to repay the loans. Countrywide used a "reasonableness standard" in order to check fraudulent stated income where

employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.

113.   Even more egregious, Countrywide loan officers often told potential borrowers the income they would need – given their credit scores and desired payment amount – in order to be approved for loan, after which potential borrowers would state that they made the required level of income.

114.   Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  In addition, Countrywide pressured its employees to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and not requiring them to verify documentation and information provided by borrowers that allowed them to qualify for loans.

115.   The absence of readily obtainable income verifications was also reported in an April 6, 2008 article in the New York Times.  The article noted that even though Countrywide had the right to verify stated income on an application through the IRS (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.  As the 4506 Audit demonstrated, had Countrywide made any attempt to verify borrowers' stated income with the IRS at the time of application, it would have shown that at least one-third of the Pay-Option loan applications were overstated by 50% or more.

### E.   Countrywide Retained The Best Quality Loans For Its Own Portfolio, Selling Only The Riskiest Loans To BANKERS And Other Investors

116.   Countrywide represented in the Prospectus Supplements that it would not select loans for securitization "in a manner intended to affect the interests of the certificateholders

adversely." (*See* Exhibit "16" at S-15). This representation was material to BANKERS because it relied on Countrywide's assurance that the loans included in the pools for the Certificates were high-quality loans with low credit risk.

117. However, it was Countrywide's practice to act adversely to the interests of BANKERS and other Certificateholders. First, as described above, Countrywide's Secondary Markets SLD was created for the sole purpose of approving otherwise unapprovable loans as long as they could be sold in their entirety through securitizations. Second, Countrywide protected its own investment portfolio, choosing only the best quality loans for retention, while unloading the riskiest loans to secondary market investors, including BANKERS.

118. Defendants knew that this practice of "cherry-picking" the higher quality loans for Countrywide's portfolio would adversely affect the secondary market securitizations. In an August 2, 2005 email from Sambol to Mozilo, Stan Kurland (CEO, President and Chairman of each of the Depositor Defendants), and Carlos Garcia, Sambol wrote:

> While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. ***This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversely selected pool***. (emphasis added).

### F. Countrywide Pressured Appraisers To Submit Falsified Appraisal Reports

119. An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating LTV, a financial metric commonly used by investors, including BANKERS, to evaluate the price and risk of MBS certificates. The LTV expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV is

equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV would be 100% ($90,000 divided by $90,000). The "value" of the mortgaged property, other than with respect to refinance loans, is generally the lesser of: (i) the appraised value determined in an appraisal by the loan originator at the time of the origination, or (ii) the sale price for such property.

120.    From an investor's perspective, the higher the LTV, the riskier the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property. Third, a high LTV means that, in the event of default or foreclosure, there is no remaining equity to pay for the fees and expenses related to a foreclosure.

121.    Consequently, the LTV of the loans underlying MBS are important to investors', including BANKERS', assessment of the value of the MBS. Indeed, prospectuses typically provide information regarding LTV, and even guarantee certain LTV limits for the loans that will support the MBS. All of the Prospectuses represented that no LTV would exceed 100%, and many promised an even lower threshold of 95%.

122.    The Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans. In each Prospectus Supplement, Countrywide represented that one or more appraisals were obtained for nearly every mortgage loan, and that these appraisals were "independent." (*See* Exhibit "16" at S-35). As originator and securitizer of the loans, Countrywide had an incentive to inflate the value of properties if that inflation would

allow a loan to be approved when it otherwise would not have been. However, loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the MBS investor in foreclosure. As such, an independent appraisal is necessary to ensure that appraisals are not inflated.

123. Countrywide allowed its sales personnel and account executives to order and control the appraisal process. These individuals were typically on a commission only pay structure and were therefore motivated to close as many loans as possible. These individuals would pressure appraisers to appraise properties at artificially high levels and threaten that if the appraisers did not that they would not be hired again.

124. According to the April 7, 2010, Financial Crisis Inquiry Commission testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years, "[w]ith the appraisal process highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted. This meant that either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much 10%. This meant one out of two appraisals were still within an acceptable tolerance for our end investors. Our experience showed that 10% was the most an appraisal could be overvalued and still be purchased by these investors. Another quarter that we reviewed were overvalued by 11-20%. These loans were either declined or we reduced the property value to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. ***Throwing a dart at a board while blindfolded would've produced more accurate results.*** (emphasis added).

125. In addition, Mr. Bitner testified about the implications of inflated appraisals:

> If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself. We saw it on several occasions. We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we

45

financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant. *In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country*.

\* \* \*

*If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to a lack of funds*. Inevitably, this would have forced sellers to drop their exorbitant asking prices to more reasonable levels. The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.

(emphasis added).

126.    Mr. Bitner also testified that the engine behind the increased malfeasance was the Wall Street Banks, stating that "the demand from Wall Street investment banks to feed the securitization machines couple [sic] with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

127.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on Banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor their reports or else never see work from those parties again." He continued, "[o]ur organizations are also concerned about the subtler practice of 'blacklists' or 'exclusionary appraiser lists,' particularly when they are used as levers to pressure appraisers." Too often, this pressure exerted by Countrywide succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis by which appraisers issued their appraisal without reasonable bases for doing so.

128.    A 2007 survey of 1,200 appraisers conducted by October Research Corporation,

which publishes *Valuation Review*, considered by many to be the real estate appraisal industry's most comprehensive source of market intelligence, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also found that 75% of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, and provide a higher valuation.

129.    Countrywide engaged in widespread appraisal-related misconduct by inflating the value of properties in order to support the loans that it wished to make. Countrywide often required the borrower to have the property appraised by its affiliates so that Countrywide was able to control the appraisal process and influence and inflate the appraised values assigned to properties on which it was lending. Further, Countrywide engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that meet Countrywide's business objectives even if the use of such appraisal technique is improper and in violation of industry standards. Countrywide allegedly black-listed appraisers who did not provide appraisal reports consistent with Countrywide's expectations.

130.    Countrywide loan officers were permitted to discard appraisals that did not support loan transactions in favor of appraisals by replacement appraisers that would support a qualifying LTV. In fact, Countrywide executives were strongly encouraged to inflate the appraised value of homes, which not only misled the buyer, but also the secondary mortgage market by overstating the value of the property securing the mortgage note.

### G.    The Credit Ratings Assigned To Countrywide's Certificates Materially Misrepresented The Credit Risk Of The Certificates

131.    The AAA and otherwise investment grade credit ratings of the Certificates were a factor in BANKERS' purchase of the Certificates. Because BANKERS is a conservative

institutional investor, the subject Certificates purchased by BANKERS were all investment-grade and received the highest AAA rating.  In addition, BANKERS purchased purportedly low-risk securities that were high in the capital structure of the Certificate offerings.  Thus, BANKERS relied to its detriment on the ratings and the Countrywide Defendants' representations regarding the ratings in the Offering Documents.

132.    "Investment grade" products are understood in the marketplace to be stable, secure and safe.  Using S&P's scale, "investment grade" ratings are AAA, AA, A and BBB, and represent, high credit quality (AAA), upper-medium credit quality (AA and A) and medium credit quality (BBB).  Any instrument rated below BBB is considered below investment grade or "junk bond."

133.    The Countrywide Defendants well understood the important role the credit ratings played in the MBS markets.  They featured the ratings prominently in the Offering Documents and discussed at length the ratings received by the different tranches of the Certificates and the bases for the ratings.  Yet, the Countrywide Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by the Countrywide Defendants to the credit rating agencies.

134.    Each Prospectus Supplement states that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.  (*See* Exhibit "16" at S-3).  All of the tranches of Certificates purchased by BANKERS were AAA-rated.  The AAA rating denotes "high credit-quality," and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills.

135.    Historically, before 2007, investments with AAA ratings had an expected

cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to nil. According to S&P, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about 0.094% per year with no year higher than 0.41%.

136. The Certificates did not deserve these investment grade ratings, as evidenced most clearly by the fact that all of the tranches of Certificates purchased by BANKERS have now been downgraded to junk, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default.

137. The credit rating agencies received enormous revenue from the issuers who paid them for rating the products they sold. Because the desired rating of a securitized product was the starting point for any securities offering, the credit rating agencies were actively involved in helping Countrywide structure the products to achieve the requested rating. As a result, the credit rating agencies essentially worked backwards, starting with Countrywide's target rating and thereafter working toward a structure that could conceivably yield the desired rating. To estimate the expected losses or probability of default, the credit rating agencies used historical data to estimate the likely sensitivity of the expected loss or probability of default to underwriting characteristics of the loan, the experience of the originator and servicer, and the local and national economic conditions. Based on the expected losses or the probability of default, the cash flows available to each of the tranches were simulated. Once the cash flows were simulated, the rating agencies and Countrywide then determined how much credit enhancement would be made available to each tranche of the Certificates, with an ultimate goal of maximizing Countrywide's profit.

138.   A 2008 SEC Report entitled, "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies" revealed that the issuers and the credit rating agencies worked together so that securities would receive the highest ratings:

> Typically, if the analyst concludes that the capital structure of the RMBS [residential mortgage-backed securities] does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

139.   As a result of this collaboration with the credit rating agencies, Countrywide was able to manipulate the system to achieve inflated ratings.  For example, through repeated interactions with the credit rating agencies, Countrywide effectively reverse engineered aspects of the ratings models and then modified the structure of a financing to improve its ratings without actually improving its credit quality.

140.   This rating process was further compromised by the practice of "rating shopping." Countrywide did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating.  This practice created bidding wars where the Depositor Defendants would hire the agency that provided the highest rating for the lowest price.  The credit rating agencies were paid only if they provided the desired investment grade ratings and only in the event that the transaction closed with those ratings.   Unbeknownst to investors such as BANKERS, Countrywide's practice of "rating shopping" jeopardized the integrity and independence of the rating process.

141.   The credit ratings of the Certificates were further compromised by misinformation provided by Countrywide regarding the abandonment of its underwriting standards, rampant use

of aggressive exceptions, the Company's knowledge of pervasive fraud in the stated income loan programs, and the inflated appraisals assigned to the underlying collateral, as described above.

142.    Subsequent downgrades confirm that the investment grade ratings reported in the Offering Documents were unjustifiably high and misstated the true credit risk of the Certificates purchased by BANKERS.  Beginning in 2008, the Certificates purchased by BANKERS became subject to these rating agency downgrades.  Today, all of the tranches purchased by BANKERS, which were initially awarded AAA ratings, have been downgraded to junk, indicating that the ratings set forth in the Offering Documents were false, unreliable and inflated.

143.    The Countrywide Defendants knew that the AAA and other investment grade ratings assigned to the Certificates were false because, unbeknownst to BANKERS, the underwriting and appraisal standards of Countrywide Home had been abandoned and, as such, no reliable estimate could be made concerning the level of enhancement necessary to ensure that the top tranches purchased by BANKERS were of AAA quality.  By including and endorsing these AAA ratings in the Prospectus Supplements, the Countrywide Defendants were making a false representation that they actually believed that the AAA ratings were an accurate reflection of the credit quality of the Certificates.

### H.    Countrywide Failed To Ensure That Title To The Underlying Loans Was Effectively Transferred

144.    An essential aspect of the mortgage securitization process is that the Trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default.  Two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

51

145. The rules for these transfers are governed by the law of the state where the property is located, by the terms of the PSAs for each securitization, and by the law governing the issuing trust (with respect to matters of trust law). Generally, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

146. In order to preserve the bankruptcy-remote status of the issuing trusts in Residential MBS transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the issuing trust. Rather, the notes and security instruments are generally initially transferred from the originator (e.g., Countrywide Home) to the depositor (e.g., CWALT), either directly or via one or more special-purpose entities established by Countrywide Financial. After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

147. In addition, the PSAs generally require the transfers of the mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC").

148. The applicable state trust law generally requires strict compliance with the trust documents, including the PSAs, so that failure to comply strictly with the timeliness, indorsement, physical delivery, and other requirements of the PSAs with respect to the transfers of the notes and security instruments means that the transfers would be void and the issuing trust

would not have good title to the mortgage loans.

149. The Offering Documents for each offering of the Certificates represented that the Trusts for each Certificate had obtained good title to the mortgage loans comprising the pool for the offering. (*See* Exhibit "1" at 24; Exhibit "16" at S-15). In reality, however, Countrywide routinely failed to comply with the requirements of state law and the PSAs for valid transfers of the notes and security instruments to the Trusts.

150. While Countrywide Home transferred an originated loan to the trustee for the Trusts, Countrywide Servicing retained the original note in its own possession and never delivered it to the trustee, as required pursuant to the terms of the PSAs. This improper course of conduct was Countrywide's standard business practice.

151. The Countrywide Defendants failed to validly transfer the promissory notes and security instruments for many of the mortgage loans underlying the Certificates purchased by BANKERS to the Trusts for the Certificates, thereby precluding BANKERS from enforcing the mortgage loans in cases of default.

## IV. BANKERS' INVESTMENTS IN THE COUNTRYWIDE CERTIFICATES

152. The Certificates were issued pursuant to the Offering Documents. These documents generally explained the structure and provided an overview of the Certificates. The Depositor Defendants, Countrywide Home, Countrywide Servicing and Countrywide Securities, amongst others, prepared the Offering Documents. The Countrywide Defendants knew that the Offering Documents would be used by secondary market investors, such as BANKERS, in connection with the offer and sale of Countrywide MBS.

153. For each of the Certificates that BANKERS purchased, Countrywide Home was the Seller and Countrywide Servicing was the Servicer. Countrywide Securities was the

underwriter for 2005-11, 2005-12, 2005-13, 2005-16, 2006-11, 2006-13, 2006-15, 2006-S8, 2005-J13, 2006-6CB, and 2006-8T1.

154. BANKERS decided to purchase each tranche of the Certificates on the basis of the information contained in the applicable Offering Documents and the Countrywide Defendants' public statements, as described herein, about the underwriting guidelines that were purportedly followed in originating the mortgage loans for Countrywide's MBS.

155. The Prospectus Supplements filed with the SEC contained detailed descriptions of the mortgage pools underlying the Certificates. The respective Prospectus Supplements provided the specific terms of the particular Certificate offering. Each Prospectus Supplement included tabular data concerning the loans underlying the Certificates, including, but not limited to: (a) the type of loans; (b) the number of loans; (c) the mortgage rate and net mortgage rate (the mortgage rate net of the premium for any lender paid mortgage insurance less the sum of the master servicing fee and the trustee fee on the mortgage loan); (d) the aggregate scheduled principal balance of the loans; (e) the weighted average original combined LTV ratio; (f) occupancy rates; (g) types of level of credit enhancement; (h) and the geographic concentration of the mortgaged properties. The Prospectus Supplements also contained a summary of Countrywide's underwriting and appraisal standards, guidelines and practices.

156. BANKERS' investment personnel reviewed and analyzed the information contained in the Offering Documents with respect to each offering of Certificates and performed various analyses of the Certificate-specific data for each offering before deciding to purchase Certificates in the Offering. The analyses conducted by BANKERS before deciding to purchase a tranche of a Certificate included various credit analyses based on the information provided by Countrywide Securities with respect to both the credit characteristics of the mortgage loan pool

and the structure of the securitization with respect to the seniority and risk characteristics of the particular tranche of Certificates.

157. The Offering Documents contained numerous statements of material fact about the Certificates, including statements concerning: (i) Countrywide Home's and any other applicable mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Certificates; (ii) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (iii) the LTVs, DTIs, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (iv) Countrywide Securities' due diligence of the loans and Countrywide Home's – underwriting practices; and (v) various forms of credit enhancement applicable to certain tranches of Certificates.

158. These statements of material facts were untrue because: (i) Countrywide Home and the other mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (ii) inflated appraisals caused the listed LTVs and levels of credit enhancement to be untrue; and (iii) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as DTIs were untrue as a result of Countrywide Home's acceptance of untrue information from mortgage applicants. For example, Countrywide Home and the other mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported incomes. As a result of the above misstatements of material fact, the Certificates purchased by BANKERS were far riskier and their rate of default was far higher than they were represented to be by the Countrywide

55

Defendants.

159.    BANKERS reasonably relied upon the Countrywide Defendants' representations in the Offering Documents and, indirectly, on the Countrywide Defendants' public statements regarding loan quality and Countrywide's reputation.  BANKERS neither knew, nor could have known, at the time it purchased the Certificates that, for example:

a.    Countrywide had stopped following its underwriting guidelines to the point of abandoning those guidelines, which lead to a drastic increase in the origination of risky loans;

b.    The property appraisals secured by Countrywide were not independent and resulted in false appraisal values; and

c.    Countrywide knowingly or recklessly accepted false information about material facts such as borrowers' stated income and intention to live in the mortgaged properties, which caused the Countrywide Defendants' representations to be false.

If BANKERS had known of these and the other above-referenced misrepresentations and omissions of material fact, BANKERS would not have purchased the Certificates.

160.    In deciding to purchase the Certificates, BANKERS relied on the Countrywide Defendants' false representations and omissions of material fact regarding Countrywide's underwriting and origination standards and the characteristics of the mortgage loans underlying the Certificates.  But for the Countrywide Defendants' fraudulent representations and omissions, BANKERS would not have purchased the Certificates.

**V.    COUNTRYWIDE DEFENDANTS' FALSE AND MISLEADING MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

161.    The Offering Documents pursuant to which BANKERS purchased its Certificates contained untrue statements of material fact, or omitted material facts necessary to make the statements therein not misleading, regarding: (i) Countrywide's and other originators' underwriting processes and guidelines by which the loans were originated, including the prevalence and type of exceptions to those guidelines being applied to the underlying loans, and the rampant fraud in stated income loans; (ii) the value of the underlying real estate securing the loans, in terms of LTVs and the appraisal standards by which such real estate values were measured; (iii) the credit ratings of the Securities; and (iv) the adequacy of Countrywide's transfer of good title and legal ownership of the underlying loans to the issuing trusts.

**A.    Countrywide Defendants Made False And Misleading Statements Regarding Countrywide's Underwriting Guidelines**

162.    Countrywide Home originated and/or packaged the mortgage loans that were included in the pools for the Certificates.  The Prospectus Supplements for the Certificates all contained identical or materially similar statements of material fact regarding Countrywide's underwriting standards and practices.

163.    All the Certificates at issue in this action were issued by the Depositor Defendants. The Prospectus Supplements, in sum and substance, made the following misrepresentations regarding Countrywide's underwriting guidelines and practices:

> ***All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.*** Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program — Underwriting Process" in the prospectus.  (emphasis added) (*See* Exhibit "16" at S-34).

164.    All of the Prospectus Supplements issued by Depositor Defendants made the following material misrepresentations:

> ***Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.*** Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.
>
> * * *
>
> The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

(emphasis added) (*See* Exhibit "16" at S-35).

165.    All of the Prospectus Supplements represented that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (*See* Exhibit "16" at S-35).

166.    All of the Prospectus Supplements, in sum and substance, represented that "Countrywide Home Loans will represent and warrant to the depositor in the pooling and servicing agreement . . . the selection was not made in a manner intended to affect the interests of the certificateholders adversely." (*See* Exhibit "16" at S-15).

167.    The above statements of material facts were untrue when made because, as explained above, they failed to disclose that Countrywide: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of

generating increased loan volume for securitizations; (iv) routinely allowed fraudulent representations of an applicant's stated income and, in many cases, knowingly falsified the stated income; and (v) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.   Moreover, Defendants routinely acted adversely to the interests of BANKERS and other Certificate holders by knowingly selecting risky loans for the Certificates while "cherry picking" the best loans for Countrywide's own portfolio.

168.   On September 1, 2004, Mozilo wrote an e-mail to Stan Kurland and Keith McLaughlin in which he stated:

> As I look at production trends, not only at Countrywide but also with other lenders, there is a clear deterioration in the credit quality of loans being originated over the past several years. In addition, from my point of view, the trend is getting worse as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate.

169.   However, in a March 15, 2005 Piper Jaffray Investor Conference, Mozilo was quoted as saying: "I will say this to you that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share."   Mozilo once again defended Countrywide's underwriting standards in Countrywide's Second Quarter 2005 Earnings call held on July 26, 2005, when he stated:

> I am not aware of any change of substance in underwriting policies. If they are referring to the fact that we are participating in pay-option and I/O product and they are defining that as a loosening of standards, if that is the definition, then that would be correct. We are a big player in the pay-option and I/O product. I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past.

170.   At a second quarter 2004 meeting of Countrywide's Corporate Credit Risk Committee, Countrywide's Chief Credit Officer, John McMurray, delivered a presentation entitled "Credit Risk is Increasing," explaining to senior executives, including Sambol, that

Countrywide's underwriting standards had become more aggressive, and more loans were being originated under riskier loan programs, with riskier features and at higher CLTVs. During his presentation, McMurray explained to Countrywide's senior executives that as underwriting guidelines expand, the probability of a loan going into default or serious delinquency increases.

171.    Countrywide knew that loan quality was a significant credit risk factor, and thus, knew that Countrywide's move to more aggressive underwriting guidelines greatly increased credit risk. However, despite such knowledge, Countrywide did not undertake a substantive effort to impose new controls with respect to the underwriting guidelines applicable to the subprime 80/20 loan products.

172.    Even after a so-called "no-exceptions" policy was issued for 80/20 loans, Countrywide's production and secondary marketing divisions continued to ignore this policy and continued to grant exceptions with respect to 80/20 loans, as reflected by McMurray on a September 7, 2007 email explaining that the secondary and production SLDs "basically continued to operate as though they never received this policy."

**B.     Countrywide Defendants Made Untrue Statements And Omissions Regarding Appraisals And LTVs**

173.    The adequacy of the mortgaged properties as security for repayment of the loans was purportedly determined by appraisals. The Prospectus Supplements represented that independent appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals. For example, all of the Prospectus Supplements contained the following representation:

> ***Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans.*** The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. ***Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales***

*of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.* (emphasis added) (*See* Exhibit "16" at S-35 and S-36).

174.    The Prospectus Supplements provided information regarding LTVs, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.   All of the Prospectus Supplements stated that, with respect to non-conforming loans, Countrywide Home's standard guidelines:

> generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000. (*See* Exhibit "16" at S-36).

175.    The Prospectus Supplements also stated that "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100%."[11] (*See* Exhibit "16" at S-36).

176.    The representations regarding appraisals and LTVs were materially false and misleading in that they omitted to state that the appraisals were inaccurate because: (i) the appraisers were not independent from Countrywide and the appraisals were not accurate reflections of property values; (ii) the actual LTVs for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser as represented in the Offering Documents; and (iii) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated.

---

[11] Some of the Prospectus Supplements stated that the LTVs of mortgage loans at origination would not be more than 90% or 95%.

C.     **Countrywide Defendants Materially Misrepresented The Accuracy Of The Credit Ratings Assigned To The Certificates**

177.    The Countrywide Defendants represented in the Offering Documents that the tranches of Certificates purchased by BANKERS were worthy of being rated AAA, signifying that the risk of loss was virtually non-existent.

178.    By providing ratings, the Countrywide Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected Countrywide's underwriting guidelines and practices, and the specific qualities of the underlying loans.  As stated in detail above, this representation was false.

179.    The Countrywide Defendants further represented in the Prospectus Supplements, in sum or substance, that:

> *The ratings assigned by [the rating agency] to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related Certificateholders under the agreements pursuant to which the certificates are issued.* [The rating agency's] ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.  (emphasis added) (*See* Exhibit "16" at S-89).

These above statement regarding the ratings assigned to the Certificates were false because the Countrywide Defendants stated the assigned ratings while knowing that misleading information was provided to the rating agencies by Countrywide to ensure AAA ratings.

180.    The falsity of these statements is further evidenced by the rapid downgrades of all the Certificates to junk within a few years of issuance, as reflected in the below chart:

| Certificate Offering and Class | Original Moody's Rating | Current Moody's Rating | Original S&P Rating | Current S&P Rating |
|---|---|---|---|---|
| CWABS 2005-11 AF3 | Aaa | B2 | AAA | B |
| CWABS 2005-12 2A4 | Aaa | B2 | AAA | A- |

| CWABS 2005-13 3AV4 | Aaa | Caa1 | AAA | B |
|---|---|---|---|---|
| CWABS 2005-16 2AF3 | Aaa | Caa2 | AAA | CCC |
| CWABS 2006-11 1AF2 | Aaa | Ca | AAA | CCC |
| CWABS 2006-13 1AF5 | Aaa | Ca | AAA | D |
| CWABS 2006-15 A6 | Aaa | Caa3 | AAA | CCC |
| CWHEQ 2006-S8 A2 | Aaa | B3*- | AAA | B |
| CWALT 2005-J13 1A4 | Aaa | Ca | AAA | CCC |
| CWALT 2005-73CB 1A2 | Aaa | Caa2 | AAA | CCC |
| CWALT 2006-6CB 1A2 | Aaa | Caa3 | AAA | CC |
| CWALT 2006-8T1 1A4 | Aaa | Caa3 | AAA | CC |
| CWALT 2007-21CB 1A5 | Aa1 | C | AAA | CCC |
| CWMBS 2005-21 A39 | Aaa | CCC | CCC[12] | N/A |
| CWMBS 2006-10 1A3 | N/A | N/A | AAA | CCC |

**D.      Countrywide Defendants Materially Misrepresented Countrywide's Transfer Of Good Title To The Mortgage Loans To The Issuing Trusts**

181.     The Countrywide Defendants stated in each Prospectus Supplement that "each of the sellers will represent and warrant that, prior to the sale of the related Mortgage Loans to the depositor, the applicable seller had good title to the Mortgage Loans sold by it." (*See* Exhibit "16" at S-15).  In addition, the Prospectus Supplements stated "[u]nder the pooling and servicing agreement, *the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the Certificateholders*. (emphasis added) (*See* Exhibit "16" at S-15).

182.     These representations were false because, as alleged above, the Countrywide Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the Trusts, as required by applicable state laws and the PSAs.  These representations were also false because the Countrywide Defendants routinely

---

[12] 2005-21 was not rated by S&P, but was given a CCC by Fitch Ratings ("Fitch").

failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs. The Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in case of default.

## VI. BECAUSE OF DEFENDANTS' CONDUCT, BANKERS HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES

183.  The Countrywide Defendants' misrepresentations and omissions of material facts caused BANKERS to suffer losses on the Certificates, because the mortgage loans underlying the Certificates experienced defaults and delinquencies at a much higher rate.

184.  The higher rate of defaults and delinquencies have resulted in principal amounts of various subordinate tranches being wiped out, which in turn, has significantly devalued BANKERS' investment and foreclosed the full payment of principle and interest in connection with BANKERS' Certificates.

185.  Further, the delinquency, bank ownership and foreclosure rates on the underlying mortgages have soared since issuance. As reflected in the below chart, the average percentage of loans comprising the Certificates purchased by BANKERS that are currently 30 days or more delinquent, in foreclosure, or bank-owned is over 37%:

| Certificate Offering | Number of Active Loans | Number of Delinquent Loans (30 Day + 60 Day + 90 Day + REO + Foreclosure) | Total % of Loan Delinquencies |
|---|---|---|---|
| CWABS 2005-11 | 4,355 | 2,140 | 49.14% |
| CWABS 2005-12 | 1,672 | 926 | 55.38% |
| CWABS 2005-13 | 3,797 | 2,109 | 55.54% |
| CWABS 2005-16 | 6,005 | 2,735 | 45.55% |
| CWABS 2006-11 | 5,603 | 3,080 | 54.97% |
| CWABS 2006-13 | 4,487 | 2,414 | 53.80% |
| CWABS 2006-15 | 3,316 | 1,445 | 43.58% |

| | | | |
|---|---|---|---|
| CWHEQ 2006-S8 | 8,207 | 528 | 6.43% |
| CWALT 2005-J13 | 316 | 78 | 24.68% |
| CWALT 2005-73CB | 1026 | 234 | 22.81% |
| CWALT 2006-6CB | 6031 | 1,672 | 27.72% |
| CWALT 2006-8T1 | 315 | 124 | 39.37% |
| CWALT 2007-21CB | 2117 | 419 | 19.79% |
| CWMBS 2005-21 | 1093 | 191 | 17.47% |
| CWMBS 2006-10 | 532 | 113 | 21.24% |
| **TOTAL** | 48,872 | 18,208 | 37.26% |

Moreover, these current performance numbers do not reflect the number of loans which have been foreclosed since issuance and which are no longer included within the loan pools.  The above chart reflects the original number of loans in the loan pools and the total number of loans which have been removed from the pools, largely due to either foreclosure or early payout, negatively impacting the income payable to BANKERS and other Certificateholders.

186.   Based largely on the increased amount of defaults, delinquencies, foreclosures, and real estate owned properties, the ratings on all of the Certificates purchased by BANKERS have since been downgraded and they are no longer marketable at the prices paid for them by BANKERS.

**VII.   AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA
IS VICARIOUSLY LIABLE FOR COUNTRYWIDE'S ACTIONS**

187.   As Countrywide's successor in liability, Bank of America is jointly and severally liable for any and all damages resulting to BANKERS from the wrongful actions of Countrywide.

188.   Bank of America has acknowledged that its acquisition of Countrywide through an all-stock transaction on July 1, 2008 was a "merger."  In a July 1, 2008 press release, Barbara Desoer, the President of Bank of America Home Loans and Insurance since July 2008, said:

"Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  In addition, Mozilo stated in another press release that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."  Further, in its 2008 Annual Report, Bank of America confirmed that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined company we believe we will be recognized as a responsible lender who is committed to helping our customers become successful homeowners."

189.    In connection with the integration of Countrywide with Bank of America, Countrywide Financial and Countrywide Home have transferred substantially all of their assets and operations to Bank of America.

190.    Countrywide also ceased submitting filings to the SEC, and instead consolidated with Bank of America's filings.  Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

191.    Upon information and belief, Bank of America has been operating Countrywide Home as a division of Bank of America.  To that end, on April 27, 2009, Bank of America announced: "The Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008.  The Countrywide brand has been retired."

192.    Further, Countrywide's former website redirects customers to Bank of America's website, which states that "Countrywide customers . . . have access to Bank of America's 6,100 banking centers."

<u>**COUNT I**</u>

**Common Law Fraud**
(Common Law Fraud Against Countrywide Financial, Countrywide Home,
Countrywide Securities, and the Depositor Defendants)

193.    BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through 192 above, as if fully set forth herein.

194.    As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

195.    As a corporate parent, Countrywide Financial directed the activities of Countrywide Home, Countrywide Securities, and the Depositor Defendants.

196.    Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

197.    Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing BANKERS to purchase the Certificates, given that they knew secondary market investors would rely upon said misleading statements and omissions.

198.    Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants knew that BANKERS was relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations, as described

herein.

199. Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants knew that BANKERS would rely upon their representations in connection with BANKERS' decision to purchase the Certificates.

200. Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

201. It was only by making such representations that Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants were able to induce BANKERS to buy the Certificates. BANKERS would not have purchased or otherwise acquired the Certificates but for Countrywide Financial's, Countrywide Home's, Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

202. BANKERS justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

203. As a result of the false and misleading statements and omissions, as alleged herein, BANKERS has suffered substantial damages.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a) compensatory and/or rescissionary damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest;

(b)      costs for the successful prosecution of this claim; and

(c)      such other relief as this Court considers appropriate.

## COUNT II

**Fraudulent Inducement**
(Against Countrywide Financial, Countrywide Home,
Countrywide Securities, and the Depositor Defendants)

204.   BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through 192 above, as if fully set forth herein.

205.   As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

206.   As a corporate parent, Countrywide Financial directed the activities of Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.

207.   Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

208.   Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing BANKERS to purchase the Certificates, given that they knew secondary market investors would rely upon said misleading statements and omissions.

209.   Countrywide Financial, Countrywide Home, Countrywide Securities, and the

Depositor Defendants knew that BANKERS was relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations, as described herein.

210.   Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants knew that BANKERS would rely upon their representations in connection with BANKERS' decision to purchase the Certificates.   Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

211.   It was only by making such representations that Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants were able to induce BANKERS to buy the Certificates.   BANKERS would not have purchased the Certificates but for Countrywide Financial's, Countrywide Home's, Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

212.   BANKERS justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home's, Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

213.   By virtue of Countrywide Financial's, Countrywide Home's, Countrywide Securities', and the Depositor Defendants' false and misleading statements and omissions, as alleged herein, BANKERS has suffered substantial damages.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)   compensatory and/or rescissionary damages against all Defendants, jointly and

severally, for all damages sustained as a result of Defendants' wrongdoing, plus

pre-judgment and post-judgment interest;

(b)      costs for the successful prosecution of this claim; and

(c)      such other relief as this Court considers appropriate.

## COUNT III

### Aiding and Abetting Fraud
(Against Countrywide Financial, Countrywide Home, Countrywide Securities,
Countrywide Servicing, Countrywide Capital, and the Depositor Defendants)

214.      BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through

192 above, as if fully set forth herein.

215.      The above-named aiding and abetting Countrywide Defendants knew of the fraud

perpetrated by Countrywide Financial, Countrywide Home, Countrywide Securities, and the

Depositor Defendants on BANKERS.

216.      Furthermore, the above-named aiding and abetting Countrywide Defendants

provided Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor

Defendants with substantial assistance in advancing the commission of the fraud.

217.      Each of the above-named aiding and abetting Countrywide Defendants knew that

the Certificates were not backed by high quality loans and were not underwritten according to

Countrywide Home's underwriting standards, received internal reports about the violations of

Countrywide Home's mortgage loan underwriting and appraisal standards, participated in those

violations and had actual knowledge of their own acts, or participated in and had actual

knowledge of Defendants' failure to convey good title to the mortgage loans underlying the

Certificates to the Trusts.

218.      In addition, each of the above-named aiding and abetting Countrywide Defendants

participated in the violations of Countrywide Home's mortgage loan underwriting and appraisal

71

standards, made false public statements about Countrywide Home's mortgage loan underwriting and appraisal standards, provided false information about the mortgage loans underlying the Certificates to the credit rating agencies, provided false information for use in the Offering Documents, or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the issuing trusts.

219.    It was foreseeable to the above-named aiding and abetting Countrywide Defendants at the time they actively assisted in the commission of the fraud that BANKERS would be harmed as a result of their assistance.

220.    As a direct and natural result of the fraud committed by Countrywide Financial, Countrywide Home, Countrywide Securities, and the Depositor Defendants and the above-named aiding and abetting Countrywide Defendants' knowing and active participation therein, BANKERS has suffered substantial damages.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)    compensatory and/or rescissionary damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest;

(b)    costs for the successful prosecution of this claim; and

**(c)**    such other relief as this Court considers appropriate.

## COUNT IV

### Successor and Vicarious Liability
(Against the Bank of America Defendants for the Fraud Claims)

221.    BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through 220 above, as if fully set forth herein.

222.    The Bank of America Defendants, Bank of America, BAC Home, and NB Holdings, are jointly and severally liable for any and all damages resulting from the wrongful actions of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital, as alleged herein, because it is the successor-in-interest to Countrywide and is vicariously liable for the conduct of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital as a result of a de facto merger of the two entities.

223.    This acquisition was a de facto merger because Bank of America intended to take over and effectively took over Countrywide Financial and its subsidiaries in their entirety and, thus, should carry the liabilities of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital as a concomitant to the benefits it derived from the purchase.

224.    The acquisition resulted in continuity of ownership because the shareholders of Countrywide Financial became shareholders of Bank of America as a result of Bank of America's acquisition of Countrywide Financial on July 1, 2008, through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide Financial.  Bank of America has described the transaction as a merger, and has actively incorporated Countrywide's mortgage business into Bank of America.

225.    Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital.

226.    The ordinary business of Countrywide Financial ceased and the Company

dissolved soon after the acquisition.

227.    On November 7, 2008, Bank of America acquired substantially all of the assets of Countrywide Financial, and at that time, Countrywide Financial ceased submitting filings to the SEC.   Thus, Countrywide Financial's assets and liabilities are now included in Bank of America's filings.

228.    Bank of America has also taken responsibility for the pre-merger liabilities of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital, including restructuring hundreds of thousands of loans created and serviced by these Defendants.

229.    Because Bank of America has merged with Countrywide Financial, and acquired substantially all of the assets of Countrywide Home, Countrywide Securities, Countrywide Servicing and Countrywide Capital, through BAC Home Loans Servicing, NB Holdings and others, the Bank of America Defendants are the successors in liability to Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital, and are jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of these Defendants.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)    compensatory and/or rescissionary damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest;

(b)    costs for the successful prosecution of this claim; and

(c)    such other relief as this Court considers appropriate.

74

## COUNT V

### Negligent Misrepresentation
(Negligent Misrepresentation Against Countrywide Financial, Countrywide Securities, Countrywide Home, Countrywide Servicing, and Countrywide Capital)

230.    BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through 220 above, as if fully set forth herein.  For the purposes of this Count, BANKERS does not incorporate any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly, and BANKERS expressly disclaims any claim of fraud or intentional misconduct.

231.    This is a claim for negligent misrepresentation against Countrywide Financial, Countrywide Securities, Countrywide Home, Countrywide Servicing, Countrywide Capital Markets (the "Negligent Misrepresentation Defendants").

232.    BANKERS made nineteen (19) separate investments in fifteen (15) Offerings of Certificates that the Countrywide Defendants securitized and sold.   The Negligent Misrepresentation Defendants also originated or acquired, underwrote, and serviced all the loans in the Offerings.

233.    Because the Negligent Misrepresentation Defendants arranged the Certificates, and originated or acquired, underwrote, and serviced all of the underlying mortgage loans, they had unique and special knowledge about the loans in the Offerings.  In particular, the Negligent Misrepresentation Defendants had unique and special knowledge and expertise regarding the quality of the underwriting of those loans as well as the servicing practices employed as to such loans.

234.    Because BANKERS could not evaluate the loan files for the mortgage loans underlying its Certificates, and because BANKERS could not examine the underwriting quality or servicing practices for the mortgage loans in the Certificates on a loan-by-loan basis,

BANKERS was heavily reliant on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the underlying mortgage loans when determining whether to make each investment of Certificates. To that end, BANKERS was entirely reliant on the Negligent Misrepresentation Defendants to provide accurate information regarding the loans in engaging in that analysis. Accordingly, the Negligent Misrepresentation Defendants were uniquely situated to evaluate the economics of each Certificate.

235. Over the course of three years, for four separate investments, BANKERS relied on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the quality of the underlying mortgage loans and their underwriting when determining whether to invest in the Offerings.

236. The Negligent Misrepresentation Defendants were aware that BANKERS relied on their unique and special expertise and experience and depended upon them for accurate and truthful information. The Negligent Misrepresentation Defendants also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within their knowledge.

237. Based on their expertise and superior knowledge the Negligent Misrepresentation Defendants owed a duty to BANKERS to provide complete, accurate, and timely information regarding the mortgage loans and the Certificates.

238. The Negligent Misrepresentation Defendants made misrepresentations which they knew or should have known to be false in order to induce BANKERS' investment in the Certificates, given that the Negligent Misrepresentation Defendants provided the Offering Documents with knowledge that secondary market investors, like BANKERS, would rely upon them.

239.    As alleged above, the Offering Documents contained materially false and misleading information and the Negligent Misrepresentation Defendants knew or should have known that the information in the Offering Documents was materially false and misleading.

240.    Unaware that the Offering Documents contained materially false and misleading statements, BANKERS reasonably relied on those false and misleading statements when deciding to purchase the Certificates in the Offerings.

241.    BANKERS reasonably relied on the information provided by the Negligent Misrepresentation Defendants and have suffered substantial damages as a result of their misrepresentations.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)    compensatory and/or rescissionary damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest;

(b)    costs for the successful prosecution of this claim; and

(c)    such other relief as this Court considers appropriate.

## COUNT VI

### Successor and Vicarious Liability
(Against the Bank of America Defendants for the Negligent Misrepresentation Claim)

242.    BANKERS repeats and realleges the allegations set forth in Paragraphs 1 through 192 and Paragraphs 230 through 241, as if fully set forth herein.

243.    The Bank of America Defendants, Bank of America, BAC Home, and NB Holdings, are jointly and severally liable for any and all damages resulting from the wrongful actions of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide

77

Servicing, and Countrywide Capital, as alleged herein, because it is the successor-in-interest to Countrywide and is vicariously liable for the conduct of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital as a result of a de facto merger of the two entities.

244.    This acquisition was a de facto merger because Bank of America intended to take over and effectively took over Countrywide Financial and its subsidiaries in their entirety and, thus, should carry the liabilities of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital as a concomitant to the benefits it derived from the purchase.

245.    The acquisition resulted in continuity of ownership because the shareholders of Countrywide Financial became shareholders of Bank of America as a result of Bank of America's acquisition of Countrywide Financial on July 1, 2008, through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide Financial.  Bank of America has described the transaction as a merger, and has actively incorporated the Countrywide's mortgage business into Bank of America.

246.    Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital.

247.    The ordinary business of Countrywide Financial ceased and the Company dissolved soon after the acquisition.

248.    On November 7, 2008, Bank of America acquired substantially all of the assets of Countrywide Financial, and at that time, Countrywide Financial ceased submitting filings to the

SEC. Thus, Countrywide Financial's assets and liabilities are now included in Bank of America's filings.

249. Bank of America has also taken responsibility for the pre-merger liabilities of Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital, including restructuring hundreds of thousands of loans created and serviced by these Defendants.

250. Because Bank of America has merged with Countrywide Financial, and acquired substantially all of the assets of Countrywide Home, Countrywide Securities, Countrywide Servicing and Countrywide Capital, through BAC Home Loans Servicing, NB Holdings and others, the Bank of America Defendants are the successors in liability to Countrywide Financial, Countrywide Home, Countrywide Securities, Countrywide Servicing, and Countrywide Capital, and are jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of these Defendants.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

    (a)    compensatory and/or rescissionary damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest;

    (b)    costs for the successful prosecution of this claim; and

    (c)    such other relief as this Court considers appropriate.

## DERIVATIVE COMPLAINT AGAINST BNYM

251.    In addition to the claims set forth above, BANKERS asserts additional claims against The Bank of New York Mellon ("BNYM") in its capacity as Trustee of the Trusts created to hold the subject Certificates, for BNYM's inactions, which caused damages to the Trusts and, in turn, the Certificateholders of each Trust who have been damaged.

252.    Although the Derivative Complaint asserts claims only against BNYM, the allegations in support thereof concern acts and omissions by Countrywide Home, Countrywide Servicing, as described above and in more detail below.

## VIII.   FACTUAL BACKGROUND

253.    During 2005 through 2008, BANKERS purchased a substantial portion of twelve separate tranches of the Certificates identified as 2005-73CB 1A2, 2005-73CB 1A3, 2005-J13 1A4, 2006-6CB 1A2, 2006-8T1 1A4, 2007-21CB 1A5, 2005-11 AF3, 2005-12 2A4, 2005-13 3AV4, 2005-16 2AF3, 2006-11 1AF2, and 2005-21 A39.  The aforementioned Certificates were acquired by BANKERS as set forth in Paragraph 5, *supra*.

254.    The Trusts utilized a senior/subordinated structure where tranches of the Certificates were layered so that each tranche benefits from the credit protection of all the tranches subordinated to it.  The junior tranches are subordinated in the payment of both principal and interest to the senior tranches and the subordination levels were to be sufficient to absorb loan losses and prevent downgrades and writedowns of the senior tranches.  The tranches purchased by BANKERS were all senior certificates in that the rights of holders of the subordinated tranches of the Certificates to receive distributions with respect to the mortgage loans were subordinated to the rights of holders of the senior tranches of the Certificates, like BANKERS.  Thus, the subordinated tranches of the Certificates were to provide credit support

for the senior tranches of the Certificates.   BANKERS currently owns these tranches.   The allegations herein regarding the specific Tranches purchased by BANKERS are demonstrative of the activities and harm which has occurred to similarly situated Certificateholders who purchased the various tranches of Certificates issued.

255.   The tranches purchased by BANKERS and the other Certificateholders were part of Certificates issued by CWMBS (as to 2005-21 A39), CWALT (as to 2005-J13 1A4, 2005-73CB 1A2, 2005-73CB 1A3, 2006-6CB 1A2, 2006-8T1 1A4, and 2007-21CB 1A5), and CWABS (as to 2005-11 AF3, 2005-12 2A4, 2005-13 3AV4, 2005-16 2AF3, and 2006-11 1AF2). The Certificates were collateralized by pools of "sub-prime" residential real estate mortgages[13] located throughout the United States that had been first purchased by Countrywide Home, and then sold to CWALT, CWMBS, and CWABS.  Each Certificate is what is commonly known in the industry as an "Asset Backed Security".[14]

256.   Amongst other actions, in order to facilitate the sale of the Certificates on the open market, Countrywide Home, with the assistance of its affiliates:

---

[13] The collateral for 2005-J13 consisted of a pool of 572 mortgage loans with an aggregate principal balance of $248,054,797.  The collateral for 2005-73CB consisted of a pool of 1,791 mortgage loans with an aggregate principal balance of $359,722,468.  The collateral for 2006-6CB consisted of a pool of 10,241 mortgage loans with an aggregate principal balance of $2,164,334,096.  The collateral for 2006-8T1 consisted of a pool of 543 mortgage loans with an aggregate principal balance of $355,528,517.  The collateral for 2007-21CB consisted of a pool of 2,668 mortgage loans with an aggregate principal balance of $769,186,604.  The collateral for 2005-21 consisted of a pool of 1,808 mortgage loans with an aggregate principal balance of $983,059,554.  The collateral for 2005-11 consisted of a pool of 10,507 mortgage loans with an aggregate principal balance of $1,929,704,100.  The collateral for 2005-12 consisted of a pool of 4,828 mortgage loans with an aggregate principal balance of $876,150,100.  The collateral for 2005-13 consisted of a pool of 9,981 mortgage loans with an aggregate principal balance of $1,950,700,100.  The collateral for 2005-16 consisted of a pool of 12,552 mortgage loans with an aggregate principal balance of $2,209,500,100.  The collateral for 2006-11 consisted of a pool of 10,044 mortgage loans with an aggregate principal balance of $1,846,600,100.

[14] On January 18, 2005, the SEC approved the following definition of Asset-Backed Securities:
    The term "asset-backed security" is currently defined in Form S-3 to mean a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets either fixed or revolving that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the securing or timely distribution of proceeds to the Certificateholders.

a. Published Prospectuses regarding the sale of the Certificates (*See* Exhibits "1", "2", "3", "4", "5", "7", "8", "9", "12", "14", and "15"); and

b. Published Prospectus Supplements regarding the sale of the Certificates (*See* Exhibits "16", "17", "18", "19", "20", "22", "23", "24", "27", "29", and "30").

257. The Prospectuses and the Prospectus Supplements were prepared and issued with the input and consent of Countrywide Home, as Seller, Countrywide Servicing, as Master Servicer, CWALT, CWMBS and CWABS, as Issuer and Depositor, and BNYM, as Trustee.

258. Amongst other actions, in order to facilitate the sale of the Certificates on the open market, CWALT, CWMBS, and CWABS:

a. Entered into Pooling and Servicing Agreements ("PSA" or "PSAs") with, amongst others, Countrywide Home, Countrywide Servicing, and BNYM (*See* Exhibits "31", "32", "33", "34", "35", "37", "38", "39", "42", "44", and "45");

b. Created Trusts by way of the PSAs to hold the Certificates for the benefit of Certificateholders and to be administered by BNYM, as Trustee; and

c. For the benefit of the Trusts, and pursuant to the PSAs, acquired primary mortgage guaranty insurance ("PMI") policies for loans that had an LTV in excess of 80 percent (80%), which served as "credit enhancements" in order to offer additional security to Certificateholders in the Trusts and to

induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers.[15]

259.    Given that the success of the Trusts relied on the performance of the pools of real estate mortgages provided by Countrywide Home, the Prospectus Supplements issued by CWALT, CWMBS, and CWABS provide that in the event of a breach of any representation or warranty relating to a mortgage loan with the pools that materially and adversely affects the interest of the Certificateholders in that mortgage loan, Countrywide Home, as Seller of that mortgage loan, would be obligated to cure that breach by doing one of the following (a) cure that breach, (b) repurchase that mortgage loan, or (c) substitute a replacement mortgage loan for that mortgage loan within two years of the closing date (*See* Exhibit "16" at S-33).

260.    Additionally, the Prospectus Supplement stated that credit support would be provided by PMI for each mortgage loan with an LTV at origination of greater than 80%.[16]  (*See* Exhibit "16" at S-16).

261.    In addition to the above-described assurances, all Certificates were to be protected by the watchful eye and care of the BNYM, as Trustee, because the Trusts were created to hold the Certificates for the benefit of Certificateholders.  BNYM was empowered with mortgage guaranty insurance for the benefit of each Trust, in the event a real estate mortgage comprised

---

[15] At the date of issuance, all of the Certificates purchased by BANKERS were rated either AAA by Standard & Poor's ("S&P") or Aaa by Moody's.  An AAA rating by S&P is the highest rating given by the agency and denotes an "[e]xtremely strong capacity to meet financial commitments."  An Aaa rating by Moody's is the highest rating given by the agency and denotes obligations that "are judged to be of the highest quality, with minimal credit risk."  The initial ratings for each of the classes of Certificates is set forth in each Prospectus Supplement (*See* Exhibit "16" at S-3).

[16] Given that the stated LTV's were inaccurate the Trusts have incurred significant realized losses because Countrywide Servicing wrongfully charged the Trusts for losses that should have been covered by insurance or cures or repurchases by Countrywide Home, the Seller of the mortgage loans, in violation of the representations made to Certificateholders.  Had BNYM enforced the terms of the PSAs, including making sure that Countrywide Servicing did not neglect its duties and requesting data from Countrywide Servicing as to the LTV's of mortgage loans and PMI claims, BNYM would have been able to prevent harm to the Trusts, and in turn the Certificateholders.

within the subject pools of mortgages failed to perform.

262.    Certificateholders, including BANKERS, are intended third party beneficiaries to the PSAs because:  (a) the PSAs clearly express an intent to primarily and directly benefit the class of persons to which BANKERS belongs; that is, owners of the Certificates or of any part thereof; and (b) all of the parties to the PSAs intended to benefit the class of persons to which BANKERS belongs.  Further, the Certificates contain the following language, which binds the Certificateholders to the terms of the PSA to which the Certificates relate:  "This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound."  (*See* Exhibit "31" at A-3).

263.    In the PSAs, Countrywide Home, as Seller, represented and warranted, amongst other things, that:

  a.    All payments due prior to the Cut-off Date for such Mortgage Loan have been made as of the Closing Date and the Mortgage Loan is not delinquent in payment more than 30 days (*See* Exhibit "31" at S-III-A-1(2));

  b.    There are no material defaults under the terms of the Mortgage Loan (*See* Exhibit "31" at S-III-A-5(30));

  c.    Each Mortgage Loan was underwritten in all material respects in accordance with Countrywide's underwriting guidelines as set forth in the Prospectus Supplement (*See* Exhibit "31" at S-III-A-5(35));

  d.    No fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to a Mortgage Loan has taken place on the part of Seller or the Mortgager, or, on the part of any other party involved in the

origination of the Mortgage Loan, given that the origination, underwriting, and collection practices with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business  (*See* Exhibit "31" at S-III-A-3(21));

e.    Each Mortgage Loan that had a LTV at origination in excess of 80% would be covered by PMI (*See* Exhibit "31" at S-III-A-4(26)); and

f.    Upon discovery of any breach of a representation or warranty that materially and adversely affects the interests of the Certificateholders, Countrywide Home, as Seller, would cure the breach, or, if the breach occurred prior to the second anniversary of the Closing Date, Countrywide Home would have the alternative options of supplying a substitute mortgage loan for the loan that caused the breach or repurchase the subject mortgage loan.  Pursuant to the PSAs, after the second anniversary of the Closing Date, curing breaches or repurchasing the subject mortgage loans was required of Countrywide Home.  (*See* Exhibit "31" at § 2.03).

264.    Given that under § 3.01 of the PSAs, Countrywide Servicing, as Master Servicer of the mortgage loans which served as collateral for the Certificates, was obligated to "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan …", Countrywide Servicing had a duty to enforce Countrywide Home's obligation to cure, repurchase, or substitute any Mortgage Loan as to which a breach has occurred.  (*See* Exhibit "31" at § 3.01).

265.    In addition, under the PSAs, Countrywide Servicing, as Master Servicer, was

obligated to (a) pursue claims for insurance coverage regarding the loans in the pool (*See* Exhibit "31" at § 3.09(c)); and (b) foreclose on delinquent loans (*See* Exhibit "31" at § 3.11(a)).

266.   Further, under the PSAs, Countrywide Servicing, as Master Servicer, was required to provide the loan-level information for each mortgage loan to BNYM as outlined in Schedule VI of the PSAs.  (*See* Exhibit "31" at S-VI-1).

267.   From the information provided by Countrywide Servicing, BNYM was required to provide credit rating agencies, notice of (1) any material change or amendment under the PSAs; (2) the occurrence of any Event of Default that has not been cured; (3) the resignation or termination of the Master Servicer or the Trustee and the appointment of any successor; (4) the repurchase or substitution of mortgage loans pursuant to § 2.03; (5) the final payment to Certificateholders;  and  (6)  any  rating  action  involving  the  long-term  credit  rating  of Countrywide.  (*See* Exhibit "31" at § 10.05).

268.   In addition, from the information provided by Countrywide Servicing, BNYM was required to provide monthly statements to both Certificateholders, including BANKERS, and the rating agencies regarding various aspects of the mortgage loans and the Certificates, including but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages. (*See* Exhibit "31" at § 4.06).

269.   Under the PSAs, BNYM was required to examine the statements provided to it by Countrywide Servicing to determine whether they were in conformity with the requirements of the PSAs.  (*See* Exhibit "31" at § 8.01).  Given that BNYM, as Trustee, was charged with protecting the interests of the Trusts, BNYM had an obligation to request a corrected statement from Countrywide Servicing, and if such a corrected statement was not received, then BNYM

was required to notify Certificateholders of the nonconformity.

270.    The available credit support for the Certificates greatly diminished because at all material times Countrywide Home failed to cure the breach of representation and warranty (21), (26), (35), and (30) in Schedule IIIA of the PSAs.  (*See* Exhibit "31" at S-III-A-3, 4, and 5).

271.    Specifically, pursuant to § 2.03 of the PSAs, Countrywide was required to cure, repurchase or substitute any Mortgage Loan as to which a breach has occurred, including defaulted mortgages.  (*See* Exhibit "31" at § 2.03).  Given that issues alleged herein post-date the second anniversary of the Closing Date, Countrywide Home was not permitted to supply a substitute mortgage loan to cure breaches of any representation or warranty.  (*See* Exhibit "31" at § 2.03).

272.    To date, Countrywide Home failed to cure or repurchase the mortgage loans to which a breach has occurred.

273.    At all material times, Countrywide Servicing did not enforce Countrywide Home's obligations under the PSAs to cure breaches, as more fully set forth in § 2.03 of the PSAs.

274.    Further, Countrywide Servicing failed to use reasonable efforts to foreclose upon defaulted mortgage loans and pursue claims for insurance coverage regarding the loans in the pool.  Instead, Countrywide Servicing wrongly charged the over-collateralization accounts for losses that should have been covered by PMI or tendered to Countrywide Home, thereby reducing the fund of money available to pay Certificateholders.

275.    As such, Countrywide Servicing failed to observe or perform in a material respect the covenants and/or agreements on its part contained in the PSAs, thus constituting a continuing Event of Default, as defined by § 7.01(ii) of the PSAs.  (*See* Exhibit "31" at § 7.01(ii)).

276.    Further, Countrywide Servicing breached the PSAs by failing to supply BNYMwith complete and accurate information regarding the mortgage loans constituting the pool collateralizing the Certificates, as outlined in Schedule S-VI-1 of the PSAs.  (*See* Exhibit "31" at S-VI-1)

277.    BNYM, as Trustee, knew or should have known that Countrywide Servicing: (1) failed to enforce Countrywide Home's obligations under the PSAs; (2) failed to use reasonable efforts to foreclose upon defaulted mortgage loans; and (3) failed to supply it with complete and accurate information regarding the mortgage loans.

278.    In addition, assuming that BNYM made the requisite timely demands on Countrywide Servicing, BNYM knew or should have known that Countrywide Servicing's inactions continued in response to BNYM's demands, thereby creating an Event of Default under § 7.01(ii) of the PSAs.  Alternatively, if BNYM failed to make the requisite demands on Countrywide Servicing, then BNYM failed in meeting its duties to Certificateholders.

279.    BNYM, as Trustee, knew or should have known that under § 3.01 of the Pooling and Servicing Agreements, Countrywide Servicing, as Servicer, was obligated to "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan …"  (*See* Exhibit "31" at § 3.01).

280.    Further, BNYM, as Trustee, knew or should have known that Countrywide Servicing, being in such a position to represent and protect the interests of the Trust Fund, would cause harm to the Trust as a result of its failure to satisfy its obligations under § 2.03 of the PSAs.

281.    Notwithstanding, BNYM failed to provide information to Certificateholders that BNYM was permitted to request from Countrywide Servicing and which Countrywide Servicing

was obligated to provide, and further failed to make demands that Countrywide Servicing perform its contractual servicing obligations with regard to PMI claims or demands that Countrywide Home, as Seller, repurchase loans, all of which are basic non-discretionary, ministerial tasks.

282.    At no time after BANKERS's and the other Certificateholders purchases of the Certificates, did anyone amend the PSAs or the Prospectus Supplements for the subject Trusts to do away with the obligations to pursue (a) repurchase, cure, or substitution of mortgage loans; or (b) PMI claims or the wrongful denial of PMI claims.

283.    Further, BNYM, as Trustee, had an obligation to act fairly and honestly toward all Certificateholders because BNYM agreed to be placed in a position of trust in which it was required to manage the Certificates for the benefit of the Certificateholders.

284.    After the Certificates were sold, including BANKERS's purchase of the above referenced Certificates, BNYM, as Trustee, failed to notify S&P and/or Fitch and Moody's, sources commonly relied on in the industry by investors in making decisions to maintain particular securities in one's portfolio and for ratings on various securities, including the Certificates at issue in this case, that:

      a.    There were numerous loan delinquencies and defaults in the pool;

      b.    Countrywide Servicing had not enforced against Countrywide Home, as Seller, its rights under the PSAs to prevent the impairment of the collateral and its concomitant diminution in value;

      c.    The PMI insurer had declined to cover many of the mortgage loans in the pool on the basis, amongst other things, that the loans had been procured through the use of fraud;

       d.      Neither the Trustee nor Servicer had sought to enforce their rights against the PMI insurer for denying insurance coverage for many of the delinquent mortgage loans; or

       e.      That an Event of Default as a result of sub-paragraphs (a) through (d), above.

285.    Notwithstanding the extensive safeguards and collateral support, as explained above, years after BANKERS's and others' purchases of subordinate Certificates in the subject Trusts, those Certificates suffered sudden and drastic downgrades from S&P and/or Fitch and Moody's.[17]

286.    Had the Certificates been earlier and gradually downgraded to reflect the problems with loan delinquencies and the improper administration of the insurance and other credit enhancements, after the purchase, BANKERS and other Certificateholders would have sold the Certificates before their value further decreased.

287.    BNYM knew or should have known that the ratings of the Certificates at issue were falsely maintained.

288.    Further, as Trustee, BNYM had the ability to prevent the harm alleged herein to BANKERS and other Certificateholders by accurately reporting on the state of the mortgage loans comprising the pools in question.

289.    This would have resulted in Certificateholders being notified about the true state of affairs concerning the Trusts' assets underlying their investments in order to take action in

---

[17] As reflected in the chart in Paragraph 180, *supra*, currently, the Certificates have the following credit ratings: 2005-16: S&P – CCC; Moody's – Caa2; 2006-11: S&P – CCC; Moody's – Ca; 2005-J13: S&P – CCC; Moody's – Ca; 2005-73CB: S&P – CCC; Moody's – Caa2; 2007-21CB: S&P – CCC; Moody's – C; 2006-6CB: S&P – CC; Moody's – Caa3; 2006-8T1: S&P – CC; Moody's – Caa3; 2005-11: S&P – B; Moody's – B2; 2005-13: S&P – B; Moody's – Caa1; 2005-12: S&P – A-; Moody's – B2; and 2005-21: Fitch – CCC; Moody's – Caa1.

response to rating changes to the Certificates and sell them in advance of any risk that they would be further downgraded to an unmarketable rating, or to have put pressure on BNYM to take appropriate and necessary actions to protect Certificateholders' interests by making demands upon Countrywide Home, as Seller, and Countrywide Servicing, as Servicer.

290.   Instead, BNYM turned a blind eye to Countrywide Home's and Countrywide Servicing's breaches of the obligations required of them by the Prospectuses, Prospectus Supplements, and PSAs.

291.   Rather than make statements regarding the declining quality of the collateral Countrywide Home, Countrywide Servicing, and BNYM created in breach of their obligations to Certificateholders, or curing defaults attributed to the mortgages in the mortgage pools, BNYM sat silent while BANKERS and other Certificateholders relied on the Certificates' original Offering Documents, the incorrect information credit rating agencies like S&P and Moody's published (also in reliance on BNYM's misinformation), and the incomplete and inaccurate monthly statements issued to Certificateholders.

292.   As a result of BNYM's breaches, the financial obligations owed to BANKERS and other Certificateholders, including payment of principal and interest was delayed having not been paid according to the anticipated schedule, thereby causing harm to BANKERS and other Certificateholders.  Had BNYM met its obligations, such payments would have been made on a timely basis.  Further, Certificateholders owning classes of Certificates subordinate to those owned by BANKERS have seen their interests get wiped out by BNYM's conduct.

293.   Pursuant to Fed. R. Civ. P. 23.1(b)(3), BANKERS states that providing written notice to BNYM to perform its obligations under the PSAs, including BNYM making demand on Countrywide Home or Countrywide Servicing to perform their obligations under the PSAs,

pursuant to § 10.08 of the PSAs, would be futile given that BNYM was involved in the conduct underlying the claims in this Complaint. In addition, given that the demand requirement is inextricably intertwined with the remaining requirements of § 10.08, BANKERS is excused from complying with all elements of § 10.08 of related to its claims against BNYM.

294.   In addition, pursuant to Fed. R. Civ. P. 23.1(b)(1) and (2), BANKERS states that it was a Certificateholder at all times material to the transactions complained of herein, and that this action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

295.   Pursuant to Fed. R. Civ. P. 23.1, this Derivative Complaint is verified by virtue of BANKERS's verification at the end of this pleading.

296.   All conditions precedent to the institution of this action have occurred, have been excused, are futile or impossible, are satisfied, or have been otherwise waived.

297.   BANKERS has retained the undersigned counsel to prosecute the claims in this Derivative Complaint and has agreed to pay the firm its reasonable attorney's fee and costs incurred with the prosecution of the Derivative Complaint.

298.   Under New York law, BANKERS is entitled to recover its reasonable attorney's fees and costs upon being successful in the prosecution of the derivative claims asserted in this Derivative Complaint.

## COUNT VII

### Breach of Contract Against BNYM
(Information to Credit Rating Agencies)

299.   BANKERS repeats and realleges each and every allegation contained in Paragraphs 251 through 298 above, with the same force and effect as if set forth fully herein.

300.   Under § 4.06 of the PSAs, BNYM, as Trustee, was required to provide monthly statements to credit rating agencies regarding various aspects of the mortgage loans and the

Certificates, including but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.  (*See* Exhibit "31" at § 4.06).

301.    Under § 10.05 of the PSAs, BNYM, as Trustee, was required to provide to credit rating agencies notice of (1) any material change or amendment under the PSAs; (2) the occurrence of any Event of Default that has not been cured; (3) the resignation or termination of the Master Servicer or the Trustee and the appointment of any successor; (4) the repurchase or substitution of mortgage loans pursuant to Section 2.03; (5) the final payment to Certificateholders; and (6) any rating action involving the long-term credit rating of Countrywide.  (*See* Exhibit "31" at § 10.05).

302.    Under the PSAs, BNYM was required to examine the statements provided to it by Countrywide Servicing to determine whether they were in conformity with the requirements of the PSAs.  (*See* Exhibit "31" at § 8.01).

303.    BNYM breached § 8.01 of the PSAs by failing to examine the statements provided to it by Countrywide Servicing, as Servicer, to determine whether they were in conformity with the requirements of the PSAs.

304.    At all material times, BNYM breached § 4.06 by failing to by failing to provide full and accurate information regarding various aspects of the mortgage loans and the Certificates, including, but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.

305.    At all material times, BNYM breached § 10.05 by failing to disclose to the credit rating agencies notice of (1) any material change or amendment under the PSAs; (2) the

occurrence of any Event of Default that has not been cured; (3) the resignation or termination of the Master Servicer or the Trustee and the appointment of any successor; (4) the repurchase or substitution of mortgage loans pursuant to Section 2.03; (5) the final payment to Certificateholders; and (6) any rating action involving the long-term credit rating of Countrywide.

306.    As a result of BNYM's failure to examine the statements provided to it by Countrywide Servicing, at all times material, BNYM breached §§ 4.06 and 10.05 by failing to provide full and accurate information regarding various aspects of the mortgage loans and the Certificates, including, but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.  In doing so, BNYM failed to avoid losses to the Trusts that were the result of the breaches of Countrywide Home.

307.    BNYM's breaches of §§ 4.06 and 10.05 have monetarily damages each of the subject Trusts and, in turn, BANKERS and other Certificateholders because no one with an interest in the Certificates could know the accurate state of the Trust assets so as to prompt demand on BNYM.

308.    Had BNYM provided complete and conforming information to the rating agencies, earlier and less drastic downgrades in ratings would have signaled to Certificateholders that there were problems with the Trusts' performance.

309.    In addition, had BYNM reported the true state of the mortgage loans underlying the Trusts, it would have also prevented the principal amounts of various classes of bonds from being wiped out, as losses recognized by the Trusts, have foreclosed repayment of principal and interest to subordinate bondholders.

310.    BANKERS, on behalf of all Cerftificateholders, is entitled to a judgment for damages against BNYM requiring payment to the Trusts for distribution to the holders of the classes of Certificates harmed by BNYM's breaches.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)    damages to the Trusts caused by BNYM's breach of contract, plus pre-judgment and post-judgment interest;

(b)    attorney's fees and costs for the successful prosecution of this derivative claim; and

(c)    such other and further relief as this Court considers appropriate.

## COUNT VIII

### Breach of Contract Against BNYM
(Information to Certificateholders)

311.    BANKERS repeats and realleges each and every allegation contained in Paragraphs 251 through 298, with the same force and effect as if set forth fully herein.

312.    Under § 4.06 of the PSAs, BNYM was required to provide monthly statements to Certificateholders regarding various aspects of the mortgage loans and the Certificates, including but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.  (*See* Exhibit "31" at § 4.06).

313.    Under the PSAs, BNYM was required to examine the statements provided to it by Countrywide Servicing to determine whether they were in conformity with the requirements of the PSAs.  (*See* Exhibit "31" at § 8.01).

314.    BNYM breached § 8.01 of the PSAs by failing to examine the statements

provided to it by Countrywide Servicing, as Servicer, to determine whether they were in conformity with the requirements of the PSAs.  In doing so, BNYM failed to avoid losses to the Trusts that were the result of the breaches of Countrywide Home.

315.   As a result of BNYM's failure to examine the statements provided to it by Countrywide Servicing, at all times material, BNYM breached § 4.06 by failing to provide full and accurate information regarding various aspects of the mortgage loans and the Certificates, including, but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.

316.   BNYM's breaches of § 4.06 has monetarily damaged each of the subject Trusts and, in turn, BANKERS and other Certificateholders because no one with an interest in the Certificates could know the accurate state of the Trust assets so as to prompt demand on BNYM.

317.   Had BNYM provided complete and conforming information to Certificateholders the statements would have signaled to Certificateholders that there were problems with the Trusts' performance.  This would have prompted Certificateholders to make demands on BNYM at an earlier point in time, which would have resulted in the preservation of the Trust assets.

318.   Substitutions and repurchases of defaulted mortgage loans would have occurred on a more timely basis and insurance claims would have been properly submitted so as to prevent the wrongful charge of losses to the Trusts' over-collateralization accounts.  This would have resulted in payments of principal and interest being more timely paid, and thus, Certificateholders receiving the full benefit of their ownership in the Trusts.

319.   In addition, had BNYM reported the true state of the mortgage loans underlying the Trusts, it would have also prevented the principal amounts of various classes of bonds from being wiped out, as losses recognized by the Trusts, have foreclosed repayment of principal and

interest to subordinate bondholders.

320.   BANKERS, on behalf of all Certificateholders, is entitled to a judgment for damages against BNYM requiring payment to the Trusts for distribution to the holders of the classes of Certificates harmed by BNYM's breaches.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)   damages to the Trusts caused by BNYM's breach of contract, plus pre-judgment and post-judgment interest;

(b)   attorney's fees and costs for the successful prosecution of this derivative claim; and

(c)   such other further relief as this Court considers appropriate.

## COUNT IX

### Breach of Contract Against BNYM
(Failure to Perform Basic, Non-Discretionary, Ministerial Tasks)

321.   BANKERS repeats and realleges each and every allegation contained in Paragraphs 251 through 298, with the same force and effect as if set forth fully herein.

322.   As Trustee, BNYM had a duty to act on behalf of BANKERS and other Certificateholders without regard to the interests of any other party.

323.   BNYM, as Trustee, was in a unique position to enforce the PSAs and to prevent harm to BANKERS and other Certificateholders.

324.   BNYM had a duty to make full disclosure and to act fairly and honestly to and toward all Certificateholders.

325.   BNYM was responsible for, and obligated to disclose to Certificateholders, information regarding the mortgage loans and the Certificates, as outlined in § 4.06 of the PSAs,

including, but not limited to, the number and aggregate principal amounts of both delinquent mortgages and mortgages in foreclosure, and insurance proceeds relating to defaulted mortgages.

326.   BNYM had a duty to seek data from Countrywide Services as to the number of and status of mortgage insurance claims, particularly claim denials, and particularly in light of BANKERS' repeated requests to BNYM to provide this information coupled with the diminishing credit support.

327.   BNYM breached its duty to BANKERS and other Certificateholders to request Countrywide Services to provide necessary data regarding insurance claims and to insist that Countrywide Services and the mortgage guaranty insurer process appropriate mortgage insurance claims.

328.   BNYM failed to act in the interests of its beneficiaries and instead stood idly by, which contributed materially to the losses suffered by Certificateholders.

329.   BNYM breached its additional duty to BANKERS and other Certificateholders to request that Countrywide Services enforce the obligations of Countrywide Home, as Seller, under the PSAs.

330.   Had BANKERS and the other affected Certificateholders known that BNYM would not properly perform, and was not properly performing, its obligations as Trustee, BANKERS and other Certificateholders would have acted to make demands on BNYM in an effort to avoid losses to the Trusts, which have occurred, thereby creating damages for Certificateholders.

331.   BANKERS is aware of § 10.08 of the PSAs; however, in light of the fact that BNYM is involved in the underlying conduct at issue and that BNYM would be required to sue itself, any demand by BANKERS on behalf of all affected Certificateholders would be futile.

332.    BNYM's breaches of fiduciary duty have monetarily damaged each of the subject Trusts and, in turn, BANKERS and other Certificateholders because no one with an interest in the Certificates could know the accurate state of the Trust assets so as to make prompt demand on BNYM.

333.    Had BNYM provided accurate information to Certificateholders the statements would have signaled to Certificateholders that there were problems with the Trusts' performance. This would have prompted Certificateholders to make demands on BNYM at an earlier point in time, which would have resulted in the preservation of the Trust assets.

334.    Substitutions and repurchases of defaulted mortgage loans would have occurred on a more timely basis and insurance claims would have been properly submitted so as to prevent the wrongful charge of losses to the Trusts' over-collateralization accounts.  This would have resulted in payments of principal and interest being more timely paid, and thus, Certificateholders receiving the full benefit of their ownership in the Trusts.

335.    In addition, had BNYM reported the true state of the mortgage loans underlying the Trusts, it would have also prevented the principal amounts of various classes of bonds from being wiped out, as losses recognized by the Trusts, have foreclosed repayment of principal and interest to subordinate bondholders.

336.    BANKERS, on behalf of all Certificateholders, is entitled to a judgment for damages against BNYM requiring payment to the Trusts for distribution to the holders of the classes of Certificates harmed by BNYM's breaches.

WHEREFORE, BANKERS respectfully requests that this Court enter a judgment in its favor for:

(a)    damages to the Trusts caused by BNYM's breach of fiduciary duty, plus pre-

judgment and post-judgment interest;

(b)   attorney's fees and costs for the successful prosecution of this derivative claim; and

(c)   such other and further relief as this Court considers appropriate.

## DEMAND FOR JURY TRIAL

As to all Causes of Action, where applicable, Plaintiffs demand a trial by jury.

Dated: July 21, 2011                                    Respectfully submitted,

/s/ *Dale Ledbetter*                                      /s/ *Brian R. Kopelowitz*
Dale Ledbetter, Esq.                                   Brian R. Kopelowitz, Esq.
Florida Bar No. 094811                                 Florida Bar No. 097225
dledbetter@dlsecuritieslaw.com                         kopelowitz@kolawyers.com
**Ledbetter & Associates, P.A.**                        Jason H. Alperstein, Esq.
333 N. New River Drive E.                               Florida Bar No. 0064205
Suite 1500                                             alperstein@kolawyers.com
Fort Lauderdale, FL 33301                              **KOPELOWITZ OSTROW**
Telephone: (954) 302-7698                              **Ferguson Weiselberg Keechl**
Facsimile: (954) 622-9107                              200 S.W. First Avenue, 12th Floor
                                                       Fort Lauderdale, FL 33301
*Counsel for Plaintiffs*                                Telephone: (954) 525-4100
                                                       Facsimile: (954) 525-4300
-and-
                                                       *Counsel for Plaintiffs*

100

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

BANKERS INSURANCE COMPANY, *et al.*,          )
                                              )
          Plaintiffs,                         )
vs.                                           )
                                              )
COUNTRYWIDE FINANCIAL                         )          Case No. _____
CORPORATION, *et al.*,                        )
                                              )
          Defendants.                         )
_____/

## VERIFICATION TO DERIVATIVE COMPLAINT

I, William M. Gray, II, in my capacity as Vice President of Investments for Plaintiffs, Bankers Insurance Company, Bankers Life Insurance Company, First Community Insurance Company, and Bankers Specialty Insurance Company, and in accordance with Federal Rule of Civil Procedure 23.1, state that I have read the Verified Certificateholder Derivative Complaint ("Derivative Complaint") to which this Verification is attached.  Based on the information available to the Plaintiffs at the time of the filing of the Derivative Complaint, I verify under penalty of perjury under the laws of the United States of America that the factual allegations contained in the Derivative Complaint are true and correct.

_____

**William M. Gray, II,**
as Vice President of Bankers Insurance
Company, Bankers Life Insurance
Company, First Community Insurance
Company, and Bankers Specialty Insurance
Company