PSA CWL 06-13.txt

```
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<FILENAME>efc6-1971_5903346exh41.txt
<TEXT>
```

Exhibit 4.1

EXECUTION COPY

===============================================================================

CWABS, INC.,
Depositor

COUNTRYWIDE HOME LOANS, INC.,
Seller

PARK MONACO INC.,
Seller

PARK SIENNA LLC,
Seller

COUNTRYWIDE HOME LOANS SERVICING LP,
Master Servicer

and

THE BANK OF NEW YORK,
Trustee

---------------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of June 1, 2006

---------------------------------------

ASSET-BACKED CERTIFICATES, SERIES 2006-10

```
<PAGE>

<TABLE>
<CAPTION>
```

Table of Contents
-----------------

Page

----

Page 1

PSA CWL 06-13.txt

ARTICLE I.
DEFINITIONS

&lt;S&gt;                &lt;C&gt;
                        &lt;C&gt;

Section 1.01     Defined Terms..............................................................................12
Section 1.02     Certain Interpretive Provisions...........................................................62

ARTICLE II.
CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND
WARRANTIES

Section 2.01     Conveyance of Mortgage Loans................................................62
Section 2.02     Acceptance by Trustee of the Mortgage Loans................................70
Section 2.03     Representations, Warranties and Covenants of the Master Servicer and the Sellers..............76
Section 2.04     Representations and Warranties of the Depositor...........................94
Section 2.05     Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases..............96
Section 2.06     Authentication and Delivery of Certificates.................................96
Section 2.07     Covenants of the Master Servicer...........................................97

ARTICLE III.
ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01     Master Servicer to Service Mortgage Loans................................97
Section 3.02     Subservicing; Enforcement of the Obligations of Master Servicer.............................99
Section 3.03     Rights of the Depositor, the Sellers, the Certificateholders, the NIM Insurer and
                 the Trustee in Respect of the Master Servicer.................................99
Section 3.04     Trustee to Act as Master Servicer.........................................100
Section 3.05     Collection of Mortgage Loan Payments; Certificate Account; Distribution Account;
                 Pre-Funding Account; Seller Shortfall Interest Requirement...................101
Section 3.06     Collection of Taxes, Assessments and Similar Items; Escrow Accounts.........................104
Section 3.07     Access to Certain Documentation and Information Regarding the Mortgage Loans...................104
Section 3.08     Permitted Withdrawals from the Certificate Account, Distribution Account,
                 Carryover Reserve Fund and the Principal Reserve Fund.......................105
Section 3.09     [Reserved]..................................................................108
Section 3.10     Maintenance of Hazard Insurance...........................................108
Section 3.11     Enforcement of Due-On-Sale Clauses; Assumption Agreements...................109

PSA CWL 06-13.txt

Section 3.12      Realization Upon Defaulted Mortgage Loans; Determination of Excess Proceeds
                  and Realized Losses; Repurchase of Certain Mortgage Loans.........................................110
Section 3.13      Trustee to Cooperate; Release of Mortgage Files.........................................113
Section 3.14      Documents, Records and Funds in Possession of Master Servicer to be Held for the Trustee......114
Section 3.15      Servicing Compensation.......................................................115

                                                                    i

<PAGE>

Section 3.16      Access to Certain Documentation.....................................................115
Section 3.17      Annual Statement as to Compliance.....................................................116
Section 3.18      Prepayment Charges.....................................................................116
Section 3.19      Swap Contract...........................................................................117

                                         ARTICLE IV.
                         DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER

Section 4.01      Advances; Remittance Reports....................................................119
Section 4.02      Reduction of Servicing Compensation in Connection with Prepayment Interest Shortfalls.........121
Section 4.03      [Reserved]...................................................121
Section 4.04      Distributions..................................................121
Section 4.05      Monthly Statements to Certificateholders.................................................132
Section 4.06      [Reserved]...................................................133
Section 4.07      Carryover Reserve Fund..............................................................133
Section 4.08      Credit Comeback Excess Account.................................................134
Section 4.09      Swap Trust and Swap Account..................................................136

                                         ARTICLE V.
                                       THE CERTIFICATES

Section 5.01      The Certificates..................................................................136
Section 5.02      Certificate Register; Registration of Transfer and Exchange of Certificates....................138
Section 5.03      Mutilated, Destroyed, Lost or Stolen

                                       Page 3

PSA CWL 06-13.txt

Certificates.........................................142
Section 5.04      Persons Deemed
Owners............................................................................142
Section 5.05      Access to List of Certificateholders' Names and
Addresses........................143
Section 5.06      Book-Entry
Certificates................................................................1
43
Section 5.07      Notices to
Depository................................................................1
44
Section 5.08      Definitive
Certificates..............................................................1
44
Section 5.09      Maintenance of Office or
Agency...........................................................145

ARTICLE VI.
THE DEPOSITOR, THE MASTER SERVICER AND THE

SELLERS

Section 6.01      Respective Liabilities of the Depositor, the Master Servicer and
the Sellers..................145
Section 6.02      Merger or Consolidation of the Depositor, the Master Servicer or
the Sellers..................145
Section 6.03      Limitation on Liability of the Depositor, the Sellers, the Master
Servicer, the NIM Insurer and
Others.............................................................................
......146
Section 6.04      Limitation on Resignation of Master
Servicer...........................................146
Section 6.05      Errors and Omissions Insurance; Fidelity
Bonds..............................................147

ARTICLE VII.
DEFAULT; TERMINATION OF MASTER SERVICER

Section 7.01      Events of
Default.....................................................................
147

ii

<PAGE>

Section 7.02      Trustee to Act; Appointment of
Successor..........................................149
Section 7.03      Notification to
Certificateholders..............................................................151

ARTICLE VIII.
CONCERNING THE TRUSTEE

Section 8.01      Duties of
Trustee......................................................................
151
Section 8.02      Certain Matters Affecting the
Trustee...........................................153
Section 8.03      Trustee Not Liable for Mortgage

PSA CWL 06-13.txt

Loans......................................................154
Section 8.04      Trustee May Own
Certificates.......................................................154
Section 8.05      Master Servicer to Pay Trustee's Fees and
Expenses.................................154
Section 8.06      Eligibility Requirements for
Trustee...........................................155
Section 8.07      Resignation and Removal of
Trustee.............................................155
Section 8.08      Successor
Trustee....................................................
157
Section 8.09      Merger or Consolidation of
Trustee.............................................157
Section 8.10      Appointment of Co-Trustee or Separate
Trustee.........................157
Section 8.11      Tax
Matters................................................
......159
Section 8.12      Access to Records of the
Trustee.............................................162
Section 8.13      Suits for
Enforcement..............................................
162

ARTICLE IX.
TERMINATION

Section 9.01      Termination upon Liquidation or Repurchase of all Mortgage
Loans...............................162
Section 9.02      Final Distribution on the
Certificates.......................................163
Section 9.03      Additional Termination
Requirements.........................................165

ARTICLE X.
MISCELLANEOUS PROVISIONS

Section 10.01
Amendment.................................................
..........166
Section 10.02      Recordation of Agreement;
Counterparts.......................................167
Section 10.03      Governing
Law.......................................................
168
Section 10.04      Intention of
Parties...........................................168
Section 10.05
Notices..................................................
..........169
Section 10.06      Severability of
Provisions........................................171
Section 10.07
Assignment................................................
..........171
Section 10.08      Limitation on Rights of
Certificateholders...................................171
Section 10.09      Inspection and Audit
Rights...............................................172
Section 10.10      Certificates Nonassessable and Fully
Paid...................................172
Section 10.11      Rights of NIM

PSA CWL 06-13.txt

Insurer...............................................................................172

ARTICLE XI.
EXCHANGE ACT REPORTING

Section 11.01    Filing
Obligations.........................................................................
...173
Section 11.02    Form 10-D
Filings............................................................................
174
Section 11.03    Form 8-K
Filings............................................................................
.175
Section 11.04    Form 10-K
Filings............................................................................
175

iii

<PAGE>

Section 11.05    Sarbanes-Oxley
Certification......................................................................176
Section 11.06    Form 15
Filing.............................................................................
..176
Section 11.07    Report on Assessment of Compliance and
Attestation.........................................176
Section 11.08    Use of Subservicers and
Subcontractors....................................................................178
Section 11.09
Amendments..........................................................................
..........179
Section 11.10    Reconciliation of
Accounts...........................................................................179

</TABLE>

Exhibits

EXHIBIT A                    Forms of Certificates
    EXHIBIT A-1              Form of Class 1-AF-1 Certificate
    EXHIBIT A-2              Form of Class 1-AF-2 Certificate
    EXHIBIT A-3              Form of Class 1-AF-3 Certificate
    EXHIBIT A-4              Form of Class 1-AF-4 Certificate
    EXHIBIT A-5              Form of Class 1-AF-5 Certificate
    EXHIBIT A-6              Form of Class 1-AF-6 Certificate
    EXHIBIT A-7              Form of Class MF-1 Certificate
    EXHIBIT A-8              Form of Class MF-2 Certificate
    EXHIBIT A-9              Form of Class MF-3 Certificate
    EXHIBIT A-10             Form of Class MF-4 Certificate
    EXHIBIT A-11             Form of Class MF-5 Certificate
    EXHIBIT A-12             Form of Class MF-6 Certificate
    EXHIBIT A-13             Form of Class MF-7 Certificate
    EXHIBIT A-14             Form of Class MF-8 Certificate
    EXHIBIT A-15             Form of Class BF Certificate
    EXHIBIT A-16             Form of Class 2-AV Certificate
    EXHIBIT A-17             Form of Class 3-AV-1 Certificate
    EXHIBIT A-18             Form of Class 3-AV-2 Certificate
    EXHIBIT A-19             Form of Class 3-AV-3 Certificate

PSA CWL 06-13.txt

| | | |
|---|---|---|
| EXHIBIT A-20 | Form of Class 3-AV-4 Certificate | |
| EXHIBIT A-21 | Form of Class MV-1 Certificate | |
| EXHIBIT A-22 | Form of Class MV-2 Certificate | |
| EXHIBIT A-23 | Form of Class MV-3 Certificate | |
| EXHIBIT A-24 | Form of Class MV-4 Certificate | |
| EXHIBIT A-25 | Form of Class MV-5 Certificate | |
| EXHIBIT A-26 | Form of Class MV-6 Certificate | |
| EXHIBIT A-27 | Form of Class MV-7 Certificate | |
| EXHIBIT A-28 | Form of Class MV-8 Certificate | |
| EXHIBIT A-29 | Form of Class MV-9 Certificate | |
| EXHIBIT A-30 | Form of Class BV Certificate | |
| EXHIBIT B | Forms of Class P Certificates | |
| EXHIBIT B-1 | Form of Class PF Certificate | |
| EXHIBIT B-2 | Form of Class PV Certificate | |
| EXHIBIT C | Forms of Class C Certificates | |
| EXHIBIT C-1 | Form of Class CF Certificate | |
| EXHIBIT C-2 | Form of Class CV Certificate | |
| EXHIBIT D | Form of Class A-R Certificate | |
| EXHIBIT E | Form of Tax Matters Person Certificate | |

iv

<PAGE>

| | | |
|---|---|---|
| EXHIBIT F | Mortgage Loan Schedule | |
| EXHIBIT F-1 | List of Mortgage Loans | |
| EXHIBIT F-2 | Mortgage Loans for which All or a Portion of a Related Mortgage File is not Delivered to the Trustee on or prior to the Closing Date | |
| EXHIBIT G | Forms of Certification of Trustee | |
| EXHIBIT G-1 | Form of Initial Certification of Trustee (Initial Mortgage Loans) | |
| EXHIBIT G-2 | Form of Interim Certification of Trustee | |
| EXHIBIT G-3 | Form of Delay Delivery Certification | |
| EXHIBIT G-4 | Form of Initial Certification of Trustee (Subsequent Mortgage Loans) | |
| EXHIBIT H | Form of Final Certification of Trustee | |
| EXHIBIT I | Transfer Affidavit for Class A-R Certificates | |
| EXHIBIT J-1 | Form of Transferor Certificate for Class A-R Certificates | |
| EXHIBIT J-2 | Form of Transferor Certificate for Private Certificates | |
| EXHIBIT K | Form of Investment Letter (Non-Rule 144A) | |
| EXHIBIT L | Form of Rule 144A Letter | |
| EXHIBIT M | Form of Request for Document Release | |
| EXHIBIT N | Form of Request for File Release | |
| EXHIBIT O | Copy of Depository Agreement | |
| EXHIBIT P | Form of Subsequent Transfer Agreement | |
| EXHIBIT Q | [Reserved] | |
| EXHIBIT R | [Reserved] | |
| EXHIBIT S-1 | [Reserved] | |
| EXHIBIT S-2 | [Reserved] | |
| EXHIBIT T | Officer's Certificate with respect to Prepayments | |
| EXHIBIT U | Form of Swap Contract | |
| EXHIBIT V-1 | Form of Swap Contract Assignment Agreement | |
| EXHIBIT V-2 | Form of Swap Contract Administration Agreement | |
| EXHIBIT W | Form of Monthly Statement | |
| EXHIBIT X-1 | Form of Performance Certification (Subservicer) | |
| EXHIBIT X-2 | Form of Performance Certification (Trustee) | |
| EXHIBIT Y | Form of Servicing Criteria to be Addressed in Assessment of Compliance Statement | |
| EXHIBIT Z | List of Item 1119 Parties | |

PSA CWL 06-13.txt

| EXHIBIT AA | Form of Sarbanes-Oxley Certification (Replacement Master Servicer) |
| SCHEDULE I | Prepayment Charge Schedule and Prepayment Charge Summary |
| SCHEDULE II | Collateral Schedule |

v

<PAGE>

POOLING AND SERVICING AGREEMENT, dated as of June 1, 2006, by and among CWABS, INC., a Delaware corporation, as depositor (the "Depositor"), COUNTRYWIDE HOME LOANS, INC., a New York corporation, as seller ("CHL" or a "Seller"), PARK MONACO INC., a Delaware corporation, as a seller ("Park Monaco" or a "Seller"), PARK SIENNA LLC, a Delaware limited liability company, as a seller ("Park Sienna" or a "Seller," and together with CHL and Park Monaco, the "Sellers"), COUNTRYWIDE HOME LOANS SERVICING LP, a Texas limited partnership, as master servicer (the "Master Servicer"), and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the "Trustee").

PRELIMINARY STATEMENT

The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. The Trust Fund (excluding the Credit Comeback Excess Account, the Carryover Reserve Fund and the assets held in the Pre-Funding Account) for federal income tax purposes will consist of three REMICs (the "Swap-IO REMIC," the "Strip REMIC" and the "Master REMIC"). Each Certificate, other than the Class A-R Certificate, will represent ownership of one or more regular interests in the Master REMIC for purposes of the REMIC Provisions. The Class A-R Certificate represents ownership of the sole class of residual interest in the Swap-IO REMIC, the Strip REMIC and the Master REMIC. The Master REMIC will hold as assets the several classes of uncertificated Strip REMIC Interests (other than the STR-A-R Interest). Each Strip REMIC Interest (other than the STR-A-R Interest) is hereby designated as a regular interest in the Strip REMIC. The Strip REMIC will hold as assets the several classes of uncertificated Swap-IO REMIC Interests (other than the SWR-A-R Interest). Each Swap-IO REMIC Interest (other than the SWR-A-R Interest) is hereby designated as a regular interest in the Swap-IO REMIC. The Swap-IO REMIC will hold as assets all property of the Trust Fund (excluding the Credit Comeback Excess Account, the Carryover Reserve Fund and the assets held in the Pre-Funding Account). The latest possible maturity date of all REMIC regular interests created in this Agreement shall be the Latest Possible Maturity Date.

None of the REMICs described herein shall hold any interest in the Swap Trust, Swap Contract or Swap Account.

SWAP-IO REMIC:

The Swap-IO REMIC Interests will have the principal balances and pass-through rates as set forth below.

| Swap-IO REMIC Interest | Initial Principal Balance | Pass-Through Rate |
| --- | --- | --- |
| SWR-1F | (1) | (2) |
| SWR-PF | $      100.00 | (3) |
| SWR-1A | $  1,430,236.50 | (4) |
| SWR-1B | $  1,430,236.50 | (5) |

Page 8

```
                              PSA CWL 06-13.txt
SWR-2A                    $     1,619,415.50                      (4)
SWR-2B                    $     1,619,415.50                      (5)
SWR-3A                    $     1,806,846.00                      (4)
```

<PAGE>

| Swap-IO REMIC Interest | Initial Principal Balance | Pass-Through Rate |
|------------------------|---------------------------|-------------------|
| SWR-1F                 | (1)                       | (2)               |
| SWR-PF                 | $           100.00        | (3)               |
| SWR-3B                 | $     1,806,846.00        | (5)               |
| SWR-4A                 | $     1,991,829.50        | (4)               |
| SWR-4B                 | $     1,991,829.50        | (5)               |
| SWR-5A                 | $     2,173,657.00        | (4)               |
| SWR-5B                 | $     2,173,657.00        | (5)               |
| SWR-6A                 | $     2,352,744.50        | (4)               |
| SWR-6B                 | $     2,352,744.50        | (5)               |
| SWR-7A                 | $     2,463,959.00        | (4)               |
| SWR-7B                 | $     2,463,959.00        | (5)               |
| SWR-8A                 | $     2,625,446.00        | (4)               |
| SWR-8B                 | $     2,625,446.00        | (5)               |
| SWR-9A                 | $     2,688,084.50        | (4)               |
| SWR-9B                 | $     2,688,084.50        | (5)               |
| SWR-10A                | $     2,861,776.50        | (4)               |
| SWR-10B                | $     2,861,776.50        | (5)               |
| SWR-11A                | $     3,027,811.50        | (4)               |
| SWR-11B                | $     3,027,811.50        | (5)               |
| SWR-12A                | $     3,185,361.00        | (4)               |
| SWR-12B                | $     3,185,361.00        | (5)               |
| SWR-13A                | $     3,274,184.00        | (4)               |
| SWR-13B                | $     3,274,184.00        | (5)               |
| SWR-14A                | $     3,400,813.00        | (4)               |
| SWR-14B                | $     3,400,813.00        | (5)               |
| SWR-15A                | $     3,517,695.00        | (4)               |
| SWR-15B                | $     3,517,695.00        | (5)               |
| SWR-16A                | $     3,624,352.50        | (4)               |
| SWR-16B                | $     3,624,352.50        | (5)               |
| SWR-17A                | $     3,720,342.00        | (4)               |
| SWR-17B                | $     3,720,342.00        | (5)               |
| SWR-18A                | $     3,800,619.50        | (4)               |
| SWR-18B                | $     3,800,619.50        | (5)               |
| SWR-19A                | $     3,670,963.00        | (4)               |
| SWR-19B                | $     3,670,963.00        | (5)               |
| SWR-20A                | $     3,544,485.50        | (4)               |
| SWR-20B                | $     3,544,485.50        | (5)               |
| SWR-21A                | $     3,422,093.50        | (4)               |
| SWR-21B                | $     3,422,093.50        | (5)               |
| SWR-22A                | $     3,303,653.00        | (4)               |
| SWR-22B                | $     3,303,653.00        | (5)               |
| SWR-23A                | $     3,189,031.50        | (4)               |
| SWR-23B                | $     3,189,031.50        | (5)               |
| SWR-24A                | $     5,180,693.00        | (4)               |

2

<PAGE>

PSA CWL 06-13.txt

| Swap-IO REMIC Interest | Initial Principal Balance | Pass-Through Rate |
|---|---|---|
| SWR-1F | (1) | (2) |
| SWR-PF | $          100.00 | (3) |
| SWR-24B | $      5,180,693.00 | (5) |
| SWR-25A | $      4,799,651.50 | (4) |
| SWR-25B | $      4,799,651.50 | (5) |
| SWR-26A | $      4,518,450.00 | (4) |
| SWR-26B | $      4,518,450.00 | (5) |
| SWR-27A | $      4,253,655.50 | (4) |
| SWR-27B | $      4,253,655.50 | (5) |
| SWR-28A | $      4,004,272.00 | (4) |
| SWR-28B | $      4,004,272.00 | (5) |
| SWR-29A | $      3,769,369.00 | (4) |
| SWR-29B | $      3,769,369.00 | (5) |
| SWR-30A | $      2,329,897.00 | (4) |
| SWR-30B | $      2,329,897.00 | (5) |
| SWR-31A | $      2,242,821.00 | (4) |
| SWR-31B | $      2,242,821.00 | (5) |
| SWR-32A | $      2,158,596.50 | (4) |
| SWR-32B | $      2,158,596.50 | (5) |
| SWR-33A | $      2,077,129.00 | (4) |
| SWR-33B | $      2,077,129.00 | (5) |
| SWR-34A | $      1,998,319.00 | (4) |
| SWR-34B | $      1,998,319.00 | (5) |
| SWR-35A | $      1,974,500.50 | (4) |
| SWR-35B | $      1,974,500.50 | (5) |
| SWR-36A | $      1,954,941.00 | (4) |
| SWR-36B | $      1,954,941.00 | (5) |
| SWR-37A | $      1,867,757.50 | (4) |
| SWR-37B | $      1,867,757.50 | (5) |
| SWR-38A | $      1,795,089.00 | (4) |
| SWR-38B | $      1,795,089.00 | (5) |
| SWR-39A | $      1,724,933.50 | (4) |
| SWR-39B | $      1,724,933.50 | (5) |
| SWR-40A | $      1,657,192.50 | (4) |
| SWR-40B | $      1,657,192.50 | (5) |
| SWR-41A | $      1,561,393.00 | (4) |
| SWR-41B | $      1,561,393.00 | (5) |
| SWR-42A | $      1,524,320.00 | (4) |
| SWR-42B | $      1,524,320.00 | (5) |
| SWR-43A | $      1,464,475.00 | (4) |
| SWR-43B | $      1,464,475.00 | (5) |
| SWR-44A | $      1,408,474.00 | (4) |
| SWR-44B | $      1,408,474.00 | (5) |
| SWR-45A | $      1,354,208.50 | (4) |

3

<PAGE>

| Swap-IO REMIC Interest | Initial Principal Balance | Pass-Through Rate |
|---|---|---|
| SWR-1F | (1) | (2) |
| SWR-PF | $          100.00 | (3) |

PSA CWL 06-13.txt

| | | | |
|---|---|---|---|
| SWR-45B | $ | 1,354,208.50 | (5) |
| SWR-46A | $ | 1,301,622.50 | (4) |
| SWR-46B | $ | 1,301,622.50 | (5) |
| SWR-47A | $ | 1,255,080.00 | (4) |
| SWR-47B | $ | 1,255,080.00 | (5) |
| SWR-48A | $ | 1,227,373.50 | (4) |
| SWR-48B | $ | 1,227,373.50 | (5) |
| SWR-49A | $ | 1,221,601.50 | (4) |
| SWR-49B | $ | 1,221,601.50 | (5) |
| SWR-50A | $ | 1,175,176.50 | (4) |
| SWR-50B | $ | 1,175,176.50 | (5) |
| SWR-51A | $ | 1,130,190.50 | (4) |
| SWR-51B | $ | 1,130,190.50 | (5) |
| SWR-52A | $ | 1,086,595.50 | (4) |
| SWR-52B | $ | 1,086,595.50 | (5) |
| SWR-53A | $ | 1,045,984.00 | (4) |
| SWR-53B | $ | 1,045,984.00 | (5) |
| SWR-54A | $ | 1,009,851.00 | (4) |
| SWR-54B | $ | 1,009,851.00 | (5) |
| SWR-55A | $ | 974,895.50 | (4) |
| SWR-55B | $ | 974,895.50 | (5) |
| SWR-56A | $ | 941,121.50 | (4) |
| SWR-56B | $ | 941,121.50 | (5) |
| SWR-57A | $ | 908,405.50 | (4) |
| SWR-57B | $ | 908,405.50 | (5) |
| SWR-58A | $ | 876,779.50 | (4) |
| SWR-58B | $ | 876,779.50 | (5) |
| SWR-59A | $ | 846,504.00 | (4) |
| SWR-59B | $ | 846,504.00 | (5) |
| SWR-60A | $ | 28,801,711.00 | (4) |
| SWR-60B | $ | 28,801,711.00 | (5) |
| SWR-Support | (6) | | (7) |
| SWR-PV | $ | 100.00 | (8) |
| SW-A-R | (9) | | (9) |

--------------------------------------------

(1)   On the Closing Date and on each Distribution Date, following the
      allocation of Principal Amounts and Realized Losses in respect of the
      Group 1 Mortgage Loans, the principal balance in respect of the Class
      SWR-F1 Interest will equal the sum of (a) the principal balance of the
      Group 1 Mortgage Loans (as of the end of the related Due Period, reduced
      by principal prepayments received after the Due Period that are to be
      distributed on the Distribution Date related to the Due Period) and (b)
      the amount, if any, on deposit in the Pre-Funding Account in respect of
      Loan Group 1.


                                    4

<PAGE>


(2)   A rate equal to the Loan Group 1 Net Rate Cap. The "Loan Group 1 Net Rate
      Cap" means the weighted average of the Adjusted Net Mortgage Rates of all
      the Mortgage Loans in Loan Group 1.

(3)   On each Distribution Date the Class SWR-PF Interest is entitled to all
      Prepayment Charges collected with respect to the Fixed Rate Mortgage
      Loans. It pays no interest.

(4)   Prior to the 61st Distribution Date, a rate equal to twice the Adjustable
      Rate Loan Group Tax Cap less 10.920% per annum. On and after the 61st

PSA CWL 06-13.txt
Distribution Date a rate equal to the Adjustable Rate Loan Group Tax Cap.
The "Adjustable Rate Loan Group Tax Cap" means the weighted average of
the Adjusted Net Mortgage Rates of all the Mortgage Loans in Loan Group 2
and Loan Group 3.

(5)   Prior to the 61st Distribution Date, a rate equal to the lesser of (i)
      10.920% per annum and (ii) twice the Adjustable Rate Loan Group Tax Cap.
      On and after the 61st Distribution Date, a rate equal to the Adjustable
      Rate Loan Group Tax Cap.

(6)   On the Closing Date and on each Distribution Date, following the
      allocation of Principal Amounts and Realized Losses in respect of the
      Group 2 and Group 3 Mortgage Loans, the principal balance in respect of
      the SWR-Support Interest will equal the excess of (a) (i) the principal
      balance of the Group 2 and Group 3 Mortgage Loans (as of the end of the
      related Due Period, reduced by principal prepayments received after the
      Due Period that are to be distributed on the Distribution Date related to
      the Due Period) and (ii) the amount, if any, on deposit in the
      Pre-Funding Account in respect of Loan Group 2 and Loan Group 3 over (b)
      the principal balance in respect of the remaining Swap-IO REMIC Interests
      (other than the SWR-1F, SWR-PF, SWR-PV and the SWR-A-R Interests).

(7)   A rate equal to the Adjustable Rate Loan Group Tax Cap.

(8)   On each Distribution Date the Class SWR-PV Interest is entitled to all
      Prepayment Charges collected with respect to the Adjustable Rate Mortgage
      Loans. It pays no interest.

(9)   The Class SW-A-R Interest is the sole class of residual interest in the
      Swap-IO REMIC. It has no principal and pays no principal or interest.

      On each Distribution Date, the Interest Funds and the Principal
Distribution Amount payable with respect to the Group 1 Mortgage Loans shall
be payable in the following manner:

      (1) Interest. Interest is to be distributed with respect to the
      SWR-1F Interest at the rate described above.

      (2) Principal. Scheduled principal, prepayments and Realized Losses
      will be allocated between the SWR-PF Interest and the SWR-1F in the
      same way that scheduled principal, prepayments and Realized Losses
      Interest are allocated between the Class PF Certificate and all other
      certificates relating to Loan Group 1.

      (3) Prepayment Penalties. All Prepayment Charges related to the Fixed
      Rate Mortgage Loans will be allocated to the SWR-PF Interest.

5

<PAGE>

      On each Distribution Date, the Interest Funds and the Principal
Distribution Amount payable with respect to the Group 2 and Group 3 Mortgage
Loans shall be payable in the following manner:

      (1) Interest. Interest is to be distributed with respect to the Class
      SWR-1A through Class SWR-60B Interests and the Class SWR-Support
      Interests at the rate, or according to the formulas, described above.

      (2) Principal. Scheduled principal, prepayments and Realized
Page 12

PSA CWL 06-13.txt

Losses will be allocated first, to the SWR-Support Interest and second, to the numbered classes (Class SWR-1A through Class SWR-60B) sequentially (from lowest to highest). Amounts so allocated to a numbered class (Class SWR-1A through Class SWR-60B ) shall be further allocated among the "A" and "B" components of such numbered class pro-rata until the entire class is reduced to zero.

(3) Prepayment Penalties. All Prepayment Charges related to the Adjustable Rate Mortgage Loans shall be allocated to the SWR-PV Interest.

STRIP REMIC:

The Strip REMIC Regular Interests will have the principal balances, pass-through rates and Corresponding Classes of Certificates as set forth in the following table:

<TABLE>
<CAPTION>

| Corresponding Class of Strip REMIC Interest Certificates | Initial Principal Balance | Pass-Through Rate |
|---|---|---|
| <S> | <C> | <C> |
| <C> | | |
| STR-1-AF-1.................... 1-AF-1 | (1) | (2) |
| STR-1-AF-2.................... 1-AF-2 | (1) | (2) |
| STR-1-AF-3.................... 1-AF-3 | (1) | (2) |
| STR-1-AF-4.................... 1-AF-4 | (1) | (2) |
| STR-1-AF-5.................... 1-AF-5 | (1) | (2) |
| STR-1-AF-6.................... 1-AF-6 | (1) | (2) |
| STR-MF-1.................... MF-1 | (1) | (2) |
| STR-MF-2.................... MF-2 | (1) | (2) |
| STR-MF-3.................... | (1) | (2) |

PSA CWL 06-13.txt

| | MF-3 | | |
|---|---|---|---|
| STR-MF-4...................... | MF-4 | (1) | (2) |
| STR-MF-5...................... | MF-5 | (1) | (2) |
| STR-MF-6...................... | MF-6 | (1) | (2) |
| STR-MF-7...................... | MF-7 | (1) | (2) |
| STR-MF-8...................... | MF-8 | (1) | (2) |
| STR-BF........................ | BF | (1) | (2) |
| STR-PF........................ | PF | $100 | (3) |
| STR-F-Accrual................. | N/A | (1) | (2) |
| STR-2-AV | 2-AV | (4) | (5) |
| STR-3-AV-1 | 3-AV-1 | (4) | (5) |
| STR-3-AV-2 | 3-AV-2 | (4) | (5) |

<PAGE>

| Corresponding Class of Strip REMIC Interest Certificates | Initial Principal Balance | Pass-Through Rate |
|---|---|---|
| STR-3-AV-3 | (4) | (5) |

PSA CWL 06-13.txt
```
                3-AV-3
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-3-AV-4                                (4)                              (5)
                3-AV-4
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-1.....................             (4)                              (5)
                MV-1
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-2.....................             (4)                              (5)
                MV-2
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-3.....................             (4)                              (5)
                MV-3
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-4.....................             (4)                              (5)
                MV-4
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-5.....................             (4)                              (5)
                MV-5
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-6.....................             (4)                              (5)
                MV-6
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-7.....................             (4)                              (5)
                MV-7
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-8.....................             (4)                              (5)
                MV-8
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-MV-9.....................             (4)                              (5)
                MV-9
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-BV........................            (4)                              (5)
                BV
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-$100......................            $100                             (6)
                A-R
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-CV-OC.....................            (7)                              (5)
                N/A
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-CV-Swap-IO                            (8)                              (5)
                N/A
----------------------------------- ---------------------------
----------------------------------- ---------------------------
STR-PV........................            $100                             (9)
                PV
----------------------------------- ---------------------------
----------------------------------- ---------------------------
                             Page 15
```

```
                                  PSA CWL 06-13.txt
STR-A-R.......................                (10)                   (10)
                N/A
------------------------------ ---------------------------
-------------------------- ---------------------------
```

</TABLE>

(1) This Strip REMIC Interest has a principal balance that is initially equal to 50% of its Corresponding Certificate Class issued by the Master REMIC. Principal payments, both scheduled and prepaid, Realized Losses and Subsequent Recoveries with respect to the Class SWR-1F Interest and, if necessary, interest accruing on the STR-F-Accrual Interest, will be allocated to this class to maintain its size relative to its Corresponding Certificate Class (that is, 50%) with any excess payments of principal, Realized Losses and Subsequent Recoveries being allocated to the STR-F-Accrual Interest in such manner as to cause the principal balance of the STR-F-Accrual Interest to have a principal balance equal to the sum of (a) 50% of the Loan Group 1 principal balance, (b) 50% of the amount, if any, on deposit in the Pre-Funding Account in respect of Loan Group 1 and (c) 50% of the Fixed Rate Overcollateralized Amount for such Distribution Date.

(2) The pass-through rate with respect to any Distribution Date (and the related Accrual Period) for this Strip REMIC Interest is a per annum rate equal to the Loan Group 1 Net Rate Cap.

(3) The STR-PF Interest is entitled to all amounts collected with respect to the SWR-PF Interest. It pays no interest.

(4) This Strip REMIC Interest has a principal balance that is initially equal to 100% of its Corresponding Certificate Class issued by the Master REMIC. Principal payments, both scheduled and prepaid, Realized Losses and Subsequent Recoveries attributable to the Swap-IO REMIC Interests held by the Strip REMIC (other than the Class SWR-1F, Class SWR-PF and SWR-PV Interests) will be allocated to this class to maintain its size relative to its Corresponding Certificate Class.

(5) On each Distribution Date, the pass-through rate will equal the weighted average of the pass-through rates of the Swap-IO REMIC Interests (other than the Class SWR-1F, Class SWR-PF,

                                      7

<PAGE>

Class SWR-PV and Class SWR-A-R Interests) treating each "B" Interest the cardinal number of which (for example, SWR-1B, SWR-2B, SWR-3B, etc.) is not less than the ordinal number of the Distribution Date (first Distribution Date, second Distribution Date, third Distribution Date, etc.) as capped at a rate equal to the product of (i) 2 and (ii) LIBOR (the "Strip REMIC Cap").

(6) This Strip REMIC Interest pays no interest.

(7) This Strip REMIC Interest has a principal balance that is initially equal to 100% of the Adjustable Rate Overcollateralized Amount. Principal payments, both scheduled and prepaid, Realized Losses and Subsequent Recoveries attributable to the Swap-IO REMIC Interests held by the Strip REMIC (other than the Class SWR-1F, Class SWR-PF, Class SWR-PV and Class SWR-A-R Interests) will be allocated to this class to maintain its size relative to the Adjustable Rate Overcollateralized Amount.

(8) For each Distribution Date, the STR-CV-Swap-IO Interest is entitled to

PSA CWL 06-13.txt

receive from each Swap REMIC "B" Interest the cardinal number of which (for
example, SWR-1B, SWR-2B, SWR-3B, etc.) is not less than the ordinal number of
the Distribution Date (first Distribution Date, second Distribution Date,
third Distribution Date, etc.) the interest accruing on such interest in
excess of a per annum rate equal to the product of (i) 2 and (ii) LIBOR.

(9) The STR-PV Interest is entitled to all amounts payable with respect to the
SWR-PV Interest. It pays no interest.

(10) The STR-A-R Interest is the sole class of residual interest in the Strip
REMIC. It has no principal balance and pays no principal or interest.

        On each Distribution Date, the Interest Funds and the Principal
Distribution Amount payable with respect to the Swap-IO Interests shall be
payable with respect to the Strip REMIC Interests in the following manner:

        (1) Interest. Interest is to be distributed with respect to each
Strip REMIC Interest at the rate, or according to the formulas, described
above.

        (2) Principal. Principal Distribution Amounts shall be allocated
among the Strip REMIC Interests as described above.

        (3) Prepayment Penalties. All Prepayment Charges are allocated as
described above.


                                    8

<PAGE>


        MASTER REMIC:

        The following table specifies the class designation, interest rate,
and principal amount for each class of Master REMIC Interest:

| Class | Original Certificate Principal Balance | Pass-Through Rate |
|-------|---------------------------------------|-------------------|
| Class 1-AF-1................. | $56,658,000 | (1) |
| Class 1-AF-2................. | $11,210,000 | (1) |
| Class 1-AF-3................. | $33,323,000 | (1) |
| Class 1-AF-4................. | $8,849,000 | (1) |
| Class 1-AF-5................. | $13,040,000 | (1) |
| Class 1-AF-6................. | $17,000,000 | (1) |
| Class MF-1................... | $5,270,000 | (1) |
| Class MF-2................... | $4,760,000 | (1) |
| Class MF-3................... | $2,890,000 | (1) |
| Class MF-4................... | $2,550,000 | (1) |
| Class MF-5................... | $2,465,000 | (1) |
| Class MF-6................... | $2,295,000 | (1) |
| Class MF-7................... | $2,125,000 | (1) |
| Class MF-8................... | $1,700,000 | (1) |
| Class BF..................... | $1,700,000 | (1) |
| Class 2-AV................... | $118,696,000 | (2) |
| Class 3-AV-1................. | $106,235,000 | (2) |
| Class 3-AV-2................. | $26,699,000 | (2) |
| Class 3-AV-3................. | $68,697,000 | (2) |
| Class 3-AV-4................. | $24,533,000 | (2) |
| Class MV-1................... | $15,910,000 | (2) |
| Class MV-2................... | $14,190,000 | (2) |
| Class MV-3................... | $8,600,000 | (2) |

PSA CWL 06-13.txt

```
Class MV-4...................        $7,740,000              (2)
Class MV-5...................        $7,095,000              (2)
Class MV-6...................        $6,665,000              (2)
Class MV-7...................        $6,450,000              (2)
Class MV-8...................        $5,515,000              (2)
Class MV-9...................        $3,655,000              (2)
Class BV....................        $4,085,000              (2)
Class CF....................               (3)              (4)
Class CV....................               (5)              (6)
Class PF....................             $100               (7)
Class PV....................             $100               (8)
Class A-R...................             $100               (9)
```

(1)   These Certificates will accrue interest at the related Pass-Through Rates
      identified in this Agreement. For federal income tax purposes, including
      the computation of the Class CF Distributable Amount and entitlement to
      Net Rate Carryover the pass-through rate in respect of this certificate
      will be subject to a cap equal to the Loan Group 1 Net Rate Cap.


                                      9

<PAGE>


(2)   These Certificates will accrue interest at the related Pass-Through Rates
      identified in this Agreement. For federal income tax purposes, including
      the computation of the Class CV Distributable Amount and entitlement to
      Net Rate Carryover, the pass-through rate in respect of this certificate
      will be the Strip REMIC Cap.

(3)   For federal income tax purposes, the Class CF Certificates will be
      treated as having a Certificate Principal Balance equal to the Fixed Rate
      Overcollateralized Amount.

(4)   For each Interest Accrual Period the Class CF Certificates are entitled
      to an amount (the "Class CF Distributable Amount") equal to a specified
      portion of the interest payable on the Strip REMIC Regular Interests
      having an "F" in their designation (other than the STR-PF Interests)
      equal to the excess of the Loan Group 1 Net Rate Cap over the product of
      two and the weighted average interest rate of the Strip REMIC Regular
      Interests having an "F" in their designation (other than the STR-PF
      Interests) with each such Class other than the STR-F-Accrual Interest,
      subject to a cap equal to the Pass-Through Rate of the Corresponding
      Master REMIC Class and the STR-F-Accrual Interest subject to a cap of
      0.00%. The Pass-Through Rate of the Class CF Certificates shall be a rate
      sufficient to entitle it to an amount equal to all interest accrued on
      the Group 1 Mortgage Loans less the interest accrued on the other Master
      REMIC Interests having the letter "F" in their designation. The Class CF
      Distributable Amount for any Distribution Date is payable from current
      interest on the Group 1 Mortgage Loans and any related Fixed Rate
      Overcollateralization Reduction Amount for that Distribution Date.

(5)   For federal income tax purposes, the Class CV Certificates will be
      treated as having a Certificate Principal Balance equal to the Adjustable
      Rate Overcollateralized Amount.

(6)   For each Interest Accrual Period the Class CV Certificates are entitled
      to an amount (the "Class CV Distributable Amount") equal to the sum of
      (a) the interest payable on the STR-CV-Swap-IO Interest, (b) the interest
      payable on the STR-CV-OC Interest and (c) a specified portion of the
      interest payable on the Strip REMIC Regular Interests having the letter

Case 8:11-cv-01630-EAK-MAP   Document 1-41   Filed 07/22/11   Page 19 of 253 PageID 6222

PSA CWL 06-13.txt
"V" in their designation (other than the STR-CV-OC, STR-CV-Swap-IO and STR-PV Interests) equal to the excess of the Strip REMIC Cap over the weighted average interest rate of the Strip REMIC Regular Interests having the letter "V" in their designation (other than the STR-CV-OC, STR-CV-Swap-IO and STR-PV Interests) with each such Class subject to a cap equal to the Pass-Through Rate of the Corresponding Master REMIC Class. The Pass-Through Rate of the Class CV Certificates shall be a rate sufficient to entitle it to an amount equal to all interest accrued on the Group 2 and Group 3 Mortgage Loans less the interest accrued on the other Master REMIC Interests having the letter "V" in their designation. The Class CV Distributable Amount for any Distribution Date is payable from current interest on the Group 2 and Group 3 Mortgage Loans and any related Adjustable Rate Overcollateralization Reduction Amount for that Distribution Date.

(7)  For each Distribution Date the Class PF Certificates are entitled to all amounts distributed with respect to the STR-PF Interest.

(8)  For each Distribution Date the Class PV Certificates are entitled to all amounts distributed with respect to the STR-PV Interest.

(9)  The Class A-R Certificates represent the sole class of residual interest in each REMIC created hereunder. The Class A-R Certificates are not entitled to distributions of interest.

        The foregoing REMIC structure is intended to cause all of the cash from the Mortgage Loans to flow through to the Master REMIC as cash flow on REMIC regular interests,

                                10

<PAGE>


without creating any shortfall--actual or potential (other than for credit losses)-- to any REMIC regular interest. It is not intended that the Class A-R Certificates be entitled to any cash flows pursuant to this Agreement except as provided in Section 3.08(a) hereunder

                                11

<PAGE>


                        ARTICLE I.
                        DEFINITIONS

        Section 1.01 Defined Terms.

        Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

        Account: Any Escrow Account, the Carryover Reserve Fund, the Certificate Account, the Credit Comeback Excess Account, the Distribution Account, the Pre-Funding Account, the Principal Reserve Fund, the Swap Account or any other account related to the Trust Fund or the Mortgage Loans.

        Accrual Period: With respect to any Distribution Date and each Class of Adjustable Rate Certificates, the period commencing on the immediately
                        Page 19

PSA CWL 06-13.txt

preceding Distribution Date (or, in the case of the first Distribution Date, the Closing Date) and ending on the day immediately preceding such Distribution Date. With respect to any Distribution Date and each Class of Fixed Rate Certificates and the Class C Certificates, the calendar month preceding the month in which such Distribution Date occurs. All calculations of interest on the Adjustable Rate Certificates will be made on the basis of the actual number of days elapsed in the related Accrual Period and on a 360-day year. All calculations of interest on the Fixed Rate Certificates and Class C Certificates will be made on the basis of a 360-day year consisting of twelve 30-day months.

Additional Designated Information: As defined in Section 11.02.

Adjustable Rate Certificates: The Class AV Certificates and the Adjustable Rate Subordinate Certificates.

Adjustable Rate Cumulative Loss Trigger Event: With respect to any Distribution Date on or after the Adjustable Rate Stepdown Date, an Adjustable Rate Cumulative Loss Trigger Event occurs if (x) the aggregate amount of Realized Losses on the Mortgage Loans in Loan Group 2 and Loan Group 3 from the Cut-off Date for each such Mortgage Loan to (and including) the last day of the related Due Period (reduced by the aggregate amount of any Subsequent Recoveries related to the Mortgage Loans in Loan Group 2 and Loan Group 3 received through the last day of that Due Period) exceeds (y) the applicable percentage, for such Distribution Date, of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 2 and Loan Group 3, the Group 2 Pre-Funded Amount and the Group 3 Pre-Funded Amount, as set forth below:

| Distribution Date | Percentage |
| ----------------- | ---------- |
| July 2008 -- June 2009........ | 1.35% with respect to July 2008, plus an additional 1/12th of 1.70% for each month thereafter through June 2009 |
| July 2009 -- June 2010........ | 3.05% with respect to July 2009, plus an additional 1/12th of 1.80% |

12

<PAGE>

| Distribution Date | Percentage |
| ----------------- | ---------- |
|  | for each month thereafter through June 2010 |
| July 2010 -- June 2011........ | 4.85% with respect to July 2010, plus an additional 1/12th of 1.45% for each month thereafter through June 2011 |
| July 2011 -- June 2012........ | 6.30% with respect to July 2011, plus an additional 1/12th of 0.80% for each month thereafter through June 2012 |
| July 2012 -- June 2013........ | 7.10% with respect to July 2012, plus an additional 1/12th of 0.10% for each month thereafter through June 2013 |
| July 2013 and thereafter...... | 7.20% |

Adjustable Rate Delinquency Trigger Event: With respect to any

PSA CWL 06-13.txt

Distribution Date on or after the Adjustable Rate Stepdown Date, an Adjustable Rate Delinquency Trigger Event exists if the Rolling Sixty-Day Delinquency Rate for Outstanding Mortgage Loans in Loan Group 2 and Loan Group 3 equals or exceeds the product of (x) the Adjustable Rate Senior Enhancement Percentage for such Distribution Date and (y) the applicable percentage listed below for the most senior Class of outstanding Class AV Certificates and Adjustable Rate Subordinate Certificates:

| Class | Percentage |
|-------|-----------|
| Class AV........................ | 40.400% |
| Class MV-1...................... | 49.684% |
| Class MV-2...................... | 62.494% |
| Class MV-3...................... | 74.067% |
| Class MV-4...................... | 88.880% |
| Class MV-5...................... | 108.833% |
| Class MV-6...................... | 137.917% |
| Class MV-7...................... | 186.028% |
| Class MV-8...................... | 246.129% |
| Class MV-9...................... | 333.300% |
| Class BV........................ | 551.669% |

Adjustable Rate Excess Overcollateralization Amount: With respect to any Distribution Date, an amount equal to the excess, if any, of the Adjustable Rate Overcollateralized Amount for such Distribution Date over the Adjustable Rate Overcollateralization Target Amount for such Distribution Date.

13

<PAGE>

Adjustable Rate Loan Group Credit Comeback Excess Cashflow: With respect to any Distribution Date, any amounts in the Credit Comeback Excess Account in respect of Loan Group 2 and Loan Group 3 available for such Distribution Date.

Adjustable Rate Loan Group Excess Cashflow: With respect to any Distribution Date the sum of (i) the amount remaining after the distribution of interest to Certificateholders for such Distribution Date pursuant to Section 4.04(b)(iv)(b), (ii) the amount remaining after the distribution of principal to Certificateholders for such Distribution Date, pursuant to Section 4.04(d)(1)(B)(ii) or 4.04(d)(2)(D), and (iii) the Adjustable Rate Overcollateralization Reduction Amount for such Distribution Date, if any.

Adjustable Rate Loan Group Tax Cap: As defined in the Preliminary Statement.

Adjustable Rate Mortgage Loans: The Mortgage Loans identified in the Mortgage Loan Schedule as having a Mortgage Rate which is adjustable in accordance with the terms of the related Mortgage Note.

Adjustable Rate OC Floor: For any Distribution Date, an amount equal to 0.50% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 2 and Loan Group 3, the Group 2 Pre-Funded Amount and the Group 3 Pre-Funded Amount.

Adjustable Rate Overcollateralization Deficiency Amount: With respect to any Distribution Date, the amount, if any, by which the Adjustable Rate Overcollateralization Target Amount exceeds the Adjustable Rate

PSA CWL 06-13.txt

Overcollateralized Amount on such Distribution Date (after giving effect to distribution of the Principal Distribution Amount (other than the portion thereof consisting of the Extra Principal Distribution Amount) for Loan Group 2 and Loan Group 3 on such Distribution Date).

Adjustable Rate Overcollateralization Reduction Amount: With respect to any Distribution Date, an amount equal to the lesser of (i) the Adjustable Rate Excess Overcollateralization Amount for such Distribution Date and (ii) the aggregate Principal Remittance Amount for Loan Group 2 and Loan Group 3 for such Distribution Date.

Adjustable Rate Overcollateralization Target Amount: With respect to any Distribution Date (a) prior to the Adjustable Rate Stepdown Date, an amount equal to 1.45% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 2 and Loan Group 3, the Group 2 Pre-Funded Amount and the Group 3 Pre-Funded Amount and (b) on or after the Adjustable Rate Stepdown Date, the greater of (i) an amount equal to 2.90% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for the current Distribution Date and (ii) the Adjustable Rate OC Floor; provided, however, that if an Adjustable Rate Trigger Event is in effect on any Distribution Date, the Adjustable Rate Overcollateralization Target Amount will be the Adjustable Rate Overcollateralization Target Amount as in effect for the prior Distribution Date.

Adjustable Rate Overcollateralized Amount: With respect to any Distribution Date, the amount, if any, by which (x) the sum of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for such Distribution Date and any amount

14

<PAGE>

on deposit in the Pre-Funding Account in respect of Loan Group 2 and Loan Group 3 exceeds (y) the sum of the aggregate Certificate Principal Balance of the Class AV Certificates and the Adjustable Rate Subordinate Certificates as of such Distribution Date (after giving effect to distribution of the Principal Remittance Amounts for Loan Group 2 and Loan Group 3 to be made on such Distribution Date and, in the case of the Distribution Date immediately following the end of the Funding Period, any amounts to be released from the Pre-Funding Account in respect of Loan Group 2 and Loan Group 3).

Adjustable Rate Senior Enhancement Percentage: With respect to a Distribution Date on or after the Adjustable Rate Stepdown Date, the fraction (expressed as a percentage) (1) the numerator of which is the excess of (a) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for the preceding Distribution Date over (b) (i) before the Certificate Principal Balances of the Class AV Certificates have been reduced to zero, the sum of the Certificate Principal Balances of the Class AV Certificates, or (ii) after the Certificate Principal Balances of the Class AV Certificates have been reduced to zero, the Certificate Principal Balance of the most senior Class of Adjustable Rate Subordinate Certificates outstanding, as of the related Master Servicer Advance Date, and (2) the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for the preceding Distribution Date.

Adjustable Rate Stepdown Date: The earlier to occur of: (1) the Distribution Date on which the aggregate Certificate Principal Balance of the Class AV Certificates is reduced to zero, and (2) the later to occur of (x) the Distribution Date in July 2009 and (y) the first Distribution Date on

PSA CWL 06-13.txt
which the aggregate Certificate Principal Balance of the Class AV Certificates
(after calculating anticipated distributions on such Distribution Date) is
less than or equal to 60.40% of the aggregate Stated Principal Balance of the
Mortgage Loans in Loan Group 2 and Loan Group 3 for such Distribution Date.

       Adjustable Rate Subordinate Certificates: Any Class MV-1, Class MV-2,
Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class MV-8, Class
MV-9 or Class BV Certificates.

       Adjustable Rate Subordinate Class Principal Distribution Amount: With
respect to any Distribution Date and any Class of Adjustable Rate Subordinate
Certificates (other than the Class MV-1, Class MV-2 and Class MV-3
Certificates), the excess of (1) the sum of (a) the aggregate Certificate
Principal Balance of the Class AV Certificates (after taking into account
distribution of the Class 2-AV Principal Distribution Amount and the Class
3-AV Principal Distribution Amount for such Distribution Date), (b) the
aggregate Certificate Principal Balance of the Class MV-1, Class MV-2 and
Class MV-3 Certificates (after taking into account distribution of the
Combined Class MV-1, MV-2 and MV-3 Principal Distribution Amount for such
Distribution Date), (c) the aggregate Certificate Principal Balance of any
Class(es) of Adjustable Rate Subordinate Certificates (other than the Class
MV-1, Class MV-2 and Class MV-3 Certificates) that are senior to the subject
Class (in each case, after taking into account distribution of the Adjustable
Rate Subordinate Class Principal Distribution Amount(s) for such senior
Class(es) of Certificates for such Distribution Date), and (d) the Certificate
Principal Balance of the subject Class of Adjustable Rate Subordinate
Certificates immediately prior to such Distribution Date over (2) the lesser
of (a) the product of (x) 100% minus the Stepdown

                                    15

<PAGE>

Target Subordination Percentage for the subject Class of Certificates and (y)
the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2
and Loan Group 3 for such Distribution Date and (b) the aggregate Stated
Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for
such Distribution Date minus the Adjustable Rate OC Floor; provided, however,
that if such Class of Adjustable Rate Subordinate Certificates is the only
Class of Adjustable Rate Subordinate Certificates outstanding on such
Distribution Date, that Class will be entitled to receive the entire remaining
Principal Distribution Amount for Loan Group 2 and Loan Group 3 until the
Certificate Principal Balance thereof is reduced to zero.

       Adjustable Rate Subordinate Net Rate Cap: With respect to any
Distribution Date and each Class of Adjustable Rate Subordinate Certificates,
the weighted average of the Class 2-AV Net Rate Cap for that Distribution Date
and the Class 3-AV Net Rate Cap for that Distribution Date, weighted on the
basis of the excess (if any) of the sum of the aggregate Stated Principal
Balance of the Mortgage Loans in the related Loan Group and the amount on
deposit in the Pre-Funding Account in respect of that Loan Group over the
outstanding Certificate Principal Balance of the related Class AV
Certificates.

       Adjustable Rate Trigger Event: With respect to any Distribution Date
on or after the Adjustable Rate Stepdown Date, either an Adjustable Rate
Delinquency Trigger Event with respect to that Distribution Date or an
Adjustable Rate Cumulative Loss Trigger Event with respect to that
Distribution Date.

       Adjusted Net Mortgage Rate: As to each Mortgage Loan, the Mortgage
                                 Page 23

PSA CWL 06-13.txt
Rate less the related Expense Fee Rate.

        Adjusted Replacement Upfront Amount: As defined in Section 3.19.

        Adjustment Date: As to each Adjustable Rate Mortgage Loan, each date
on which the related Mortgage Rate is subject to adjustment, as provided in
the related Mortgage Note.

        Advance: The aggregate of the advances required to be made by the
Master Servicer with respect to any Distribution Date pursuant to Section
4.01, the amount of any such advances being equal to the aggregate of payments
of principal of, and interest on the Stated Principal Balance of, the Mortgage
Loans (net of the Servicing Fees) that were due on the related Due Date and
not received by the Master Servicer as of the close of business on the related
Determination Date including an amount equivalent to interest on the Stated
Principal Balance of each Mortgage Loan as to which the related Mortgaged
Property is an REO Property or as to which the related Mortgaged Property has
been liquidated but such Mortgage Loan has not yet become a Liquidated
Mortgage Loan; provided, however, that the net monthly rental income (if any)
from such REO Property deposited in the Certificate Account for such
Distribution Date pursuant to Section 3.12 may be used to offset such Advance
for the related REO Property; provided, further, that for the avoidance of
doubt, no Advances shall be required to be made in respect of any Liquidated
Mortgage Loan.

        Agreement: This Pooling and Servicing Agreement and any and all
amendments or supplements hereto made in accordance with the terms herein.


                                    16

<PAGE>


        Amount Held for Future Distribution: As to any Distribution Date, the
aggregate amount held in the Certificate Account at the close of business on
the immediately preceding Determination Date on account of (i) all Scheduled
Payments or portions thereof received in respect of the Mortgage Loans due
after the related Due Date, (ii) Principal Prepayments received in respect of
such Mortgage Loans after the last day of the related Prepayment Period and
(iii) Liquidation Proceeds and Subsequent Recoveries received in respect of
such Mortgage Loans after the last day of the related Due Period.

        Applied Realized Loss Amount: With respect to any Distribution Date
and any Loan Group or Loan Groups, the amount, if any, by which, the aggregate
Certificate Principal Balance of the Class(es) of Certificates listed opposite
such Loan Group(s) in the following table (after all distributions of
principal on such Distribution Date) exceeds the sum of (x) the Stated
Principal Balance of the Mortgage Loans in such Loan Group(s) for such
Distribution Date and (y) the amount on deposit in the Pre-Funding Account in
respect of such Loan Group(s); provided, however, that an Applied Realized
Loss Amount will not exist for a Class of Class 1-AF Certificates unless the
Certificate Principal Balances of the Fixed Rate Subordinate Certificates have
been reduced to zero; and provided further, however, that an Applied Realized
Loss Amount will not exist for a Class of Class AV Certificates unless the
Certificate Principal Balances of the Adjustable Rate Subordinate Certificates
have been reduced to zero.

              Loan Group(s)           Class(es) of Certificates

                   1              1-AF and Fixed Rate Subordinate
                2 and 3           AV and Adjustable Rate Subordinate
                                  Page 24

```
                        PSA CWL 06-13.txt
                2                            2-AV
                3                            3-AV
```

Appraised Value: The appraised value of the Mortgaged Property based upon the appraisal made for the originator of the related Mortgage Loan by an independent fee appraiser at the time of the origination of the related Mortgage Loan, or the sales price of the Mortgaged Property at the time of such origination, whichever is less, or with respect to any Mortgage Loan originated in connection with a refinancing, the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing.

Bankruptcy Code: Title 11 of the United States Code.

Book-Entry Certificates: Any of the Certificates that shall be registered in the name of the Depository or its nominee, the ownership of which is reflected on the books of the Depository or on the books of a person maintaining an account with the Depository (directly, as a "Depository Participant", or indirectly, as an indirect participant in accordance with the rules of the Depository and as described in Section 5.06). As of the Closing Date, each Class of Interest Bearing Certificates (other than the Class BV Certificates) constitutes a Class of Book-Entry Certificates.

17

<PAGE>

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of New York or California or the city in which the Corporate Trust Office of the Trustee is located are authorized or obligated by law or executive order to be closed.

Carryover Reserve Fund: The separate Eligible Account created and initially maintained by the Trustee pursuant to Section 4.07 in the name of the Trustee for the benefit of the Certificateholders and designated "The Bank of New York in trust for registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-10". Funds in the Carryover Reserve Fund shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement.

Certificate: Any one of the certificates of any Class executed and authenticated by the Trustee in substantially the forms attached hereto as Exhibits A-1 through A-30, Exhibits B-1 and B-2, Exhibits C-1 and C-2, Exhibit D and Exhibit E.

Certificate Account: The separate Eligible Account created and initially maintained by the Master Servicer pursuant to Section 3.05(b) with a depository institution in the name of the Master Servicer for the benefit of the Trustee on behalf of the Certificateholders and designated "Countrywide Home Loans Servicing LP in trust for registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-10". Funds in the Certificate Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement.

Certificate Owner: With respect to a Book-Entry Certificate, the person that is the beneficial owner of such Book-Entry Certificate.

Certificate Principal Balance: As to any Certificate (other than the Class C Certificates) and as of any Distribution Date, the Initial Certificate Principal Balance of such Certificate (A) less the sum of (i) all amounts

PSA CWL 06-13.txt
distributed with respect to such Certificate in reduction of the Certificate
Principal Balance thereof on previous Distribution Dates pursuant to Section
4.04(c) or 4.04(d) and (ii) any Applied Realized Loss Amounts allocated to
such Certificate on previous Distribution Dates pursuant to Section 4.04(k),
and (B) increased by any Subsequent Recoveries allocated to such Class of
Certificate pursuant to Section 4.04(l) on such Distribution Date. References
herein to the Certificate Principal Balance of a Class of Certificates shall
mean the Certificate Principal Balances of all Certificates in such Class. The
Class C Certificates do not have a Certificate Principal Balance. With respect
to any Certificate (other than the Class C Certificates) of a Class and any
Distribution Date, the portion of the Certificate Principal Balance of such
Class represented by such Certificate equal to the product of the Percentage
Interest evidenced by such Certificate and the Certificate Principal Balance
of such Class.

     Certificate Register: The register maintained pursuant to Section
5.02 hereof.

     Certificateholder or Holder: The person in whose name a Certificate
is registered in the Certificate Register (initially, Cede & Co., as nominee
for the Depository, in the case of any Class of Book-Entry Certificates),
except that solely for the purpose of giving any consent pursuant to this
Agreement, any Certificate registered in the name of the Depositor or any

                              18

<PAGE>

affiliate of the Depositor shall be deemed not to be Outstanding and the
Voting Interest evidenced thereby shall not be taken into account in
determining whether the requisite amount of Voting Interests necessary to
effect such consent has been obtained; provided that if any such Person
(including the Depositor) owns 100% of the Voting Interests evidenced by a
Class of Certificates, such Certificates shall be deemed to be Outstanding for
purposes of any provision hereof (other than the second sentence of Section
10.01 hereof) that requires the consent of the Holders of Certificates of a
particular Class as a condition to the taking of any action hereunder. The
Trustee is entitled to rely conclusively on a certification of the Depositor
or any affiliate of the Depositor in determining which Certificates are
registered in the name of an affiliate of the Depositor.

     Certification Party: As defined in Section 11.05.

     Certifying Person: As defined in Section 11.05.

     CHL: Countrywide Home Loans, Inc., a New York corporation, and its
successors and assigns.

     CHL Mortgage Loans: The Mortgage Loans identified as such on the
Mortgage Loan Schedule for which CHL is the applicable Seller.

     Class: All Certificates bearing the same Class designation as set
forth in Section 5.01 hereof.

     Class 1-AF Certificate: Any Class 1-AF-1, Class 1-AF-2, Class 1-AF-3,
Class 1-AF-4, Class 1-AF-5 or Class 1-AF-6 Certificate.

     Class 1-AF Principal Distribution Amount: With respect to any
Distribution Date, the excess of (1) the aggregate Certificate Principal
Balance of the Class 1-AF Certificates immediately prior to such Distribution

PSA CWL 06-13.txt
Date, over (2) the lesser of (x) 62.70% of the aggregate Stated Principal
Balance of the Mortgage Loans in Loan Group 1 for such Distribution Date and
(y) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group
1 for such Distribution Date minus the Fixed Rate OC Floor.

        Class 1-AF-1 Certificate: Any Certificate designated as a "Class
1-AF-1 Certificate" on the face thereof, in the form of Exhibit A-1 hereto,
representing the right to distributions as set forth herein.

        Class 1-AF-2 Certificate: Any Certificate designated as a "Class
1-AF-2 Certificate" on the face thereof, in the form of Exhibit A-2 hereto,
representing the right to distributions as set forth herein.

        Class 1-AF-3 Certificate: Any Certificate designated as a "Class
1-AF-3 Certificate" on the face thereof, in the form of Exhibit A-3 hereto,
representing the right to distributions as set forth herein.


                                      19

<PAGE>


        Class 1-AF-4 Certificate: Any Certificate designated as a "Class
1-AF-4 Certificate" on the face thereof, in the form of Exhibit A-4 hereto,
representing the right to distributions as set forth herein.

        Class 1-AF-5 Certificate: Any Certificate designated as a "Class
1-AF-5 Certificate" on the face thereof, in the form of Exhibit A-5 hereto,
representing the right to distributions as set forth herein.

        Class 1-AF-6 Certificate: Any Certificate designated as a "Class
1-AF-6 Certificate" on the face thereof, in the form of Exhibit A-6 hereto,
representing the right to distributions as set forth herein.

        Class 1-AF-6 Portion: With respect to any Distribution Date, a
percentage, expressed as a fraction, the numerator of which is the Certificate
Principal Balance of the Class 1-AF-6 Certificates immediately prior to such
Distribution Date and the denominator of which is the aggregate Certificate
Principal Balance of all Classes of the Class 1-AF Certificates immediately
prior to such Distribution Date.

        Class 2-AV Certificate: Any Certificate designated as a "Class 2-AV
Certificate" on the face thereof, in the form of Exhibit A-16 hereto,
representing the right to distributions as set forth herein.

        Class 2-AV Net Rate Cap: For any Distribution Date, (A) the weighted
average Adjusted Net Mortgage Rate of the Mortgage Loans in Loan Group 2 as of
the first day of the related Due Period (after giving effect to Principal
Prepayments received during the Prepayment Period that ends during such Due
Period), adjusted to an effective rate reflecting the calculation of interest
on the basis of the actual number of days elapsed during the related Accrual
Period and a 360-day year minus (B) the percentage equivalent of a fraction,
the numerator of which is (x) the product of (a) the sum of (1) the Net Swap
Payment payable to the Swap Counterparty with respect to such Distribution
Date times a fraction, the numerator of which is equal to 360 and the
denominator of which is equal to the actual number of days in the related
Accrual Period and (2) any Swap Termination Payment payable to the Swap
Counterparty for such Distribution Date (other than a Swap Termination Payment
due to a Swap Counterparty Trigger Event), and (b) a fraction, the numerator
of which is the Interest Funds for Loan Group 2 for that Distribution Date and
the denominator of which is the sum of the Interest Funds for Loan Group 2 and

PSA CWL 06-13.txt

Loan Group 3 for that Distribution Date, and the denominator of which is (y) the sum of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and the amount on deposit in the Pre-Funding Account in respect of Loan Group 2.

Class 2-AV Principal Distribution Amount: With respect to any Distribution Date, the product of (x) the Class AV Principal Distribution Target Amount and (y) a fraction, the numerator of which is the Class 2-AV Principal Distribution Target Amount and the denominator of which is the sum of the Class 2-AV Principal Distribution Target Amount and Class 3-AV Principal Distribution Target Amount.

Class 2-AV Principal Distribution Target Amount: With respect to any Distribution Date, the excess of (1) the Certificate Principal Balance of the Class 2-AV

20

<PAGE>

Certificates immediately prior to such Distribution Date, over (2) the lesser of (x) 60.40% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 for such Distribution Date and (y) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 for such Distribution Date minus 0.50% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 2 and the original Group 2 Pre-Funded Amount.

Class 3-AV-1 Certificate: Any Certificate designated as a "Class 3-AV-1 Certificate" on the face thereof, in the form of Exhibit A-17 hereto, representing the right to distributions as set forth herein.

Class 3-AV-2 Certificate: Any Certificate designated as a "Class 3-AV-2 Certificate" on the face thereof, in the form of Exhibit A-18 hereto, representing the right to distributions as set forth herein.

Class 3-AV-3 Certificate: Any Certificate designated as a "Class 3-AV-3 Certificate" on the face thereof, in the form of Exhibit A-19 hereto, representing the right to distributions as set forth herein.

Class 3-AV-4 Certificate: Any Certificate designated as a "Class 3-AV-4 Certificate" on the face thereof, in the form of Exhibit A-20 hereto, representing the right to distributions as set forth herein.

Class 3-AV Certificate: Any Class 3-AV-1, Class 3-AV-2, Class 3-AV-3 or Class 3-AV-4 Certificate.

Class 3-AV Net Rate Cap: For any Distribution Date, (A) the weighted average Adjusted Net Mortgage Rate of the Mortgage Loans in Loan Group 3 as of the first day of the related Due Period (after giving effect to Principal Prepayments received during the Prepayment Period that ends during such Due Period), adjusted to an effective rate reflecting the calculation of interest on the basis of the actual number of days elapsed during the related Accrual Period and a 360-day year minus (B) the percentage equivalent of a fraction, the numerator of which is (x) the product of (a) the sum of (1) the Net Swap Payment payable to the Swap Counterparty with respect to such Distribution Date times a fraction, the numerator of which is equal to 360 and the denominator of which is equal to the actual number of days in the related Accrual Period and (2) any Swap Termination Payment payable to the Swap Counterparty for such Distribution Date (other than a Swap Termination Payment

Page 28

PSA CWL 06-13.txt

due to a Swap Counterparty Trigger Event), and (b) a fraction, the numerator of which is the Interest Funds for Loan Group 3 for that Distribution Date and the denominator of which is the sum of the Interest Funds for Loan Group 2 and Loan Group 3 for that Distribution Date, and the denominator of which is (y) the sum of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 3 and the amount on deposit in the Pre-Funding Account in respect of Loan Group 3.

Class 3-AV Principal Distribution Amount: With respect to any Distribution Date, the product of (x) the Class AV Principal Distribution Target Amount and (y) a fraction, the numerator of which is the Class 3-AV Principal Distribution Target Amount and the denominator of which is the sum of the Class 2-AV Principal Distribution Target Amount and the Class 3-AV Principal Distribution Target Amount.

21

<PAGE>

Class 3-AV Principal Distribution Target Amount: With respect to any Distribution Date, the excess of (1) the aggregate Certificate Principal Balance of the Class 3-AV Certificates immediately prior to such Distribution Date, over (2) the lesser of (x) 60.40% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 3 for such Distribution Date and (y) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 3 for such Distribution Date minus 0.50% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 3 and the original Group 3 Pre-Funded Amount.

Class A-R Certificate: Any Certificate designated as a "Class A-R Certificate" on the face thereof, in the form of Exhibit D hereto or, in the case of the Tax Matters Person Certificate, Exhibit E hereto, in either case representing the right to distributions as set forth herein.

Class AV Certificate: Any Class 2-AV or Class 3-AV Certificate.

Class AV Principal Distribution Allocation Amount: With respect to any Distribution Date, (a) in the case of the Class 2-AV Certificates, the Class 2-AV Principal Distribution Amount and (b) in the case of the Class 3-AV Certificates, the Class 3-AV Principal Distribution Amount.

Class AV Principal Distribution Target Amount: With respect to any Distribution Date will equal the excess of: (1) the aggregate Certificate Principal Balance of the Class AV Certificates immediately prior to such Distribution Date, over (2) the lesser of (i) 60.40% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for such Distribution Date and (ii) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 2 and Loan Group 3 for such Distribution Date minus the Adjustable Rate OC Floor.

Class BF Certificate: Any Certificate designated as a "Class BF Certificate" on the face thereof, in the form of Exhibit A-15 hereto, representing the right to distributions as set forth herein.

Class BV Certificate: Any Certificate designated as a "Class BV Certificate" on the face thereof, in the form of Exhibit A-30 hereto, representing the right to distributions as set forth herein.

Class C Certificate: Any Class CF or Class CV Certificate.

PSA CWL 06-13.txt
        Class CF Certificate: Any Certificate designated as a "Class CF
Certificate" on the face thereof, in the form of Exhibit C-1 hereto,
representing the right to distributions as set forth herein.

        Class CF Distributable Amount: As defined in the Preliminary
Statement.

        Class CV Certificate: Any Certificate designated as a "Class CV
Certificate" on the face thereof, in the form of Exhibit C-2 hereto,
representing the right to distributions as set forth herein.


                                   22

<PAGE>


        Class CV Distributable Amount: As defined in the Preliminary
Statement.

        Class MF-1 Certificate: Any Certificate designated as a "Class MF-1
Certificate" on the face thereof, in the form of Exhibit A-7 hereto,
representing the right to distributions as set forth herein.

        Class MF-2 Certificate: Any Certificate designated as a "Class MF-2
Certificate" on the face thereof, in the form of Exhibit A-8 hereto,
representing the right to distributions as set forth herein.

        Class MF-3 Certificate: Any Certificate designated as a "Class MF-3
Certificate" on the face thereof, in the form of Exhibit A-9 hereto,
representing the right to distributions as set forth herein.

        Class MF-4 Certificate: Any Certificate designated as a "Class MF-4
Certificate" on the face thereof, in the form of Exhibit A-10 hereto,
representing the right to distributions as set forth herein.

        Class MF-5 Certificate: Any Certificate designated as a "Class MF-5
Certificate" on the face thereof, in the form of Exhibit A-11 hereto,
representing the right to distributions as set forth herein.

        Class MF-6 Certificate: Any Certificate designated as a "Class MF-6
Certificate" on the face thereof, in the form of Exhibit A-12 hereto,
representing the right to distributions as set forth herein.

        Class MF-7 Certificate: Any Certificate designated as a "Class MF-7
Certificate" on the face thereof, in the form of Exhibit A-13 hereto,
representing the right to distributions as set forth herein.

        Class MF-8 Certificate: Any Certificate designated as a "Class MF-8
Certificate" on the face thereof, in the form of Exhibit A-14 hereto,
representing the right to distributions as set forth herein.

        Class MF Certificate: Any Class MF-1, Class MF-2, Class MF-3, Class
MF-4, Class MF-5, Class MF-6, Class MF-7 or Class MF-8 Certificate.

        Class MV-1 Certificate: Any Certificate designated as a "Class MV-1
Certificate" on the face thereof, in the form of Exhibit A-21 hereto,
representing the right to distributions as set forth herein.

        Class MV-2 Certificate: Any Certificate designated as a "Class MV-2
Certificate" on the face thereof, in the form of Exhibit A-22 hereto,
representing the right to distributions as set forth herein.
                              Page 30

PSA CWL 06-13.txt

Class MV-3 Certificate: Any Certificate designated as a "Class MV-3 Certificate" on the face thereof, in the form of Exhibit A-23 hereto, representing the right to distributions as set forth herein.

23

<PAGE>

Class MV-4 Certificate: Any Certificate designated as a "Class MV-4 Certificate" on the face thereof, in the form of Exhibit A-24 hereto, representing the right to distributions as set forth herein.

Class MV-5 Certificate: Any Certificate designated as a "Class MV-5 Certificate" on the face thereof, in the form of Exhibit A-25 hereto, representing the right to distributions as set forth herein.

Class MV-6 Certificate: Any Certificate designated as a "Class MV-6 Certificate" on the face thereof, in the form of Exhibit A-26 hereto, representing the right to distributions as set forth herein.

Class MV-7 Certificate: Any Certificate designated as a "Class MV-7 Certificate" on the face thereof, in the form of Exhibit A-27 hereto, representing the right to distributions as set forth herein.

Class MV-8 Certificate: Any Certificate designated as a "Class MV-8 Certificate" on the face thereof, in the form of Exhibit A-28 hereto, representing the right to distributions as set forth herein.

Class MV-9 Certificate: Any Certificate designated as a "Class MV-9 Certificate" on the face thereof, in the form of Exhibit A-29 hereto, representing the right to distributions as set forth herein.

Class MV Certificate: Any Class MV-1, Class MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class MV-8 or Class MV-9 Certificate.

Class P Certificate: Any Class PF Certificate or Class PV Certificate.

Class PF Certificate: Any Certificate designated as a "Class PF Certificate" on the face thereof, in the form of Exhibit B-1 hereto, representing the right to distributions as set forth herein.

Class PF Principal Distribution Date: The first Distribution Date that occurs after the end of the latest Prepayment Charge Period for all Mortgage Loans in Loan Group 1 that have a Prepayment Charge Period.

Class PV Certificate: Any Certificate designated as a "Class PV Certificate" on the face thereof, in the form of Exhibit B-2 hereto, representing the right to distributions as set forth herein.

Class PV Principal Distribution Date: The first Distribution Date that occurs after the end of the latest Prepayment Charge Period for all Mortgage Loans in Loan Group 2 and Loan Group 3 that have a Prepayment Charge Period.

Closing Date: June 30, 2006.

PSA CWL 06-13.txt
24

<PAGE>

        Code: The Internal Revenue Code of 1986, including any successor or
amendatory provisions.

        Collateral Schedule: Schedule II hereto.

        Combined Class MV-1, MV-2 and MV-3 Principal Distribution Amount:
With respect to any Distribution Date and the Class MV-1, Class MV-2 and Class
MV-3 Certificates, the excess of (1) the sum of (a) the aggregate Certificate
Principal Balance of the Class AV Certificates (after taking into account
distribution of the Class 2-AV Principal Distribution Amount and the Class
3-AV Principal Distribution Amount for such Distribution Date) and (b) the
aggregate Certificate Principal Balance of the Class MV-1, Class MV-2 and
Class MV-3 Certificates immediately prior to such Distribution Date over (2)
the lesser of (a) 78.40% of the aggregate Stated Principal Balance of the
Mortgage Loans in Loan Group 2 and Loan Group 3 for the Distribution Date and
(b) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group
2 and Loan Group 3 for such Distribution Date minus the Adjustable Rate OC
Floor; provided, however, that if the Class MV-1, Class MV-2 and/or Class MV-3
Certificates are the only Class(es) of Adjustable Rate Subordinate
Certificates outstanding on such Distribution Date, that Class(es) will be
entitled to receive the entire remaining Principal Distribution Amount for
Loan Group 2 and Loan Group 3 until the Certificate Principal Balance(s)
thereof is/are reduced to zero.

        Commission: The U.S. Securities and Exchange Commission.

        Compensating Interest: With respect to the Mortgage Loans in each
Loan Group and any Distribution Date, an amount equal to the lesser of (x)
one-half of the Servicing Fee for such Mortgage Loans for the related Due
Period and (y) the aggregate Prepayment Interest Shortfalls for such Mortgage
Loans for such Distribution Date.

        Confirmation: The confirmation, reference number FXCWL0610, with a
trade date of June June 16, 2006 evidencing a transaction between the Swap
Counterparty and CHL relating to the Swap Contract.

        Corporate Trust Office: The designated office of the Trustee in the
State of New York where at any particular time its corporate trust business
with respect to this Agreement shall be administered, which office at the date
of the execution of this Agreement is located at 101 Barclay Street, New York,
New York 10286 (Attention: Corporate Trust MBS Administration), telephone:
(212) 815-3236, facsimile: (212) 815-3986.

        Credit Bureau Risk Score: A statistical credit score obtained by CHL
in connection with the origination of a Mortgage Loan.

        Credit Comeback Excess Account: The separate Eligible Account created
and initially maintained by the Trustee pursuant to Section 4.08 in the name
of the Trustee for the benefit of the Certificateholders and designated "The
Bank of New York in trust for registered Holders of CWABS, Inc., Asset-Backed
Certificates, Series 2006-10". Funds in the Credit Comeback Excess Account
shall be held in trust for the Certificateholders for the uses and purposes
set forth in this Agreement.

25

<PAGE>

PSA CWL 06-13.txt

Credit Comeback Excess Amount: With respect to the Credit Comeback Loans in any Loan Group and any Master Servicer Advance Date, the portion of the sum of the following (without duplication) attributable to the excess, if any, of the actual mortgage rate on each Credit Comeback Loan in such Loan Group and the Mortgage Rate on such Credit Comeback Loan: (i) all scheduled interest collected during the related Due Period with respect to the Credit Comeback Loans in such Loan Group, (ii) all interest on prepayments received during the related Prepayment Period with respect to the Credit Comeback Loans in such Loan Group, other than Prepayment Interest Excess, (iii) all Advances relating to interest with respect to the Credit Comeback Loans in such Loan Group, (iv) all Compensating Interest with respect to the Credit Comeback Loans in such Loan Group and (v) Liquidation Proceeds with respect to the Credit Comeback Loans in such Loan Group collected during the related Due Period (to the extent such Liquidation Proceeds relate to interest), less all Nonrecoverable Advances for such Loan Group relating to interest reimbursed during the related Due Period.

Credit Comeback Loan: Any Fixed Rate Mortgage Loan for which the related Mortgage Rate is subject to reduction (not exceeding 0.375% per annum) for good payment history of Scheduled Payments by the related Mortgagor.

Current Interest: With respect to each Class of Interest Bearing Certificates and each Distribution Date, the interest accrued at the applicable Pass-Through Rate for the applicable Accrual Period on the Certificate Principal Balance of such Class immediately prior to such Distribution Date.

Cut-off Date: When used with respect to any Mortgage Loan the "Cut-off Date" shall mean the Initial Cut-off Date or the related Subsequent Cut-off Date, as the case may be.

Cut-off Date Principal Balance: As to any Mortgage Loan, the unpaid principal balance thereof as of the close of business on the Cut-off Date after application of all payments of principal due on or prior to the Cut-off Date, whether or not received, and all Principal Prepayments received on or prior to the Cut-off Date, but without giving effect to any installments of principal received in respect of Due Dates after the Cut-off Date.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for such Mortgage Loan that became final and non-appealable, except such a reduction resulting from a Deficient Valuation or any other reduction that results in a permanent forgiveness of principal.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under such Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any Scheduled Payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court that is final and non-appealable in a proceeding under the Bankruptcy Code.

Definitive Certificates: As defined in Section 5.06.

26

<PAGE>

PSA CWL 06-13.txt

Delay Delivery Mortgage Loans: (i) The Initial Mortgage Loans
identified on the schedule of Mortgage Loans hereto set forth on Exhibit F-2
hereof for which all or a portion of a related Mortgage File is not delivered
to the Trustee on or prior to the Closing Date, and (ii) the Subsequent
Mortgage Loans identified on the schedule of Subsequent Mortgage Loans set
forth in Annex A to each related Subsequent Transfer Agreement for which all
or a portion of the related Mortgage File is not delivered to the Trustee on
or prior to the related Subsequent Transfer Date. The Depositor shall deliver
(or cause delivery of) the Mortgage Files to the Trustee: (A) with respect to
at least 50% of the Initial Mortgage Loans in each Loan Group, not later than
the Closing Date and with respect to at least 10% of the Subsequent Mortgage
Loans in each Loan Group conveyed on a Subsequent Transfer Date, not later
than such Subsequent Transfer Date, (B) with respect to at least an additional
40% of the Initial Mortgage Loans in each Loan Group, not later than 20 days
after the Closing Date, and not later than 20 days after the relevant
Subsequent Transfer Date with respect to the remaining Subsequent Mortgage
Loans conveyed on such Subsequent Transfer Date, and (C) with respect to the
remaining Initial Mortgage Loans, not later than thirty days after the Closing
Date. To the extent that Countrywide Home Loans, Inc. shall be in possession
of any Mortgage Files with respect to any Delay Delivery Mortgage Loan, until
delivery of such Mortgage File to the Trustee as provided in Section 2.01,
Countrywide Home Loans, Inc. shall hold such files as agent and in trust for
the Trustee.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced by
a Replacement Mortgage Loan.

Delinquent: A Mortgage Loan is "delinquent" if any payment due
thereon is not made pursuant to the terms of such Mortgage Loan by the close
of business on the day such payment is scheduled to be due. A Mortgage Loan is
"30 days delinquent" if such payment has not been received by the close of
business on the corresponding day of the month immediately succeeding the
month in which such payment was due, or, if there is no such corresponding day
(e.g., as when a 30-day month follows a 31-day month in which a payment was
due on the 31st day of such month), then on the last day of such immediately
succeeding month. Similarly for "60 days delinquent," "90 days delinquent" and
so on.

Denomination: With respect to each Certificate, the amount set forth
on the face thereof as the "Initial Certificate Balance of this Certificate"
or, if not the foregoing, the Percentage Interest appearing on the face
thereof, as applicable.

Depositor: CWABS, Inc., a Delaware corporation, or its successor in
interest.

Depository: The initial Depository shall be The Depository Trust
Company, the nominee of which is Cede & Co., or any other organization
registered as a "clearing agency" pursuant to Section 17A of the Securities
Exchange Act of 1934, as amended. The Depository shall initially be the
registered Holder of the Book-Entry Certificates. The Depository shall at all
times be a "clearing corporation" as defined in Section 8-102(a)(5) of the
Uniform Commercial Code of the State of New York.

27

<PAGE>

Depository Agreement: With respect to the Book-Entry Certificates,
the agreement among the Depositor and the initial Depository, dated as of the
Closing Date, substantially in the form of Exhibit O.

PSA CWL 06-13.txt

Depository Participant: A broker, dealer, bank or other financial institution or other person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Determination Date: With respect to any Distribution Date, the 15th day of the month of such Distribution Date or, if such 15th day is not a Business Day, the immediately preceding Business Day.

Distribution Account: The separate Eligible Account created and maintained by the Trustee pursuant to Section 3.05(c) in the name of the Trustee for the benefit of the Certificateholders and designated "The Bank of New York, in trust for registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-10". Funds in the Distribution Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement.

Distribution Account Deposit Date: As to any Distribution Date, 1:00 p.m. Pacific time on the Business Day immediately preceding such Distribution Date.

Distribution Date: The 25th day of each month, or if such day is not a Business Day, on the first Business Day thereafter, commencing in July 2006.

Due Date: With respect to any Mortgage Loan and Due Period, the due date for Scheduled Payments of interest and/or principal on that Mortgage Loan occurring in such Due Period as provided in the related Mortgage Note.

Due Period: With respect to any Distribution Date, the period beginning on the second day of the calendar month preceding the calendar month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

EDGAR: The Commission's Electronic Data Gathering, Analysis and Retrieval system.

Eligible Account: Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company, the long-term unsecured debt obligations and short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company, if Moody's is not a Rating Agency) are rated by each Rating Agency in one of its two highest long-term and its highest short-term rating categories respectively, at the time any amounts are held on deposit therein, or (ii) an account or accounts in a depository institution or trust company in which such accounts are insured by the FDIC (to the limits established by the FDIC) and the uninsured deposits in which accounts are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to the Trustee and to each Rating Agency, the Certificateholders have a claim with respect to the funds in such account or a perfected first priority security interest against any collateral (which shall be limited to Permitted Investments)

28

<PAGE>

securing such funds that is superior to claims of any other depositors or creditors of the depository institution or trust company in which such account is maintained, or (iii) a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company having capital and surplus of not less than
Page 35

PSA CWL 06-13.txt
$50,000,000, acting in its fiduciary capacity or (iv) any other account
acceptable to the Rating Agencies without reduction or withdrawal of their
then-current ratings of the Certificates as evidenced by a letter from each
Rating Agency to the Trustee. Eligible Accounts may bear interest, and may
include, if otherwise qualified under this definition, accounts maintained
with the Trustee.

      Eligible Repurchase Month: As defined in Section 3.12(d) hereof.

      ERISA: The Employee Retirement Income Security Act of 1974, as
amended.

      ERISA-Qualifying Underwriting: A best efforts or firm commitment
underwriting or private placement that meets the applicable requirements of
the Underwriter's Exemption.

      ERISA-Restricted Certificates: The Class A-R Certificates, Class P
Certificates, Class C Certificates, Class BV Certificates and Certificates of
any Class that does not have or no longer has a rating of BBB- or its
equivalent, or better, from at least one Rating Agency.

      Escrow Account: As defined in Section 3.06 hereof.

      Event of Default: As defined in Section 7.01 hereof.

      Excess Proceeds: With respect to any Liquidated Mortgage Loan, the
amount, if any, by which the sum of any Liquidation Proceeds and Subsequent
Recoveries are in excess of the sum of (i) the unpaid principal balance of
such Liquidated Mortgage Loan as of the date of liquidation of such Liquidated
Mortgage Loan plus (ii) interest at the Mortgage Rate from the Due Date as to
which interest was last paid or advanced to Certificateholders (and not
reimbursed to the Master Servicer) up to the Due Date in the month in which
Liquidation Proceeds are required to be distributed on the Stated Principal
Balance of such Liquidated Mortgage Loan outstanding during each Due Period as
to which such interest was not paid or advanced.

      Exchange Act: The Securities Exchange Act of 1934, as amended, and
the rules and regulations promulgated thereunder.

      Exchange Act Reports: Any reports on Form 10-D, Form 8-K and Form
10-K required to be filed by the Depositor with respect to the Trust Fund
under the Exchange Act.

      Expense Fee Rate: With respect to any Mortgage Loan, the sum of (i)
the Servicing Fee Rate, (ii) the Trustee Fee Rate and (iii) with respect to
any Mortgage Loan covered by a lender paid mortgage insurance policy, the
related mortgage insurance premium rate.

      Extra Principal Distribution Amount: With respect to any Distribution
Date and (A) Loan Group 1, the lesser of (1) the Fixed Rate
Overcollateralization Deficiency Amount and (2) the sum of the Fixed Rate Loan
Group Excess Cashflow and Fixed Rate Loan Group Credit

29

<PAGE>

Comeback Excess Cashflow available for payment thereof and (B) each of Loan
Group 2 and Loan Group 3, the lesser of (1) the Adjustable Rate
Overcollateralization Deficiency Amount and (2) the Adjustable Rate Loan Group
Excess Cashflow and Adjustable Rate Loan Group Credit Comeback Excess Cashflow

PSA CWL 06-13.txt
available for payment thereof, to be allocated between Loan Group 2 and Loan
Group 3, pro rata, based on the Principal Remittance Amount for each such Loan
Group for such Distribution Date.

        Fannie Mae: The Federal National Mortgage Association, a federally
chartered and privately owned corporation organized and existing under the
Federal National Mortgage Association Charter Act, or any successor thereto.

        FDIC: The Federal Deposit Insurance Corporation, or any successor
thereto.

        Five-Year Hybrid Mortgage Loan: A Mortgage Loan having a Mortgage
Rate that is fixed for 60 months after origination thereof before such
Mortgage Rate becomes subject to adjustment.

        Fixed Rate Certificates: The Class 1-AF-1, Class 1-AF-2, Class
1-AF-3, Class 1-AF-4, Class 1-AF-5, Class 1-AF-6, Class MF-1, Class MF-2,
Class MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class MF-8 and
Class BF Certificates.

        Fixed Rate Cumulative Loss Trigger Event: With respect to a
Distribution Date on or after the Fixed Rate Stepdown Date, a Fixed Rate
Cumulative Loss Trigger Event occurs if (x) the aggregate amount of Realized
Losses on the Mortgage Loans in Loan Group 1 from the Cut-off Date for each
such Mortgage Loan to (and including) the last day of the related Due Period
(reduced by the aggregate amount of any Subsequent Recoveries related to Loan
Group 1 received through the last day of that Due Period) exceeds (y) the
applicable percentage, for such Distribution Date, of the sum of the aggregate
Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 1
and the Group 1 Pre-Funded Amount, as set forth below:

| Distribution Date | Percentage |
| --- | --- |
| July 2008 -- June 2009....... | 0.75% with respect to July 2008, plus an additional 1/12th of 1.00% for each month thereafter through June 2009 |
| July 2009 -- June 2010....... | 1.75% with respect to July 2009, plus an additional 1/12th of 1.20% for each month thereafter through June 2010 |
| July 2010 -- June 2011....... | 2.95% with respect to July 2010, plus an additional 1/12th of 1.00% for each month thereafter through June 2011 |
| July 2011 -- June 2012....... | 3.95% with respect to July 2011, plus an additional 1/12th of 0.75% for each month thereafter through |

                                  30
<PAGE>

| Distribution Date | Percentage |
| --- | --- |
| | June 2012 |
| July 2012 -- June 2013....... | 4.70% with respect to July 2012, plus an additional 1/12th of 0.20% for each month thereafter through June 2013 |
| July 2013 and thereafter..... | 4.90% |

                               Page 37

PSA CWL 06-13.txt

Fixed Rate Delinquency Trigger Event: With respect to any Distribution Date on or after the Fixed Rate Stepdown Date, a Fixed Rate Delinquency Trigger Event exists if the Rolling Sixty-Day Delinquency Rate for Outstanding Mortgage Loans in Loan Group 1 equals or exceeds the product of (x) the Fixed Rate Senior Enhancement Percentage for such Distribution Date and (y) the applicable percentage listed below for the most senior class of outstanding Class 1-AF Certificates and Fixed Rate Subordinate Certificates:

| Class or Classes | Percentage |
|---|---|
| Class 1-AF | 42.900% |
| Class MF-1 | 51.452% |
| Class MF-2 | 62.752% |
| Class MF-3 | 72.406% |
| Class MF-4 | 83.779% |
| Class MF-5 | 98.776% |
| Class MF-6 | 118.531% |
| Class MF-7 | 145.470% |
| Class MF-8 | 177.797% |
| Class BF | 228.596% |

Fixed Rate Excess Overcollateralization Amount: With respect to any Distribution Date, an amount equal to the excess, if any, of the Fixed Rate Overcollateralized Amount for such Distribution Date over the Fixed Rate Overcollateralization Target Amount for such Distribution Date.

Fixed Rate Loan Group Credit Comeback Excess Cashflow: With respect to any Distribution Date, any amounts in the Credit Comeback Excess Account in respect of Loan Group 1 available for such Distribution Date.

Fixed Rate Loan Group Excess Cashflow: With respect to any Distribution Date the sum of (i) the amount remaining after the distribution of interest to Certificateholders for such Distribution Date pursuant to Section 4.04(a)(iii), (ii) the amount remaining after the distribution of principal to Certificateholders for such Distribution Date pursuant to Section 4.04(c)(1)(C) or (c)(2)(C), and (iii) the Fixed Rate Overcollateralization Reduction Amount for such Distribution Date, if any.

Fixed Rate Mortgage Loans: The Mortgage Loans identified in the Mortgage Loan Schedule as having a Mortgage Rate which is fixed for the life of the related Mortgage and

31

<PAGE>

any Credit Comeback Loans, including in each case any Mortgage Loans delivered in replacement thereof.

Fixed Rate Net Rate Cap: For any Distribution Date, the weighted average Adjusted Net Mortgage Rate on the Mortgage Loans in Loan Group 1 as of the first day of the related Due Period (after giving effect to Principal Prepayments received during the Prepayment Period that ends during such Due Period).

Fixed Rate OC Floor: An amount equal to 0.50% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans in Loan Group 1 and the Group 1 Pre-Funded Amount.

Fixed Rate Overcollateralization Deficiency Amount: With respect to

PSA CWL 06-13.txt
any Distribution Date, the amount, if any, by which the Fixed Rate
Overcollateralization Target Amount exceeds the Fixed Rate Overcollateralized
Amount on such Distribution Date (after giving effect to distribution of the
Principal Distribution Amount (other than the portion thereof consisting of
the Extra Principal Distribution Amount) for Loan Group 1 on such Distribution
Date).

        Fixed Rate Overcollateralization Reduction Amount: With respect to
any Distribution Date, an amount equal to the lesser of (i) the Fixed Rate
Excess Overcollateralization Amount for such Distribution Date and (ii) the
Principal Remittance Amount for Loan Group 1 for such Distribution Date.

        Fixed Rate Overcollateralization Target Amount: With respect to any
Distribution Date (a) prior to the Fixed Rate Stepdown Date, an amount equal
to 3.50% of the sum of the aggregate Cut-off Date Principal Balance of the
Initial Mortgage Loans in Loan Group 1 and the Group 1 Pre-Funded Amount and
(b) on or after the Fixed Rate Stepdown Date, the greater of (i) an amount
equal to 7.00% of the aggregate Stated Principal Balance of the Mortgage Loans
in Loan Group 1 for the current Distribution Date and (ii) the Fixed Rate OC
Floor; provided, however, that if a Fixed Rate Trigger Event is in effect on
any Distribution Date, the Fixed Rate Overcollateralization Target Amount will
be the Fixed Rate Overcollateralization Target Amount as in effect for the
prior Distribution Date.

        Fixed Rate Overcollateralized Amount: With respect to any
Distribution Date, the amount, if any, by which (x) the sum of the aggregate
Stated Principal Balance of the Mortgage Loans in Loan Group 1 for such
Distribution Date and any amount on deposit in the Pre-Funding Account in
respect of Loan Group 1 exceeds (y) the aggregate Certificate Principal
Balance of the Class 1-AF Certificates and the Fixed Rate Subordinate
Certificates as of such Distribution Date (after giving effect to distribution
of the Principal Remittance Amount for Loan Group 1 to be made on such
Distribution Date and, in the case of the Distribution Date immediately
following the end of the Funding Period, any amounts to be released from the
Pre-Funding Account in respect of Loan Group 1).

        Fixed Rate Senior Enhancement Percentage: With respect to a
Distribution Date on or after the Fixed Rate Stepdown Date, the fraction
(expressed as a percentage) (1) the numerator of which is the excess of (a)
the aggregate Stated Principal Balance of the Mortgage


                                  32

<PAGE>


Loans in Loan Group 1 for the preceding Distribution Date over (b) (i) before
the Certificate Principal Balances of the Class 1-AF Certificates have been
reduced to zero, the sum of the Certificate Principal Balances of the Class
1-AF Certificates, or (ii) after the Certificate Principal Balances of the
Class 1-AF Certificates have been reduced to zero, the Certificate Principal
Balance of the most senior Class of Fixed Rate Subordinate Certificates
outstanding, as of the related Master Servicer Advance Date, and (2) the
denominator of which is the aggregate Stated Principal Balance of the Mortgage
Loans in Loan Group 1 for the preceding Distribution Date.

        Fixed Rate Subordinate Class Principal Distribution Amount: With
respect to any Distribution Date and any Class of Fixed Rate Subordinate
Certificates the excess of (1) the sum of (a) the aggregate Certificate
Principal Balance of the Class 1-AF Certificates (after taking into account
distribution of the Class 1-AF Principal Distribution Amount for such

PSA CWL 06-13.txt

Distribution Date), (b) the aggregate Certificate Principal Balance of any Class(es) of Fixed Rate Subordinate Certificates that are senior to the subject Class (in each case, after taking into account distribution of the Fixed Rate Subordinate Class Principal Distribution Amount(s) for such senior Class(es) of Certificates for such Distribution Date), and (c) the Certificate Principal Balance of such Class of Fixed Rate Subordinate Certificates immediately prior to the subject Distribution Date over (2) the lesser of (a) the product of (x) 100% minus the Stepdown Target Subordination Percentage for the subject Class of Certificates and (y) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 1 for such Distribution Date and (b) the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 1 for such Distribution Date minus the Fixed Rate OC Floor; provided, however, that if such Class of Fixed Rate Subordinate Certificates is the only Class of Fixed Rate Subordinate Certificates outstanding on such Distribution Date, that Class will be entitled to receive the entire remaining Principal Distribution Amount for Loan Group 1 until the Certificate Principal Balance thereof is reduced to zero.

Fixed Rate Stepdown Date: The earlier to occur of: (1) the Distribution Date on which the aggregate Certificate Principal Balance of the Class 1-AF Certificates is reduced to zero, and (2) the later to occur of (x) the Distribution Date in July 2009 and (y) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class 1-AF Certificates (after calculating anticipated distributions on such Distribution Date) is less than or equal to 62.70% of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 1 for such Distribution Date.

Fixed Rate Subordinate Certificates: The Class MF-1, Class MF-2, Class MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class MF-8 and Class BF Certificates.

Fixed Rate Trigger Event: With respect to any Distribution Date on or after the Fixed Rate Stepdown Date, either a Fixed Rate Delinquency Trigger Event with respect to that Distribution Date or a Fixed Rate Cumulative Loss Trigger Event with respect to that Distribution Date.

Form 10-D Disclosure Item: With respect to any Person, any material litigation or governmental proceedings pending against such Person, or against any of the Trust Fund, the Depositor, the Trustee, any co-trustee, the Master Servicer or any Subservicer, if such Person has actual knowledge thereof.

33

<PAGE>

Form 10-K Disclosure Item: With respect to any Person, (a) Form 10-D Disclosure Item, and (b) any affiliations or relationships between such Person and any Item 1119 Party.

Freddie Mac: The Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

Funding Period: The period from the Closing Date to and including the earlier to occur of (x) the date the amount in the Pre-Funding Account is less than $175,000 and (y) August 14, 2006.

Gross Margin: The percentage set forth in the related Mortgage Note to be added to the Index for use in determining the Mortgage Rate for each Adjustable Rate Mortgage Loan on each of its Adjustment Dates.

PSA CWL 06-13.txt

Group 1 Mortgage Loans: The group of Mortgage Loans identified in the related Mortgage Loan Schedule as "Group 1 Mortgage Loans", including in each case any Mortgage Loans delivered in replacement thereof.

Group 1 Pre-Funded Amount: The portion of the Pre-Funded Amount allocable for purchase of Subsequent Mortgage Loans as Group 1 Mortgage Loans on the Closing Date, which shall equal $2.81.

Group 2 Mortgage Loans: The group of Mortgage Loans identified in the related Mortgage Loan Schedule as "Group 2 Mortgage Loans", including in each case any Mortgage Loans delivered in replacement thereof.

Group 2 Overcollateralization Reduction Amount: With respect to any Distribution Date, the Adjustable Rate Overcollateralization Reduction Amount for such Distribution Date multiplied by a fraction, the numerator of which is the Principal Remittance Amount for Loan Group 2 for such Distribution Date, and the denominator of which is the aggregate Principal Remittance Amount for Loan Group 2 and Loan Group 3 for such Distribution Date.

Group 2 Pre-Funded Amount: The portion of the Pre-Funded Amount allocable for purchase of Subsequent Mortgage Loans as Group 2 Mortgage Loans on the Closing Date, which shall equal $0.00.

Group 3 Mortgage Loans: The group of Mortgage Loans identified in the related Mortgage Loan Schedule as "Group 3 Mortgage Loans", including in each case any Mortgage Loans delivered in replacement thereof.

Group 3 Overcollateralization Reduction Amount: With respect to any Distribution Date, the Adjustable Rate Overcollateralization Reduction Amount for such Distribution Date multiplied by a fraction, the numerator of which is the Principal Remittance Amount for Loan Group 3 for such Distribution Date, and the denominator of which is the

34

<PAGE>

aggregate Principal Remittance Amount for Loan Group 2 and Loan Group 3 for such Distribution Date.

Group 3 Pre-Funded Amount: The portion of the Pre-Funded Amount allocable for purchase of Subsequent Mortgage Loans as Group 3 Mortgage Loans on the Closing Date, which shall equal $11.42.

Index: As to any Adjustable Rate Mortgage Loan on any Adjustment Date related thereto, the index for the adjustment of the Mortgage Rate set forth as such in the related Mortgage Note, such index in general being the average of the London interbank offered rates for six-month U.S. dollar deposits in the London market, as set forth in The Wall Street Journal, as most recently announced as of a date 45 days prior to such Adjustment Date or, if the Index ceases to be published in The Wall Street Journal or becomes unavailable for any reason, then the Index shall be a new index selected by the Master Servicer, based on comparable information.

Initial Adjustment Date: As to any Adjustable Rate Mortgage Loan, the first Adjustment Date following the origination of such Mortgage Loan.

Initial Certificate Account Deposit: An amount equal to the aggregate of all amounts in respect of (i) principal of the Initial Mortgage Loans due after the Initial Cut-off Date and received by the Master Servicer before the Closing Date and not applied in computing the Cut-off Date Principal Balance

PSA CWL 06-13.txt
thereof and (ii) interest on the Initial Mortgage Loans due after the Initial
Cut-off Date and received by the Master Servicer before the Closing Date.

Initial Certificate Principal Balance: With respect to any
Certificate (other than the Class C Certificates) the Certificate Principal
Balance of such Certificate or any predecessor Certificate on the Closing
Date.

Initial Cut-off Date: In the case of any Initial Mortgage Loan, the
later of (x) June 1, 2006 and (y) the date of origination of such Mortgage
Loan.

Initial Mortgage Loan: A Mortgage Loan conveyed to the Trustee on the
Closing Date pursuant to this Agreement as identified on the Mortgage Loan
Schedule delivered to the Trustee on the Closing Date.

Initial Mortgage Rate: As to each Adjustable Rate Mortgage Loan, the
Mortgage Rate in effect prior to the Initial Adjustment Date.

Initial Periodic Rate Cap: With respect to each Adjustable Rate
Mortgage Loan, the percentage specified in the related Mortgage Note that
limits the permissible increase or decrease in the Mortgage Rate on its
initial Adjustment Date.

Insurance Policy: With respect to any Mortgage Loan included in the
Trust Fund, any insurance policy, including all riders and endorsements
thereto in effect with respect to such Mortgage Loan, including any
replacement policy or policies for any Insurance Policy.

35

<PAGE>

Insurance Proceeds: Proceeds paid in respect of the Mortgage Loans
pursuant to any Insurance Policy or any other insurance policy covering a
Mortgage Loan, to the extent such proceeds are payable to the mortgagee under
the Mortgage, the Master Servicer or the trustee under the deed of trust and
are not applied to the restoration of the related Mortgaged Property or
released to the Mortgagor in accordance with the procedures that the Master
Servicer would follow in servicing mortgage loans held for its own account, in
each case other than any amount included in such Insurance Proceeds in respect
of Insured Expenses and received either prior to or in connection with such
Mortgage Loan becoming a Liquidated Mortgage Loan.

Insured Expenses: Expenses covered by an Insurance Policy or any
other insurance policy with respect to the Mortgage Loans.

Interest Bearing Certificates: The Fixed Rate Certificates and the
Adjustable Rate Certificates.

Interest Carry Forward Amount: With respect to each Class of Interest
Bearing Certificates and each Distribution Date, the excess of (i) the Current
Interest for such Class with respect to prior Distribution Dates over (ii) the
amount actually distributed to such Class with respect to interest on such
prior Distribution Dates.

Interest Determination Date: With respect to the first Accrual Period
for the Adjustable Rate Certificates, June 28, 2006. With respect to any
Accrual Period for the Adjustable Rate Certificates thereafter, the second
LIBOR Business Day preceding the commencement of such Accrual Period.

PSA CWL 06-13.txt

Interest Funds: With respect to any Distribution Date and Loan Group, the Interest Remittance Amount for such Loan Group and Distribution Date, less the portion of the Trustee Fee for such Distribution Date allocable to such Loan Group, plus, in the case of Loan Group 2 and Loan Group 3, the Adjusted Replacement Upfront Amount, if any, allocable to that Loan Group.

Interest Remittance Amount: With respect to the Mortgage Loans in each Loan Group and any Distribution Date, (x) the sum, without duplication, of (i) all scheduled interest collected during the related Due Period (for the avoidance of doubt, other than Credit Comeback Excess Amounts) with respect to the related Mortgage Loans less the related Servicing Fee, (ii) all interest on prepayments received during the related Prepayment Period with respect to such Mortgage Loans, other than Prepayment Interest Excess, (iii) all related Advances relating to interest with respect to such Mortgage Loans, (iv) all related Compensating Interest with respect to such Mortgage Loans, (v) Liquidation Proceeds with respect to such Mortgage Loans collected during the related Due Period (to the extent such Liquidation Proceeds relate to interest) and (vi) the related Seller Shortfall Interest Requirement, less (y) all reimbursements to the Master Servicer during the related Due Period for Advances of interest previously made allocable to such Loan Group.

Investment Letter: As defined in Section 5.02(b).

Item 1119 Party: The Depositor, any Seller, the Master Servicer, the Trustee, any Subservicer, any originator identified in the Prospectus Supplement, the Swap Counterparty and

36

<PAGE>

any other material transaction party, as identified in Exhibit Z hereto, as updated pursuant to Section 11.04.

Latest Possible Maturity Date: The Distribution Date following the third anniversary of the scheduled maturity date of the Mortgage Loan having the latest scheduled maturity date as of the Cut-off Date.

LIBOR Business Day: Any day on which banks in the City of London, England and New York City, U.S.A. are open and conducting transactions in foreign currency and exchange.

Limited Exchange Act Reporting Obligations: The obligations of the Master Servicer under Section 3.17(b), Section 6.02 and Section 6.04 with respect to notice and information to be provided to the Depositor and Article XI (except Section 11.07(a)(1) and (2)).

Liquidated Mortgage Loan: With respect to any Distribution Date, a defaulted Mortgage Loan that has been liquidated through deed-in-lieu of foreclosure, foreclosure sale, trustee's sale or other realization as provided by applicable law governing the real property subject to the related Mortgage and any security agreements and as to which the Master Servicer has certified in the related Prepayment Period that it has received all amounts it expects to receive in connection with such liquidation.

Liquidation Proceeds: Amounts, including Insurance Proceeds, received in connection with the partial or complete liquidation of Mortgage Loans, whether through trustee's sale, foreclosure sale or otherwise or amounts received in connection with any condemnation or partial release of a Mortgaged Property and any other proceeds received in connection with an REO Property

PSA CWL 06-13.txt
received in connection with or prior to such Mortgage Loan becoming a
Liquidated Mortgage Loan (other than the amount of such net proceeds
representing any profit realized by the Master Servicer in connection with the
disposition of any such properties), less the sum of related unreimbursed
Advances, Servicing Fees and Servicing Advances.

        Loan Group: Any of Loan Group 1, Loan Group 2 or Loan Group 3.

        Loan Group 1: The Group 1 Mortgage Loans.

        Loan Group 1 Net Rate Cap: As defined in the Preliminary Statement.

        Loan Group 2: The Group 2 Mortgage Loans.

        Loan Group 3: The Group 3 Mortgage Loans.

        Loan Number and Borrower Identification Mortgage Loan Schedule: With
respect to any Subsequent Transfer Date, the Loan Number and Borrower
Identification Mortgage Loan Schedule delivered in connection with such
Subsequent Transfer Date pursuant to Section 2.01(f). Each Loan Number and
Borrower Identification Mortgage Loan Schedule shall contain the information
specified in the definition of "Mortgage Loan Schedule" with respect to the
Subsequent Mortgage Loans conveyed on such Subsequent Transfer Date, and


                                    37

<PAGE>


each Loan Number and Borrower Identification Mortgage Loan Schedule shall be
deemed to be included in the Mortgage Loan Schedule.

        Loan-to-Value Ratio: The fraction, expressed as a percentage, the
numerator of which is the original principal balance of the related Mortgage
Loan and the denominator of which is the Appraised Value of the related
Mortgaged Property.

        Majority Holder: The Holders of Certificates evidencing at least 51%
of the Voting Rights allocated to such Class of Certificates.

        Master REMIC: As defined in the Preliminary Statement.

        Master Servicer: Countrywide Home Loans Servicing LP, a Texas limited
partnership, and its successors and assigns, in its capacity as master
servicer hereunder.

        Master Servicer Advance Date: As to any Distribution Date, the
Business Day immediately preceding such Distribution Date.

        Master Servicer Prepayment Charge Payment Amount: The amounts (i)
payable by the Master Servicer in respect of any Prepayment Charges waived
other than in accordance with the standard set forth in the first sentence of
Section 3.18(a), or (ii) collected from the Master Servicer in respect of a
remedy for the breach of the representation made by CHL set forth in Section
3.18(c).

        Maximum Mortgage Rate: With respect to each Adjustable Rate Mortgage
Loan, the maximum rate of interest set forth as such in the related Mortgage
Note.

        MERS: Mortgage Electronic Registration Systems, Inc., a corporation
organized and existing under the laws of the State of Delaware, or any

PSA CWL 06-13.txt
successor thereto.

MERS Mortgage Loan: Any Mortgage Loan registered with MERS on the MERS(R) System.

MERS(R) System: The system of recording transfers of mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for any MERS Mortgage Loan.

Minimum Mortgage Rate: With respect to each Adjustable Rate Mortgage Loan, the minimum rate of interest set forth as such in the related Mortgage Note.

Modified Mortgage Loan: As defined in Section 3.12(a).

MOM Loan: Any Mortgage Loan, as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Monthly Statement: The statement delivered to the Certificateholders pursuant to Section 4.05.

38

<PAGE>

Moody's: Moody's Investors Service, Inc. and its successors.

Mortgage: The mortgage, deed of trust or other instrument creating a first lien on or first priority ownership interest in an estate in fee simple in real property securing a Mortgage Note.

Mortgage File: The mortgage documents listed in Section 2.01 hereof pertaining to a particular Mortgage Loan and any additional documents delivered to the Trustee to be added to the Mortgage File pursuant to this Agreement.

Mortgage Loan Schedule: The list of Mortgage Loans (as from time to time amended by the Master Servicer to reflect the deletion of Liquidated Mortgage Loans and Deleted Mortgage Loans and the addition of (x) Replacement Mortgage Loans pursuant to the provisions of this Agreement and (y) Subsequent Mortgage Loans pursuant to the provisions of this Agreement and any Subsequent Transfer Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, attached hereto as Exhibit F-1, setting forth in the following information with respect to each Mortgage Loan:

(i) the loan number;

(ii) the Loan Group;

(iii) the Appraised Value;

(iv) the Initial Mortgage Rate;

(v) the maturity date;

(vi) the original principal balance;

(vii) the Cut-off Date Principal Balance;

PSA CWL 06-13.txt
(viii) the first payment date of the Mortgage Loan;

(ix) the Scheduled Payment in effect as of the Cut-off Date;

(x) the Loan-to-Value Ratio at origination;

(xi) a code indicating whether the residential dwelling at the time of origination was represented to be owner-occupied;

(xii) a code indicating whether the residential dwelling is either (a) a detached single-family dwelling, (b) a two-family residential property, (c) a three-family residential property, (d) a four-family residential property, (e) planned unit development, (f) a low-rise condominium unit, (g) a high-rise condominium unit or (h) manufactured housing;

(xiii) a code indicating whether such Mortgage Loan is a Credit Comeback Loan;

<center>39</center>

&lt;PAGE&gt;

(xiv) [Reserved];

(xv) [Reserved];

(xvi) the purpose of the Mortgage Loan;

(xvii) with respect to each Adjustable Rate Mortgage Loan:

(a) the frequency of each Adjustment Date;

(b) the next Adjustment Date;

(c) the Maximum Mortgage Rate;

(d) the Minimum Mortgage Rate;

(e) the Mortgage Rate as of the Cut-off Date;

(f) the related Initial Periodic Rate Cap and
    Subsequent Periodic Rate Cap; and

(g) the Gross Margin;

(xviii) a code indicating whether the Mortgage Loan is a CHL Mortgage Loan, a Park Monaco Mortgage Loan or a Park Sienna Mortgage Loan;

(xix) the premium rate for any lender-paid mortgage insurance, if applicable; and

(xx) a code indicating whether the Mortgage Loan is a Fixed Rate Mortgage Loan or an Adjustable Rate Mortgage Loan.

Such schedule shall also set forth the total of the amounts described under (vii) above for all of the Mortgage Loans and for each Loan Group. The Mortgage Loan Schedule shall be deemed to include each Loan Number and Borrower Identification Mortgage Loan Schedule delivered pursuant to Section

PSA CWL 06-13.txt
2.01(f) and all the related Subsequent Mortgage Loans and Subsequent Mortgage
Loan information included therein.

        Mortgage Loans: Such of the mortgage loans transferred and assigned
to the Trustee pursuant to the provisions hereof and any Subsequent Transfer
Agreement as from time to time are held as part of the Trust Fund (including
any REO Property), the mortgage loans so held being identified in the Mortgage
Loan Schedule, notwithstanding foreclosure or other acquisition of title of
the related Mortgaged Property. Any mortgage loan that was intended by the
parties hereto to be transferred to the Trust Fund as indicated by such
Mortgage Loan Schedule which is in fact not so transferred for any reason,
including a breach of the representation contained in Section 2.02 hereof,
shall continue to be a Mortgage Loan hereunder until the Purchase Price with
respect thereto has been paid to the Trust Fund.


                                    40

<PAGE>


        Mortgage Note: The original executed note or other evidence of
indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan.

        Mortgage Pool: The aggregate of the Mortgage Loans identified in the
Mortgage Loan Schedule.

        Mortgage Rate: The annual rate of interest borne by a Mortgage Note
from time to time; provided, however, the Mortgage Rate for each Credit
Comeback Loan shall be treated for all purposes of payments on the
Certificates, including the calculation of the Pass-Through Rates and the
applicable Net Rate Cap, as reduced by 0.375% on the Due Date following the
end of each of the first four annual periods after the origination date,
irrespective of whether the Mortgagor qualifies for the reduction by having a
good payment history.

        Mortgaged Property: The underlying property securing a Mortgage Loan.

        Mortgagor: The obligors on a Mortgage Note.

        NAS Factor: For any Distribution Date set forth below, the percentage
set forth in the following table:

| Distribution Date | Percentage |
| --- | --- |
| July 2006 -- June 2009................... | 0% |
| July 2009 -- June 2011................... | 45% |
| July 2011 -- June 2012................... | 80% |
| July 2012 -- June 2013................... | 100% |
| July 2013 and thereafter................ | 300% |

        NAS Principal Distribution Amount: For any Distribution Date, an
amount equal to the product of (i) the Class 1-AF-6 Portion for such
Distribution Date, (ii) any amounts distributed to the Class 1-AF Certificates
pursuant to Section 4.04(c), 4.04(e)(1) and 4.04(f)(4) for such Distribution
Date and (iii) the NAS Factor for such Distribution Date.

        Net Mortgage Rate: As to each Mortgage Loan, and at any time, the per
annum rate equal to the Mortgage Rate less the Servicing Fee Rate.

        Net Rate Cap: With respect to any Distribution Date, (i) with respect
to each Class of Class 1-AF Certificates and the Fixed Rate Subordinate

PSA CWL 06-13.txt
Certificates, the Fixed Rate Net Rate Cap, (ii) with respect to the Class 2-AV
Certificates, the Class 2-AV Net Rate Cap, (iii) with respect to each Class of
Class 3-AV Certificates, the Class 3-AV Net Rate Cap and (iv) with respect to
each Class of Adjustable Rate Subordinate Certificates, the Adjustable Rate
Subordinate Net Rate Cap.

Net Rate Carryover: With respect to any Class of Interest Bearing
Certificates and any Distribution Date, the sum of (A) the excess of (i) the
amount of interest that such Class would otherwise have accrued for such
Distribution Date had the Pass-Through Rate for such Class and the related
Accrual Period not been determined based on the applicable Net Rate Cap, over
(ii) the amount of interest accrued on such Class at the applicable Net Rate
Cap for such Distribution Date and (B) the Net Rate Carryover for such Class
for all previous Distribution

41

<PAGE>

Dates not previously paid pursuant to Section 4.04, together with interest
thereon at the then-applicable Pass-Through Rate for such Class, without
giving effect to the applicable Net Rate Cap.

Net Swap Payment: With respect to any Distribution Date and payment
by the Swap Contract Administrator to the Swap Counterparty, the excess, if
any, of the "Fixed Amount" (as defined in the Swap Contract) with respect to
such Distribution Date over the "Floating Amount" (as defined in the Swap
Contract) with respect to such Distribution Date. With respect to any
Distribution Date and payment by the Swap Counterparty to the Swap Contract
Administrator, the excess, if any, of the "Floating Amount" (as defined in the
Swap Contract) with respect to such Distribution Date over the "Fixed Amount"
(as defined in the Swap Contract) with respect to such Distribution Date.

NIM Insurer: Any insurer guarantying at the request of CHL certain
payments under notes backed or secured by the Class C or Class P Certificates.

Nonrecoverable Advance: Any portion of an Advance previously made or
proposed to be made by the Master Servicer that, in the good faith judgment of
the Master Servicer, will not or, in the case of a current delinquency, would
not, be ultimately recoverable by the Master Servicer from the related
Mortgagor, related Liquidation Proceeds or otherwise.

Non-United States Person: A Person that is not a citizen or resident
of the United States, a corporation, partnership, or other entity (treated as
a corporation or a partnership for federal income tax purposes) created or
organized in or under the laws of the United States, any state thereof or the
District of Columbia, an estate whose income from sources without the United
States is includible in gross income for United States federal income tax
purposes regardless of its connection with the conduct of a trade or business
within the United States, or a trust if a court within the United States is
able to exercise primary supervision over the administration of the trust and
one or more United States persons have authority to control all substantial
decisions of the trustor.

Officer's Certificate: A certificate (i) in the case of the
Depositor, signed by the Chairman of the Board, the Vice Chairman of the
Board, the President, a Managing Director, a Vice President (however
denominated), an Assistant Vice President, the Treasurer, the Secretary, or
one of the Assistant Treasurers or Assistant Secretaries of the Depositor,
(ii) in the case of the Master Servicer, signed by the President, an Executive
Vice President, a Vice President, an Assistant Vice President, the Treasurer,

PSA CWL 06-13.txt

or one of the Assistant Treasurers or Assistant Secretaries of Countrywide GP, Inc., its general partner, (iii) if provided for in this Agreement, signed by a Servicing Officer, as the case may be, and delivered to the Depositor and the Trustee, as the case may be, as required by this Agreement, or (iv) in the case of any other Person, signed by an authorized officer of such Person.

One-Month LIBOR: With respect to any Accrual Period for the Adjustable Rate Certificates, the rate determined by the Trustee on the related Interest Determination Date on the basis of the rate for U.S. dollar deposits for one month as quoted on the Bloomberg Terminal on such Interest Determination Date; provided that the parties hereto acknowledge that One-Month LIBOR calculated for the first Accrual Period for the Adjustable Rate Certificates shall equal

42

<PAGE>

5.35000% per annum. If such rate is not quoted on the Bloomberg Terminal (or if such service is no longer offered, such other service for displaying One-Month LIBOR or comparable rates as may be reasonably selected by the Trustee), One-Month LIBOR for the applicable Accrual Period for the Adjustable Rate Certificates will be the Reference Bank Rate. If no such quotations can be obtained by the Trustee and no Reference Bank Rate is available, One-Month LIBOR will be One-Month LIBOR applicable to the preceding Accrual Period for the Adjustable Rate Certificates.

Opinion of Counsel: A written opinion of counsel, who may be counsel for the Depositor or the Master Servicer, reasonably acceptable to each addressee of such opinion; provided that with respect to Section 6.04 or 10.01, or the interpretation or application of the REMIC Provisions, such counsel must (i) in fact be independent of the Depositor and the Master Servicer, (ii) not have any direct financial interest in the Depositor or the Master Servicer or in any affiliate of either and (iii) not be connected with the Depositor or the Master Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Optional Termination: The termination of the Trust Fund provided hereunder pursuant to the purchase of the Mortgage Loans pursuant to clause (a) of the first sentence of Section 9.01 hereof.

Optional Termination Date: The first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to 10% of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans and the Pre-Funded Amount.

Original Value: The value of the property underlying a Mortgage Loan based, in the case of the purchase of the underlying Mortgaged Property, on the lower of an appraisal satisfactory to the Master Servicer or the sales price of such property or, in the case of a refinancing, on an appraisal satisfactory to the Master Servicer.

OTS: The Office of Thrift Supervision.

Outstanding: With respect to the Certificates as of any date of determination, all Certificates theretofore executed and authenticated under this Agreement except:

(i) Certificates theretofore canceled by the Trustee or delivered to the Trustee for cancellation; and

Page 49

PSA CWL 06-13.txt

          (ii) Certificates in exchange for which or in lieu of which
     other Certificates have been executed and delivered by the Trustee
     pursuant to this Agreement.

          Outstanding Mortgage Loan: As of any Distribution Date, a Mortgage
Loan with a Stated Principal Balance greater than zero that was not the
subject of a Principal Prepayment in full, and that did not become a
Liquidated Mortgage Loan, prior to the end of the related Prepayment Period.


                                   43

<PAGE>


          Ownership Interest: As to any Certificate, any ownership interest in
such Certificate including any interest in such Certificate as the Holder
thereof and any other interest therein, whether direct or indirect, legal or
beneficial.

          Park Monaco: Park Monaco Inc., a Delaware corporation, and its
successors and assigns.

          Park Monaco Mortgage Loans: The Mortgage Loans identified as such on
the Mortgage Loan Schedule for which Park Monaco is the applicable Seller.

          Park Sienna: Park Sienna LLC, a Delaware limited liability company,
and its successors and assigns.

          Park Sienna Mortgage Loans: The Mortgage Loans identified as such on
the Mortgage Loan Schedule for which Park Sienna is the applicable Seller.

          Pass-Through Margin: With respect to any Accrual Period and Class of
Adjustable Rate Certificates, the per annum rate indicated in the following
table:

| Class | Pass-Through Margin (1) | Pass-Through Margin (2) |
|---|---|---|
| Class 2-AV.................... | 0.130% | 0.260% |
| Class 3-AV-1................. | 0.050% | 0.100% |
| Class 3-AV-2................. | 0.110% | 0.220% |
| Class 3-AV-3................. | 0.160% | 0.320% |
| Class 3-AV-4................. | 0.260% | 0.520% |
| Class MV-1................... | 0.260% | 0.390% |
| Class MV-2................... | 0.300% | 0.450% |
| Class MV-3................... | 0.350% | 0.525% |
| Class MV-4................... | 0.420% | 0.630% |
| Class MV-5................... | 0.440% | 0.660% |
| Class MV-6................... | 0.500% | 0.750% |

PSA CWL 06-13.txt

| | | |
|---|---|---|
| Class MV-7.................... | 1.000% | 1.500% |
| Class MV-8.................... | 1.250% | 1.875% |
| Class MV-9.................... | 2.200% | 3.300% |
| Class BV..................... | 2.250% | 3.375% |

(1)   For any Accrual Period relating to any Distribution Date occurring on or
      prior to the Optional Termination Date.
(2)   For any Accrual Period relating to any Distribution Date occurring after
      the Optional Termination Date.

      Pass-Through Rate: With respect to any Accrual Period and each Class
of Adjustable Rate Certificates the lesser of (x) One-Month LIBOR for such
Accrual Period plus the Pass-Through Margin for such Class and Accrual Period
and (y) the applicable Net Rate Cap for such Class and the related
Distribution Date. With respect to any Accrual Period and each Class of Fixed
Rate Certificates, the lesser of (x) the per annum rate set forth in the
following

44

<PAGE>

table for such Class and Accrual Period and (y) the applicable Net Rate Cap
for such Class and the related Distribution Date.

| Class | Pass-Through Margin (1) | Pass-Through Margin (2) |
|---|---|---|
| 1-AF-1 | 6.128% | 6.128% |
| 1-AF-2 | 5.931% | 5.931% |
| 1-AF-3 | 5.971% | 5.971% |
| 1-AF-4 | 6.273% | 6.273% |
| 1-AF-5 | 6.367% | 6.867% |
| 1-AF-6 | 6.116% | 6.116% |
| MF-1 | 6.474% | 6.474% |
| MF-2 | 6.573% | 6.573% |
| MF-3 | 6.678% | 6.678% |
| MF-4 | 6.850% | 6.850% |
| MF-5 | 6.850% | 6.850% |
| MF-6 | 6.850% | 6.850% |
| MF-7 | 6.850% | 6.850% |
| MF-8 | 6.850% | 6.850% |

PSA CWL 06-13.txt

```
----------------------- ---------------------- -------------------
          BF                    6.850%                  6.850%
----------------------- ---------------------- -------------------
```

(1)  For any Accrual Period relating to any Distribution Date occurring on or
     prior to the Optional Termination Date.
(2)  For any Accrual Period relating to any Distribution Date occurring after
     the Optional Termination Date.

     Percentage Interest: With respect to any Interest Bearing
Certificate, a fraction, expressed as a percentage, the numerator of which is
the Certificate Principal Balance represented by such Certificate and the
denominator of which is the aggregate Certificate Principal Balance of the
related Class. With respect to the Class C, Class P and Class A-R
Certificates, the portion of the Class evidenced thereby, expressed as a
percentage, as stated on the face of such Certificate.

     Performance Certification: As defined in Section 11.05.

     Permitted Investments: At any time, any one or more of the following
obligations and securities:

          (i) obligations of the United States or any agency thereof,
     provided such obligations are backed by the full faith and credit of
     the United States;

          (ii) general obligations of or obligations guaranteed by any
     state of the United States or the District of Columbia receiving the
     highest long-term debt rating of each Rating Agency, or such lower
     rating as each Rating Agency has confirmed in writing is sufficient
     for the ratings originally assigned to the Certificates by such
     Rating Agency;

          (iii) commercial or finance company paper which is then
     receiving the highest commercial or finance company paper rating of
     each Rating Agency, or

                                   45

<PAGE>

     such lower rating as each Rating Agency has confirmed in writing is
     sufficient for the ratings originally assigned to the Certificates
     by such Rating Agency;

          (iv) certificates of deposit, demand or time deposits, or
     bankers' acceptances issued by any depository institution or trust
     company incorporated under the laws of the United States or of any
     state thereof and subject to supervision and examination by federal
     and/or state banking authorities, provided that the commercial paper
     and/or long term unsecured debt obligations of such depository
     institution or trust company (or in the case of the principal
     depository institution in a holding company system, the commercial
     paper or long-term unsecured debt obligations of such holding
     company, but only if Moody's is not a Rating Agency) are then rated
     one of the two highest long-term and the highest short-term ratings
     of each such Rating Agency for such securities, or such lower
     ratings as each Rating Agency has confirmed in writing is sufficient
     for the ratings originally assigned to the Certificates by such
     Rating Agency;

PSA CWL 06-13.txt

(v) repurchase obligations with respect to any security
described in clauses (i) and (ii) above, in either case entered into
with a depository institution or trust company (acting as principal)
described in clause (iv) above;

(vi) securities (other than stripped bonds, stripped coupons or
instruments sold at a purchase price in excess of 115% of the face
amount thereof) bearing interest or sold at a discount issued by any
corporation incorporated under the laws of the United States or any
state thereof which, at the time of such investment, have one of the
two highest long term ratings of each Rating Agency (except (x) if
the Rating Agency is Moody's, such rating shall be the highest
commercial paper rating of S&P for any such securities) and (y), or
such lower rating as each Rating Agency has confirmed in writing is
sufficient for the ratings originally assigned to the Certificates
by such Rating Agency;

(vii) interests in any money market fund which at the date of
acquisition of the interests in such fund and throughout the time
such interests are held in such fund has the highest applicable long
term rating by each Rating Agency or such lower rating as each
Rating Agency has confirmed in writing is sufficient for the ratings
originally assigned to the Certificates by such Rating Agency;

(viii) short term investment funds sponsored by any trust
company or national banking association incorporated under the laws
of the United States or any state thereof which on the date of
acquisition has been rated by each Rating Agency in their respective
highest applicable rating category or such lower rating as each
Rating Agency has confirmed in writing is sufficient for the ratings
originally assigned to the Certificates by such Rating Agency; and

(ix) such other relatively risk free investments having a
specified stated maturity and bearing interest or sold at a discount
acceptable to each Rating Agency as will not result in the
downgrading or withdrawal of the rating then assigned to the
Certificates by any Rating Agency, as evidenced by a signed

46

<PAGE>

writing delivered by each Rating Agency, and reasonably acceptable
to the NIM Insurer, as evidenced by a signed writing delivered by
the NIM Insurer;

provided, that no such instrument shall be a Permitted Investment if such
instrument (i) evidences the right to receive interest only payments with
respect to the obligations underlying such instrument, (ii) is purchased at a
premium or (iii) is purchased at a deep discount; provided further that no
such instrument shall be a Permitted Investment (A) if such instrument
evidences principal and interest payments derived from obligations underlying
such instrument and the interest payments with respect to such instrument
provide a yield to maturity of greater than 120% of the yield to maturity at
par of such underlying obligations, or (B) if it may be redeemed at a price
below the purchase price (the foregoing clause (B) not to apply to investments
in units of money market funds pursuant to clause (vii) above); provided
further that no amount beneficially owned by any REMIC (including, without
limitation, any amounts collected by the Master Servicer but not yet deposited
in the Certificate Account) may be invested in investments (other than money

PSA CWL 06-13.txt
market funds) treated as equity interests for Federal income tax purposes,
unless the Master Servicer shall receive an Opinion of Counsel, at the expense
of Master Servicer, to the effect that such investment will not adversely
affect the status of any such REMIC as a REMIC under the Code or result in
imposition of a tax on any such REMIC. Permitted Investments that are subject
to prepayment or call may not be purchased at a price in excess of par.

        Permitted Transferee: Any Person other than (i) the United States,
any State or political subdivision thereof, or any agency or instrumentality
of any of the foregoing, (ii) a foreign government, International Organization
or any agency or instrumentality of either of the foregoing, (iii) an
organization (except certain farmers' cooperatives described in section 521 of
the Code) that is exempt from tax imposed by Chapter 1 of the Code (including
the tax imposed by section 511 of the Code on unrelated business taxable
income) on any excess inclusions (as defined in section 860E(c)(1) of the
Code) with respect to any Class A-R Certificate, (iv) rural electric and
telephone cooperatives described in section 1381(a)(2)(C) of the Code, (v) an
"electing large partnership" as defined in section 775 of the Code, (vi) a
Person that is not a citizen or resident of the United States, a corporation,
partnership, or other entity (treated as a corporation or a partnership for
federal income tax purposes) created or organized in or under the laws of the
United States, any state thereof or the District of Columbia, or an estate
whose income from sources without the United States is includible in gross
income for United States federal income tax purposes regardless of its
connection with the conduct of a trade or business within the United States,
or a trust if a court within the United States is able to exercise primary
supervision over the administration of the trust and one or more United States
Persons have authority to control all substantial decisions of the trustor
unless such Person has furnished the transferor and the Trustee with a duly
completed Internal Revenue Service Form W-8ECI, and (vii) any other Person so
designated by the Trustee based upon an Opinion of Counsel that the Transfer
of an Ownership Interest in a Class A-R Certificate to such Person may cause
any REMIC formed hereunder to fail to qualify as a REMIC at any time that any
Certificates are Outstanding. The terms "United States," "State" and
"International Organization" shall have the meanings set forth in section 7701
of the Code or successor provisions. A corporation will not be treated as an
instrumentality of the United States or of any State or political subdivision
thereof for these purposes if all of its activities are subject to tax and,
with the exception of the

                                    47

<PAGE>

Federal Home Loan Mortgage Corporation, a majority of its board of directors
is not selected by such government unit.

        Person: Any individual, corporation, partnership, limited liability
company, joint venture, association, joint-stock company, trust,
unincorporated organization or government, or any agency or political
subdivision thereof.

        Plan: An "employee-benefit plan" as defined in section 3(3) of ERISA
that is subject to Title I of ERISA, a "plan" as defined in section 4975 of
the Code that is subject to section 4975 of the Code, or any Person investing
on behalf of or with plan assets (as defined in 29 CFR ss.2510.3-101 or
otherwise under ERISA) of such an employee benefit plan or plan.

        Pool Stated Principal Balance: The aggregate of the Stated Principal
Balances of the Mortgage Loans which were Outstanding Mortgage Loans.

PSA CWL 06-13.txt

Pre-Funded Amount: The amount deposited in the Pre-Funding Account on the Closing Date, which shall equal $23.61.

Pre-Funding Account: The separate Eligible Account created and maintained by the Trustee pursuant to Section 3.05 in the name of the Trustee for the benefit of the Certificateholders and designated "The Bank of New York, in trust for registered holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-10." Funds in the Pre-Funding Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement and shall not be a part of any REMIC created hereunder, provided, however that any investment income earned from Permitted Investments made with funds in the Pre-Funding Account will be for the account of CHL.

Prepayment Assumption: The applicable rate of prepayment, as described in the Prospectus Supplement relating to the Certificates.

Prepayment Charge: With respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a full or partial prepayment of such Mortgage Loan within the related Prepayment Charge Period in accordance with the terms thereof (other than any Master Servicer Prepayment Charge Payment Amount).

Prepayment Charge Period: With respect to any Mortgage Loan, the period of time during which a Prepayment Charge may be imposed.

Prepayment Charge Schedule: As of the Initial Cut-off Date with respect to each Initial Mortgage Loan and as of the Subsequent Cut-off Date with respect to each Subsequent Mortgage Loan, a list attached hereto as Schedule I (including the Prepayment Charge Summary attached thereto), setting forth the following information with respect to each Prepayment Charge:

(i) the Mortgage Loan identifying number;

(ii) a code indicating the type of Prepayment Charge;

48

<PAGE>

(iii) the state of origination of the related Mortgage Loan;

(iv) the date on which the first monthly payment was due on the related Mortgage Loan;

(v) the term of the related Prepayment Charge; and

(vi) the principal balance of the related Mortgage Loan as of the Cut-off Date.

As of the Closing Date, the Prepayment Charge Schedule shall contain the necessary information for each Initial Mortgage Loan. The Prepayment Charge Schedule shall be amended by the Master Servicer upon the sale of any Subsequent Mortgage Loans to the Trust Fund. In addition, the Prepayment Charge Schedule shall be amended from time to time by the Master Servicer in accordance with the provisions of this Agreement and a copy of each related amendment shall be furnished by the Master Servicer to the Class P and Class C Certificateholders and the NIM Insurer.

Prepayment Interest Excess: With respect to any Distribution Date,

PSA CWL 06-13.txt
for each Mortgage Loan that was the subject of a Principal Prepayment during
the period from the related Due Date to the end of the related Prepayment
Period, any payment of interest received in connection therewith (net of any
applicable Servicing Fee) representing interest accrued for any portion of
such month of receipt.

Prepayment Interest Shortfall: With respect to any Distribution Date,
for each Mortgage Loan that was the subject of a partial Principal Prepayment
or a Principal Prepayment in full during the period from the beginning of the
related Prepayment Period to the Due Date in such Prepayment Period (other
than a Principal Prepayment in full resulting from the purchase of a Mortgage
Loan pursuant to Section 2.02, 2.03, 2.04, 3.12 or 9.01 hereof) and for each
Mortgage Loan that became a Liquidated Mortgage Loan during the related Due
Period, the amount, if any, by which (i) one month's interest at the
applicable Net Mortgage Rate on the Stated Principal Balance of such Mortgage
Loan immediately prior to such prepayment (or liquidation) or in the case of a
partial Principal Prepayment on the amount of such prepayment (or Liquidation
Proceeds) exceeds (ii) the amount of interest paid or collected in connection
with such Principal Prepayment or such Liquidation Proceeds.

Prepayment Period: As to any Distribution Date and related Due Date,
the period beginning with the opening of business on the sixteenth day of the
calendar month preceding the month in which such Distribution Date occurs (or,
with respect to the first Distribution Date, the period beginning with the
opening of business on June 2, 2006) and ending on the close of business on
the fifteenth day of the month in which such Distribution Date occurs.

Prime Rate: The prime commercial lending rate of The Bank of New
York, as publicly announced to be in effect from time to time. The Prime Rate
shall be adjusted automatically, without notice, on the effective date of any
change in such prime commercial lending rate. The Prime Rate is not
necessarily The Bank of New York's lowest rate of interest.


49

<PAGE>


Principal Distribution Amount: With respect to each Distribution Date
and a Loan Group, the sum of (i) the Principal Remittance Amount for such Loan
Group for such Distribution Date, in the case of Loan Group 2 and Loan Group
3, less any portion of such amount used to cover any payment due to the Swap
Counterparty with respect to such Distribution Date pursuant to Section 4.09,
(ii) the Extra Principal Distribution Amount for such Loan Group for such
Distribution Date, and (iii) with respect to the Distribution Date immediately
following the end of the Funding Period, the amount, if any, remaining in the
Pre-Funding Account at the end of the Funding Period (net of any investment
income therefrom) allocable to such Loan Group, minus (iv) (a) the Fixed Rate
Overcollateralization Reduction Amount for such Distribution Date, in the case
of Loan Group 1, (b) the Group 2 Overcollateralization Reduction Amount for
such Distribution Date, in the case of Loan Group 2 and (c) the Group 3
Overcollateralization Reduction Amount for such Distribution Date, in the case
of Loan Group 3.

Principal Prepayment: Any Mortgagor payment or other recovery of (or
proceeds with respect to) principal on a Mortgage Loan (including loans
purchased or repurchased under Sections 2.02, 2.03, 2.04, 3.12 and 9.01
hereof) that is received in advance of its scheduled Due Date to the extent it
is not accompanied by an amount as to interest representing scheduled interest
due on any date or dates in any month or months subsequent to the month of
prepayment. Partial Principal Prepayments shall be applied by the Master
Servicer in accordance with the terms of the related Mortgage Note.

PSA CWL 06-13.txt

        Principal Remittance Amount: With respect to the Mortgage Loans in
each Loan Group and any Distribution Date, (a) the sum, without duplication,
of: (i) the scheduled principal collected with respect to the Mortgage Loans
during the related Due Period or advanced with respect to such Distribution
Date, (ii) Principal Prepayments collected in the related Prepayment Period,
with respect to the Mortgage Loans, (iii) the Stated Principal Balance of each
Mortgage Loan that was repurchased by a Seller or purchased by the Master
Servicer with respect to such Distribution Date, (iv) the amount, if any, by
which the aggregate unpaid principal balance of any Replacement Mortgage Loans
delivered by the Sellers in connection with a substitution of a Mortgage Loan
is less than the aggregate unpaid principal balance of any Deleted Mortgage
Loans and (v) all Liquidation Proceeds (to the extent such Liquidation
Proceeds related to principal) and Subsequent Recoveries collected during the
related Due Period; less (b) all Advances relating to principal and certain
expenses reimbursable pursuant to Section 6.03 and reimbursed during the
related Due Period, in each case with respect to such Loan Group.

        Principal Reserve Fund: The separate Eligible Account created and
initially maintained by the Trustee pursuant to Section 3.08 in the name of
the Trustee for the benefit of the Certificateholders and designated "The Bank
of New York in trust for registered Holders of CWABS, Inc., Asset-Backed
Certificates, Series 2006-10". Funds in the Principal Reserve Fund shall be
held in trust for the Certificateholders for the uses and purposes set forth
in this Agreement.

        Private Certificates: The Class C and Class P Certificates.

        Prospectus: The prospectus dated June 26, 2006, relating to
asset-backed securities to be sold by the Depositor.


                                      50

<PAGE>



        Prospectus Supplement: The prospectus supplement dated June 29, 2006,
relating to the public offering of the certain Classes of Certificates offered
thereby.

        PTCE 95-60: As defined in Section 5.02(b).

        PUD: A Planned Unit Development.

        Purchase Price: With respect to any Mortgage Loan (x) required to be
(1) repurchased by a Seller or purchased by the Master Servicer, as
applicable, pursuant to Section 2.02, 2.03 or 3.12 hereof or (2) repurchased
by the Depositor pursuant to Section 2.04 hereof, or (y) that the Master
Servicer has a right to purchase pursuant to Section 3.12 hereof, an amount
equal to the sum of (i) 100% of the unpaid principal balance (or, if such
purchase or repurchase, as the case may be, is effected by the Master
Servicer, the Stated Principal Balance) of the Mortgage Loan as of the date of
such purchase, (ii) accrued interest thereon at the applicable Mortgage Rate
(or, if such purchase or repurchase, as the case may be, is effected by the
Master Servicer, at the Net Mortgage Rate) from (a) the date through which
interest was last paid by the Mortgagor (or, if such purchase or repurchase,
as the case may be, is effected by the Master Servicer, the date through which
interest was last advanced and not reimbursed by the Master Servicer) to (b)
the Due Date in the month in which the Purchase Price is to be distributed to
Certificateholders and (iii) any costs, expenses and damages incurred by the
Trust Fund resulting from any violation of any predatory or abusive lending

PSA CWL 06-13.txt
law in connection with such Mortgage Loan.

        Rating Agency: Each of Moody's and S&P. If any such organization or
its successor is no longer in existence, "Rating Agency" shall be a nationally
recognized statistical rating organization, or other comparable Person,
identified as a "Rating Agency" in the Underwriter's Exemption and designated
by the Depositor, notice of which designation shall be given to the Trustee.
References herein to a given rating category of a Rating Agency shall mean
such rating category without giving effect to any modifiers.

        Realized Loss: With respect to each Liquidated Mortgage Loan, an
amount (not less than zero or more than the Stated Principal Balance of the
Mortgage Loan) as of the date of such liquidation, equal to (i) the Stated
Principal Balance of such Liquidated Mortgage Loan as of the date of such
liquidation, minus (ii) the Liquidation Proceeds, if any, received in
connection with such liquidation during the month in which such liquidation
occurs, to the extent applied as recoveries of principal of the Liquidated
Mortgage Loan. With respect to each Mortgage Loan that has become the subject
of a Deficient Valuation, (i) if the value of the related Mortgaged Property
was reduced below the principal balance of the related Mortgage Note, the
amount by which the value of the Mortgaged Property was reduced below the
principal balance of the related Mortgage Note, and (ii) if the principal
amount due under the related Mortgage Note has been reduced, the difference
between the principal balance of the Mortgage Loan outstanding immediately
prior to such Deficient Valuation and the principal balance of the Mortgage
Loan as reduced by the Deficient Valuation.

        Record Date: With respect to any Distribution Date and the Adjustable
Rate Certificates, the Business Day immediately preceding such Distribution
Date, or if such Certificates are no longer Book-Entry Certificates, the last
Business Day of the month preceding


                                    51


<PAGE>


the month of such Distribution Date. With respect to any Distribution Date and
the Fixed Rate Certificates and the Class A-R, Class C and Class P
Certificates, the last Business Day of the month preceding the month of such
Distribution Date.

        Reference Bank Rate: With respect to any Accrual Period, the
arithmetic mean (rounded upwards, if necessary, to the nearest whole multiple
of 0.03125%) of the offered rates for United States dollar deposits for one
month that are quoted by the Reference Banks as of 11:00 a.m., New York City
time, on the related Interest Determination Date to prime banks in the London
interbank market for a period of one month in amounts approximately equal to
the outstanding aggregate Certificate Principal Balance of the Adjustable Rate
Certificates on such Interest Determination Date, provided that at least two
such Reference Banks provide such rate. If fewer than two offered rates
appear, the Reference Bank Rate will be the arithmetic mean (rounded upwards,
if necessary, to the nearest whole multiple of 0.03125%) of the rates quoted
by one or more major banks in New York City, selected by the Trustee, as of
11:00 a.m., New York City time, on such date for loans in U.S. dollars to
leading European banks for a period of one month in amounts approximately
equal to the aggregate Certificate Principal Balance of the Adjustable Rate
Certificates on such Interest Determination Date.

        Reference Banks: Barclays Bank PLC, Deutsche Bank and NatWest, N.A.,
provided that if any of the foregoing banks are not suitable to serve as a
Reference Bank, then any leading banks selected by the Trustee which are
                                  Page 58

PSA CWL 06-13.txt
engaged in transactions in Eurodollar deposits in the international
Eurocurrency market (i) with an established place of business in London,
England, (ii) not controlling, under the control of or under common control
with the Depositor, CHL or the Master Servicer and (iii) which have been
designated as such by the Trustee.

        Refinancing Mortgage Loan: Any Mortgage Loan originated in connection
with the refinancing of an existing mortgage loan.

        Regular Certificate: Any Certificate other than the Class A-R
Certificates.

        Regulation AB: Subpart 229.1100 - Asset Backed Securities (Regulation
AB), 17 C.F.R. ss.ss. 229.1100-229.1123, as such may be amended from time to
time, and subject to such clarification and interpretation as have been
provided by the Commission in the adopting release (Asset-Backed Securities,
Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005))
or by the staff of the Commission, or as may be provided by the Commission or
its staff from time to time and publicly available. -

        Relief Act: The Servicemembers Civil Relief Act.

        REMIC Provisions: Provisions of the federal income tax law relating
to real estate mortgage investment conduits which appear at section 860A
through 860G of Subchapter M of Chapter 1 of the Code, and related provisions,
and regulations and rulings promulgated thereunder, as the foregoing may be in
effect from time to time.

        Remittance Report: A report prepared by the Master Servicer and
delivered to the Trustee and the NIM Insurer in accordance with Section 4.04.


                                    52

<PAGE>


        REO Property: A Mortgaged Property acquired by the Master Servicer
through foreclosure or deed-in-lieu of foreclosure in connection with a
defaulted Mortgage Loan.

        Replacement Mortgage Loan: A Mortgage Loan substituted by a Seller
for a Deleted Mortgage Loan which must, on the date of such substitution, as
confirmed in a Request for File Release, (i) have a Stated Principal Balance,
after deduction of the principal portion of the Scheduled Payment due in the
month of substitution, not in excess of, and not less than 90% of the Stated
Principal Balance of the Deleted Mortgage Loan; (ii) with respect to any Fixed
Rate Mortgage Loan, have a Mortgage Rate not less than or no more than 1% per
annum higher than the Mortgage Rate of the Deleted Mortgage Loan and, with
respect to any Adjustable Rate Mortgage Loan: (a) have a Maximum Mortgage Rate
no more than 1% per annum higher or lower than the Maximum Mortgage Rate of
the Deleted Mortgage Loan; (b) have a Minimum Mortgage Rate no more than 1%
per annum higher or lower than the Minimum Mortgage Rate of the Deleted
Mortgage Loan; (c) have the same Index and intervals between Adjustment Dates
as that of the Deleted Mortgage Loan; (d) have a Gross Margin not more than 1%
per annum higher or lower than that of the Deleted Mortgage Loan; and (e) have
an Initial Periodic Rate Cap and a Subsequent Periodic Rate Cap each not more
than 1% lower than that of the Deleted Mortgage Loan; (iii) have the same or
higher credit quality characteristics than that of the Deleted Mortgage Loan;
(iv) be accruing interest at a rate not more than 1% per annum higher or lower
than that of the Deleted Mortgage Loan; (v) have a Loan-to-Value Ratio no
higher than that of the Deleted Mortgage Loan; (vi) have a remaining term to
maturity not greater than (and not more than one year less than) that of the
                                 Page 59

PSA CWL 06-13.txt
Deleted Mortgage Loan; (vii) not permit conversion of the Mortgage Rate from a
fixed rate to a variable rate or vice versa; (viii) provide for a Prepayment
Charge on terms substantially similar to those of the Prepayment Charge, if
any, of the Deleted Mortgage Loan; (ix) have the same occupancy type and lien
priority as the Deleted Mortgage Loan; and (x) comply with each representation
and warranty set forth in Section 2.03 as of the date of substitution;
provided, however, that notwithstanding the foregoing, to the extent that
compliance with clause (x) of this definition would cause a proposed
Replacement Mortgage Loan to fail to comply with one or more of clauses (i),
(ii), (iv), (viii) and/or (ix) of this definition, then such proposed
Replacement Mortgage Loan must comply with clause (x) and need not comply with
one or more of clauses (i), (ii), (iv), (viii) and/or (ix), to the extent, and
only to the extent, necessary to assure that the Replacement Mortgage Loan
otherwise complies with clause (x).

        Reportable Event: Any event required to be reported on Form 8-K, and
in any event, the following:

        (a) entry into a definitive agreement related to the Trust Fund, the
Certificates or the Mortgage Loans, or an amendment to a Transaction Document,
even if the Depositor is not a party to such agreement (e.g., a servicing
agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB);

        (b) termination of a Transaction Document (other than by expiration
of the agreement on its stated termination date or as a result of all parties
completing their obligations under such agreement), even if the Depositor is
not a party to such agreement (e.g., a servicing agreement with a servicer
contemplated by Item 1108(a)(3) of Regulation AB);

                                     53

<PAGE>

        (c) with respect to the Master Servicer only, if the Master Servicer
becomes aware of any bankruptcy or receivership with respect to CHL, the
Depositor, the Master Servicer, any Subservicer, the Trustee, the Swap
Counterparty, any enhancement or support provider contemplated by Items
1114(b) or 1115 of Regulation AB, or any other material party contemplated by
Item 1101(d)(1) of Regulation AB;

        (d) with respect to the Trustee, the Master Servicer and the
Depositor only, the occurrence of an early amortization, performance trigger
or other event, including an Event of Default under this Agreement;

        (e) any amendment to this Agreement;

        (f) the resignation, removal, replacement, substitution of the Master
Servicer, any Subservicer, the Trustee or any co-trustee;

        (g) with respect to the Master Servicer only, if the Master Servicer
becomes aware that (i) any material enhancement or support specified in Item
1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB that was
previously applicable regarding one or more classes of the Certificates has
terminated other than by expiration of the contract on its stated termination
date or as a result of all parties completing their obligations under such
agreement; (ii) any material enhancement specified in Item 1114(a)(1) through
(3) of Regulation AB or Item 1115 of Regulation AB has been added with respect
to one or more classes of the Certificates; or (iii) any existing material
enhancement or support specified in Item 1114(a)(1) through (3) of Regulation
AB or Item 1115 of Regulation AB with respect to one or more classes of the
Certificates has been materially amended or modified; and
                                Page 60

PSA CWL 06-13.txt

(h) with respect to the Trustee, the Master Servicer and the
Depositor only, a required distribution to Holders of the Certificates is not
made as of the required Distribution Date under this Agreement.

Reporting Subcontractor: With respect to the Master Servicer or the
Trustee, any Subcontractor determined by such Person pursuant to Section
11.08(b) to be "participating in the servicing function" within the meaning of
Item 1122 of Regulation AB. References to a Reporting Subcontractor shall
refer only to the Subcontractor of such Person and shall not refer to
Subcontractors generally.

Representing Party: As defined in Section 2.03(e).

Request for Document Release: A Request for Document Release
submitted by the Master Servicer to the Trustee, substantially in the form of
Exhibit M.

Request for File Release: A Request for File Release submitted by the
Master Servicer to the Trustee, substantially in the form of Exhibit N.

Required Carryover Reserve Fund Deposit: With respect to any
Distribution Date, an amount equal to the excess of (i) $1,000 over (ii) the
amount of funds on deposit in the Carryover Reserve Fund.

54

<PAGE>

Required Insurance Policy: With respect to any Mortgage Loan, any
insurance policy that is required to be maintained from time to time under
this Agreement.

Responsible Officer: When used with respect to the Trustee, any Vice
President, any Assistant Vice President, the Secretary, any Assistant
Secretary, any Trust Officer or any other officer of the Trustee customarily
performing functions similar to those performed by any of the above designated
officers and also to whom, with respect to a particular matter, such matter is
referred because of such officer's knowledge of and familiarity with the
particular subject.

Rolling Sixty-Day Delinquency Rate: With respect to any Distribution
Date and any Loan Group or Loan Groups, the average of the Sixty-Day
Delinquency Rates for such Loan Group or Loan Groups and such Distribution
Date and the two immediately preceding Distribution Dates.

Rule 144A: Rule 144A under the Securities Act.

Rule 144A Letter: As defined in Section 5.02(b).

S&P: Standard & Poor's Ratings Services, a division of The
McGraw-Hill Companies, Inc. and its successors.

Sarbanes-Oxley Certification: As defined in Section 11.05.

Scheduled Payment: With respect to any Mortgage Loan, the scheduled
monthly payment of principal and/or interest due on any Due Date on such
Mortgage Loan which is payable by the related Mortgagor from time to time
under the related Mortgage Note, determined: (a) after giving effect to (i)
any Deficient Valuation and/or Debt Service Reduction with respect to such
Page 61

PSA CWL 06-13.txt
Mortgage Loan and (ii) any reduction in the amount of interest collectible
from the related Mortgagor pursuant to the Relief Act or any similar state or
local law; (b) without giving effect to any extension granted or agreed to by
the Master Servicer pursuant to Section 3.05(a); and (c) on the assumption
that all other amounts, if any, due under such Mortgage Loan are paid when
due.

        Securities Act: The Securities Act of 1933, as amended.

        Sellers: CHL, in its capacity as seller of the CHL Mortgage Loans to
the Depositor, Park Monaco, in its capacity as seller of the Park Monaco
Mortgage Loans to the Depositor and Park Sienna, in its capacity as seller of
the Park Sienna Mortgage Loans to the Depositor.

        Seller Shortfall Interest Requirement: With respect to the
Distribution Date in each of July, August and September 2006, is the sum of:

        (a) the product of: (1) the excess of the aggregate Stated Principal
Balance for such Distribution Date of all the Mortgage Loans in the Mortgage
Pool (including the Subsequent Mortgage Loans, if any) owned by the Trust Fund
at the beginning of the related Due Period, over the aggregate Stated
Principal Balance for such Distribution Date of such

                                    55

<PAGE>


Mortgage Loans (including such Subsequent Mortgage Loans, if any) that have a
scheduled payment of interest due in the related Due Period, and (2) a
fraction, the numerator of which is the weighted average Net Mortgage Rate of
all the Mortgage Loans in the Mortgage Pool (including such Subsequent
Mortgage Loans, if any) (weighted on the basis of the Stated Principal
Balances thereof for such Distribution Date) and the denominator of which is
12; and

        (b) the product of: (1) the amount on deposit in the Pre-Funding
Account at the beginning of the related Due Period, and (2) a fraction, the
numerator of which is the weighted average Net Mortgage Rate of the Mortgage
Loans (including Subsequent Mortgage Loans, if any) owned by the Trust Fund at
the beginning of the related Due Period (weighted on the basis of the Stated
Principal Balances thereof for such Distribution Date) and the denominator of
which is 12.

        Senior Certificates: The Class 1-AF, Class AV and Class A-R
Certificates.

        Servicing Advances: All customary, reasonable and necessary "out of
pocket" costs and expenses incurred in the performance by the Master Servicer
of its servicing obligations hereunder, including, but not limited to, the
cost of (i) the preservation, restoration and protection of a Mortgaged
Property, (ii) any enforcement or judicial proceedings, including
foreclosures, (iii) the management and liquidation of any REO Property and
(iv) compliance with the obligations under Section 3.10.

        Servicing Criteria: The "servicing criteria" set forth in Item
1122(d) of Regulation AB.

        Servicing Fee: As to each Mortgage Loan and any Distribution Date, an
amount equal to one month's interest at the Servicing Fee Rate on the Stated
Principal Balance of such Mortgage Loan for the preceding Distribution Date
or, in the event of any payment of interest that accompanies a Principal

PSA CWL 06-13.txt
Prepayment in full made by the Mortgagor, interest at the Servicing Fee Rate on the Stated Principal Balance of such Mortgage Loan for the period covered by such payment of interest.

Servicing Fee Rate: With respect to each Mortgage Loan, 0.50% per annum.

Servicing Officer: Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and facsimile signature appear on a list of servicing officers furnished to the Trustee by the Master Servicer on the Closing Date pursuant to this Agreement, as such list may from time to time be amended.

Sixty-Day Delinquency Rate: With respect to any Distribution Date and any Loan Group or Loan Groups, a fraction, expressed as a percentage, the numerator of which is the aggregate Stated Principal Balance for such Distribution Date of all Mortgage Loans in such Loan Group or Loan Groups 60 or more days delinquent as of the close of business on the last day of the calendar month preceding such Distribution Date (including Mortgage Loans in foreclosure, bankruptcy and REO Properties) and the denominator of which is the aggregate Stated Principal Balance for such Distribution Date of all Mortgage Loans in such Loan Group or Loan Groups.

56

<PAGE>

Stated Principal Balance: With respect to any Mortgage Loan or related REO Property (i) as of the Cut-off Date, the unpaid principal balance of the Mortgage Loan as of such date (before any adjustment to the amortization schedule for any moratorium or similar waiver or grace period), after giving effect to any partial prepayments or Liquidation Proceeds received prior to such date and to the payment of principal due on or prior to such date and irrespective any delinquency in payment by the related Mortgagor, and (ii) as of any other Distribution Date, the Stated Principal Balance of the Mortgage Loan as of its Cut-off Date, minus the sum of (a) the principal portion of the Scheduled Payments (x) due with respect to such Mortgage Loan during each Due Period ending prior to such Distribution Date and (y) that were received by the Master Servicer as of the close of business on the Determination Date related to such Distribution Date or with respect to which Advances were made as of the Master Servicer Advance Date related to such Distribution Date, (b) all Principal Prepayments with respect to such Mortgage Loan received by the Master Servicer during each Prepayment Period ending prior to such Distribution Date, (c) all Liquidation Proceeds collected with respect to such Mortgage Loan during each Due Period ending prior to such Distribution Date, to the extent applied by the Master Servicer as recoveries of principal in accordance with Section 3.12 and (d) any Realized Loss previously incurred in connection with a Deficient Valuation. The Stated Principal Balance of any Mortgage Loan that becomes a Liquidated Mortgage Loan will be zero on each date following the Due Period in which such Mortgage Loan becomes a Liquidated Mortgage Loan. References herein to the Stated Principal Balance of the Mortgage Loans at any time shall mean the aggregate Stated Principal Balance of all Mortgage Loans in the Trust Fund as of such time, and references herein to the Stated Principal Balance of a Loan Group at any time shall mean the aggregate Stated Principal Balance of all Mortgage Loans in such Loan Group at such time.

Stepdown Target Subordination Percentage: For each Class of Subordinate Certificates, the respective percentage indicated in the following table:

PSA CWL 06-13.txt

| | Stepdown Target Subordination Percentage |
|---|---|
| Class MF-1................... | 31.10% |
| Class MF-2................... | 25.50% |
| Class MF-3................... | 22.10% |
| Class MF-4................... | 19.10% |
| Class MF-5................... | 16.20% |
| Class MF-6................... | 13.50% |
| Class MF-7................... | 11.00% |
| Class MF-8................... | 9.00% |
| Class BF..................... | 7.00% |
| Class MV-1................... | 32.20% |
| Class MV-2................... | 25.60% |
| Class MV-3................... | 21.60% |
| Class MV-4................... | 18.00% |
| Class MV-5................... | 14.70% |
| Class MV-6................... | 11.60% |
| Class MV-7................... | 8.60% |

57

<PAGE>

| | Stepdown Target Subordination Percentage |
|---|---|
| Class MV-8................... | 6.50% |
| Class MV-9................... | 4.80% |
| Class BV..................... | 2.90% |

Strip REMIC: As defined in the Preliminary Statement.

Strip REMIC Cap: As defined in the Preliminary Statement.

Subcontractor: Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to the Mortgage Loans under the direction or authority of the Master Servicer or a Subservicer or the Trustee, as the case may be.

Subordinate Certificates: The Fixed Rate Subordinate Certificates and the Adjustable Rate Subordinate Certificates.

Subsequent Certificate Account Deposit: With respect to any Subsequent Transfer Date, an amount equal to the aggregate of all amounts in respect of (i) principal of the related Subsequent Mortgage Loans due after the related Subsequent Cut-off Date and received by the Master Servicer on or before such Subsequent Transfer Date and not applied in computing the Cut-off Date Principal Balance thereof and (ii) interest on the such Subsequent Mortgage Loans due after such Subsequent Cut-off Date and received by the Master Servicer on or before the Subsequent Transfer Date.

Subsequent Cut-off Date: In the case of any Subsequent Mortgage Loan, the later of (x) the first day of the month of the related Subsequent Transfer Date and (y) the date of origination of such Subsequent Mortgage Loan.

Subsequent Mortgage Loan: Any Mortgage Loan conveyed to the Trustee on a Subsequent Transfer Date, and listed on the related Loan Number and

Page 64

PSA CWL 06-13.txt
Borrower Identification Mortgage Loan Schedule delivered pursuant to Section
2.01(f). When used with respect to a single Subsequent Transfer Date,
"Subsequent Mortgage Loan" shall mean a Subsequent Mortgage Loan conveyed to
the Trustee on such Subsequent Transfer Date.

        Subsequent Periodic Rate Cap: With respect to each Adjustable Rate
Mortgage Loan, the percentage specified in the related Mortgage Note that
limits permissible increases and decreases in the Mortgage Rate on any
Adjustment Date (other than the initial Adjustment Date).

        Subsequent Recoveries: As to any Distribution Date, with respect to a
Liquidated Mortgage Loan that resulted in a Realized Loss in a prior calendar
month, unexpected amounts received by the Master Servicer (net of any related
expenses permitted to be reimbursed pursuant to Section 3.08 and 3.12)
specifically related to such Liquidated Mortgage Loan after the classification
of such Mortgage Loan as a Liquidated Mortgage Loan.


                                    58

<PAGE>


        Subsequent Transfer Agreement: A Subsequent Transfer Agreement
substantially in the form of Exhibit P hereto, executed and delivered by the
Sellers, the Depositor and the Trustee as provided in Section 2.01(d).

        Subsequent Transfer Date: For any Subsequent Transfer Agreement, the
"Subsequent Transfer Date" identified in such Subsequent Transfer Agreement;
provided, however, the Subsequent Transfer Date for any Subsequent Transfer
Agreement must be a Business Day and may not be a date earlier than the date
on which the Subsequent Transfer Agreement is executed and delivered by the
parties thereto pursuant to Section 2.01(d).

        Subsequent Transfer Date Purchase Amount: With respect to any
Subsequent Transfer Date, the "Subsequent Transfer Date Purchase Amount"
identified in the related Subsequent Transfer Agreement which shall be an
estimate of the aggregate Stated Principal Balances of the Subsequent Mortgage
Loans identified in such Subsequent Transfer Agreement.

        Subsequent Transfer Date Transfer Amount: With respect to any
Subsequent Transfer Date, an amount equal to the lesser of (i) the aggregate
Stated Principal Balances as of the related Subsequent Cut-off Dates of the
Subsequent Mortgage Loans conveyed on such Subsequent Transfer Date, as listed
on the related Loan Number and Borrower Identification Mortgage Loan Schedule
delivered pursuant to Section 2.01(f) and (ii) the amount on deposit in the
Pre-Funding Account.

        Subservicer: As defined in Section 3.02(a).

        Subservicing Agreement: As defined in Section 3.02(a).

        Substitution Adjustment Amount: The meaning ascribed to such term
pursuant to Section 2.03(e).

        Substitution Amount: With respect to any Mortgage Loan substituted
pursuant to Section 2.03(e), the excess of (x) the principal balance of the
Mortgage Loan that is substituted for, over (y) the principal balance of the
related substitute Mortgage Loan, each balance being determined as of the date
of substitution.

        Swap Account: The separate Eligible Account created and initially
maintained by the Swap Trustee pursuant to Section 4.09.

PSA CWL 06-13.txt

Swap Certificates: The Class AV Certificates and the Adjustable Rate Subordinate Certificates.

Swap Contract: With respect to the Swap Certificates, the transaction evidenced by the related Confirmation (as assigned to the Swap Contract Administrator pursuant to the Swap Contract Assignment Agreement), a form of which is attached hereto as Exhibit U.

Swap Contract Administration Agreement: The swap contract administration agreement dated as of the Closing Date among CHL, the Trustee and the Swap Contract Administrator, a form of which is attached hereto as Exhibit V-2.


59

<PAGE>


Swap Contract Administrator: The Bank of New York, in its capacity as swap contract administrator under the Swap Contract Administration Agreement.

Swap Contract Assignment Agreement: The Assignment Agreement dated as of the Closing Date among CHL, the Swap Contract Administrator and the Swap Counterparty, a form of which is attached hereto as Exhibit V-1.

Swap Counterparty: Bear Stearns Financial Products Inc. and its successors.

Swap Contract Termination Date: The Distribution Date in June 2011.

Swap Counterparty Trigger Event: A Swap Termination Payment that is triggered upon (i) an "Event of Default" under the Swap Contract with respect to which the Swap Counterparty is the sole "Defaulting Party" (as defined in the Swap Contract) or (ii) a "Termination Event" or "Additional Termination Event" under the Swap Contract with respect to which the Swap Counterparty is the sole "Affected Party" (as defined in the Swap Contract).

Swap-IO REMIC: As defined in the Preliminary Statement.

Swap Termination Payment: The payment payable to either party under the Swap Contract due to an early termination of the Swap Contract.

Swap Trust: The trust fund established by Section 4.09.

Swap Trustee: The Bank of New York, a New York banking corporation, not in its individual capacity, but solely in its capacity as trustee for the benefit of the Holders of the Swap Certificates under this Agreement, and any successor thereto, and any corporation or national banking association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee as may from time to time be serving as successor trustee hereunder.

Tax Matters Person: The person designated as "tax matters person" in the manner provided under Treasury regulation ss. 1.860F-4(d) and Treasury regulation ss. 301.6231(a)(7)-1. Initially, this person shall be the Trustee.

Tax Matters Person Certificate: With respect to the Master REMIC, the Swap-IO REMIC and the Strip REMIC, the Class A-R Certificate with a Denomination of $0.05 and in the form of Exhibit E hereto.

Terminator: As defined in Section 9.01.

PSA CWL 06-13.txt

Three-Year Hybrid Mortgage Loan: A Mortgage Loan having a Mortgage Rate that is fixed for 36 months after origination thereof before such Mortgage Rate becomes subject to adjustment.

Transaction Documents: This Agreement, the Swap Contract, the Swap Contract Administration Agreement and any other document or agreement entered into in connection with the Trust Fund, the Certificates or the Mortgage Loans.

60

<PAGE>

Transfer: Any direct or indirect transfer or sale of any Ownership Interest in a Certificate.

Transfer Affidavit: As defined in Section 5.02(c).

Transferor Certificate: As defined in Section 5.02(b).

Trust Fund: The corpus of the trust created hereunder consisting of (i) the Mortgage Loans and all interest and principal received on or with respect thereto after the Cut-off Date to the extent not applied in computing the Cut-off Date Principal Balance thereof, exclusive of interest not required to be deposited in the Certificate Account pursuant to Section 3.05(b)(2); (ii) the Certificate Account, the Distribution Account, the Principal Reserve Fund, the Carryover Reserve Fund, the Credit Comeback Excess Account, the Pre-Funding Account and all amounts deposited therein pursuant to the applicable provisions of this Agreement; (iii) property that secured a Mortgage Loan and has been acquired by foreclosure, deed in lieu of foreclosure or otherwise; (iv) the mortgagee's rights under the Insurance Policies with respect to the Mortgage Loan; and (v) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property.

Trustee: The Bank of New York, a New York banking corporation, not in its individual capacity, but solely in its capacity as trustee for the benefit of the Certificateholders under this Agreement, and any successor thereto, and any corporation or national banking association resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee as may from time to time be serving as successor trustee hereunder.

Trustee Advance Notice: As defined in Section 4.01(d).

Trustee Advance Rate: With respect to any Advance made by the Trustee pursuant to Section 4.01(d), a per annum rate of interest determined as of the date of such Advance equal to the Prime Rate in effect on such date plus 5.00%.

Trustee Fee: As to any Distribution Date, an amount equal to one-twelfth of the Trustee Fee Rate multiplied by the sum of (i) the Pool Stated Principal Balance and (ii) any amounts remaining in the Pre-Funding Account (excluding any investment earnings thereon) with respect to such Distribution Date.

Trustee Fee Rate: With respect to each Mortgage Loan, the per annum rate agreed upon in writing on or prior to the Closing Date by the Trustee and the Depositor, which is 0.009% per annum.

PSA CWL 06-13.txt

Two-Year Hybrid Mortgage Loan: A Mortgage Loan having a Mortgage Rate that is fixed for 24 months after origination thereof before such Mortgage Rate becomes subject to adjustment.

Underwriter's Exemption: Prohibited Transaction Exemption 2002-41, 67 Fed. Reg. 54487 (2002), as amended (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

61

<PAGE>

Underwriter: Countrywide Securities Corporation.

Unpaid Realized Loss Amount: For any Class of Certificates and any Distribution Date, (x) the portion of the aggregate Applied Realized Loss Amount previously allocated to that Class remaining unpaid from prior Distribution Dates minus (y) any increase in the Certificate Principal Balance of that Class due to the allocation of Subsequent Recoveries to the Certificate Principal Balance of that Class pursuant to Section 4.04(l).

Variable Pool Net Rate Cap: As defined in the Preliminary Statement.

Voting Rights: The voting rights of all the Certificates that are allocated to any Certificates for purposes of the voting provisions hereunder. Voting Rights allocated to each Class of Certificates shall be allocated 95% to the Certificates other than the Class A-R, Class CF, Class CV, Class PF and Class PV Certificates (with the allocation among the Certificates to be in proportion to the Certificate Principal Balance of each Class relative to the Certificate Principal Balance of all other such Classes), and 1% to each of the Class A-R, Class CF, Class CV, Class PF and Class PV Certificates. Voting Rights will be allocated among the Certificates of each such Class in accordance with their respective Percentage Interests.

Section 1.02 Certain Interpretive Provisions.

All terms defined in this Agreement shall have the defined meanings when used in any certificate, agreement or other document delivered pursuant hereto unless otherwise defined therein. For purposes of this Agreement and all such certificates and other documents, unless the context otherwise requires: (a) accounting terms not otherwise defined in this Agreement, and accounting terms partly defined in this Agreement to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles; (b) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement (or the certificate, agreement or other document in which they are used) as a whole and not to any particular provision of this Agreement (or such certificate, agreement or document); (c) references to any Section, Schedule or Exhibit are references to Sections, Schedules and Exhibits in or to this Agreement, and references to any paragraph, subsection, clause or other subdivision within any Section or definition refer to such paragraph, subsection, clause or other subdivision of such Section or definition; (d) the term "including" means "including without limitation"; (e) references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (f) references to any agreement refer to that agreement as amended from time to time; and (g) references to any Person include that Person's permitted successors and assigns.

ARTICLE II.
Page 68

PSA CWL 06-13.txt
CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01 Conveyance of Mortgage Loans.

        (a) Each Seller hereby sells, transfers, assigns, sets over and
otherwise conveys to the Depositor, without recourse, all the right, title and
interest of such Seller in and to the applicable Initial Mortgage Loans,
including all interest and principal received and receivable

                                         62

<PAGE>

by such Seller on or with respect to applicable Initial Mortgage Loans after
the Initial Cut-off Date (to the extent not applied in computing the Cut-off
Date Principal Balance thereof) or deposited into the Certificate Account by
the Master Servicer on behalf of such Seller as part of the Initial
Certificate Account Deposit as provided in this Agreement, other than
principal due on the applicable Initial Mortgage Loans on or prior to the
Initial Cut-off Date and interest accruing prior to the Initial Cut-off Date.
The Master Servicer confirms that, on behalf of the Sellers, concurrently with
the transfer and assignment, it has deposited into the Certificate Account the
Initial Certificate Account Deposit.

        Immediately upon the conveyance of the Initial Mortgage Loans
referred to in the preceding paragraph, the Depositor sells, transfers,
assigns, sets over and otherwise conveys to the Trustee for benefit of the
Certificateholders, without recourse, all right, title and interest in and to
the Initial Mortgage Loans.

        CHL further agrees (x) to cause The Bank of New York to enter into
the Swap Contract Administration Agreement as Swap Contract Administrator and
(y) to assign all of its right, title and interest in and to the interest rate
swap transaction evidenced by the Confirmation, and to cause all of its
obligations in respect of such transaction to be assumed by, the Swap Contract
Administrator, on the terms and conditions set forth in the Swap Contract
Assignment Agreement.

        (b) Subject to the execution and delivery of the related Subsequent
Transfer Agreement as provided by Section 2.01(d) and the terms and conditions
of this Agreement, each Seller sells, transfers, assigns, sets over and
otherwise conveys to the Depositor, without recourse, on each Subsequent
Transfer Date, all the right, title and interest of such Seller in and to the
related Subsequent Mortgage Loans, including all interest and principal
received and receivable by such Seller on or with respect to such Subsequent
Mortgage Loans after the related Subsequent Cut-off Date (to the extent not
applied in computing the Cut-off Date Principal Balance thereof) or deposited
into the Certificate Account by the Master Servicer on behalf of such Seller
as part of any related Subsequent Certificate Account Deposit as provided in
this Agreement, other than principal due on such Subsequent Mortgage Loans on
or prior to the related Subsequent Cut-off Date and interest accruing prior to
the related Subsequent Cut-off Date.

        Immediately upon the conveyance of the Subsequent Mortgage Loans
referred to in the preceding paragraph, the Depositor sells, transfers,
assigns, sets over and otherwise conveys to the Trustee for benefit of the
Certificateholders, without recourse, all right title and interest in the
Subsequent Mortgage Loans.

        (c) Each Seller has entered into this Agreement in consideration for

PSA CWL 06-13.txt
the purchase of the Mortgage Loans by the Depositor and has agreed to take the
actions specified herein. The Depositor, concurrently with the execution and
delivery of this Agreement, hereby sells, transfers, assigns and otherwise
conveys to the Trustee for the use and benefit of the Certificateholders,
without recourse, all right title and interest in the portion of the Trust
Fund not otherwise conveyed to the Trustee pursuant to Section 2.01(a) or (b).

63

<PAGE>

        (d) On any Business Day during the Funding Period designated by CHL
to the Trustee, the Sellers, the Depositor and the Trustee shall complete,
execute and deliver a Subsequent Transfer Agreement. After the execution and
delivery of such Subsequent Transfer Agreement, on the Subsequent Transfer
Date, the Trustee shall set aside in the Pre-Funding Account an amount equal
to the related Subsequent Transfer Date Purchase Amount.

        (e) The transfer of Subsequent Mortgage Loans on the Subsequent
Transfer Date is subject to the satisfaction of each of the following
conditions:

            (1) the Trustee and the Underwriter will be provided Opinions
        of Counsel addressed to the Rating Agencies as with respect to the sale
        of the Subsequent Mortgage Loans conveyed on such Subsequent Transfer
        Date (such opinions being substantially similar to the opinions delivered
        on the Closing Date to the Rating Agencies with respect to the sale of
        the Initial Mortgage Loans on the Closing Date), to be delivered as
        provided in Section 2.01(f);

            (2) the execution and delivery of such Subsequent Transfer
        Agreement or conveyance of the related Subsequent Mortgage Loans does not
        result in a reduction or withdrawal of any ratings assigned to the
        Certificates by the Rating Agencies;

            (3) the Depositor shall deliver to the Trustee an Officer's
        Certificate confirming the satisfaction of each of the conditions set
        forth in this Section 2.01(e) required to be satisfied by such Subsequent
        Transfer Date;

            (4) each Subsequent Mortgage Loan conveyed on such Subsequent
        Transfer Date satisfies the representations and warranties applicable to
        it under this Agreement, provided, however, that with respect to a breach
        of a representation and warranty with respect to a Subsequent Mortgage
        Loan set forth in this clause (4), the obligation under Section 2.03(e)
        of this Agreement of the applicable Seller, to cure, repurchase or
        replace such Subsequent Mortgage Loan shall constitute the sole remedy
        against such Seller respecting such breach available to
        Certificateholders, the Depositor or the Trustee;

            (5) the Subsequent Mortgage Loans conveyed on such Subsequent
        Transfer Date were selected in a manner reasonably believed not to be
        adverse to the interests of the Certificateholders;

            (6) no Subsequent Mortgage Loan conveyed on such Subsequent
        Transfer Date was 30 or more days delinquent;

            (7) following the conveyance of the Subsequent Mortgage Loans
        on such Subsequent Transfer Date, the characteristics of each Loan Group
        will not vary by more than the amount specified below (other than (i) the
        percentage of Mortgage Loans secured by Mortgaged Properties located in

PSA CWL 06-13.txt
the State of California, which will not exceed 50% of the Mortgage Loans
in each Loan Group and (ii) the percentage of Mortgage Loans in the
Credit Grade Categories of "C" or below, which will not exceed 10% of the
Mortgage Loans in each Loan Group) from the characteristics listed below;
provided that for the purpose of making such calculations, the
characteristics for any Initial Mortgage

64

<PAGE>

Loan made will be taken as of the Initial Cut-off Date and the
characteristics for any Subsequent Mortgage Loans will be taken as of the
Subsequent Cut-off Date:

<TABLE>
<CAPTION>
Loan Group 1

| Characteristic Permitted Variance | Value |
| --- | --- |
| ----------------------------- ------------------------- | ------------- |
| <S> | <C> |
| <C> | |
| Weighted Average Mortgage Rate......................... +/-0.10% | 7.693% |
| Weighted Average Original Loan-to-Value Ratio.......... +/-3.00% | 76.12% |
| Weighted Average Credit Bureau Risk Score.............. +/-5 points | 612 points |
| Percentage Originated under CHL's Full Documentation Program................................................ +/-3.00% | 72.35% |

Loan Group 2

| Characteristic Permitted Variance | Value |
| --- | --- |
| ----------------------------- ------------------------- | ------------- |
| Weighted Average Mortgage Rate......................... +/-0.10% | 8.610% |
| Weighted Average Original Loan-to-Value Ratio.......... +/-3.00% | 80.18% |
| Weighted Average Credit Bureau Risk Score.............. +/-5 points | 607 points |
| Percentage Originated under CHL's Full Documentation Program................................................ +/-3.00% | 69.21% |
| Weighted Average Gross Margin of Adjustable Rate Mortgage Loans......................................... +/-0.10% | 7.150% |

Loan Group 3

| Characteristic Permitted Variance | Value |
| --- | --- |
| ----------------------------- ------------------------- | ------------- |
| Weighted Average Mortgage Rate......................... | 8.633% |

Page 71

PSA CWL 06-13.txt

|  |  |
|---|---|
| +/-0.10% | |
| Weighted Average Original Loan-to-Value Ratio.......... | 79.63% |
| +/-3.00% | |
| Weighted Average Credit Bureau Risk Score.............. | 616 points |
| +/-5 points | |
| Percentage Originated under CHL's Full Documentation | |
| Program.................................................... | 57.61% |
| +/-3.00% | |
| Weighted Average Gross Margin of Adjustable Rate | |
| Mortgage Loans......................................... | 7.515% |
| +/-0.10% | |

</TABLE>

(8)    none of the Sellers or the Depositor is insolvent and neither of the Sellers nor the Depositor will be rendered insolvent by the conveyance of Subsequent Mortgage Loans on such Subsequent Transfer Date; and

(9)    the Trustee and the Underwriter will be provided with an Opinion of Counsel, which Opinion of Counsel shall not be at the expense of either the Trustee or the Trust Fund, addressed to the Trustee, to the effect that such purchase of Subsequent Mortgage Loans will not (i) result in the imposition of the tax on "prohibited transactions" on the Trust Fund or contributions after the Startup Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively or (ii) cause any REMIC formed hereunder to fail to qualify as a REMIC, such opinion to be delivered as provided in Section 2.01(f).

65

<PAGE>

The Trustee shall not be required to investigate or otherwise verify compliance with these conditions, except for its own receipt of documents specified above, and shall be entitled to rely on the required Officer's Certificate.

(f)    Within six Business Days after each Subsequent Transfer Date, upon (1) delivery to the Trustee by the Depositor of the Opinions of Counsel referred to in Section 2.01(e)(1) and (e)(9), (2) delivery to the Trustee by CHL (on behalf of each Seller) of a Loan Number and Borrower Identification Mortgage Loan Schedule reflecting the Subsequent Mortgage Loans conveyed on such Subsequent Transfer Date and the Loan Group into which each Subsequent Mortgage Loan was conveyed, (3) deposit in the Certificate Account by the Master Servicer on behalf of the Sellers of the applicable Subsequent Certificate Account Deposit, and (4) delivery to the Trustee by the Depositor of an Officer's Certificate confirming the satisfaction of each of the conditions precedent set forth in this Section 2.01(f), the Trustee shall pay the applicable Seller the Subsequent Transfer Date Transfer Amount from such funds that were set aside in the Pre-Funding Account pursuant to Section 2.01(d). The positive difference, if any, between the Subsequent Transfer Date Transfer Amount and the Subsequent Transfer Date Purchase Amount shall be re-invested by the Trustee in the Pre-Funding Account.

The Trustee shall not be required to investigate or otherwise verify compliance with the conditions set forth in the preceding paragraph, except for its own receipt of documents specified above, and shall be entitled to rely on the required Officer's Certificate.

Within thirty days after each Subsequent Transfer Date, the Depositor shall deliver to the Trustee a letter of a nationally recognized

PSA CWL 06-13.txt
firm of independent public accountants stating whether or not the Subsequent
Mortgage Loans conveyed on such Subsequent Transfer Date conform to the
characteristics described in Section 2.01(e)(6) and (7).

        (g)    In connection with the transfer and assignment of each
Mortgage Loan, the Depositor has delivered to, and deposited with, the Trustee
(or, in the case of the Delay Delivery Mortgage Loans, will deliver to, and
deposit with, the Trustee within the time periods specified in the definition
of Delay Delivery Mortgage Loans) (except as provided in clause (vi) below)
for the benefit of the Certificateholders, the following documents or
instruments with respect to each such Mortgage Loan so assigned (with respect
to each Mortgage Loan, clause (i) through (vi) below, together, the "Mortgage
File" for each such Mortgage Loan):

            (i)    the original Mortgage Note, endorsed by manual or
facsimile signature in blank in the following form: "Pay to the
order of _____ without recourse", with all intervening
endorsements that show a complete chain of endorsement from the
originator to the Person endorsing the Mortgage Note (each such
endorsement being sufficient to transfer all right, title and
interest of the party so endorsing, as noteholder or assignee
thereof, in and to that Mortgage Note), or, if the original
Mortgage Note has been lost or destroyed and not replaced, an
original lost note affidavit, stating that the original Mortgage
Note was lost or destroyed, together with a copy of the related
Mortgage Note and all such intervening endorsements;

                                    66

<PAGE>

            (ii)   in the case of each Mortgage Loan that is not a MERS
Mortgage Loan, the original recorded Mortgage or a copy of such
Mortgage, with recording information, and in the case of each MERS
Mortgage Loan, the original Mortgage or a copy of such Mortgage,
with recording information, noting the presence of the MIN of the
Mortgage Loan and language indicating that the Mortgage Loan is a
MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of
recording indicated thereon, or a copy of the Mortgage certified
by the public recording office in which such Mortgage has been
recorded;

            (iii)  in the case of each Mortgage Loan that is not a MERS
Mortgage Loan, a duly executed assignment of the Mortgage to
"Asset-Backed Certificates, Series 2006-10, CWABS, Inc., by The
Bank of New York, a New York banking corporation, as trustee under
the Pooling and Servicing Agreement dated as of June 1, 2006,
without recourse" or a copy of such assignment, with recording
information (each such assignment, when duly and validly
completed, to be in recordable form and sufficient to effect the
assignment of and transfer to the assignee thereof, under the
Mortgage to which such assignment relates);

            (iv)   the original recorded assignment or assignments of the
Mortgage or a copy of such assignments, with recording
information, together with all interim recorded assignments of
such Mortgage or a copy of such assignments, with recording
information (in each case noting the presence of a MIN in the case
of each MERS Mortgage Loan);

            (v)    the original or copies of each assumption,
modification, written assurance or substitution agreement, if any;
                              Page 73

PSA CWL 06-13.txt
and

      (vi)  the original or duplicate original lender's title
policy or a copy of lender's title policy or a printout of the
electronic equivalent and all riders thereto or, in the event such
original title policy has not been received from the insurer, such
original or duplicate original lender's title policy and all
riders thereto shall be delivered within one year of the Closing
Date.

     In addition, in connection with the assignment of any MERS
Mortgage Loan, each Seller agrees that it will cause, at such Seller's own
expense, the MERS(R) System to indicate (and provide evidence to the Trustee
that it has done so) that such Mortgage Loans have been assigned by such
Seller to the Trustee in accordance with this Agreement for the benefit of the
Certificateholders by including (or deleting, in the case of Mortgage Loans
which are repurchased in accordance with this Agreement) in such computer
files (a) the code "[IDENTIFY TRUSTEE SPECIFIC CODE]" in the field "[IDENTIFY
THE FIELD NAME FOR TRUSTEE]" which identifies the Trustee and (b) the code
"[IDENTIFY SERIES SPECIFIC CODE NUMBER]" in the field "Pool Field" which
identifies the series of the Certificates issued in connection with such
Mortgage Loans. The Sellers further agree that they will not, and will not
permit the Master Servicer to, and the Master Servicer agrees that it will
not, alter the codes referenced in this paragraph with respect to any Mortgage
Loan during the term of this Agreement unless and until such Mortgage Loan is
repurchased in accordance with the terms of this Agreement.

67

<PAGE>

     In the event that in connection with any Mortgage Loan that is not
a MERS Mortgage Loan a Seller cannot deliver the original recorded Mortgage or
all interim recorded assignments of the Mortgage satisfying the requirements
of clause (ii), (iii) or (iv) concurrently with the execution and delivery
hereof, such Seller shall deliver or cause to be delivered to the Trustee a
true copy of such Mortgage and of each such undelivered interim assignment of
the Mortgage each certified by such Seller, the applicable title company,
escrow agent or attorney, or the originator of such Mortgage, as the case may
be, to be a true and complete copy of the original Mortgage or assignment of
Mortgage submitted for recording. For any such Mortgage Loan that is not a
MERS Mortgage Loan each Seller shall promptly deliver or cause to be delivered
to the Trustee such original Mortgage and such assignment or assignments with
evidence of recording indicated thereon upon receipt thereof from the public
recording official, or a copy thereof, certified, if appropriate, by the
relevant recording office, but in no event shall any such delivery be made
later than 270 days following the Closing Date; provided that in the event
that by such date such Seller is unable to deliver or cause to be delivered
each such Mortgage and each interim assignment by reason of the fact that any
such documents have not been returned by the appropriate recording office, or,
in the case of each interim assignment, because the related Mortgage has not
been returned by the appropriate recording office, such Seller shall deliver
or cause to be delivered such documents to the Trustee as promptly as possible
upon receipt thereof. If the public recording office in which a Mortgage or
interim assignment thereof is recorded retains the original of such Mortgage
or assignment, a copy of the original Mortgage or assignment so retained, with
evidence of recording thereon, certified to be true and complete by such
recording office, shall satisfy a Seller's obligations in Section 2.01. If any
document submitted for recording pursuant to this Agreement is (x) lost prior
to recording or rejected by the applicable recording office, the applicable
Seller shall immediately prepare or cause to be prepared a substitute and
submit it for recording, and shall deliver copies and originals thereof in

PSA CWL 06-13.txt
accordance with the foregoing or (y) lost after recording, the applicable
Seller shall deliver to the Trustee a copy of such document certified by the
applicable public recording office to be a true and complete copy of the
original recorded document. Each Seller shall promptly forward or cause to be
forwarded to the Trustee (x) from time to time additional original documents
evidencing an assumption or modification of a Mortgage Loan and (y) any other
documents required to be delivered by the Depositor or the Master Servicer to
the Trustee within the time periods specified in this Section 2.01.

        With respect to each Mortgage Loan other than a MERS Mortgage Loan
as to which the related Mortgaged Property and Mortgage File are located in
any jurisdiction under the laws of which the recordation of the assignment
specified in clause (iii) above is not necessary to protect the Trustee's and
the Certificateholders' interest in the related Mortgage Loan, as evidenced by
an Opinion of Counsel delivered by CHL to the Trustee within 120 days of the
Closing Date (which opinion may be in the form of a "survey" opinion and is
not required to be delivered by counsel admitted to practice law in the
jurisdiction as to which such opinion applies), in lieu of recording the
assignment specified in clause (iii) above, the applicable Seller may deliver
an unrecorded assignment in blank, in form otherwise suitable for recording to
the Trustee; provided that if the related Mortgage has not been returned from
the applicable public recording office, such assignment, or any copy thereof,
of the Mortgage may exclude the information to be provided by the recording
office. As to any Mortgage Loan other than a MERS Mortgage Loan, the
procedures of the preceding sentence shall be applicable only so long as the
related Mortgage File is maintained in the possession of the Trustee in the
State or

                                    68

<PAGE>

jurisdiction described in such sentence. In the event that with respect to
Mortgage Loans other than MERS Mortgage Loans (I) any Seller, the Depositor,
the Master Servicer or the NIM Insurer gives written notice to the Trustee
that recording is required to protect the right, title and interest of the
Trustee on behalf of the Certificateholders in and to any Mortgage Loan, (II)
a court recharacterizes any sale of the Mortgage Loans as a financing, or
(III) as a result of any change in or amendment to the laws of the State or
jurisdiction described in the first sentence of this paragraph or any
applicable political subdivision thereof, or any change in official position
regarding application or interpretation of such laws, including a holding by a
court of competent jurisdiction, such recording is so required, the Trustee
shall complete the assignment in the manner specified in clause (iii) above
and CHL shall submit or cause to be submitted for recording as specified above
or, should CHL fail to perform such obligations, the Trustee shall cause the
Master Servicer, at the Master Servicer's expense, to cause each such
previously unrecorded assignment to be submitted for recording as specified
above. In the event a Mortgage File is released to the Master Servicer as a
result of the Master Servicer's having completed a Request for Document
Release, the Trustee shall complete the assignment of the related Mortgage in
the manner specified in clause (iii) above.

        So long as the Trustee or its agent maintains an office in the
State of California, the Trustee or its agent shall maintain possession of and
not remove or attempt to remove from the State of California any of the
Mortgage Files as to which the related Mortgaged Property is located in such
State. In the event that a Seller fails to record an assignment of a Mortgage
Loan as herein provided within 90 days of notice of an event set forth in
clause (I), (II) or (III) of the preceding paragraph, the Master Servicer
shall prepare and, if required hereunder, file such assignments for
recordation in the appropriate real property or other records office. Each
Seller hereby appoints the Master Servicer (and any successor servicer
                                Page 75

PSA CWL 06-13.txt

hereunder) as its attorney-in-fact with full power and authority acting in its stead for the purpose of such preparation, execution and filing.

In the case of Mortgage Loans that become the subject of a Principal Prepayment between the Closing Date (in the case of Initial Mortgage Loans) or related Subsequent Transfer Date (in the case of Subsequent Mortgage Loans) and the Cut-off Date, CHL shall deposit or cause to be deposited in the Certificate Account the amount required to be deposited therein with respect to such payment pursuant to Section 3.05 hereof.

Notwithstanding anything to the contrary in this Agreement, within thirty days after the Closing Date (in the case of Initial Mortgage Loans) or within twenty days after the related Subsequent Transfer Date (in the case of Subsequent Mortgage Loans), CHL (on behalf of each Seller) shall either (i) deliver to the Trustee the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or (ii) (A) repurchase the Delay Delivery Mortgage Loan or (B) substitute the Delay Delivery Mortgage Loan for a Replacement Mortgage Loan, which repurchase or substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, provided that if CHL fails to deliver a Mortgage File for any Delay Delivery Mortgage Loan within the period provided in the prior sentence, the cure period provided for in Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the Mortgage File for such Delay Delivery Mortgage Loan, but rather CHL shall have five (5) Business Days to cure such failure to deliver. CHL shall promptly provide each Rating Agency with written notice of any cure, repurchase or substitution made pursuant to the proviso of the

69

<PAGE>

preceding sentence. On or before the thirtieth (30th) day (or if such thirtieth day is not a Business Day, the succeeding Business Day) after the Closing Date (in the case of Initial Mortgage Loans) or within twenty days after the related Subsequent Transfer Date (in the case of Subsequent Mortgage Loans), the Trustee shall, in accordance with the provisions of Section 2.02, send a Delay Delivery Certification substantially in the form annexed hereto as Exhibit G-3 (with any applicable exceptions noted thereon) for all Delay Delivery Mortgage Loans delivered within thirty (30) days after such date. The Trustee will promptly send a copy of such Delay Delivery Certification to each Rating Agency.

Each Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans sold by such Seller to the Depositor and has agreed to take the actions specified herein. The Depositor, concurrently with the execution and delivery of this Agreement, hereby sells, transfers, assigns and otherwise conveys to the Trustee for the use and benefit of the Certificateholders, without recourse, all right title and interest in the portion of the Trust Fund not otherwise conveyed to the Trust Fund pursuant to Sections 2.01(a) or (b).

Section 2.02    Acceptance by Trustee of the Mortgage Loans.

(a)    The Trustee acknowledges receipt, subject to the limitations contained in and any exceptions noted in the Initial Certification in the form annexed hereto as Exhibit G-1 and in the list of exceptions attached thereto, of the documents referred to in clauses (i) and (iii) of Section 2.01(g) above with respect to the Initial Mortgage Loans and all other assets included in the Trust Fund and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders.

PSA CWL 06-13.txt
        The Trustee agrees to execute and deliver on the Closing Date to
the Depositor, the Master Servicer and CHL (on behalf of each Seller) an
Initial Certification substantially in the form annexed hereto as Exhibit G-1
to the effect that, as to each Initial Mortgage Loan listed in the Mortgage
Loan Schedule (other than any Initial Mortgage Loan paid in full or any
Initial Mortgage Loan specifically identified in such certification as not
covered by such certification), the documents described in Section 2.01(g)(i)
and, in the case of each Initial Mortgage Loan that is not a MERS Mortgage
Loan, the documents described in Section 2.01(g)(iii) with respect to such
Initial Mortgage Loans as are in the Trustee's possession and based on its
review and examination and only as to the foregoing documents, such documents
appear regular on their face and relate to such Initial Mortgage Loan. The
Trustee agrees to execute and deliver within 30 days after the Closing Date to
the Depositor, the Master Servicer and CHL (on behalf of each Seller) an
Interim Certification substantially in the form annexed hereto as Exhibit G-2
to the effect that, as to each Initial Mortgage Loan listed in the Mortgage
Loan Schedule (other than any Initial Mortgage Loan paid in full or any
Initial Mortgage Loan specifically identified in such certification as not
covered by such certification) all documents required to be delivered to the
Trustee pursuant to the Agreement with respect to such Initial Mortgage Loans
are in its possession (except those documents described in Section
2.01(g)(vi)) and based on its review and examination and only as to the
foregoing documents, (i) such documents appear regular on their face and
relate to such Initial Mortgage Loan, and (ii) the information set forth in
items (i), (iv), (v), (vi), (viii), (ix) and (xvii) of the definition of the
"Mortgage Loan Schedule" accurately

                                      70

<PAGE>

reflects information set forth in the Mortgage File. On or before the
thirtieth (30th) day after the Closing Date (or if such thirtieth day is not a
Business Day, the succeeding Business Day), the Trustee shall deliver to the
Depositor, the Master Servicer and CHL (on behalf of each Seller) a Delay
Delivery Certification with respect to the Initial Mortgage Loans
substantially in the form annexed hereto as Exhibit G-3, with any applicable
exceptions noted thereon. The Trustee shall be under no duty or obligation to
inspect, review or examine such documents, instruments, certificates or other
papers to determine that the same are genuine, enforceable or appropriate for
the represented purpose or that they have actually been recorded in the real
estate records or that they are other than what they purport to be on their
face. Not later than 180 days after the Closing Date, the Trustee shall
deliver to the Depositor, the Master Servicer, CHL (on behalf of each Seller)
and any Certificateholder that so requests, a Final Certification with respect
to the Initial Mortgage Loans substantially in the form annexed hereto as
Exhibit H, with any applicable exceptions noted thereon.

        In connection with the Trustee's completion and delivery of such
Final Certification, the Trustee shall review each Mortgage File with respect
to the Initial Mortgage Loans to determine that such Mortgage File contains
the following documents:

                (i)   the original Mortgage Note, endorsed by manual or
                facsimile signature in blank in the following form: "Pay to the
                order of _____ without recourse", with all intervening
                endorsements that show a complete chain of endorsement from the
                originator to the Person endorsing the Mortgage Note (each such
                endorsement being sufficient to transfer all right, title and
                interest of the party so endorsing, as noteholder or assignee
                thereof, in and to that Mortgage Note), or, if the original
                Mortgage Note has been lost or destroyed and not replaced, an
                original lost note affidavit, stating that the original Mortgage
                                     Page 77

PSA CWL 06-13.txt
Note was lost or destroyed, together with a copy of the related
Mortgage Note and all such intervening endorsements;

      (ii)   in the case of each Initial Mortgage Loan that is not
a MERS Mortgage Loan, the original recorded Mortgage or a copy of
such Mortgage, with recording information, and in the case of each
Initial Mortgage Loan that is a MERS Mortgage Loan, the original
Mortgage or a copy of such Mortgage, with recording information,
noting the presence of the MIN of the Initial Mortgage Loan and
language indicating that the Mortgage Loan is a MOM Loan if the
Initial Mortgage Loan is a MOM Loan, with evidence of recording
indicated thereon, or a copy of the Mortgage certified by the
public recording office in which Mortgage has been recorded;

      (iii) in the case of each Initial Mortgage Loan that is not
a MERS Mortgage Loan, a duly executed assignment of the Mortgage
or a copy thereof with recording information, in either case in
the form permitted by Section 2.01;

      (iv)   the original recorded assignment or assignments of the
Mortgage or a copy of such assignments, with recording
information, together with all interim recorded assignments of
such Mortgage or a copy of such assignments,

                              71

<PAGE>

      with recording information (in each case noting the presence of a
      MIN in the case of each MERS Mortgage Loan);

      (v)   the original or copies of each assumption,
modification, written assurance or substitution agreement, if any;
and

      (vi)   the original or duplicate original lender's title
policy or a copy of lender's title policy or a printout of the
electronic equivalent and all riders thereto.

      If, in the course of such review, the Trustee finds any document
or documents constituting a part of such Mortgage File that do not meet the
requirements of clauses (i)-(iv) and (vi) above, the Trustee shall include
such exceptions in such Final Certification (and the Trustee shall state in
such Final Certification whether any Mortgage File does not then include the
original or duplicate original lender's title policy or a printout of the
electronic equivalent and all riders thereto). If the public recording office
in which a Mortgage or assignment thereof is recorded retains the original of
such Mortgage or assignment, a copy of the original Mortgage or assignment so
retained, with evidence of recording thereon, certified to be true and
complete by such recording office, shall be deemed to satisfy the requirements
of clause (ii), (iii) or (iv) above, as applicable. CHL shall promptly correct
or cure such defect referred to above within 90 days from the date it was so
notified of such defect and, if CHL does not correct or cure such defect
within such period, CHL shall either (A) if the time to cure such defect
expires prior to the end of the second anniversary of the Closing Date,
substitute for the related Initial Mortgage Loan a Replacement Mortgage Loan,
which substitution shall be accomplished in the manner and subject to the
conditions set forth in Section 2.03, or (B) purchase such Initial Mortgage
Loan from the Trust Fund within 90 days from the date CHL was notified of such
defect in writing at the Purchase Price of such Initial Mortgage Loan;
provided that any such substitution pursuant to (A) above or repurchase
pursuant to (B) above shall not be effected prior to the delivery to the
Trustee of the Opinion of Counsel required by Section 2.05 hereof and any
                        Page 78

PSA CWL 06-13.txt

substitution pursuant to (A) above shall not be effected prior to the
additional delivery to the Trustee of a Request for File Release. No
substitution will be made in any calendar month after the Determination Date
for such month. The Purchase Price for any such Initial Mortgage Loan shall be
deposited by CHL in the Certificate Account and, upon receipt of such deposit
and Request for File Release with respect thereto, the Trustee shall release
the related Mortgage File to CHL and shall execute and deliver at CHL's
request such instruments of transfer or assignment as CHL has prepared, in
each case without recourse, as shall be necessary to vest in CHL, or a
designee, the Trustee's interest in any Initial Mortgage Loan released
pursuant hereto. If pursuant to the foregoing provisions CHL repurchases an
Initial Mortgage Loan that is a MERS Mortgage Loan, the Master Servicer shall
cause MERS to execute and deliver an assignment of the Mortgage in recordable
form to transfer the Mortgage from MERS to CHL and shall cause such Mortgage
to be removed from registration on the MERS(R) System in accordance with MERS'
rules and regulations.

     The Trustee shall retain possession and custody of each Mortgage
File in accordance with and subject to the terms and conditions set forth
herein. Each Seller shall promptly deliver to the Trustee, upon the execution
or receipt thereof, the originals of such other documents or instruments
constituting the Mortgage File that come into the possession of such Seller
from time to time.


                                    72

<PAGE>

     It is understood and agreed that the obligation of CHL to
substitute for or to purchase any Mortgage Loan that does not meet the
requirements of Section 2.02(a) above shall constitute the sole remedy
respecting such defect available to the Trustee, the Depositor and any
Certificateholder against any Seller.

     It is understood and agreed that the obligation of CHL to
substitute for or to purchase, pursuant to Section 2.02(a), any Initial
Mortgage Loan whose Mortgage File contains any document or documents that does
not meet the requirements of clauses (i)-(iv) and (vi) above and which defect
is not corrected or cured by CHL within 90 days from the date it was notified
of such defect, shall constitute the sole remedy respecting such defect
available to the Trustee, the Depositor and any Certificateholder against any
Seller.

     (b)   The Trustee agrees to execute and deliver on the Subsequent
Transfer Date to the Depositor, the Master Servicer and CHL (on behalf of each
Seller) an Initial Certification substantially in the form annexed hereto as
Exhibit G-4 to the effect that, as to each Subsequent Mortgage Loan listed in
the Mortgage Loan Schedule (other than any Subsequent Mortgage Loan paid in
full or any Subsequent Mortgage Loan specifically identified in such
certification as not covered by such certification), the documents described
in Section 2.01(g)(i) and, in the case of each Subsequent Mortgage Loan that
is not a MERS Mortgage Loan, the documents described in Section 2.01(g)(iii),
with respect to such Subsequent Mortgage Loan are in its possession, and based
on its review and examination and only as to the foregoing documents, such
documents appear regular on their face and relate to such Subsequent Mortgage
Loan.

     The Trustee agrees to execute and deliver within 30 days after the
Subsequent Transfer Date to the Depositor, the Master Servicer and CHL (on
behalf of each Seller) an Interim Certification substantially in the form
annexed hereto as Exhibit G-2 to the effect that, as to each Subsequent
Mortgage Loan listed in the Mortgage Loan Schedule (other than any Subsequent

PSA CWL 06-13.txt

Mortgage Loan paid in full or any Subsequent Mortgage Loan specifically identified in such certification as not covered by such certification), all documents required to be delivered to it pursuant to this Agreement with respect to such Subsequent Mortgage Loan are in its possession (except those described in Section 2.01(g)(vi)) and based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and relate to such Subsequent Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (ix) and (xvii) of the definition of the "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage File. On or before the thirtieth (30th) day after the Subsequent Transfer Date (or if such thirtieth day is not a Business Day, the succeeding Business Day), the Trustee shall deliver to the Depositor, the Master Servicer and CHL (on behalf of each Seller) a Delay Delivery Certification with respect to the Subsequent Mortgage Loans substantially in the form annexed hereto as Exhibit G-3, with any applicable exceptions noted thereon, together with a Subsequent Certification substantially in the form annexed hereto as Exhibit G-4. The Trustee shall be under no duty or obligation to inspect, review or examine such documents, instruments, certificates or other papers to determine that the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

73

<PAGE>

        Not later than 180 days after the Subsequent Transfer Date, the Trustee shall deliver to the Depositor, the Master Servicer, CHL (on behalf of each Seller) and to any Certificateholder that so requests a Final Certification with respect to the Subsequent Mortgage Loans substantially in the form annexed hereto as Exhibit H, with any applicable exceptions noted thereon.

        In connection with the Trustee's completion and delivery of such Final Certification, the Trustee shall review each Mortgage File with respect to the Subsequent Mortgage Loans to determine that such Mortgage File contains the following documents:

            (i)    the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse", with all intervening endorsements that show a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note), or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note and all such intervening endorsements;

            (ii)   in the case of each Subsequent Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage, with recording information, and in the case of each Subsequent Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage or a copy of such Mortgage, with recording information, noting the presence of the MIN of the Subsequent Mortgage Loan and language indicating that the Subsequent Mortgage Loan is a MOM Loan if the Subsequent Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which Mortgage has been recorded;

            (iii) in the case of each Subsequent Mortgage Loan that is

PSA CWL 06-13.txt
not a MERS Mortgage Loan, a duly executed assignment of the Mortgage or
a copy thereof with recording information, in either case in the form
permitted by Section 2.01;

    (iv)  the original recorded assignment or assignments of the
Mortgage or a copy of such assignments, with recording information,
together with all interim recorded assignments of such Mortgage or a
copy of such assignments, with recording information (in each case
noting the presence of a MIN in the case of each MERS Mortgage Loan);

    (v)  the original or copies of each assumption,
modification, written assurance or substitution agreement, if any; and

    (vi)  the original or duplicate original lender's title
policy or a copy of lender's title policy or a printout of the
electronic equivalent and all riders thereto.

    If, in the course of such review, the Trustee finds any document
or documents constituting a part of such Mortgage File that do not meet the
requirements of clauses (i)-(iv) and

74

&lt;PAGE&gt;

(vi) above, the Trustee shall include such exceptions in such Final
Certification (and the Trustee shall state in such Final Certification whether
any Mortgage File does not then include the original or duplicate original
lender's title policy or a printout of the electronic equivalent and all
riders thereto). If the public recording office in which a Mortgage or
assignment thereof is recorded retains the original of such Mortgage or
assignment, a copy of the original Mortgage or assignment so retained, with
evidence of recording thereon, certified to be true and complete by such
recording office, shall be deemed to satisfy the requirements of clause (ii),
(iii) or (iv) above, as applicable. CHL shall promptly correct or cure such
defect referred to above within 90 days from the date it was so notified of
such defect and, if CHL does not correct or cure such defect within such
period, CHL shall either (A) if the time to cure such defect expires prior to
the end of the second anniversary of the Closing Date, substitute for the
related Subsequent Mortgage Loan a Replacement Mortgage Loan, which
substitution shall be accomplished in the manner and subject to the conditions
set forth in Section 2.03, or (B) purchase such Subsequent Mortgage Loan from
the Trust Fund within 90 days from the date CHL was notified of such defect in
writing at the Purchase Price of such Subsequent Mortgage Loan; provided that
any such substitution pursuant to (A) above or repurchase pursuant to (B)
above shall not be effected prior to the delivery to the Trustee of the
Opinion of Counsel required by Section 2.05 hereof and any substitution
pursuant to (A) above shall not be effected prior to the additional delivery
to the Trustee of a Request for File Release. No substitution will be made in
any calendar month after the Determination Date for such month. The Purchase
Price for any such Subsequent Mortgage Loan shall be deposited by CHL in the
Certificate Account and, upon receipt of such deposit and Request for File
Release with respect thereto, the Trustee shall release the related Mortgage
File to CHL and shall execute and deliver at CHL's request such instruments of
transfer or assignment as CHL has prepared, in each case without recourse, as
shall be necessary to vest in CHL, or a designee, the Trustee's interest in
any Subsequent Mortgage Loan released pursuant hereto. If pursuant to the
foregoing provisions CHL repurchases a Subsequent Mortgage Loan that is a MERS
Mortgage Loan, the Master Servicer shall cause MERS to execute and deliver an
assignment of the Mortgage in recordable form to transfer the Mortgage from
MERS to CHL and shall cause such Mortgage to be removed from registration on
the MERS(R) System in accordance with MERS' rules and regulations.

PSA CWL 06-13.txt
          The Trustee shall retain possession and custody of each Mortgage
File in accordance with and subject to the terms and conditions set forth
herein. Each Seller shall promptly deliver to the Trustee, upon the execution
or receipt thereof, the originals of such other documents or instruments
constituting the Mortgage File that come into the possession of such Seller
from time to time.

          It is understood and agreed that the obligation of the Sellers to
substitute for or to purchase, pursuant to Section 2.02(b), any Subsequent
Mortgage Loan whose Mortgage File contains any document or documents that does
not meet the requirements of clauses (i)-(iv) and (vi) above and which defect
is not corrected or cured by such Seller within 90 days from the date it was
notified of such defect, shall constitute the sole remedy respecting such
defect available to the Trustee, the Depositor and any Certificateholder
against the Sellers.


                                    75

<PAGE>

          Section 2.03    Representations, Warranties and Covenants of the
                          Master Servicer and the Sellers.

          (a)    The Master Servicer hereby represents and warrants to the
Depositor and the Trustee as follows, as of the date hereof with respect to
the Initial Mortgage Loans, and the related Subsequent Transfer Date with
respect to the Subsequent Mortgage Loans:

               (1)    The Master Servicer is duly organized as a Texas
          limited partnership and is validly existing and in good standing under
          the laws of the State of Texas and is duly authorized and qualified to
          transact any and all business contemplated by this Agreement to be
          conducted by the Master Servicer in any state in which a Mortgaged
          Property is located or is otherwise not required under applicable law to
          effect such qualification and, in any event, is in compliance with the
          doing business laws of any such state, to the extent necessary to ensure
          its ability to enforce each Mortgage Loan, to service the Mortgage Loans
          in accordance with the terms of this Agreement and to perform any of its
          other obligations under this Agreement in accordance with the terms
          hereof.

               (2)    The Master Servicer has the full partnership power and
          authority to sell and service each Mortgage Loan, and to execute,
          deliver and perform, and to enter into and consummate the transactions
          contemplated by this Agreement and has duly authorized by all necessary
          partnership action on the part of the Master Servicer the execution,
          delivery and performance of this Agreement; and this Agreement, assuming
          the due authorization, execution and delivery hereof by the other
          parties hereto, constitutes a legal, valid and binding obligation of the
          Master Servicer, enforceable against the Master Servicer in accordance
          with its terms, except that (a) the enforceability hereof may be limited
          by bankruptcy, insolvency, moratorium, receivership and other similar
          laws relating to creditors' rights generally and (b) the remedy of
          specific performance and injunctive and other forms of equitable relief
          may be subject to equitable defenses and to the discretion of the court
          before which any proceeding therefor may be brought.

               (3)    The execution and delivery of this Agreement by the
          Master Servicer, the servicing of the Mortgage Loans by the Master
          Servicer under this Agreement, the consummation of any other of the
          transactions contemplated by this Agreement, and the fulfillment of or
          compliance with the terms hereof are in the ordinary course of business

PSA CWL 06-13.txt
of the Master Servicer and will not (A) result in a material breach of
any term or provision of the certificate of limited partnership,
partnership agreement or other organizational document of the Master
Servicer or (B) materially conflict with, result in a material breach,
violation or acceleration of, or result in a material default under, the
terms of any other material agreement or instrument to which the Master
Servicer is a party or by which it may be bound, or (C) constitute a
material violation of any statute, order or regulation applicable to the
Master Servicer of any court, regulatory body, administrative agency or
governmental body having jurisdiction over the Master Servicer; and the
Master Servicer is not in breach or violation of any material indenture
or other material agreement or instrument, or in violation of any
statute, order or regulation of any court, regulatory body,
administrative agency or governmental body

                                    76
<PAGE>

having jurisdiction over it which breach or violation may materially
impair the Master Servicer's ability to perform or meet any of its
obligations under this Agreement.

          (4)   The Master Servicer is an approved servicer of
conventional mortgage loans for Fannie Mae and Freddie Mac and is a
mortgagee approved by the Secretary of Housing and Urban Development
pursuant to sections 203 and 211 of the National Housing Act.

          (5)   No litigation is pending or, to the best of the Master
Servicer's knowledge, threatened, against the Master Servicer that would
materially and adversely affect the execution, delivery or
enforceability of this Agreement or the ability of the Master Servicer
to service the Mortgage Loans or to perform any of its other obligations
under this Agreement or any Subsequent Transfer Agreement in accordance
with the terms hereof or thereof.

          (6)   No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by the Master Servicer of, or compliance by the
Master Servicer with, this Agreement or the consummation of the
transactions contemplated hereby, or if any such consent, approval,
authorization or order is required, the Master Servicer has obtained the
same.

          (7)   The Master Servicer is a member of MERS in good
standing, and will comply in all material respects with the rules and
procedures of MERS in connection with the servicing of the Mortgage
Loans for as long as such Mortgage Loans are registered with MERS.

          (8)   The Master Servicer has fully furnished and will fully
furnish, in accordance with the Fair Credit Reporting Act and its
implementing regulations, accurate and complete information (i.e.,
favorable and unfavorable) on its borrower credit files to Equifax,
Experian, and Trans Union Credit Information Company (three of the
credit repositories), on a monthly basis for the Mortgage Loans in Loan
Group 2.

          (b)   CHL hereby represents and warrants to the Depositor and the
Trustee as follows, as of the Initial Cut-off Date in the case of the Initial
Mortgage Loans and as of the related Subsequent Cut-off Date in the case of
the Subsequent Mortgage Loans (unless otherwise indicated or the context
otherwise requires, percentages with respect to the Initial Mortgage Loans in
the Trust Fund or in a Loan Group or Loan Groups are measured by the Cut-off
Date Principal Balance of the Initial Mortgage Loans in the Trust Fund or of

PSA CWL 06-13.txt
the Initial Mortgage Loans in the related Loan Group or Loan Groups, as
applicable):

        (1)   CHL is duly organized as a New York corporation and is
validly existing and in good standing under the laws of the State of New
York and is duly authorized and qualified to transact any and all
business contemplated by this Agreement and each Subsequent Transfer
Agreement to be conducted by CHL in any state in which a Mortgaged
Property is located or is otherwise not required under applicable law to
effect such qualification and, in any event, is in compliance with the
doing business laws of any such state, to the extent necessary to ensure
its ability to enforce each Mortgage

77

<PAGE>

Loan, to sell the CHL Mortgage Loans in accordance with the terms of
this Agreement and each Subsequent Transfer Agreement and to perform any
of its other obligations under this Agreement and each Subsequent
Transfer Agreement in accordance with the terms hereof and thereof.

        (2)   CHL has the full corporate power and authority to sell
each CHL Mortgage Loan, and to execute, deliver and perform, and to
enter into and consummate the transactions contemplated by this
Agreement and each Subsequent Transfer Agreement and has duly authorized
by all necessary corporate action on the part of CHL the execution,
delivery and performance of this Agreement and each Subsequent Transfer
Agreement; and this Agreement and each Subsequent Transfer Agreement,
assuming the due authorization, execution and delivery hereof by the
other parties hereto, constitutes a legal, valid and binding obligation
of CHL, enforceable against CHL in accordance with its terms, except
that (a) the enforceability hereof may be limited by bankruptcy,
insolvency, moratorium, receivership and other similar laws relating to
creditors' rights generally and (b) the remedy of specific performance
and injunctive and other forms of equitable relief may be subject to
equitable defenses and to the discretion of the court before which any
proceeding therefor may be brought.

        (3)   The execution and delivery of this Agreement and each
Subsequent Transfer Agreement by CHL, the sale of the CHL Mortgage Loans
by CHL under this Agreement and each Subsequent Transfer Agreement, the
consummation of any other of the transactions contemplated by this
Agreement and each Subsequent Transfer Agreement, and the fulfillment of
or compliance with the terms hereof and thereof are in the ordinary
course of business of CHL and will not (A) result in a material breach
of any term or provision of the charter or by-laws of CHL or (B)
materially conflict with, result in a material breach, violation or
acceleration of, or result in a material default under, the terms of any
other material agreement or instrument to which CHL is a party or by
which it may be bound, or (C) constitute a material violation of any
statute, order or regulation applicable to CHL of any court, regulatory
body, administrative agency or governmental body having jurisdiction
over CHL; and CHL is not in breach or violation of any material
indenture or other material agreement or instrument, or in violation of
any statute, order or regulation of any court, regulatory body,
administrative agency or governmental body having jurisdiction over it
which breach or violation may materially impair CHL's ability to perform
or meet any of its obligations under this Agreement and each Subsequent
Transfer Agreement.

        (4)   CHL is an approved seller of conventional mortgage
loans for Fannie Mae and Freddie Mac and is a mortgagee approved by the
Page 84

PSA CWL 06-13.txt
Secretary of Housing and Urban Development pursuant to sections 203 and
211 of the National Housing Act.

(5)   No litigation is pending or, to the best of CHL's
knowledge, threatened, against CHL that would materially and adversely
affect the execution, delivery or enforceability of this Agreement or
any Subsequent Transfer Agreement or the ability of CHL to sell the CHL
Mortgage Loans or to perform any of its other obligations under this
Agreement or any Subsequent Transfer Agreement in accordance with the
terms hereof or thereof.


                                78

<PAGE>

(6)   No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by CHL of, or compliance by CHL with, this
Agreement or any Subsequent Transfer Agreement or the consummation of
the transactions contemplated hereby, or if any such consent, approval,
authorization or order is required, CHL has obtained the same.

(7)   The information set forth on Exhibit F-1 hereto with
respect to each Initial Mortgage Loan is true and correct in all
material respects as of the Closing Date.

(8)   CHL will treat the transfer of the CHL Mortgage Loans
to the Depositor as a sale of the CHL Mortgage Loans for all tax,
accounting and regulatory purposes.

(9)   None of the Mortgage Loans is 30 days or more
delinquent in payment of principal and interest.

(10)  No Mortgage Loan had a Loan-to-Value Ratio at
origination in excess of 100.00%.

(11)  Each Mortgage Loan is secured by a valid and
enforceable first lien on the related Mortgaged Property subject only to
(1) the lien of non-delinquent current real property taxes and
assessments, (2) covenants, conditions and restrictions, rights of way,
easements and other matters of public record as of the date of recording
of such Mortgage, such exceptions appearing of record being acceptable
to mortgage lending institutions generally or specifically reflected in
the appraisal made in connection with the origination of the related
Mortgage Loan and (3) other matters to which like properties are
commonly subject that do not materially interfere with the benefits of
the security intended to be provided by such Mortgage.

(12)  Immediately prior to the assignment of each CHL
Mortgage Loan to the Depositor, CHL had good title to, and was the sole
owner of, such CHL Mortgage Loan free and clear of any pledge, lien,
encumbrance or security interest and had full right and authority,
subject to no interest or participation of, or agreement with, any other
party, to sell and assign the same pursuant to this Agreement.

(13)  There is no delinquent tax or assessment lien against
any Mortgaged Property.

(14)  There is no valid offset, claim, defense or
counterclaim to any Mortgage Note or Mortgage, including the obligation
of the Mortgagor to pay the unpaid principal of or interest on such
Mortgage Note.
                            Page 85

PSA CWL 06-13.txt

(15)  There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property that are or may be a lien prior to, or equal with, the lien of such Mortgage, except those that are insured against by the title insurance policy referred to in item (18) below.

79

<PAGE>

(16)  As of the Closing Date in the case of the Initial Mortgage Loans and as of the related Subsequent Transfer Date in the case of the Subsequent Mortgage Loans, to the best of CHL's knowledge, each Mortgaged Property is free of material damage and is in good repair.

(17)  As of the Closing Date in the case of the Initial Mortgage Loans and as of the related Subsequent Transfer Date in the case of the Subsequent Mortgage Loans, neither CHL nor any prior holder of any Mortgage has modified the Mortgage in any material respect (except that a Mortgage Loan may have been modified by a written instrument that has been recorded or submitted for recordation, if necessary, to protect the interests of the Certificateholders and the original or a copy of which has been delivered to the Trustee); satisfied, cancelled or subordinated such Mortgage in whole or in part; released the related Mortgaged Property in whole or in part from the lien of such Mortgage; or executed any instrument of release, cancellation, modification (except as expressly permitted above) or satisfaction with respect thereto.

(18)  A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect, and each such policy was issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located and acceptable to Fannie Mae and Freddie Mac and is in a form acceptable to Fannie Mae and Freddie Mac, which policy insures the Sellers and successor owners of indebtedness secured by the insured Mortgage, as to the first priority lien, of the Mortgage subject to the exceptions set forth in paragraph (11) above; to the best of CHL's knowledge, no claims have been made under such mortgage title insurance policy and no prior holder of the related Mortgage, including any Seller, has done, by act or omission, anything that would impair the coverage of such mortgage title insurance policy.

(19)  No Initial Mortgage Loan was the subject of a Principal Prepayment in full between the Initial Cut-off Date and the Closing Date. No Subsequent Mortgage Loan was the subject of a Principal Prepayment in full between the Subsequent Cut-off Date and the Subsequent Transfer Date.

(20)  To the best of CHL's knowledge, all of the improvements that were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property.

PSA CWL 06-13.txt
(21)  To the best of CHL's knowledge, no improvement located
on or being part of the Mortgaged Property is in violation of any
applicable zoning law or regulation. To the best of CHL's knowledge, all
inspections, licenses and certificates required to be made or issued
with respect to all occupied portions of the Mortgaged Property and,
with respect to the use and occupancy of the same, including but not
limited to certificates of occupancy and fire underwriting certificates,
have been made or

80

<PAGE>

obtained from the appropriate authorities, unless the lack thereof would
not have a material adverse effect on the value of such Mortgaged
Property, and the Mortgaged Property is lawfully occupied under
applicable law.

(22)  The Mortgage Note and the related Mortgage are
genuine, and each is the legal, valid and binding obligation of the
maker thereof, enforceable in accordance with its terms and under
applicable law, except that (a) the enforceability thereof may be
limited by bankruptcy, insolvency, moratorium, receivership and other
similar laws relating to creditors' rights generally and (b) the remedy
of specific performance and injunctive and other forms of equitable
relief may be subject to equitable defenses and to the discretion of the
court before which any proceeding therefor may be brought. To the best
of CHL's knowledge, all parties to the Mortgage Note and the Mortgage
had legal capacity to execute the Mortgage Note and the Mortgage and
each Mortgage Note and Mortgage have been duly and properly executed by
such parties.

(23)  The proceeds of the Mortgage Loan have been fully
disbursed, there is no requirement for future advances thereunder, and
any and all requirements as to completion of any on-site or off-site
improvements and as to disbursements of any escrow funds therefor have
been complied with. All costs, fees and expenses incurred in making, or
closing or recording the Mortgage Loan were paid.

(24)  The related Mortgage contains customary and
enforceable provisions that render the rights and remedies of the holder
thereof adequate for the realization against the Mortgaged Property of
the benefits of the security, including, (i) in the case of a Mortgage
designated as a deed of trust, by trustee's sale, and (ii) otherwise by
judicial foreclosure.

(25)  With respect to each Mortgage constituting a deed of
trust, a trustee, duly qualified under applicable law to serve as such,
has been properly designated and currently so serves and is named in
such Mortgage, and no fees or expenses are or will become payable by the
Certificateholders to the trustee under the deed of trust, except in
connection with a trustee's sale after default by the Mortgagor.

(26)  Each Mortgage Note and each Mortgage is acceptable in
form to Fannie Mae and Freddie Mac.

(27)  There exist no deficiencies with respect to escrow
deposits and payments, if such are required, for which customary
arrangements for repayment thereof have not been made, and no escrow
deposits or payments of other charges or payments due the Sellers have
been capitalized under the Mortgage or the related Mortgage Note.

(28)  The origination, underwriting, servicing and
Page 87

PSA CWL 06-13.txt
collection practices with respect to each Mortgage Loan have been in all
respects legal, proper, prudent and customary in the mortgage lending
and servicing business, as conducted by prudent lending institutions
which service mortgage loans of the same type in the jurisdiction in
which the Mortgaged Property is located.


                                    81
<PAGE>

            (29)  There is no pledged account or other security other
than real estate securing the Mortgagor's obligations.

            (30)  No Mortgage Loan has a shared appreciation feature, or
other contingent interest feature.

            (31)  Each Mortgage Loan contains a customary "due on sale"
clause.

            (32)  No less than approximately the percentage specified in
the Collateral Schedule of the Initial Mortgage Loans in Loan Group 1,
Loan Group 2 and Loan Group 3 are secured by single family detached
dwellings. No more than approximately the percentage specified in the
Collateral Schedule of the Initial Mortgage Loans in Loan Group 1, Loan
Group 2 and Loan Group 3 are secured by two- to four-family dwellings.
No more than approximately the percentage specified in the Collateral
Schedule of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and
Loan Group 3 are secured by low-rise condominium units. No more than
approximately the percentage specified in the Collateral Schedule of the
Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3
are secured by high-rise condominium units. No more than approximately
the percentage specified in the Collateral Schedule of the Initial
Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3 are
secured by manufactured housing. No more than approximately the
percentage specified in the Collateral Schedule of the Initial Mortgage
Loans in Loan Group 1, Loan Group 2 and Loan Group 3 are secured by
PUDs.

            (33)  Each Initial Mortgage Loan in Loan Group 1, Loan Group
2 and Loan Group 3 was originated on or after the date specified in the
Collateral Schedule.

            (34)  Each Initial Mortgage Loan that is an Adjustable Rate
Mortgage Loan, other than a Two-Year Hybrid Mortgage Loan, a Three-Year
Hybrid Mortgage Loan or a Five-Year Hybrid Mortgage Loan, had an initial
Adjustment Date no later than the applicable date specified on the
Collateral Schedule; each Initial Mortgage Loan that is a Two-Year
Hybrid Mortgage Loan had an initial Adjustment Date no later than the
applicable date specified on the Collateral Schedule; each Initial
Mortgage Loan that is a Three-Year Hybrid Mortgage Loan had an initial
Adjustment Date no later than the applicable date specified on the
Collateral Schedule; and each Initial Mortgage Loan that is a Five-Year
Hybrid Mortgage Loan had an initial Adjustment Date no later than the
applicable date specified on the Collateral Schedule.

            (35)  Approximately the percentage specified in the
Collateral Schedule of the Initial Mortgage Loans in Loan Group 1, Loan
Group 2 and Loan Group 3 provide for a Prepayment Charge.

            (36)  On the basis of representations made by the Mortgagors
in their loan applications, no more than approximately the percentage
specified in the Collateral Schedule of the Initial Mortgage Loans in
                              Page 88

PSA CWL 06-13.txt
Loan Group 1, Loan Group 2 and Loan Group 3, respectively, are secured
by investor properties, and no less than approximately the percentage
specified in the Collateral Schedule of the Initial Mortgage Loans in
Loan

82

<PAGE>

Group 1, Loan Group 2 and Loan Group 3 respectively, are secured by
owner-occupied Mortgaged Properties that are primary residences.

        (37)   At the Cut-off Date, the improvements upon each
Mortgaged Property are covered by a valid and existing hazard insurance
policy with a generally acceptable carrier that provides for fire and
extended coverage and coverage for such other hazards as are customary
in the area where the Mortgaged Property is located in an amount that is
at least equal to the lesser of (i) the maximum insurable value of the
improvements securing such Mortgage Loan or (ii) the greater of (a) the
outstanding principal balance of the Mortgage Loan and (b) an amount
such that the proceeds of such policy shall be sufficient to prevent the
Mortgagor and/or the mortgagee from becoming a co-insurer. If the
Mortgaged Property is a condominium unit, it is included under the
coverage afforded by a blanket policy for the condominium unit. All such
individual insurance policies and all flood policies referred to in item
(38) below contain a standard mortgagee clause naming the applicable
Seller or the original mortgagee, and its successors in interest, as
mortgagee, and the applicable Seller has received no notice that any
premiums due and payable thereon have not been paid; the Mortgage
obligates the Mortgagor thereunder to maintain all such insurance,
including flood insurance, at the Mortgagor's cost and expense, and upon
the Mortgagor's failure to do so, authorizes the holder of the Mortgage
to obtain and maintain such insurance at the Mortgagor's cost and
expense and to seek reimbursement therefor from the Mortgagor.

        (38)   If the Mortgaged Property is in an area identified in
the Federal Register by the Federal Emergency Management Agency as
having special flood hazards, a flood insurance policy in a form meeting
the requirements of the current guidelines of the Flood Insurance
Administration is in effect with respect to such Mortgaged Property with
a generally acceptable carrier in an amount representing coverage not
less than the least of (A) the original outstanding principal balance of
the Mortgage Loan, (B) the minimum amount required to compensate for
damage or loss on a replacement cost basis, or (C) the maximum amount of
insurance that is available under the Flood Disaster Protection Act of
1973, as amended.

        (39)   To the best of CHL's knowledge, there is no proceeding
occurring, pending or threatened for the total or partial condemnation
of the Mortgaged Property.

        (40)   There is no material monetary default existing under
any Mortgage or the related Mortgage Note and, to the best of CHL's
knowledge, there is no material event that, with the passage of time or
with notice and the expiration of any grace or cure period, would
constitute a default, breach, violation or event of acceleration under
the Mortgage or the related Mortgage Note; and no Seller has waived any
default, breach, violation or event of acceleration.

        (41)   Each Mortgaged Property is improved by a one- to
four-family residential dwelling, including condominium units and
dwelling units in PUDs. To the best of CHL's knowledge, no improvement
to a Mortgaged Property includes a cooperative or a mobile home or
Page 89

PSA CWL 06-13.txt
constitutes other than real property under state law.

83

<PAGE>

    (42)   Each Mortgage Loan is being serviced by the Master Servicer.

    (43)   Any future advances made prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan. The Mortgage Note does not permit or obligate the Master Servicer to make future advances to the Mortgagor at the option of the Mortgagor.

    (44)   All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents that previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item that remains unpaid and that has been assessed, but is not yet due and payable. Except for (A) payments in the nature of escrow payments, and (B) interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is later, to the day that precedes by one month the Due Date of the first installment of principal and interest, including without limitation, taxes and insurance payments, the Master Servicer has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required by the Mortgage.

    (45)   The Mortgage Loans originated by CHL were underwritten in all material respects in accordance with CHL's underwriting guidelines for credit blemished quality mortgage loans or, with respect to Mortgage Loans purchased by CHL were underwritten in all material respects in accordance with customary and prudent underwriting guidelines generally used by originators of credit blemished quality mortgage loans.

    (46)   Prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to Fannie Mae and Freddie Mac.

    (47)   None of the Mortgage Loans is a graduated payment mortgage loan or a growing equity mortgage loan, and no Mortgage Loan is subject to a buydown or similar arrangement.

    (48)   The Mortgage Rates borne by the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3 as of the Cut-off Date ranged between the approximate per annum percentages specified on the Collateral Schedule and the weighted average Mortgage Rate as of the Cut-off Date was approximately the per annum rate specified on the Collateral Schedule.

PSA CWL 06-13.txt
84

&lt;PAGE&gt;

(49)  The Mortgage Loans were selected from among the
outstanding one- to four-family mortgage loans in the applicable
Seller's portfolio at the Closing Date as to which the representations
and warranties made as to the Mortgage Loans set forth in this Section
2.03(b) and Sections 2.03(c) and 2.03(d) can be made. No selection was
made in a manner that would adversely affect the interests of
Certificateholders.

(50)  The Gross Margins on the Initial Mortgage Loans in
Loan Group 1, Loan Group 2 and Loan Group 3 range between the
approximate percentages specified on the Collateral Schedule, and the
weighted average Gross Margin was approximately the percentage specified
in the Collateral Schedule.

(51)  Each of the Initial Mortgage Loans in the Mortgage
Pool has a Due Date on or before the date specified in the Collateral
Schedule.

(52)  The Mortgage Loans, individually and in the aggregate,
conform in all material respects to the descriptions thereof in the
Prospectus Supplement.

(53)  There is no obligation on the part of any Seller under
the terms of the Mortgage or related Mortgage Note to make payments in
addition to those made by the Mortgagor.

(54)  Any leasehold estate securing a Mortgage Loan has a
term of not less than five years in excess of the term of the related
Mortgage Loan.

(55)  Each Mortgage Loan represents a "qualified mortgage"
within the meaning of Section 860(a)(3) of the Code (but without regard
to the rule in Treasury Regulation ss. 1.860G-2(f)(2) that treats a
defective obligation as a qualified mortgage, or any substantially
similar successor provision) and applicable Treasury regulations
promulgated thereunder.

(56)  No Mortgage Loan was either a "consumer credit
contract" or a "purchase money loan" as such terms are defined in 16
C.F.R. ss. 433 nor is any Mortgage Loan a "mortgage" as defined in 15
U.S.C. ss. 1602(aa).

(57)  To the extent required under applicable law, each
originator and subsequent mortgagee or servicer of the Mortgage Loan
complied with all licensing requirements and was authorized to transact
and do business in the jurisdiction in which the related Mortgaged
Property is located at all times when it held or serviced the Mortgage
Loan. Any and all requirements of any federal, state or local laws or
regulations, including, without limitation, usury, truth-in-lending,
real estate settlement procedures, consumer credit protection,
anti-predatory lending, fair credit reporting, unfair collection
practice, equal credit opportunity, fair housing and disclosure laws and
regulations, applicable to the solicitation, origination, collection and
servicing of such Mortgage Loan have been complied with in all material
respects; and any obligations of the holder of the Mortgage Note,
Mortgage and other loan documents have been complied with in all
material respects; servicing of each Mortgage Loan has been in
accordance with prudent mortgage servicing standards, any applicable
laws, rules and regulations and in accordance with the terms of the
Mortgage Notes, Mortgage and other

PSA CWL 06-13.txt

85

<PAGE>

loan documents, whether such origination and servicing was done by the applicable Seller, its affiliates, or any third party which originated the Mortgage Loan on behalf of, or sold the Mortgage Loan to, any of them, or any servicing agent of any of the foregoing.

(58)  The methodology used in underwriting the extension of credit for the Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the Mortgage Loan.

(59)  No borrower was required to purchase any credit life, disability, accident or health insurance product as a condition of obtaining the extension of credit. No borrower obtained a prepaid single-premium credit life, disability, accident or health insurance policy in connection with the origination of the Mortgage Loan.

(60)  If the Mortgage Loan provides that the interest rate on the principal balance of the related Mortgage Loan may be adjusted, all of the terms of the related Mortgage pertaining to interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance have been made in accordance with the terms of the related Mortgage Note and applicable law and are enforceable and such adjustments will not affect the priority of the Mortgage lien.

(61)  The Mortgaged Property complies with all applicable laws, rules and regulations relating to environmental matters, including but not limited to those relating to radon, asbestos and lead paint and no Seller nor, to the best of CHL's knowledge, the Mortgagor, has received any notice of any violation or potential violation of such law.

(62)  There is no action, suit or proceeding pending, or to the best of CHL's knowledge, threatened or likely to be asserted with respect to the Mortgage Loan against or affecting any Seller before or by any court, administrative agency, arbitrator or governmental body.

(63)  No action, inaction, or event has occurred and no state of fact exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to coverage under any applicable hazard insurance policy, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by CHL or any designee of CHL or any corporation in which CHL or any officer, director, or employee had a financial interest at the time of placement of such insurance.

(64)  Each Mortgage Loan has a fully assignable life of loan tax service contract which may be assigned without the payment of any fee.

86

<PAGE>

PSA CWL 06-13.txt

(65)  No Mortgagor has notified CHL or the Master Servicer on CHL's behalf, and CHL has no knowledge, of any relief requested or allowed to a Mortgagor under the Relief Act or any similar state or local law.

(66)  Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or mortgage banking company which is supervised and examined by a federal or state authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 2.03 and 2.11 of the National Housing Act.

(67)  Each Mortgage Loan was (A) originated no earlier than six months prior to the time the applicable Seller purchased such Mortgage Loan pursuant to a mortgage loan purchase agreement or other similar agreement and (B) underwritten or reunderwritten by the applicable Seller in accordance with the applicable Seller's underwriting guidelines in effect at the time the loan was underwritten or reunderwritten, as applicable.

(68)  Each Mortgage Loan, at the time it was originated and as of the Closing Date or the related Subsequent Transfer Date, as applicable, complied in all material respects with applicable local, state and federal laws, including, but not limited to, all predatory and abusive lending laws.

(69)  None of the Mortgage Loans is a "high cost" mortgage loan as defined by applicable federal, state and local predatory and abusive lending laws.

(70)  Each Prepayment Charge is enforceable and was originated in compliance with all applicable federal, state and local laws.

(71)  None of the Mortgage Loans that are secured by property located in the State of Illinois are in violation of the provisions of the Illinois Interest Act; 815 Ill. Comp. Stat. 205/0.01 (2004).

(72)  There is no Mortgage Loan in the Trust Fund that was originated on or after March 7, 2003, which is a "high cost home loan" as defined under the Georgia Fair Lending Act.

(73)  No Mortgage Loan in the Trust Fund is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then-current Standard & Poor's LEVELS(R) Glossary which is now Version 5.6(c), Appendix E) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act.

(74)  Each Mortgage Loan is secured by a "single family residence" within the meaning of Section 25(e)(10) of the Code. The fair market value of the manufactured home securing each Mortgage Loan was at least equal to 80% of the adjusted issue price of the contract at either (i) the time the contract was originated (determined pursuant to the REMIC Provisions) or (ii) the time the contract is transferred to the purchaser.

87

PSA CWL 06-13.txt

(75)  No Mortgage Loan in the Trust Fund is a "high cost home," "covered" (excluding home loans defined as "covered home loans" in the New Jersey Home Ownership Security Act of 2002 that were originated between November 26, 2003 and July 7, 2004), "high risk home" or "predatory" loan under any applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees).

(76)  There is no Mortgage Loan in the Trust Fund that was originated on or after October 1, 2002 and before March 7, 2003, which is secured by property located in the State of Georgia.

(77)  Representations and Warranties relating to the Mortgage Loans in Loan Group 2:

(i)  No Mortgage Loan in Loan Group 2 is covered by the Home Ownership and Equity Protection Act of 1994 ("HOEPA");

(ii)  No borrower was required to purchase any single premium credit insurance policy (e.g., life, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit. No borrower obtained a prepaid single-premium credit insurance policy (e.g., life, disability, accident, unemployment, mortgage, or health insurance) in connection with the origination of the Mortgage Loan; No proceeds from any Mortgage Loan in Loan Group 2 were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan;

(iii)  No Mortgage Loan in Loan Group 2 originated on or after October 1, 2002 will impose a prepayment premium for a term in excess of three years. Any Mortgage Loan in Loan Group 2 originated prior to such date will not impose prepayment penalties in excess of five years;

(iv)  With respect to (a) any Mortgage Loan in Loan Group 2 originated by CHL from August 1, 2004 through April 30, 2005 and (b) any Mortgage Loan in Loan Group 2 originated by any other entity through April 30, 2005, if the related Mortgage or the related Mortgage Note, or any document relating to the loan transaction, contains a mandatory arbitration clause (that is, a clause that requires the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction), CHL will (i) notify the related borrower in writing within 60 days after the issuance of the Certificates that none of the related seller, the related servicer or any subsequent party that acquires an interest in the loan or services such Mortgage Loan will enforce such arbitration clause against the borrower, but that the borrower will continue to have the right to submit a dispute to arbitration and (ii) place a copy of such notice in the Mortgage File; and with respect to any Mortgage Loan in Loan Group 2 and originated on or after May 1, 2005, neither the related mortgage nor the related

Page 94

PSA CWL 06-13.txt

88

<PAGE>

          mortgage note requires the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction; and

          (v)   Each Mortgage Loan in Loan Group 2 had an original principal balance that conforms to Freddie Mac guidelines concerning original principal balance limits at the time of the origination of such mortgage loan.

          (78)   The representations in Section 2.03(c)(1)-(6) and 2.03(d)(1)-(6) are true and correct.

          (c)   Park Monaco hereby represents and warrants to the Depositor and the Trustee as follows, as of the Cut-off Date:

          (1)   Park Monaco is duly organized as a Delaware corporation and is validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to transact any and all business contemplated by this Agreement and each Subsequent Transfer Agreement to be conducted by Park Monaco in any state in which a Mortgaged Property securing a Park Monaco Mortgage Loan is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each Park Monaco Mortgage Loan, to sell the Park Monaco Mortgage Loans in accordance with the terms of this Agreement and each Subsequent Transfer Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof.

          (2)   Park Monaco has the full company power and authority to sell each Park Monaco Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and each Subsequent Transfer Agreement and has duly authorized by all necessary corporate action on the part of Park Monaco the execution, delivery and performance of this Agreement and each Subsequent Transfer Agreement; and this Agreement and each Subsequent Transfer Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Park Monaco, enforceable against Park Monaco in accordance with its terms, except that (a) the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

          (3)   The execution and delivery of this Agreement and each Subsequent Transfer Agreement by Park Monaco, the sale of the Park Monaco Mortgage Loans by Park Monaco under this Agreement and each Subsequent Transfer Agreement, the consummation of any other of the transactions contemplated by this Agreement and each Subsequent Transfer Agreement, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of Park Monaco and will not (A) result in a material breach of any term or provision of the certificate of incorporation or by-laws of

89

PSA CWL 06-13.txt

<PAGE>

Park Monaco or (B) materially conflict with, result in a material
breach, violation or acceleration of, or result in a material default
under, the terms of any other material agreement or instrument to which
Park Monaco is a party or by which it may be bound, or (C) constitute a
material violation of any statute, order or regulation applicable to
Park Monaco of any court, regulatory body, administrative agency or
governmental body having jurisdiction over Park Monaco; and Park Monaco
is not in breach or violation of any material indenture or other
material agreement or instrument, or in violation of any statute, order
or regulation of any court, regulatory body, administrative agency or
governmental body having jurisdiction over it which breach or violation
may materially impair Park Monaco's ability to perform or meet any of
its obligations under this Agreement.

(4)   No litigation is pending or, to the best of Park
Monaco's knowledge, threatened, against Park Monaco that would
materially and adversely affect the execution, delivery or
enforceability of this Agreement or any Subsequent Transfer Agreement or
the ability of Park Monaco to sell the Park Monaco Mortgage Loans or to
perform any of its other obligations under this Agreement or any
Subsequent Transfer Agreement in accordance with the terms hereof or
thereof.

(5)   No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by Park Monaco of, or compliance by Park Monaco
with, this Agreement or any Subsequent Transfer Agreement or the
consummation of the transactions contemplated hereby, or if any such
consent, approval, authorization or order is required, Park Monaco has
obtained the same.

(6)   Park Monaco will treat the transfer of the Park Monaco
Mortgage Loans to the Depositor as a sale of the Park Monaco Mortgage
Loans for all tax, accounting and regulatory purposes.

(7)   Immediately prior to the assignment of each Park
Monaco Mortgage Loan to the Depositor, Park Monaco had good title to,
and was the sole owner of, such Park Monaco Mortgage Loan free and clear
of any pledge, lien, encumbrance or security interest and had full right
and authority, subject to no interest or participation of, or agreement
with, any other party, to sell and assign the same pursuant to this
Agreement.

(d)   Park Sienna hereby represents and warrants to the Depositor
and the Trustee as follows, as of the Cut-off Date:

(1)   Park Sienna is duly organized as a Delaware limited
liability company and is validly existing and in good standing under the
laws of the State of Delaware and is duly authorized and qualified to
transact any and all business contemplated by this Agreement and each
Subsequent Transfer Agreement to be conducted by Park Sienna in any
state in which a Mortgaged Property securing a Park Sienna Mortgage Loan
is located or is otherwise not required under applicable law to effect
such qualification and, in any event, is in compliance with the doing
business laws

90

<PAGE>

of any such state, to the extent necessary to ensure its ability to

PSA CWL 06-13.txt
enforce each Park Sienna Mortgage Loan, to sell the Park Sienna Mortgage
Loans in accordance with the terms of this Agreement and each Subsequent
Transfer Agreement and to perform any of its other obligations under
this Agreement in accordance with the terms hereof.

        (2)   Park Sienna has the full company power and authority
to sell each Park Sienna Mortgage Loan, and to execute, deliver and
perform, and to enter into and consummate the transactions contemplated
by this Agreement and each Subsequent Transfer Agreement and has duly
authorized by all necessary company action on the part of Park Sienna
the execution, delivery and performance of this Agreement and each
Subsequent Transfer Agreement; and this Agreement and each Subsequent
Transfer Agreement, assuming the due authorization, execution and
delivery hereof by the other parties hereto, constitutes a legal, valid
and binding obligation of Park Sienna, enforceable against Park Sienna
in accordance with its terms, except that (a) the enforceability hereof
may be limited by bankruptcy, insolvency, moratorium, receivership and
other similar laws relating to creditors' rights generally and (b) the
remedy of specific performance and injunctive and other forms of
equitable relief may be subject to equitable defenses and to the
discretion of the court before which any proceeding therefor may be
brought.

        (3)   The execution and delivery of this Agreement and each
Subsequent Transfer Agreement by Park Sienna, the sale of the Park
Sienna Mortgage Loans by Park Sienna under this Agreement and each
Subsequent Transfer Agreement, the consummation of any other of the
transactions contemplated by this Agreement and each Subsequent Transfer
Agreement and the fulfillment of or compliance with the terms hereof are
in the ordinary course of business of Park Sienna and will not (A)
result in a material breach of any term or provision of the certificate
of formation or limited liability company agreement of Park Sienna or
(B) materially conflict with, result in a material breach, violation or
acceleration of, or result in a material default under, the terms of any
other material agreement or instrument to which Park Sienna is a party
or by which it may be bound, or (C) constitute a material violation of
any statute, order or regulation applicable to Park Sienna of any court,
regulatory body, administrative agency or governmental body having
jurisdiction over Park Sienna; and Park Sienna is not in breach or
violation of any material indenture or other material agreement or
instrument, or in violation of any statute, order or regulation of any
court, regulatory body, administrative agency or governmental body
having jurisdiction over it which breach or violation may materially
impair Park Sienna's ability to perform or meet any of its obligations
under this Agreement.

        (4)   No litigation is pending or, to the best of Park
Sienna's knowledge, threatened, against Park Sienna that would
materially and adversely affect the execution, delivery or
enforceability of this Agreement or any Subsequent Transfer Agreement or
the ability of Park Sienna to sell the Park Sienna Mortgage Loans or to
perform any of its other obligations under this Agreement or any
Subsequent Transfer Agreement in accordance with the terms hereof or
thereof.

                                    91

<PAGE>

        (5)   No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by Park Sienna of, or compliance by Park Sienna

PSA CWL 06-13.txt

with, this Agreement or any Subsequent Transfer Agreement or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, Park Sienna has obtained the same.

(6)   Park Sienna will treat the transfer of the Park Sienna Mortgage Loans to the Depositor as a sale of the Park Sienna Mortgage Loans for all tax, accounting and regulatory purposes.

(7)   Immediately prior to the assignment of each Park Sienna Mortgage Loan to the Depositor, Park Sienna had good title to, and was the sole owner of, such the Park Sienna Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign the same pursuant to this Agreement.

(e)   Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in Section 2.03(a) through (d) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties, the NIM Insurer and the Swap Counterparty. Each of the Master Servicer and the Sellers (each, a "Representing Party") hereby covenants with respect to the representations and warranties set forth in Sections 2.03(a) through (d) that within 90 days of the earlier of the discovery by such Representing Party or receipt of written notice by such Representing Party from any party of a breach of any representation or warranty set forth herein made that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, it shall cure such breach in all material respects and, if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Replacement Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below; provided that (a) any such substitution pursuant to (i) above or repurchase pursuant to (ii) above shall not be effected prior to the delivery to the Trustee, of the Opinion of Counsel required by Section 2.05 hereof, (b) any such substitution pursuant to (i) above shall not be effected prior to the additional delivery to the Trustee of a Request for File Release and (c) any such substitution pursuant to (i) above shall include a payment by the applicable Representing Party of any amount as calculated under item (iii) of the definition of "Purchase Price". Any Representing Party liable for a breach under this Section 2.03 shall promptly reimburse the Master Servicer or the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. To enable the Master Servicer to amend the Mortgage Loan Schedule, any Representing Party liable for a breach under this Section 2.03 shall, unless it cures such breach in a timely fashion pursuant to this Section 2.03, promptly notify the Master Servicer whether such Representing Party intends either to repurchase, or to substitute for, the Mortgage Loan affected by such breach. With respect to the representations and warranties described in this Section that are made to the best of the Representing Party's knowledge, if it is discovered by any of the Depositor, the Master Servicer, the Sellers or the Trustee that the substance of such

92

<PAGE>

representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, notwithstanding the Representing Party's lack of knowledge with respect to the substance of such

PSA CWL 06-13.txt
representation or warranty, such inaccuracy shall be deemed a breach of the
applicable representation or warranty. Any breach of a representation set
forth in Section 2.03(a)(8), (b)(72), (b)(75), (b)(76) or (b)(77) shall be
deemed to materially and adversely affect the Certificateholders.

        With respect to any Replacement Mortgage Loan or Loans, the
applicable Seller delivering such Replacement Mortgage Loan shall deliver to
the Trustee for the benefit of the Certificateholders the related Mortgage
Note, Mortgage and assignment of the Mortgage, and such other documents and
agreements as are required by Section 2.01, with the Mortgage Note endorsed
and the Mortgage assigned as required by Section 2.01. No substitution will be
made in any calendar month after the Determination Date for such month.
Scheduled Payments due with respect to Replacement Mortgage Loans in the Due
Period related to the Distribution Date on which such proceeds are to be
distributed shall not be part of the Trust Fund and will be retained by the
applicable Seller delivering such Replacement Mortgage Loan on such
Distribution Date. For the month of substitution, distributions to
Certificateholders will include the Scheduled Payment due on any Deleted
Mortgage Loan for the related Due Period and thereafter the applicable Seller
shall be entitled to retain all amounts received in respect of such Deleted
Mortgage Loan. The Master Servicer shall amend the Mortgage Loan Schedule for
the benefit of the Certificateholders to reflect the removal of such Deleted
Mortgage Loan and the substitution of the Replacement Mortgage Loan or Loans
and the Master Servicer shall deliver the amended Mortgage Loan Schedule to
the Trustee. Upon such substitution, the Replacement Mortgage Loan or Loans
shall be subject to the terms of this Agreement in all respects, and the
applicable Seller delivering such Replacement Mortgage Loan shall be deemed to
have made with respect to such Replacement Mortgage Loan or Loans, as of the
date of substitution, the representations and warranties set forth in Section
2.03(b), (c) or (d) with respect to such Mortgage Loan. Upon any such
substitution and the deposit to the Certificate Account of the amount required
to be deposited therein in connection with such substitution as described in
the following paragraph, the Trustee shall release to the Representing Party
the Mortgage File relating to such Deleted Mortgage Loan and held for the
benefit of the Certificateholders and shall execute and deliver at the Master
Servicer's direction such instruments of transfer or assignment as have been
prepared by the Master Servicer, in each case without recourse, as shall be
necessary to vest in the applicable Seller, or its respective designee, title
to the Trustee's interest in any Deleted Mortgage Loan substituted for
pursuant to this Section 2.03.

        For any month in which any Seller substitutes one or more
Replacement Mortgage Loans for one or more Deleted Mortgage Loans, the Master
Servicer will determine the amount (if any) by which the aggregate principal
balance of all such Replacement Mortgage Loans as of the date of substitution
is less than the Stated Principal Balance (after application of the principal
portion of the Scheduled Payment due in the month of substitution) of all such
Deleted Mortgage Loans. An amount equal to the aggregate of the deficiencies
described in the preceding sentence (such amount, the "Substitution Adjustment
Amount") shall be forwarded by the applicable Seller to the Master Servicer
and deposited by the Master Servicer into the Certificate Account not later
than the Determination Date for the Distribution Date relating to the
Prepayment Period during which the related Mortgage Loan became required to be
purchased or replaced hereunder.

                                      93

<PAGE>

        In the event that a Seller shall have repurchased a Mortgage Loan,
the Purchase Price therefor shall be deposited in the Certificate Account
pursuant to Section 3.05 on the Determination Date for the Distribution Date

PSA CWL 06-13.txt

in the month following the month during which such Seller became obligated to repurchase or replace such Mortgage Loan and upon such deposit of the Purchase Price, the delivery of the Opinion of Counsel required by Section 2.05, if any, and the receipt of a Request for File Release, the Trustee shall release the related Mortgage File held for the benefit of the Certificateholders to such Seller, and the Trustee shall execute and deliver at such Person's direction the related instruments of transfer or assignment prepared by such Seller, in each case without recourse, as shall be necessary to transfer title from the Trustee for the benefit of the Certificateholders and transfer the Trustee's interest to such Seller to any Mortgage Loan purchased pursuant to this Section 2.03. It is understood and agreed that the obligation under this Agreement of the Sellers to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against the Sellers respecting such breach available to Certificateholders, the Depositor or the Trustee.

        (f)   The representations and warranties set forth in this Section 2.03 shall survive delivery of the respective Mortgage Files to the Trustee for the benefit of the Certificateholders with respect to each Mortgage Loan.

        Section 2.04   Representations and Warranties of the Depositor.

        The Depositor hereby represents and warrants to the Master Servicer and the Trustee as follows, as of the date hereof and as of each Subsequent Transfer Date:

        (1)   The Depositor is duly organized and is validly existing as a corporation in good standing under the laws of the State of Delaware and has full power and authority (corporate and other) necessary to own or hold its properties and to conduct its business as now conducted by it and to enter into and perform its obligations under this Agreement and each Subsequent Transfer Agreement.

        (2)   The Depositor has the full corporate power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by, this Agreement and each Subsequent Transfer Agreement and has duly authorized, by all necessary corporate action on its part, the execution, delivery and performance of this Agreement and each Subsequent Transfer Agreement; and this Agreement and each Subsequent Transfer Agreement, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, subject, as to enforceability, to (i) bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally and (ii) general principles of equity, regardless of whether enforcement is sought in a proceeding in equity or at law.

        (3)   The execution and delivery of this Agreement and each Subsequent Transfer Agreement by the Depositor, the consummation of the transactions contemplated by this Agreement, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Depositor and will not (A) result in a

                                        94

<PAGE>

        material breach of any term or provision of the charter or by-laws of the Depositor or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which the Depositor is a party or by which it may be bound or (C) constitute a

PSA CWL 06-13.txt
material violation of any statute, order or regulation applicable to the
Depositor of any court, regulatory body, administrative agency or
governmental body having jurisdiction over the Depositor; and the
Depositor is not in breach or violation of any material indenture or
other material agreement or instrument, or in violation of any statute,
order or regulation of any court, regulatory body, administrative agency
or governmental body having jurisdiction over it which breach or
violation may materially impair the Depositor's ability to perform or
meet any of its obligations under this Agreement.

        (4)     No litigation is pending, or, to the best of the
Depositor's knowledge, threatened, against the Depositor that would
materially and adversely affect the execution, delivery or
enforceability of this Agreement or any Subsequent Transfer Agreement or
the ability of the Depositor to perform its obligations under this
Agreement or any Subsequent Transfer Agreement in accordance with the
terms hereof or thereof.

        (5)     No consent, approval, authorization or order of any
court or governmental agency or body is required for the execution,
delivery and performance by the Depositor of, or compliance by the
Depositor with, this Agreement or any Subsequent Transfer Agreement or
the consummation of the transactions contemplated hereby, or if any such
consent, approval, authorization or order is required, the Depositor has
obtained the same.

        The Depositor hereby represents and warrants to the Trustee with
respect to each Mortgage Loan, as of the Closing Date or the related
Subsequent Transfer Date, as applicable, following the transfer of such
Mortgage Loan to it by the Sellers, the Depositor had good title to the
Initial Mortgage Loans or related Subsequent Mortgage Loans, as applicable,
and the related Mortgage Notes were subject to no offsets, claims, defenses or
counterclaims.

        It is understood and agreed that the representations and
warranties set forth in the two immediately preceding paragraphs shall survive
delivery of the Mortgage Files to the Trustee. Upon discovery by the Depositor
or the Trustee, of a breach of any of the foregoing representations and
warranties set forth in the immediately preceding paragraph (referred to
herein as a "breach"), which breach materially and adversely affects the
interest of the Certificateholders, the party discovering such breach shall
give prompt written notice to the others and to each Rating Agency, the NIM
Insurer and the Swap Counterparty. The Depositor hereby covenants with respect
to the representations and warranties made by it in this Section 2.04 that
within 90 days of the discovery by it or receipt of written
notice by it from any party of a breach of any representation or warranty set
forth herein made that materially and adversely affects the interests of the
Certificateholders in any Mortgage Loan, it shall cure such breach in all
material respects and, if such breach is not so cured, shall repurchase or
replace the affected Mortgage Loan or Loans in accordance with the procedure
set forth in Section 2.03(e).

                                95
<PAGE>

        Section 2.05    Delivery of Opinion of Counsel in Connection with
                        Substitutions and Repurchases.

        (a)     Notwithstanding any contrary provision of this Agreement, with
respect to any Mortgage Loan that is not in default or as to which default is
not imminent, no repurchase or substitution pursuant to Sections 2.02, 2.03 or

PSA CWL 06-13.txt
2.04 shall be made unless the Representing Party making such repurchase or substitution shall deliver to the Trustee an Opinion of Counsel (which such Representing Party shall use reasonable efforts to obtain), addressed to the Trustee to the effect that such repurchase or substitution would not (i) result in the imposition of the tax on "prohibited transactions" of the Trust Fund or contributions after the Closing Date, as defined in sections 860F(a)(2) and 860G(d) of the Code, respectively or (ii) cause any REMIC formed hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding. Any Mortgage Loan as to which repurchase or substitution was delayed pursuant to this paragraph shall be repurchased or the substitution therefor shall occur (subject to compliance with Sections 2.02, 2.03 or 2.04) upon the earlier of (a) the occurrence of a default or imminent default with respect to such loan and (b) receipt by the Trustee of an Opinion of Counsel to the effect that such repurchase or substitution, as applicable, will not result in the events described in clause (i) or clause (ii) of the preceding sentence.

          (b)    Upon discovery by the Depositor, any Seller, the Master Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within five Business Days of discovery) give written notice thereof to the other parties and the NIM Insurer. In connection therewith, the Trustee shall require CHL, at CHL's option, to either (i) substitute, if the conditions in Section 2.03(e) with respect to substitutions are satisfied, a Replacement Mortgage Loan for the affected Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of such discovery in the same manner as it would a Mortgage Loan for a breach of representation or warranty contained in Section 2.03. The Trustee shall reconvey to CHL the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty contained in Section 2.03.

          Section 2.06    Authentication and Delivery of Certificates.

          The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed, authenticated and delivered, to or upon the order of the Depositor, the Certificates in authorized denominations evidencing the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement.


                                         96

<PAGE>

          Section 2.07    Covenants of the Master Servicer.

          The Master Servicer hereby covenants to the Depositor and the Trustee as follows:

          (a)    the Master Servicer shall comply in the performance of its obligations under this Agreement with all reasonable rules and requirements of the insurer under each Required Insurance Policy; and

          (b)    no written information, certificate of an officer, statement furnished in writing or written report delivered to the Depositor, any affiliate of the Depositor or the Trustee and prepared by the Master Servicer pursuant to this Agreement will contain any untrue statement of a material fact or omit to state a material fact necessary to make the information, certificate, statement or report not misleading.

PSA CWL 06-13.txt

ARTICLE III.
ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01   Master Servicer to Service Mortgage Loans.

For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders in the respective states in which the Mortgaged Properties are located, including taking all required and appropriate actions under each Required Insurance Policy. In connection with such servicing and administration, the Master Servicer shall have full power and authority, acting alone and/or through subservicers as provided in Section 3.02 hereof, subject to the terms hereof (i) to execute and deliver, on behalf of the Certificateholders and the Trustee, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages (but only in the manner provided in this Agreement), (iii) to collect any Insurance Proceeds, other Liquidation Proceeds and Subsequent Recoveries, and (iv) subject to Section 3.12(b), to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan; provided that the Master Servicer shall take no action that is inconsistent with or prejudices the interests of the Trustee or the Certificateholders in any Mortgage Loan or the rights and interests of the Depositor and the Trustee under this Agreement. The Master Servicer shall represent and protect the interest of the Trustee in the same manner as it currently protects its own interest in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan and shall not make or permit any modification, waiver or amendment of any term of any Mortgage Loan which would (i) cause any REMIC formed hereunder to fail to qualify as a REMIC or (ii) result in the imposition of any tax under section 860(a) or 860(d) of the Code, but in any case the Master Servicer shall not act in any manner that is a lesser standard than that provided in the first sentence of this Section 3.01. Without limiting the generality of the foregoing, the Master Servicer, in its own name or in the name of the Depositor and the Trustee, is hereby authorized and empowered by the Depositor and the Trustee, when the Master Servicer believes it appropriate in its reasonable judgment, to execute and deliver, on behalf of the Trustee, the Depositor, the Certificateholders or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or

97

<PAGE>

discharge and all other comparable instruments, with respect to the Mortgage Loans, and with respect to the Mortgaged Properties held for the benefit of the Certificateholders. The Master Servicer shall prepare and deliver to the Depositor and/or the Trustee such documents requiring execution and delivery by any or all of them as are necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans. Upon receipt of such documents, the Depositor and/or the Trustee shall execute such documents and deliver them to the Master Servicer. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment to register any Mortgage Loan on the MERS(R) System, or cause the removal from the registration of any Mortgage Loan on the MERS(R) System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns.

PSA CWL 06-13.txt

In accordance with the standards of the preceding paragraph, the Master Servicer shall advance or cause to be advanced funds as necessary for the purpose of effecting the payment of taxes and assessments on the Mortgaged Properties, which advances shall be reimbursable in the first instance from related collections from the Mortgagors pursuant to Section 3.06, and further as provided in Section 3.08. All costs incurred by the Master Servicer, if any, in effecting the timely payments of taxes and assessments on the Mortgaged Properties and related insurance premiums shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the Stated Principal Balance under the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loans so permit.

The Master Servicer shall deliver a list of Servicing Officers to the Trustee by the Closing Date.

In connection with its activities as Master Servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and the Certificateholders, claims to the insurer under any primary insurance policies and, in this regard, to take any reasonable action necessary to permit recovery under any primary insurance policies respecting defaulted Mortgage Loans. Any amounts collected by the Master Servicer under any primary insurance policies shall be deposited in the Certificate Account.

In the event that a shortfall in any collection on or liability with respect to any Mortgage Loan results from or is attributable to adjustments to Mortgage Rates, Scheduled Payments or Stated Principal Balances that were made by the Master Servicer in a manner not consistent with the terms of the related Mortgage Note and this Agreement, the Master Servicer, upon discovery or receipt of notice thereof, immediately shall deliver to the Trustee for deposit in the Distribution Account from its own funds the amount of any such shortfall and shall indemnify and hold harmless the Trust Fund, the Trustee, the Depositor and any successor master servicer in respect of any such liability. Such indemnies shall survive the termination or discharge of this Agreement. Notwithstanding the foregoing, this Section 3.01 shall not limit the ability of the Master Servicer to seek recovery of any such amounts from the related Mortgagor under the terms of the related Mortgage Note, as permitted by law and shall not be an expense of the Trust Fund.

98

<PAGE>

Section 3.02   Subserving; Enforcement of the Obligations of Master Servicer.

(a)   The Master Servicer may arrange for the subserving of any Mortgage Loan by a subservicer (each, a "Subservicer") pursuant to a subserving agreement (each, a "Subserving Agreement"); provided that (i) such subserving arrangement and the terms of the related subserving agreement must provide for the servicing of such Mortgage Loans in a manner consistent with the servicing arrangements contemplated hereunder, (ii) that such subserving agreements would not result in a withdrawal or a downgrading by any Rating Agency of the ratings on any Class of Certificates, as evidenced by a letter to that effect delivered by each Rating Agency to the Depositor and the NIM Insurer and (iii) the NIM Insurer shall have consented to such subserving agreements (which consent shall not be unreasonably withheld) with Subservicers, for the servicing and administration of the Mortgage Loans. The Master Servicer shall deliver to the Trustee copies of all Sub-Servicing Agreements, and any amendments or modifications thereof, promptly upon the Master Servicer's execution and delivery of such instruments. The Master Servicer, with the written consent of the NIM Insurer (which consent shall not

PSA CWL 06-13.txt
be unreasonably withheld), shall be entitled to terminate any Subservicing
Agreement and the rights and obligations of any Subservicer pursuant to any
Subservicing Agreement in accordance with the terms and conditions of such
Subservicing Agreement. Notwithstanding the provisions of any subservicing
agreement, any of the provisions of this Agreement relating to agreements or
arrangements between the Master Servicer or a subservicer or reference to
actions taken through a Master Servicer or otherwise, the Master Servicer
shall remain obligated and liable to the Depositor, the Trustee and the
Certificateholders for the servicing and administration of the Mortgage Loans
in accordance with the provisions of this Agreement without diminution of such
obligation or liability by virtue of such subservicing agreements or
arrangements or by virtue of indemnification from the subservicer and to the
same extent and under the same terms and conditions as if the Master Servicer
alone were servicing and administering the Mortgage Loans. Every subservicing
agreement entered into by the Master Servicer shall contain a provision giving
the successor Master Servicer the option to terminate such agreement without
cost in the event a successor Master Servicer is appointed. All actions of
each subservicer performed pursuant to the related subservicing agreement
shall be performed as an agent of the Master Servicer with the same force and
effect as if performed directly by the Master Servicer.

          (b)     For purposes of this Agreement, the Master Servicer shall be
deemed to have received any collections, recoveries or payments with respect
to the Mortgage Loans that are received by a subservicer regardless of whether
such payments are remitted by the subservicer to the Master Servicer.

          Section 3.03     Rights of the Depositor, the Sellers, the
                           Certificateholders, the NIM Insurer and the Trustee
                           in Respect of the Master Servicer.

          None of the Trustee, the Sellers, the Certificateholders, the NIM
Insurer or the Depositor shall have any responsibility or liability for any
action or failure to act by the Master Servicer, and none of them is obligated
to supervise the performance of the Master Servicer hereunder or otherwise.
The Master Servicer shall afford (and any Subservicing Agreement shall provide
that each Subservicer shall afford) the Depositor, the NIM Insurer and the
Trustee, upon reasonable notice, during normal business hours, access to all
records maintained by the Master

                                   99

<PAGE>

Servicer (and any such Subservicer) in respect of the Master Servicer's rights
and obligations hereunder and access to officers of the Master Servicer (and
those of any such Subservicer) responsible for such obligations. Upon request,
the Master Servicer shall furnish to the Depositor, the NIM Insurer and the
Trustee its (and any such Subservicer's) most recent financial statements and
such other information relating to the Master Servicer's capacity to perform
its obligations under this Agreement that it possesses. To the extent such
information is not otherwise available to the public, the Depositor, the NIM
Insurer and the Trustee shall not disseminate any information obtained
pursuant to the preceding two sentences without the Masters Servicer's (or any
such Subservicer's) written consent, except as required pursuant to this
Agreement or to the extent that it is necessary to do so (i) in working with
legal counsel, auditors, taxing authorities or other governmental agencies,
rating agencies or reinsurers or (ii) pursuant to any law, rule, regulation,
order, judgment, writ, injunction or decree of any court or governmental
authority having jurisdiction over the Depositor, the Trustee, the NIM Insurer
or the Trust Fund, and in either case, the Depositor, the NIM Insurer or the
Trustee, as the case may be, shall use its reasonable best efforts to assure
the confidentiality of any such disseminated non-public information. The
Depositor may, but is not obligated to, enforce the obligations of the Master

PSA CWL 06-13.txt
Servicer under this Agreement and may, but is not obligated to, perform, or
cause a designee to perform, any defaulted obligation of the Master Servicer
under this Agreement or exercise the rights of the Master Servicer under this
Agreement; provided by virtue of such performance by the Depositor of its
designee. The Depositor shall not have any responsibility or liability for any
action or failure to act by the Master Servicer and is not obligated to
supervise the performance of the Master Servicer under this Agreement or
otherwise.

              Section 3.04    Trustee to Act as Master Servicer.

              In the event that the Master Servicer shall for any reason no
longer be the Master Servicer hereunder (including by reason of an Event of
Default or termination by the Depositor), the Trustee or its designee shall
thereupon assume all of the rights and obligations of the Master Servicer
hereunder arising thereafter (except that the Trustee shall not be (i) liable
for losses of the Master Servicer pursuant to Section 3.10 hereof or any acts
or omissions of the predecessor Master Servicer hereunder, (ii) obligated to
make Advances if it is prohibited from doing so by applicable law, (iii)
obligated to effectuate repurchases or substitutions of Mortgage Loans
hereunder, including pursuant to Section 2.02 or 2.03 hereof, (iv) responsible
for expenses of the Master Servicer pursuant to Section 2.03 or (v) deemed to
have made any representations and warranties hereunder, including pursuant to
Section 2.03 or the first paragraph of Section 6.02 hereof). If the Master
Servicer shall for any reason no longer be the Master Servicer (including by
reason of any Event of Default or termination by the Depositor), the Trustee
(or any other successor servicer) may, at its option, succeed to any rights
and obligations of the Master Servicer under any subservicing agreement in
accordance with the terms thereof; provided that the Trustee (or any other
successor servicer) shall not incur any liability or have any obligations in
its capacity as servicer under a subservicing agreement arising prior to the
date of such succession unless it expressly elects to succeed to the rights
and obligations of the Master Servicer thereunder; and the Master Servicer
shall not thereby be relieved of any liability or obligations under the
subservicing agreement arising prior to the date of such succession.

              The Master Servicer shall, upon request of the Trustee, but at the
expense of the Master Servicer, deliver to the assuming party all documents
and records relating to each

                                    100

<PAGE>

subservicing agreement and the Mortgage Loans then being serviced thereunder
and an accounting of amounts collected held by it and otherwise use its best
efforts to effect the orderly and efficient transfer of the subservicing
agreement to the assuming party.

              Section 3.05    Collection of Mortgage Loan Payments; Certificate
                              Account; Distribution Account; Pre-Funding Account;
                              Seller Shortfall Interest Requirement.

              (a)    The Master Servicer shall make reasonable efforts in
accordance with customary and usual standards of practice of prudent mortgage
lenders in the respective states in which the Mortgaged Properties are located
to collect all payments called for under the terms and provisions of the
Mortgage Loans to the extent such procedures shall be consistent with this
Agreement and the terms and provisions of any related Required Insurance
Policy. Consistent with the foregoing, the Master Servicer may in its
discretion (i) waive any late payment charge or, subject to Section 3.18, any
Prepayment Charge or penalty interest in connection with the prepayment of a
Mortgage Loan and (ii) extend the due dates for payments due on a Mortgage
                                Page 106

PSA CWL 06-13.txt
Note for a period not greater than 270 days. In the event of any such
arrangement, the Master Servicer shall make Advances on the related Mortgage
Loan during the scheduled period in accordance with the amortization schedule
of such Mortgage Loan without modification thereof by reason of such
arrangements. In addition, the NIM Insurer's prior written consent shall be
required for any waiver of Prepayment Charges or for the extension of the due
dates for payments due on a Mortgage Note, if the aggregate number of
outstanding Mortgage Loans that have been granted such waivers or extensions
exceeds 5% of the aggregate number of Initial Mortgage Loans and Subsequent
Mortgage Loans. The Master Servicer shall not be required to institute or join
in litigation with respect to collection of any payment (whether under a
Mortgage, Mortgage Note or otherwise or against any public or governmental
authority with respect to a taking or condemnation) if it reasonably believes
that enforcing the provision of the Mortgage or other instrument pursuant to
which such payment is required is prohibited by applicable law.

          (b)     The Master Servicer shall establish and maintain a Certificate
Account into which the Master Servicer shall deposit or cause to be deposited
on a daily basis within two Business Days of receipt, except as otherwise
specifically provided herein, the following payments and collections remitted
by Subservicers or received by it in respect of Mortgage Loans subsequent to
the Cut-off Date (other than in respect of principal and interest due on the
Mortgage Loans on or before the Cut-off Date) and the following amounts
required to be deposited hereunder:

               (1)     all payments on account of principal, including
Principal Prepayments, on the Mortgage Loans;

               (2)     all payments on account of interest on the Mortgage
Loans (net of the related Servicing Fee and Prepayment Interest Excess
permitted under Section 3.15 hereof to the extent not previously paid to
or withheld by the Master Servicer);

               (3)     all Insurance Proceeds;


                              101
<PAGE>

               (4)     all Liquidation Proceeds and Subsequent Recoveries,
other than proceeds to be applied to the restoration or repair of the
Mortgaged Property or released to the Mortgagor in accordance with the
Master Servicer's normal servicing procedures;

               (5)     all Compensating Interest;

               (6)     any amount required to be deposited by the Master
Servicer pursuant to Section 3.05(e) in connection with any losses on
Permitted Investments;

               (7)     any amounts required to be deposited by the Master
Servicer pursuant to Section 3.10 hereof;

               (8)     the Purchase Price and any Substitution Adjustment
Amount;

               (9)     all Advances made by the Master Servicer or the
Trustee pursuant to Section 4.01 hereof;

               (10)    all Prepayment Charges and Master Servicer Prepayment
Charge Payment Amounts; and

PSA CWL 06-13.txt
            (11)  any other amounts required to be deposited hereunder.

        The foregoing requirements for remittance by the Master Servicer
into the Certificate Account shall be exclusive, it being understood and
agreed that, without limiting the generality of the foregoing, payments in the
nature of late payment charges or assumption fees, if collected, need not be
remitted by the Master Servicer. In the event that the Master Servicer shall
remit any amount not required to be remitted and not otherwise subject to
withdrawal pursuant to Section 3.08 hereof, it may at any time withdraw or
direct the institution maintaining the Certificate Account, to withdraw such
amount from the Certificate Account, any provision herein to the contrary
notwithstanding. Such withdrawal or direction may be accomplished by
delivering written notice thereof to the institution maintaining the
Certificate Account, that describes the amounts deposited in error in the
Certificate Account. The Master Servicer shall maintain adequate records with
respect to all withdrawals made pursuant to this Section. All funds deposited
in the Certificate Account shall be held in trust for the Certificateholders
until withdrawn in accordance with Section 3.08.

        No later than 1:00 p.m. Pacific time on the Business Day prior to
the Master Servicer Advance Date in each of July, August and September 2006,
CHL shall remit to the Master Servicer, and the Master Servicer shall deposit
in the Certificate Account, the Seller Shortfall Interest Requirement (if any)
for such Master Servicer Advance Date.

        (c)   The Trustee shall establish and maintain, on behalf of the
Certificateholders, the Distribution Account. The Trustee shall, promptly upon
receipt, deposit in the Distribution Account and retain therein the following:

            (1)   the aggregate amount remitted by the Master Servicer
        pursuant to the second paragraph of Section 3.08(a); and


                                    102

<PAGE>

            (2)   any amount required to be deposited by the Master
        Servicer pursuant to Section 3.05(e) in connection with any losses on
        Permitted Investments.

        The foregoing requirements for remittance by the Master Servicer
and deposit by the Trustee into the Distribution Account shall be exclusive.
In the event that the Master Servicer shall remit any amount not required to
be remitted and not otherwise subject to withdrawal pursuant to Section 3.08
hereof, it may at any time direct the Trustee to withdraw such amount from the
Distribution Account, any provision herein to the contrary notwithstanding.
Such direction may be accomplished by delivering a written notice to the
Trustee that describes the amounts deposited in error in the Distribution
Account. All funds deposited in the Distribution Account shall be held by the
Trustee in trust for the Certificateholders until disbursed in accordance with
this Agreement or withdrawn in accordance with Section 3.08. In no event shall
the Trustee incur liability for withdrawals from the Distribution Account at
the direction of the Master Servicer.

        (d)   If the Pre-Funded Amount is greater than zero, the Trustee
shall establish and maintain, on behalf of the Certificateholders, the
Pre-Funding Account, and on the Closing Date, CHL shall remit the Pre-Funded
Amount to the Trustee for deposit in the Pre-Funding Account.

        On the Business Day before the Distribution Date following the end
of the Funding Period, the Trustee shall (i) withdraw the amount on deposit in
the Pre-Funding Account (net of investment income), (ii) promptly deposit such
                                Page 108

PSA CWL 06-13.txt
amount in the Distribution Account, and (iii) distribute each amount to the
Certificates on the Distribution Date pursuant to Section 4.04.

(e)   Each institution that maintains the Certificate Account, the
Distribution Account or the Pre-Funding Account shall invest the funds in each
such account, as directed by the Master Servicer, in Permitted Investments,
which shall mature not later than (x) in the case of the Certificate Account,
the second Business Day next preceding the related Distribution Account
Deposit Date (except that if such Permitted Investment is an obligation of the
institution that maintains such Certificate Account, then such Permitted
Investment shall mature not later than the Business Day next preceding such
Distribution Account Deposit Date) and (y) in the case of the Distribution
Account and the Pre-Funding Account, the Business Day immediately preceding
the first Distribution Date that follows the date of such investment (except
that if such Permitted Investment is an obligation of the institution that
maintains such Distribution Account or Pre-Funding Account, then such
Permitted Investment shall mature not later than such Distribution Date), in
each case, shall not be sold or disposed of prior to its maturity. All such
Permitted Investments shall be made in the name of the Trustee, for the
benefit of the Certificateholders. In the case of (i) the Certificate Account
and the Distribution Account, all income and gain net of any losses realized
from any such investment shall be for the benefit of the Master Servicer as
servicing compensation and shall be remitted to it monthly as provided herein
and (ii) the Pre-Funding Account, all income and gain net of any losses
realized from any such investment shall be for the benefit of the Depositor
and shall be remitted to the Depositor as provided herein. The amount of any
losses incurred in the Certificate Account or the Distribution Account in
respect of any such investments shall be deposited by the Master Servicer in
the Certificate Account or paid to the Trustee for deposit into the
Distribution

103

<PAGE>

Account out of the Master Servicer's own funds immediately as realized. The
amount of any losses incurred in the Pre-Funding Account in respect of any
such investments shall be paid by the Master Servicer to the Trustee for
deposit into the Pre-Funding Account out of the Master Servicer's own funds
immediately as realized. The Trustee shall not be liable for the amount of any
loss incurred in respect of any investment or lack of investment of funds held
in the Certificate Account, the Distribution Account or the Pre-Funding
Account and made in accordance with this Section 3.05.

(f)   The Master Servicer shall give at least 30 days' advance
notice to the Trustee, each Seller, each Rating Agency and the Depositor of
any proposed change of location of the Certificate Account prior to any change
thereof. The Trustee shall give at least 30 days' advance notice to the Master
Servicer, each Seller, each Rating Agency and the Depositor of any proposed
change of the location of the Distribution Account, the Pre-Funding Account or
the Carryover Reserve Fund prior to any change thereof.

(g)   Except as otherwise expressly provided in this Agreement, if
any default occurs under any Permitted Investment, the Trustee may and,
subject to Sections 8.01 and 8.02(a)(4), at the request of the Holders of
Certificates representing more than 50% of the Voting Rights or the NIM
Insurer, shall take any action appropriate to enforce payment or performance,
including the institution and prosecution of appropriate proceedings.

Section 3.06   Collection of Taxes, Assessments and Similar Items;
Escrow Accounts.

To the extent required by the related Mortgage Note, the Master
Page 109

PSA CWL 06-13.txt

Servicer shall establish and maintain one or more accounts (each, an "Escrow Account") and deposit and retain therein all collections from the Mortgagors (or advances by the Master Servicer) for the payment of taxes, assessments, hazard insurance premiums or comparable items for the account of the Mortgagors. Nothing herein shall require the Master Servicer to compel a Mortgagor to establish an Escrow Account in violation of applicable law.

Withdrawals of amounts so collected from the Escrow Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, condominium or PUD association dues, or comparable items, to reimburse the Master Servicer out of related collections for any payments made pursuant to Sections 3.01 hereof (with respect to taxes and assessments and insurance premiums) and 3.10 hereof (with respect to hazard insurance), to refund to any Mortgagors any sums as may be determined to be overages, to pay interest, if required by law or the terms of the related Mortgage or Mortgage Note, to Mortgagors on balances in the Escrow Account or to clear and terminate the Escrow Account at the termination of this Agreement in accordance with Section 9.01 hereof. The Escrow Accounts shall not be a part of the Trust Fund.

Section 3.07     Access to Certain Documentation and Information Regarding the Mortgage Loans.

The Master Servicer shall afford the Depositor, the NIM Insurer and the Trustee reasonable access to all records and documentation regarding the Mortgage Loans and all

104

<PAGE>

accounts, insurance policies and other matters relating to this Agreement, such access being afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Master Servicer designated by it. Upon request, the Master Servicer shall furnish to the Trustee and the NIM Insurer its most recent publicly available financial statements and any other information relating to its capacity to perform its obligations under this Agreement reasonably requested by the NIM Insurer.

Upon reasonable advance notice in writing if required by federal regulation, the Master Servicer will provide to each Certificateholder or Certificate Owner that is a savings and loan association, bank or insurance company certain reports and reasonable access to information and documentation regarding the Mortgage Loans sufficient to permit such Certificateholder or Certificate Owner to comply with applicable regulations of the OTS or other regulatory authorities with respect to investment in the Certificates; provided that the Master Servicer shall be entitled to be reimbursed by each such Certificateholder or Certificate Owner for actual expenses incurred by the Master Servicer in providing such reports and access.

Section 3.08     Permitted Withdrawals from the Certificate Account, Distribution Account, Carryover Reserve Fund and the Principal Reserve Fund.

(a)     The Master Servicer may from time to time make withdrawals from the Certificate Account for the following purposes:

(i)     to pay to the Master Servicer (to the extent not previously paid to or withheld by the Master Servicer), as servicing compensation in accordance with Section 3.15, that portion of any payment of interest that equals the Servicing Fee for the period with respect to which such interest payment was made, and, as additional servicing compensation to the Master

PSA CWL 06-13.txt
Servicer, those other amounts set forth in Section 3.15;

 (ii) to reimburse each of the Master Servicer and the Trustee for Advances made by it with respect to the Mortgage Loans, such right of reimbursement pursuant to this subclause (ii) being limited to amounts received on particular Mortgage Loan(s) (including, for this purpose, Liquidation Proceeds, Insurance Proceeds and Subsequent Recoveries) that represent late recoveries of payments of principal and/or interest on such particular Mortgage Loan(s) in respect of which any such Advance was made;

 (iii) [Reserved];

 (iv) to reimburse each of the Master Servicer and the Trustee for any Nonrecoverable Advance previously made;

 (v) to reimburse the Master Servicer from Insurance Proceeds for Insured Expenses covered by the related Insurance Policy;

 (vi) to pay the Master Servicer any unpaid Servicing Fees and to reimburse it for any unreimbursed Servicing Advances, the Master Servicer's right to reimbursement of Servicing Advances pursuant to this subclause (vi) with

<div align="center">105</div>

<PAGE>

respect to any Mortgage Loan being limited to amounts received on particular Mortgage Loan(s) (including, for this purpose, Liquidation Proceeds, Insurance Proceeds and Subsequent Recoveries and purchase and repurchase proceeds) that represent late recoveries of the payments for which such advances were made pursuant to Section 3.01 or Section 3.06;

 (vii) to pay to the applicable Seller, the Depositor or the Master Servicer, as applicable, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased pursuant to Section 2.02, 2.03, 2.04 or 3.12, all amounts received thereon and not taken into account in determining the related Purchase Price of such repurchased Mortgage Loan;

 (viii) to reimburse the applicable Seller, the Master Servicer, the NIM Insurer or the Depositor for expenses incurred by any of them in connection with the Mortgage Loans or Certificates and reimbursable pursuant to Section 6.03 hereof; provided that such amount shall only be withdrawn following the withdrawal from the Certificate Account for deposit into the Distribution Account pursuant to the following paragraph;

 (ix) to pay any lender-paid primary mortgage insurance premiums;

 (x) to withdraw any amount deposited in the Certificate Account and not required to be deposited therein; and

 (xi) to clear and terminate the Certificate Account upon termination of this Agreement pursuant to Section 9.01 hereof.

 In addition, no later than 1:00 p.m. Pacific time on the Distribution Account Deposit Date, the Master Servicer shall withdraw from the Certificate Account and remit to the Trustee the Interest Remittance Amount,

PSA CWL 06-13.txt
Principal Remittance Amount, Prepayment Charges collected and the Master Servicer Prepayment Charge Payment Amount for each Loan Group, and the Trustee shall deposit such amount in the Distribution Account.

The Trustee shall establish and maintain, on behalf of the Certificateholders, a Principal Reserve Fund in the name of the Trustee. On the Closing Date, CHL shall deposit into the Principal Reserve Fund $300.00. Funds on deposit in the Principal Reserve Fund shall not be invested. The Principal Reserve Fund shall be treated as an "outside reserve fund" under applicable Treasury regulations and shall not be part of any REMIC created under this Agreement.

On the Business Day before the first Distribution Date, the Trustee shall transfer $100.00 from the Principal Reserve Fund to the Distribution Account, and on the first Distribution Date, the Trustee shall withdraw $100 and distribute such amount to the Class A-R Certificates in reduction of the Certificate Principal Balance thereof.

On the Business Day before the Class PF Principal Distribution Date, the Trustee shall transfer $100.00 from the Principal Reserve Fund to the Distribution Account and shall distribute such amount to the Class PF Certificates on the Class PF Principal Distribution Date.

106

<PAGE>

On the Business Day before the Class PV Principal Distribution Date, the Trustee shall transfer from the Principal Reserve Fund to the Distribution Account $100.00 and shall distribute such amount to the Class PV Certificates on the Class PV Principal Distribution Date. Following the distributions to be made in accordance with the two preceding sentences, the Trustee shall then terminate the Principal Reserve Fund.

The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Certificate Account pursuant to subclauses (i), (ii), (iv), (v), (vi), (vii), (viii) and (ix) above. Prior to making any withdrawal from the Certificate Account pursuant to subclause (iv), the Master Servicer shall deliver to the Trustee an Officer's Certificate of a Servicing Officer indicating the amount of any previous Advance determined by the Master Servicer to be a Nonrecoverable Advance and identifying the related Mortgage Loan(s), and their respective portions of such Nonrecoverable Advance.

(b)     The Trustee shall withdraw funds from the Distribution Account for distribution to the Certificateholders and remittance to the Swap Account in the manner specified in this Agreement (and to withhold from the amounts so withdrawn, the amount of any taxes that it is authorized to retain pursuant to the third paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Distribution Account for the following purposes:

(i)     to pay the Trustee the Trustee Fee on each Distribution Date;

(ii)    to pay to the Master Servicer, as additional servicing compensation, earnings on or investment income with respect to funds in or credited to the Distribution Account;

(iii) to withdraw pursuant to Section 3.05 any amount deposited in the Distribution Account and not required to be deposited therein;

PSA CWL 06-13.txt

     (iv)   to reimburse the Trustee for any unreimbursed Advances made by it pursuant to Section 4.01(d) hereof, such right of reimbursement pursuant to this subclause (iv) being limited to (x) amounts received on the related Mortgage Loan(s) in respect of which any such Advance was made and (y) amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(ii) hereof;

     (v)   to reimburse the Trustee for any Nonrecoverable Advance previously made by the Trustee pursuant to Section 4.01(d) hereof, such right of reimbursement pursuant to this subclause (v) being limited to amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(iv) hereof; and

     (vi)   to clear and terminate the Distribution Account upon termination of the Agreement pursuant to Section 9.01 hereof.

     (c)   The Trustee shall withdraw funds from the Carryover Reserve Fund for distribution to the Certificateholders in the manner specified in this Agreement (and to withhold from the amounts so withdrawn, the amount of any taxes that it is authorized to retain pursuant to

107

<PAGE>

the third paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Carryover Reserve Fund for the following purposes:

     (1)   to withdraw any amount deposited in the Carryover Reserve Fund and not required to be deposited therein; and

     (2)   to clear and terminate the Carryover Reserve Fund upon termination of the Agreement pursuant to Section 9.01 hereof.

     Section 3.09   [Reserved].

     Section 3.10   Maintenance of Hazard Insurance.

     The Master Servicer shall cause to be maintained, for each Mortgage Loan, hazard insurance with extended coverage in an amount that is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds of such policy shall be sufficient to prevent the related Mortgagor and/or mortgagee from becoming a co-insurer. Each such policy of standard hazard insurance shall contain, or have an accompanying endorsement that contains, a standard mortgagee clause. The Master Servicer shall also cause flood insurance to be maintained on property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, to the extent described below. Pursuant to Section 3.05 hereof, any amounts collected by the Master Servicer under any such policies (other than the amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Certificate Account. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders or remittances to the Trustee for their benefit, be added to the principal balance of the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of late payments by the related Mortgagor or out of Liquidation Proceeds or Subsequent Recoveries to the extent permitted by Section 3.08 hereof. It is understood and agreed that no earthquake or other

Page 113

PSA CWL 06-13.txt

additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property is located at the time of origination of the Mortgage Loan in a federally designated special flood hazard area and such area is participating in the national flood insurance program, the Master Servicer shall cause flood insurance to be maintained with respect to such Mortgage Loan. Such flood insurance shall be in an amount equal to the lesser of (i) the original principal balance of the related Mortgage Loan, (ii) the replacement value of the improvements that are part of such Mortgaged Property, or (iii) the maximum amount of such insurance available for the related Mortgaged Property under the Flood Disaster Protection Act of 1973, as amended. If the hazard policy contains a deductible clause, the Master Servicer will be required to deposit from its own funds into the Certificate Account the amounts that would have been deposited therein but for the deductible clause.

108

<PAGE>

Section 3.11    Enforcement of Due-On-Sale Clauses; Assumption
               Agreements.

(a)    Except as otherwise provided in this Section 3.11(a), when any property subject to a Mortgage has been or is about to be conveyed by the Mortgagor, the Master Servicer shall to the extent that it has knowledge of such conveyance, enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing, the Master Servicer is not required to exercise such rights with respect to a Mortgage Loan if the Person to whom the related Mortgaged Property has been conveyed or is proposed to be conveyed satisfies the terms and conditions contained in the Mortgage Note and Mortgage related thereto and the consent of the mortgagee under such Mortgage Note or Mortgage is not otherwise so required under such Mortgage Note or Mortgage as a condition to such transfer. In the event that the Master Servicer is prohibited by law from enforcing any such due-on-sale clause, or if coverage under any Required Insurance Policy would be adversely affected, or if nonenforcement is otherwise permitted hereunder, the Master Servicer is authorized, subject to Section 3.11(b), to take or enter into an assumption and modification agreement from or with the person to whom such property has been or is about to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, unless prohibited by applicable state law, the Mortgagor remains liable thereon, provided that the Mortgage Loan shall continue to be covered (if so covered before the Master Servicer enters such agreement) by the applicable Required Insurance Policies. The Master Servicer, subject to Section 3.11(b), is also authorized with the prior approval of the insurers under any Required Insurance Policies to enter into a substitution of liability agreement with such Person, pursuant to which the original Mortgagor is released from liability and such Person is substituted as Mortgagor and becomes liable under the Mortgage Note. The Master Servicer shall notify the Trustee that any such substitution, modification or assumption agreement has been completed by forwarding to the Trustee the executed original of such substitution or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

(b)    Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.11(a) hereof, in any

PSA CWL 06-13.txt
case in which a Mortgaged Property has been conveyed to a Person by a
Mortgagor, and such Person is to enter into an assumption agreement or
modification agreement or supplement to the Mortgage Note or Mortgage that
requires the signature of the Trustee, or if an instrument of release signed
by the Trustee is required releasing the Mortgagor from liability on the
Mortgage Loan, the Master Servicer shall prepare and deliver or cause to be
prepared and delivered to the Trustee for signature and shall direct, in
writing, the Trustee to execute the assumption agreement with the Person to
whom the Mortgaged Property is to be conveyed and such modification agreement
or supplement to the Mortgage Note or Mortgage or other instruments as are
reasonable or necessary to carry out the terms of the Mortgage Note or
Mortgage or otherwise to comply with any applicable laws regarding assumptions
or the transfer of the Mortgaged Property to such Person. In connection with
any such assumption, no material term of the Mortgage Note (including, but not
limited to, the Mortgage Rate, the amount of the Scheduled Payment, the
Maximum Mortgage Rate, the Minimum Mortgage Rate, the Gross Margin, the
Initial Periodic Rate Cap, the Subsequent Periodic Rate Cap, the Adjustment
Date and any other term affecting the amount or timing of

                                      109

<PAGE>

payment on the Mortgage Loan) may be changed. In addition, the substitute
Mortgagor and the Mortgaged Property must be acceptable to the Master Servicer
in accordance with its underwriting standards as then in effect. The Master
Servicer shall notify the Trustee that any such substitution or assumption
agreement has been completed by forwarding to the Trustee the original of such
substitution or assumption agreement, which in the case of the original shall
be added to the related Mortgage File and shall, for all purposes, be
considered a part of such Mortgage File to the same extent as all other
documents and instruments constituting a part thereof. Any fee collected by
the Master Servicer for entering into an assumption or substitution of
liability agreement will be retained by the Master Servicer as additional
servicing compensation.

          Section 3.12     Realization Upon Defaulted Mortgage Loans;
                           Determination of Excess Proceeds and Realized Losses;
                           Repurchase of Certain Mortgage Loans.

          (a)    The Master Servicer may agree to a modification of any
Mortgage Loan (the "Modified Mortgage Loan") if (i) CHL purchases the Modified
Mortgage Loan from the Trust Fund immediately following the modification as
described below and (ii) the Stated Principal Balance of such Mortgage Loan,
when taken together with the aggregate of the Stated Principal Balances of all
other Mortgage Loans in the same Loan Group that have been so modified since
the Closing Date at the time of those modifications, does not exceed an amount
equal to 5% of the aggregate Certificate Principal Balance of the related
Certificates. Effective immediately after the modification, and, in any event,
on the same Business Day on which the modification occurs, all interest of the
Trustee in the Modified Mortgage Loan shall automatically be deemed
transferred and assigned to CHL and all benefits and burdens of ownership
thereof, including the right to accrued interest thereon from the date of
modification and the risk of default thereon, shall pass to CHL. The Master
Servicer shall promptly deliver to the Trustee a certification of a Servicing
Officer to the effect that all requirements of this paragraph have been
satisfied with respect to the Modified Mortgage Loan. For federal income tax
purposes, the Trustee shall account for such purchase as a prepayment in full
of the Modified Mortgage Loan. CHL shall remit the Purchase Price to the
Master Servicer for deposit into the Certificate Account pursuant to Section
3.05 within one Business Day after the purchase of the Modified Mortgage Loan.
Upon receipt by the Trustee of written notification of any such deposit signed
by a Servicing Officer, the Trustee shall release to CHL or its designee the
                                   Page 115

PSA CWL 06-13.txt
related Mortgage File and shall execute and deliver such instruments of
transfer or assignment, in each case without recourse, as shall be necessary
to vest in CHL any Modified Mortgage Loan previously transferred and assigned
pursuant hereto. CHL covenants and agrees to indemnify the Trust Fund against
any liability for any "prohibited transaction" taxes and any related interest,
additions, and penalties imposed on the Trust Fund established hereunder as a
result of any modification of a Mortgage Loan effected pursuant to this
subsection (a), any holding of a Modified Mortgage Loan by the Trust Fund or
any purchase of a Modified Mortgage Loan by CHL (but such obligation shall not
prevent CHL or any other appropriate Person from in good faith contesting any
such tax in appropriate proceedings and shall not prevent CHL from withholding
payment of such tax, if permitted by law, pending the outcome of such
proceedings). CHL shall have no right of reimbursement for any amount paid
pursuant to the foregoing indemnification, except to the extent that the
amount of any tax, interest, and penalties, together with interest thereon, is
refunded to the Trust Fund or CHL. If the Master Servicer

                                    110

<PAGE>

agrees to a modification of any Mortgage Loan pursuant to this Section
3.12(a), and if such Mortgage Loan carries a Prepayment Charge provision, CHL
shall deliver to the Trustee the amount of the Prepayment Charge, if any, that
would have been due had such Mortgage Loan been prepaid at the time of such
modification, for deposit into the Certificate Account (not later than 1:00
p.m. Pacific time on the Master Servicer Advance Date immediately succeeding
the date of such modification) for distribution in accordance with the terms
of this Agreement.

            (b)     The Master Servicer shall use reasonable efforts to foreclose
upon or otherwise comparably convert the ownership of properties securing such
of the Mortgage Loans as come into and continue in default and as to which no
satisfactory arrangements can be made for collection of delinquent payments.
In connection with such foreclosure or other conversion, the Master Servicer
shall follow such practices and procedures as it shall deem necessary or
advisable and as shall be normal and usual in its general mortgage servicing
activities and the requirements of the insurer under any Required Insurance
Policy; provided that the Master Servicer shall not be required to expend its
own funds in connection with any foreclosure or towards the restoration of any
property unless it shall determine (i) that such restoration and/or
foreclosure will increase the proceeds of liquidation of the Mortgage Loan
after reimbursement to itself of such expenses and (ii) that such expenses
will be recoverable to it through Liquidation Proceeds (respecting which it
shall have priority for purposes of withdrawals from the Certificate Account
pursuant to Section 3.08 hereof). The Master Servicer shall be responsible for
all other costs and expenses incurred by it in any such proceedings; provided
that it shall be entitled to reimbursement thereof from the proceeds of
liquidation of the related Mortgaged Property and any related Subsequent
Recoveries, as contemplated in Section 3.08 hereof. If the Master Servicer has
knowledge that a Mortgaged Property that the Master Servicer is contemplating
acquiring in foreclosure or by deed-in-lieu of foreclosure is located within a
one-mile radius of any site with environmental or hazardous waste risks known
to the Master Servicer, the Master Servicer will, prior to acquiring the
Mortgaged Property, consider such risks and only take action in accordance
with its established environmental review procedures.

            With respect to any REO Property, the deed or certificate of sale
shall be taken in the name of the Trustee for the benefit of the
Certificateholders (or the Trustee's nominee on behalf of the
Certificateholders). The Trustee's name shall be placed on the title to such
REO Property solely as the Trustee hereunder and not in its individual
capacity. The Master Servicer shall ensure that the title to such REO Property
                                 Page 116

PSA CWL 06-13.txt
references this Agreement and the Trustee's capacity thereunder. Pursuant to
its efforts to sell such REO Property, the Master Servicer shall either itself
or through an agent selected by the Master Servicer protect and conserve such
REO Property in the same manner and to such extent as is customary in the
locality where such REO Property is located and may, incident to its
conservation and protection of the interests of the Certificateholders, rent
the same, or any part thereof, as the Master Servicer deems to be in the best
interest of the Master Servicer and the Certificateholders for the period
prior to the sale of such REO Property. The Master Servicer shall prepare for
and deliver to the Trustee a statement with respect to each REO Property that
has been rented showing the aggregate rental income received and all expenses
incurred in connection with the management and maintenance of such REO
Property at such times as is necessary to enable the Trustee to comply with
the reporting requirements of the REMIC Provisions. The net monthly rental
income, if any, from such REO Property shall be deposited in the Certificate
Account no later than the close of business on each Determination Date. The
Master Servicer shall perform the tax reporting and withholding

111

<PAGE>

related to foreclosures, abandonments and cancellation of indebtedness income
as specified by Sections 1445, 6050J and 6050P of the Code by preparing and
filing such tax and information returns, as may be required.

        In the event that the Trust Fund acquires any Mortgaged Property
as aforesaid or otherwise in connection with a default or imminent default on
a Mortgage Loan, the Master Servicer shall dispose of such Mortgaged Property
as soon as practicable in a manner that maximizes the Liquidation Proceeds,
but in no event later than three years after its acquisition by the Trust Fund
or, at the expense of the Trust Fund, the Master Servicer shall request, more
than 60 days prior to the day on which such three-year period would otherwise
expire, an extension of the three-year grace period. In the event the Trustee
shall have been supplied with an Opinion of Counsel (such opinion not to be an
expense of the Trustee) to the effect that the holding by the Trust Fund of
such Mortgaged Property subsequent to such three-year period will not result
in the imposition of taxes on "prohibited transactions" of the Trust Fund as
defined in section 860F of the Code or cause any REMIC formed hereunder to
fail to qualify as a REMIC at any time that any Certificates are outstanding,
and the Trust Fund may continue to hold such Mortgaged Property (subject to
any conditions contained in such Opinion of Counsel) after the expiration of
such three-year period. Notwithstanding any other provision of this Agreement,
no Mortgaged Property acquired by the Trust Fund shall be rented (or allowed
to continue to be rented) or otherwise used for the production of income by or
on behalf of the Trust Fund in such a manner or pursuant to any terms that
would (i) cause such Mortgaged Property to fail to qualify as "foreclosure
property" within the meaning of section 860G(a)(8) of the Code or (ii) subject
the Trust Fund to the imposition of any federal, state or local income taxes
on the income earned from such Mortgaged Property under section 860G(c) of the
Code or otherwise, unless the Master Servicer has agreed to indemnify and hold
harmless the Trust Fund with respect to the imposition of any such taxes.

        The decision of the Master Servicer to foreclose on a defaulted
Mortgage Loan shall be subject to a determination by the Master Servicer that
the proceeds of such foreclosure would exceed the costs and expenses of
bringing such a proceeding. The income earned from the management of any
Mortgaged Properties acquired through foreclosure or other judicial
proceeding, net of reimbursement to the Master Servicer for expenses incurred
(including any property or other taxes) in connection with such management and
net of unreimbursed Servicing Fees, Advances, Servicing Advances and any
management fee paid or to be paid with respect to the management of such
Mortgaged Property, shall be applied to the payment of principal of, and
Page 117

PSA CWL 06-13.txt
interest on, the related defaulted Mortgage Loans (with interest accruing as
though such Mortgage Loans were still current) and all such income shall be
deemed, for all purposes in this Agreement, to be payments on account of
principal and interest on the related Mortgage Notes and shall be deposited
into the Certificate Account. To the extent the income received during a
Prepayment Period is in excess of the amount attributable to amortizing
principal and accrued interest at the related Mortgage Rate on the related
Mortgage Loan, such excess shall be considered to be a partial Principal
Prepayment for all purposes hereof.

        The Liquidation Proceeds from any liquidation of a Mortgage Loan
and any Subsequent Recoveries, net of any payment to the Master Servicer as
provided above, shall be deposited in the Certificate Account as provided in
Section 3.05 for distribution on the related

                                   112

<PAGE>

Distribution Date, except that any Excess Proceeds shall be retained by the
Master Servicer as additional servicing compensation.

        The proceeds of any Liquidated Mortgage Loan, as well as any
recovery resulting from a partial collection of Liquidation Proceeds or any
income from an REO Property, will be applied in the following order of
priority: first, to reimburse the Master Servicer for any related unreimbursed
Servicing Advances and Servicing Fees, pursuant to Section 3.08(a)(vi) or this
Section 3.12; second, to reimburse the Master Servicer for any unreimbursed
Advances, pursuant to Section 3.08(a)(ii) or this Section 3.12; third, to
accrued and unpaid interest (to the extent no Advance has been made for such
amount) on the Mortgage Loan or related REO Property, at the Net Mortgage Rate
to the Due Date occurring in the month in which such amounts are required to
be distributed; and fourth, as a recovery of principal of the Mortgage Loan.

        (c)   [Reserved].

        (d)   The Master Servicer, in its sole discretion, shall have the
right to elect (by written notice sent to the Trustee) to purchase for its own
account from the Trust Fund any Mortgage Loan that is 150 days or more
delinquent at a price equal to the Purchase Price; provided, however, that the
Master Servicer may only exercise this right on or before the last day of the
calendar month in which such Mortgage Loan became 150 days delinquent (such
month, the "Eligible Repurchase Month"); provided further, that any such
Mortgage Loan which becomes current but thereafter becomes delinquent may be
purchased by the Master Servicer pursuant to this Section in any ensuing
Eligible Repurchase Month. The Purchase Price for any Mortgage Loan purchased
hereunder shall be deposited in the Certificate Account. Any purchase of a
Mortgage Loan pursuant to this Section 3.12(d) shall be accomplished by
remittance to the Master Servicer for deposit in the Certificate Account of
the Purchase Price. The Trustee, upon receipt of certification from the Master
Servicer of such deposit and a Request for File Release from the Master
Servicer, shall release or cause to be released to the purchaser of such
Mortgage Loan the related Mortgage File and shall execute and deliver such
instruments of transfer or assignment prepared by the purchaser of such
Mortgage Loan, in each case without recourse, as shall be necessary to vest in
the purchaser of such Mortgage Loan any Mortgage Loan released pursuant hereto
and the purchaser of such Mortgage Loan shall succeed to all the Trustee's
right, title and interest in and to such Mortgage Loan and all security and
documents related thereto. Such assignment shall be an assignment outright and
not for security. The purchaser of such Mortgage Loan shall thereupon own such
Mortgage Loan, and all security and documents, free of any further obligation
to the Trustee or the Certificateholders with respect thereto.

                                 Page 118

PSA CWL 06-13.txt
Section 3.13    Trustee to Cooperate; Release of Mortgage Files.

            Upon the payment in full of any Mortgage Loan, or the receipt by
the Master Servicer of a notification that payment in full will be escrowed in
a manner customary for such purposes, the Master Servicer will promptly notify
the Trustee by delivering a Request for File Release. Upon receipt of such
request, the Trustee shall promptly release the related Mortgage File to the
Master Servicer, and the Trustee shall at the Master Servicer's direction
execute and deliver to the Master Servicer the request for reconveyance, deed
of reconveyance or release or satisfaction of mortgage or such instrument
releasing the lien of the Mortgage in each case

                                    113

<PAGE>

provided by the Master Servicer, together with the Mortgage Note with written
evidence of cancellation thereon. The Master Servicer is authorized to cause
the removal from the registration on the MERS(R) System of such Mortgage and
to execute and deliver, on behalf of the Trust Fund and the Certificateholders
or any of them, any and all instruments of satisfaction or cancellation or of
partial or full release. No expenses incurred in connection with any
instrument of satisfaction or deed of reconveyance shall be chargeable to the
Certificate Account, the Distribution Account, the Carryover Reserve Fund or
the related subservicing account. From time to time and as shall be
appropriate for the servicing or foreclosure of any Mortgage Loan, including
for such purpose, collection under any policy of flood insurance any fidelity
bond or errors or omissions policy, or for the purposes of effecting a partial
release of any Mortgaged Property from the lien of the Mortgage or the making
of any corrections to the Mortgage Note or the Mortgage or any of the other
documents included in the Mortgage File, the Trustee shall, upon delivery to
the Trustee of a Request for Document Release or a Request for File Release,
as applicable, release the documents specified in such request or the Mortgage
File, as the case may be, to the Master Servicer. Subject to the further
limitations set forth below, the Master Servicer shall cause the Mortgage File
or documents so released to be returned to the Trustee when the need therefor
by the Master Servicer no longer exists, unless the Mortgage Loan is
liquidated and the proceeds thereof are deposited in the Certificate Account,
in which case the Master Servicer shall deliver to the Trustee a Request for
File Release for any remaining documents in the Mortgage File not in the
possession of the Master Servicer.

            If the Master Servicer at any time seeks to initiate a foreclosure
proceeding in respect of any Mortgaged Property as authorized by this
Agreement, the Master Servicer shall deliver or cause to be delivered to the
Trustee, for signature, as appropriate, any court pleadings, requests for
trustee's sale or other documents necessary to effectuate such foreclosure or
any legal action brought to obtain judgment against the Mortgagor on the
Mortgage Note or the Mortgage or to obtain a deficiency judgment or to enforce
any other remedies or rights provided by the Mortgage Note or the Mortgage or
otherwise available at law or in equity. Notwithstanding the foregoing, the
Master Servicer shall cause possession of any Mortgage File or of the
documents therein that shall have been released by the Trustee to be returned
to the Trustee within 21 calendar days after possession thereof shall have
been released by the Trustee unless (i) the Mortgage Loan has been liquidated
and the Liquidation Proceeds relating to the Mortgage Loan have been deposited
in the Certificate Account, and the Master Servicer shall have delivered to
the Trustee a Request for File Release or (ii) the Mortgage File or document
shall have been delivered to an attorney or to a public trustee or other
public official as required by law for purposes of initiating or pursuing
legal action or other proceedings for the foreclosure of the Mortgaged
Property and the Master Servicer shall have delivered to the Trustee an
Officer's Certificate of a Servicing Officer certifying as to the name and

PSA CWL 06-13.txt
address of the Person to which the Mortgage File or the documents therein were
delivered and the purpose or purposes of such delivery.

Section 3.14    Documents, Records and Funds in Possession of Master
Servicer to be Held for the Trustee.

Notwithstanding any other provisions of this Agreement, the Master
Servicer shall transmit to the Trustee as required by this Agreement all
documents and instruments in respect of a Mortgage Loan coming into the
possession of the Master Servicer from time to time

114

<PAGE>

and shall account fully to the Trustee for any funds received by the Master
Servicer or that otherwise are collected by the Master Servicer as Liquidation
Proceeds, Insurance Proceeds or Subsequent Recoveries in respect of any
Mortgage Loan. All Mortgage Files and funds collected or held by, or under the
control of, the Master Servicer in respect of any Mortgage Loans, whether from
the collection of principal and interest payments or from Liquidation Proceeds
or Subsequent Recoveries including but not limited to, any funds on deposit in
the Certificate Account, shall be held by the Master Servicer for and on
behalf of the Trust Fund and shall be and remain the sole and exclusive
property of the Trust Fund, subject to the applicable provisions of this
Agreement. The Master Servicer also agrees that it shall not create, incur or
subject any Mortgage File or any funds that are deposited in the Certificate
Account, the Distribution Account, the Carryover Reserve Fund or in any Escrow
Account (as defined in Section 3.06), or any funds that otherwise are or may
become due or payable to the Trustee for the benefit of the
Certificateholders, to any claim, lien, security interest, judgment, levy,
writ of attachment or other encumbrance, or assert by legal action or
otherwise any claim or right of set off against any Mortgage File or any funds
collected on, or in connection with, a Mortgage Loan, except, however, that
the Master Servicer shall be entitled to set off against and deduct from any
such funds any amounts that are properly due and payable to the Master
Servicer under this Agreement.

Section 3.15    Servicing Compensation.

As compensation for its activities hereunder, the Master Servicer
shall be entitled to retain or withdraw from the Certificate Account out of
each payment of interest on a Mortgage Loan included in the Trust Fund an
amount equal to interest at the applicable Servicing Fee Rate on the Stated
Principal Balance of the related Mortgage Loan for the period covered by such
interest payment.

Additional servicing compensation in the form of any Excess
Proceeds, assumption fees, late payment charges, Prepayment Interest Excess,
and all income and gain net of any losses realized from Permitted Investments
shall be retained by the Master Servicer to the extent not required to be
deposited in the Certificate Account pursuant to Section 3.05 or 3.12(b)
hereof. The Master Servicer shall be required to pay all expenses incurred by
it in connection with its servicing activities hereunder (including payment of
any premiums for hazard insurance, as required by Section 3.10 hereof and
maintenance of the other forms of insurance coverage required by Section 3.10
hereof) and shall not be entitled to reimbursement therefor except as
specifically provided in Sections 3.08 and 3.12 hereof.

Section 3.16    Access to Certain Documentation.

The Master Servicer shall provide to the OTS and the FDIC and to
comparable regulatory authorities supervising Holders of the Certificates and

PSA CWL 06-13.txt
Certificate Owners and the examiners and supervisory agents of the OTS, the
FDIC and such other authorities, access to the documentation regarding the
Mortgage Loans required by applicable regulations of the OTS and the FDIC.
Such access shall be afforded without charge, but only upon reasonable and
prior written request and during normal business hours at the offices of the
Master Servicer designated by it. Nothing in this Section shall limit the
obligation of the Master Servicer to observe any applicable law prohibiting
disclosure of information regarding the Mortgagors and the failure of

115

<PAGE>

the Master Servicer to provide access as provided in this Section as a result
of such obligation shall not constitute a breach of this Section.

        Section 3.17    Annual Statement as to Compliance.

        (a)    The Master Servicer shall deliver to the Depositor and the
Trustee on or before March 15 of each year, commencing with its 2007 fiscal
year, an Officer's Certificate stating, as to the signer thereof, that (i) a
review of the activities of the Master Servicer during the preceding calendar
year (or applicable portion thereof) and of the performance of the Master
Servicer under this Agreement, has been made under such officer's supervision
and (ii) to the best of such officer's knowledge, based on such review, the
Master Servicer has fulfilled all its obligations under this Agreement, in all
material respects throughout such year (or applicable portion thereof), or, if
there has been a failure to fulfill any such obligation in any material
respect, specifying each such failure known to such officer and the nature and
status thereof and (iii) to the best of such officer's knowledge, each
Subservicer has fulfilled all its obligations under its Subservicing Agreement
in all material respects throughout such year, or, if there has been a failure
to fulfill any such obligation in any material respect specifying each such
failure known to such officer and the nature and status thereof.

        (b)    The Master Servicer shall cause each Subservicer to deliver to
the Depositor and the Trustee on or before March 15 of each year, commencing
with its 2007 fiscal year, an Officer's Certificate stating, as to the signer
thereof, that (i) a review of the activities of such Subservicer during the
preceding calendar year (or applicable portion thereof) and of the performance
of the Subservicer under the applicable Subservicing Agreement or primary
servicing agreement, has been made under such officer's supervision and (ii)
to the best of such officer's knowledge, based on such review, such
Subservicer has fulfilled all its obligations under the applicable
Subservicing Agreement or primary servicing agreement, in all material
respects throughout such year (or applicable portion thereof), or, if there
has been a failure to fulfill any such obligation in any material respect,
specifying each such failure known to such officer and the nature and status
thereof.

        The Trustee shall forward a copy of each such statement to each
Rating Agency. Copies of such statement shall be provided by the Trustee to
any Certificateholder or Certificate Owner upon request at the Master
Servicer's expense, provided such statement is delivered by the Master
Servicer to the Trustee.

        Section 3.18    Prepayment Charges.

        (a)    Notwithstanding anything in this Agreement to the contrary, in
the event of a Principal Prepayment in full or in part of a Mortgage Loan, the
Master Servicer may not waive any Prepayment Charge or portion thereof
required by the terms of the related Mortgage Note unless (i) such Mortgage
Loan is in default or the Master Servicer believes that such a default is
Page 121

PSA CWL 06-13.txt
imminent, and the Master Servicer determines that such waiver would maximize
recovery of Liquidation Proceeds for such Mortgage Loan, taking into account
the value of such Prepayment Charge, or (ii) (A) the enforceability thereof is
limited (1) by bankruptcy, insolvency, moratorium, receivership, or other
similar law relating to creditors' rights generally or (2) due to acceleration
in connection with a foreclosure or other involuntary payment, or (B)

116

<PAGE>

the enforceability is otherwise limited or prohibited by applicable law. In
the event of a Principal Prepayment in full or in part with respect to any
Mortgage Loan, the Master Servicer shall deliver to the Trustee an Officer's
Certificate substantially in the form of Exhibit T no later than the third
Business Day following the immediately succeeding Determination Date with a
copy to the Class P Certificateholders. If the Master Servicer has waived or
does not collect all or a portion of a Prepayment Charge relating to a
Principal Prepayment in full or in part due to any action or omission of the
Master Servicer, other than as provided above, the Master Servicer shall
deliver to the Trustee, together with the Principal Prepayment in full or in
part, the amount of such Prepayment Charge (or such portion thereof as had
been waived) for deposit into the Certificate Account (not later than 1:00
p.m. Pacific time on the immediately succeeding Master Servicer Advance Date,
in the case of such Prepayment Charge) for distribution in accordance with the
terms of this Agreement.

          (b)    Upon discovery by the Master Servicer or a Responsible Officer
of the Trustee of a breach of the foregoing subsection (a), the party
discovering the breach shall give prompt written notice to the other parties.

          (c)    CHL represents and warrants to the Depositor and the Trustee,
as of the Closing Date and each Subsequent Transfer Date, that the information
in the Prepayment Charge Schedule (including the attached prepayment charge
summary) is complete and accurate in all material respects at the dates as of
which the information is furnished and each Prepayment Charge is permissible
and enforceable in accordance with its terms under applicable state law,
except as the enforceability thereof is limited due to acceleration in
connection with a foreclosure or other involuntary payment.

          (d)    Upon discovery by the Master Servicer or a Responsible Officer
of the Trustee of a breach of the foregoing clause (c) that materially and
adversely affects right of the Holders of the Class P Certificates to any
Prepayment Charge, the party discovering the breach shall give prompt written
notice to the other parties. Within 60 days of the earlier of discovery by the
Master Servicer or receipt of notice by the Master Servicer of breach, the
Master Servicer shall cure the breach in all material respects or shall pay
into the Certificate Account the amount of the Prepayment Charge that would
otherwise be due from the Mortgagor, less any amount representing such
Prepayment Charge previously collected and paid by the Master Servicer into
the Certificate Account.

          Section 3.19    Swap Contract.

          CHL shall cause The Bank of New York to enter into the Swap
Contract Administration Agreement and shall assign all of its right, title and
interest in and to the interest rate swap transaction evidenced by the Swap
Contract to, and shall cause all of its obligations in respect of such
transaction to be assumed by, the Swap Contract Administrator, on the terms
and conditions set forth in the Swap Contract Assignment Agreement. The
Trustee's rights to receive certain proceeds of the Swap Contract as provided
in the Swap Contract Administration Agreement shall be rights of the Trustee
as Swap Trustee hereunder, shall be an asset of the Swap Trust and shall not

PSA CWL 06-13.txt
be an asset of the Trust Fund nor of any REMIC. The Swap Trustee shall deposit
any amounts received from time to time from the Swap Contract Administrator
with respect to the Swap Contract into the Swap Account. The Master Servicer
shall deposit any

117

<PAGE>

amounts received on behalf of the Swap Trustee from time to time with respect
to the Swap Contract into the Swap Account.

        On the Business Day preceding each Distribution Date, the Swap
Trustee shall notify the Swap Contract Administrator of any amounts
distributable to the Swap Certificates pursuant to Section 4.04(h)(3) through
(8) that will remain unpaid following all distributions to be made on such
Distribution Date pursuant to Section 4.04(a) through (f).

        No later than two Business Days following each Distribution Date,
the Trustee shall provide the Swap Contract Administrator with information
regarding the aggregate Certificate Principal Balance of the Swap Certificates
after all distributions on such Distribution Date.

        Upon the Swap Contract Administrator obtaining actual knowledge of
the rating of the Swap Counterparty falling below the Approved Rating
Thresholds (as defined in the Swap Contract), the Swap Trustee shall direct
the Swap Contract Administrator to negotiate an ISDA Credit Support Annex with
the Swap Counterparty that meets the terms of the Swap Contract. If an ISDA
Credit Support Annex is negotiated, the Swap Trustee shall direct the Swap
Contract Administrator to demand payment of the Delivery Amount (as defined in
the ISDA Credit Support Annex). In addition, if an ISDA Credit Support Annex
is negotiated, the Swap Trustee shall set up an account in accordance with
Section 4.09 to hold cash or other eligible investments pledged under such
ISDA Credit Support Annex. Any cash or other eligible investments pledged
under an ISDA Credit Support Annex shall not be part of the Swap Account or
the Distribution Account unless they are applied in accordance with such ISDA
Credit Support Annex to make a payment due to the Swap Contract Administrator
pursuant to the Swap Contract.

        Upon the Swap Trustee obtaining actual knowledge of an Event of
Default (as defined in the Swap Contract) or Termination Event (as defined in
the Swap Contract) for which the Swap Contract Administrator has the right to
designate an Early Termination Date (as defined in the Swap Contract), the
Swap Trustee shall act at the written direction of the Depositor as to whether
to direct the Swap Contract Administrator to designate an Early Termination
Date; provided, however, that the Swap Trustee shall provide written notice to
each Rating Agency following the Event of Default or Termination Event. Upon
the termination of the Swap Contract under the circumstances contemplated by
this Section 3.19, the Swap Trustee shall use its reasonable best efforts to
enforce the rights of the Swap Contract Administrator as may be permitted by
the terms of the Swap Contract and consistent with the terms hereof, and CHL
shall assist the Swap Contract Administrator in procuring a replacement swap
contract with terms approximating those of the original Swap Contract.

        In the event that the swap counterparty in respect of a
replacement swap contract pays any upfront amount to the Swap Contract
Administrator in connection with entering into the replacement swap contract
and such upfront amount is received by the Swap Contract Administrator prior
to the Distribution Date on which any Swap Termination Payment will be payable
to the Swap Counterparty in respect of the original Swap Contract, a portion
of that upfront amount equal to the lesser of (x) that upfront amount and (y)
the amount of the Swap Termination Payment due to the Swap Counterparty in
respect of the original Swap Contract
                            Page 123

PSA CWL 06-13.txt

118

<PAGE>

(the "Adjusted Replacement Upfront Amount") shall be included in Interest
Funds for Loan Group 2 and Loan Group 3 pro rata based on their respective
Interest Funds for that Distribution Date and any upfront amount in excess of
the Adjusted Replacement Upfront Amount shall be distributed to CHL and will
not be available to make distributions in respect of any Class of
Certificates. Any upfront amount paid to the Swap Contract Administrator by
the swap counterparty in respect of a replacement swap contract after the
Distribution Date on which any Swap Termination Payment will be payable to the
Swap Counterparty in respect of the original Swap Contract, such upfront
amount shall be retained by the Swap Contract Administrator and remitted to
the Swap Trustee on subsequent Distribution Dates up to and including the Swap
Contract Termination Date to pay any amounts distributable to the Swap
Certificates pursuant to Section 4.04(h)(3) through (8) that will remain
unpaid following all distributions to be made on such Distribution Date
pursuant to Section 4.04(a) through (d), (e)(1) through (4) and (f)(1) through
(4).

        Any portion of any Net Swap Payment or Swap Termination Payment
payable by the Swap Counterparty and not remitted by the Swap Contract
Administrator to the Swap Trustee with respect to any Distribution Date will
be remitted to CHL and will not be available to make distributions in respect
of any Class of Certificates.

        The Swap Counterparty shall be an express third party beneficiary
of this Agreement for the purpose of enforcing the provisions hereof to the
extent of the Swap Counterparty's rights explicitly specified herein as if a
party hereto.

                        ARTICLE IV.
          DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER

        Section 4.01   Advances; Remittance Reports.

        (a)   Within two Business Days after each Determination Date, the
Master Servicer shall deliver to the Trustee by facsimile or electronic mail
(or by such other means as the Master Servicer and the Trustee, as the case
may be, may agree from time to time) a Remittance Report with respect to the
related Distribution Date. The Trustee shall not be responsible to recompute,
recalculate or verify any information provided to it by the Master Servicer.

        (b)   Subject to the conditions of this Article IV, the Master
Servicer, as required below, shall make an Advance and deposit such Advance in
the Certificate Account. Each such Advance shall be remitted to the
Certificate Account no later than 1:00 p.m. Pacific time on the Master
Servicer Advance Date in immediately available funds. The Trustee will provide
notice to the Master Servicer by facsimile by the close of business on any
Master Servicer Advance Date in the event that the amount remitted by the
Master Servicer to the Trustee on the Distribution Account Deposit Date is
less than the Advances required to be made by the Master Servicer for such
Distribution Date. The Master Servicer shall be obligated to make any such
Advance only to the extent that such advance would not be a Nonrecoverable
Advance. If the Master Servicer shall have determined that it has made a
Nonrecoverable Advance or that a proposed Advance or a lesser portion of such
Advance would constitute a Nonrecoverable Advance, the Master Servicer shall
deliver (i) to the Trustee for the benefit of

                        119
                    Page 124

PSA CWL 06-13.txt

<PAGE>

the Certificateholders funds constituting the remaining portion of such Advance, if applicable, and (ii) to the Depositor, each Rating Agency and the Trustee an Officer's Certificate setting forth the basis for such determination.

(c)   In lieu of making all or a portion of such Advance from its own funds, the Master Servicer may (i) cause to be made an appropriate entry in its records relating to the Certificate Account that any Amount Held for Future Distributions has been used by the Master Servicer in discharge of its obligation to make any such Advance and (ii) transfer such funds from the Certificate Account to the Distribution Account. Any funds so applied and transferred shall be replaced by the Master Servicer by deposit in the Certificate Account no later than the close of business on the Business Day immediately preceding the Distribution Date on which such funds are required to be distributed pursuant to this Agreement. The Master Servicer shall be entitled to be reimbursed from the Certificate Account for all Advances of its own funds made pursuant to this Section as provided in Section 3.08. The obligation to make Advances with respect to any Mortgage Loan shall continue until such Mortgage Loan is paid in full or becomes a Liquidated Mortgage Loan or until the purchase or repurchase thereof (or substitution therefor) from the Trustee pursuant to any applicable provision of this Agreement, except as otherwise provided in this Section 4.01.

(d)   If the Master Servicer determines that it will be unable to comply with its obligation to make the Advances as and when described in paragraphs (b) and (c) immediately above, it shall use its best efforts to give written notice thereof to the Trustee (each such notice a "Trustee Advance Notice"; and such notice may be given by facsimile), not later than 3:00 p.m., New York time, on the Business Day immediately preceding the related Master Servicer Advance Date, specifying the amount that it will be unable to deposit (each such amount an "Advance Deficiency") and certifying that such Advance Deficiency constitutes an Advance hereunder and is not a Nonrecoverable Advance. If the Trustee receives a Trustee Advance Notice on or before 3:30 p.m., (New York time) on a Master Servicer Advance Date, the Trustee shall, not later than 3:00 p.m., (New York time), on the related Distribution Date, deposit in the Distribution Account an amount equal to the Advance Deficiency identified in such Trustee Advance Notice unless it is prohibited from so doing by applicable law. Notwithstanding the foregoing, the Trustee shall not be required to make such deposit if the Trustee shall have received written notification from the Master Servicer that the Master Servicer has deposited or caused to be deposited in the Certificate Account an amount equal to such Advance Deficiency. All Advances made by the Trustee pursuant to this Section 4.01(d) shall accrue interest on behalf of the Trustee at the Trustee Advance Rate from and including the date such Advances are made to but excluding the date of repayment, with such interest being an obligation of the Master Servicer and not the Trust Fund. The Master Servicer shall reimburse the Trustee for the amount of any Advance made by the Trustee pursuant to this Section 4.01(d) together with accrued interest, not later than 6:00 p.m. (New York time) on the Business Day following the related Distribution Date. In the event that the Master Servicer does not reimburse the Trustee in accordance with the requirements of the preceding sentence, the Trustee shall immediately (i) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (ii) subject to the limitations set forth in Section 3.04, assume all of the rights and obligations of the Master Servicer hereunder.

120

<PAGE>

(e)   The Master Servicer shall, not later than the close of
Page 125

PSA CWL 06-13.txt

business on the second Business Day immediately preceding each Distribution
Date, deliver to the Trustee a report (in form and substance reasonably
satisfactory to the Trustee) that indicates (i) the Mortgage Loans with
respect to which the Master Servicer has determined that the related Scheduled
Payments should be advanced and (ii) the amount of the related Scheduled
Payments. The Master Servicer shall deliver to the Trustee on the related
Master Servicer Advance Date an Officer's Certificate of a Servicing Officer
indicating the amount of any proposed Advance determined by the Master
Servicer to be a Nonrecoverable Advance.

        Section 4.02    Reduction of Servicing Compensation in Connection
                with Prepayment Interest Shortfalls.

     In the event that any Mortgage Loan is the subject of a Prepayment
Interest Shortfall, the Master Servicer shall remit any related Compensating
Interest as part of the related Interest Remittance Amount as provided in this
Agreement. The Master Servicer shall not be entitled to any recovery or
reimbursement for Compensating Interest from the Depositor, the Trustee, any
Seller, the Trust Fund or the Certificateholders.

        Section 4.03    [Reserved].

        Section 4.04    Distributions.

     (a)   On each Distribution Date, the Interest Funds for such
Distribution Date for Loan Group 1 shall be distributed from the Distribution
Account in the following order of priority:

               (i)   concurrently to each Class of Class 1-AF Certificates,
        the Current Interest and Interest Carry Forward Amount for each
        such Class and such Distribution Date, pro rata, based on their
        respective entitlements,

               (ii)   sequentially, to the Class MF-1, Class MF-2, Class
        MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class MF-8
        and Class BF Certificates, in that order, the Current Interest for
        each such Class, and

               (iii) any remainder as part of the Fixed Rate Loan Group
        Excess Cashflow.

     (b)   On each Distribution Date, the Interest Funds for such
Distribution Date with respect to Loan Group 2 and Loan Group 3 shall be
distributed by the Trustee from the Distribution Account in the following
order of priority:

&lt;PAGE&gt;

               (i)   from the Interest Funds for Loan Group 2 and Loan
        Group 3, pro rata based on the Interest Funds for each such Loan
        Group, to the Swap Account, the amount of any Net Swap Payment and
        any Swap Termination Payment (other than a Swap Termination
        Payment due to a Swap Counterparty Trigger Event) payable to the
        Swap Counterparty with respect to such Distribution Date;

               (ii)   concurrently:

                    (a)   from the Interest Funds for Loan Group 2, to the
            Class 2-AV Certificates, the Current Interest and Interest
            Carry Forward Amount for such Class and such Distribution

PSA CWL 06-13.txt

Date,

    (b)   from the Interest Funds for Loan Group 3, concurrently to each Class of Class 3-AV Certificates, the Current Interest and Interest Carry Forward Amount for each such Class and such Distribution Date, pro rata, based on their respective entitlements,

    (iii) from the remaining Interest Funds for Loan Group 2 and Loan Group 3, concurrently to each Class of Class AV Certificates, any remaining Current Interest and Interest Carry Forward Amount not paid pursuant to clause (b)(ii), pro rata, based on the Certificate Principal Balances thereof, to the extent needed to pay any Current Interest and Interest Carry Forward Amount for each such Class; provided that Interest Funds remaining after such allocation to pay any Current Interest and Interest Carry Forward Amount based on the Certificate Principal Balances of the Class AV Certificates will be distributed to each Class of Class AV Certificates with respect to which there remains any unpaid Current Interest and Interest Carry Forward Amount (after the distribution based on Certificate Principal Balances), pro rata, based on the amount of such remaining unpaid Current Interest and Interest Carry Forward Amount,

    (iv)  from the remaining Interest Funds for Loan Group 2 and Loan Group 3, sequentially:

    (a)   sequentially, to the Class MV-1, Class MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class MV-8, Class MV-9 and Class BV Certificates, in that order, the Current Interest for each such Class, and

    (b)   any remainder as part of the Adjustable Rate Loan Group Excess Cashflow.

122

<PAGE>

    (c)   On each Distribution Date, the Principal Distribution Amount for such Distribution Date with respect to Loan Group 1 shall be distributed by the Trustee from the Distribution Account in the following order of priority (with the Principal Distribution Amount exclusive of the portion thereof consisting of the Extra Principal Distribution Amount being applied first and the Extra Principal Distribution Amount being applied thereafter):

    (1)   with respect to any Distribution Date prior to the Fixed Rate Stepdown Date or on which a Fixed Rate Trigger Event is in effect, from the Principal Distribution Amount for Loan Group 1, sequentially:

    (A)   to the Classes of Class 1-AF Certificates, in the order, amounts and priorities set forth in clause (3) below,

    (B)   sequentially, to the Class MF-1, Class MF-2, Class MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class MF-8 and Class BF Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero, and

    (C)   any remainder as part of the Fixed Rate Loan Group Excess Cashflow.

    (2)   with respect to any Distribution Date on or after the Fixed

PSA CWL 06-13.txt
Rate Stepdown Date and so long as a Fixed Rate Trigger Event is not in
effect, from the Principal Distribution Amount for Loan Group 1,
sequentially:

    (A)   in an amount up to the Class 1-AF Principal
Distribution Amount, to the Class 1-AF Certificates in the order
and priorities set forth in clause (3) below, until the
Certificate Principal Balances thereof are reduced to zero,

    (B)   sequentially, to the Class MF-1, Class MF-2, Class
MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class MF-8
and Class BF Certificates, in that order, the Fixed Rate
Subordinate Class Principal Distribution Amount for each such
Class, in each case until the Certificate Principal Balance
thereof is reduced to zero, and

    (C)   any remainder as part of the Fixed Rate Loan Group
Excess Cashflow.

    (3)   On each Distribution Date on which any principal amounts are
to be distributed to the Classes of Class 1-AF Certificates, such
amounts shall be distributed to the Class 1-AF Certificates in the
following order of priority:

    (i)   the NAS Principal Distribution Amount to the Class
1-AF-6 Certificates, until the Certificate Principal Balance
thereof is reduced to zero,

    (ii)   sequentially, to the Class 1-AF-1, Class 1-AF-2, Class
1-AF-3, Class 1-AF-4 and Class 1-AF-5 Certificates, in that order,
until the Certificate Principal Balances thereof are reduced to
zero, and

<center>123</center>

<PAGE>

    (iii) to the Class 1-AF-6 Certificates without regard to the
NAS Principal Distribution Amount, until the Certificate Principal
Balance thereof is reduced to zero.

    (d)   On each Distribution Date, the Principal Distribution Amount
for such Distribution Date with respect to Loan Group 2 and Loan Group 3 shall
be distributed by the Trustee from the Distribution Account in the following
order of priority (with the Principal Distribution Amount exclusive of the
portion thereof consisting of the Extra Principal Distribution Amount being
applied first and the Extra Principal Distribution Amount being applied
thereafter):

    (1)   with respect to any Distribution Date prior to the
Adjustable Rate Stepdown Date or on which an Adjustable Rate Trigger
Event is in effect, sequentially:

    (A)   concurrently:

    (i)   from the Principal Distribution Amount for Loan Group
2, sequentially:

    (a)   to the Class 2-AV Certificates, until the
Certificate Principal Balance thereof is reduced to zero;
and

<center>Page 128</center>

PSA CWL 06-13.txt

(b)    to the Classes of Class 3-AV Certificates (after the distribution of the Principal Distribution Amount for Loan Group 3 as provided in clause (ii)(a) below), in the order and priorities set forth in clause (3) below, until the Certificate Principal Balances thereof are reduced to zero;

(ii)   from the Principal Distribution Amount for Loan Group 3, sequentially:

(a)    to the Classes of Class 3-AV Certificates, in the order and priorities set forth in clause (3) below, until the Certificate Principal Balances thereof are reduced to zero; and

(b)    to the Class 2-AV Certificates (after the distribution of the Principal Distribution Amount for Loan Group 2 as provided in clause (i)(a) above), until the Certificate Principal Balance thereof is reduced to zero;

(B)    from the remaining Principal Distribution Amounts for Loan Group 2 and Loan Group 3, sequentially:

(i)    sequentially, to the Class MV-1, Class MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class MV-8, Class MV-9 and Class BV Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero, and

124

<PAGE>

(ii)   any remainder as part of the Adjustable Rate Loan Group Excess Cashflow.

(2)    with respect to any Distribution Date on or after the Adjustable Rate Stepdown Date and so long as an Adjustable Rate Trigger Event is not in effect, from the Principal Distribution Amounts for Loan Group 2 and Loan Group 3, sequentially:

(A)    in an amount up to the Class AV Principal Distribution Target Amount, pro rata based on the related Class AV Principal Distribution Allocation Amount for the Class 2-AV Certificates and the Class 3-AV Certificates, respectively, concurrently, to (I) the Class 2-AV Certificates, in an amount up to the Class 2-AV Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero and (II) the Classes of Class 3-AV Certificates, in an amount up to the Class 3-AV Principal Distribution Amount in the order and priorities set forth in Section 4.04(d)(3) below, until the Certificate Principal Balances thereof are reduced to zero; provided, however, that if the Certificate Principal Balance of the Class 2-AV Certificates or the aggregate Certificate Principal Balance of the Class 3-AV Certificates is reduced to zero, then any remaining unpaid Class AV Principal Distribution Target Amount will be distributed to the remaining Class AV Certificates (and in the case of the Class 3-AV Certificates, in the order and priorities set forth in Section 4.04(d)(3) below), until the Certificate Principal Balance(s) thereof is/are reduced to zero,

(B)    sequentially, to the Class MV-1, Class MV-2 and Class MV-3 Certificates, in that order, the Combined Class MV-1, Class

PSA CWL 06-13.txt
MV-2 and Class MV-3 Principal Distribution Amount, in each case
until the Certificate Principal Balance thereof is reduced to
zero, and

(C)    sequentially, to the Class MV-4, Class MV-5, Class
MV-6, Class MV-7, Class MV-8, Class MV-9 and Class BV
Certificates, in that order, the Adjustable Rate Subordinate Class
Principal Distribution Amount for each such Class, in each case
until the Certificate Principal Balance thereof is reduced to
zero, and

(D)    any remainder as part of the Adjustable Rate Loan
Group Excess Cashflow.

(3)    On each Distribution Date on which any principal
amounts are to be distributed to the Class 3-AV Certificates, such
amounts shall be distributed sequentially, to the Class 3-AV-1, Class
3-AV-2, Class 3-AV-3 and Class 3-AV-4 Certificates, in that order, in
each case until the Certificate Principal Balance thereof is reduced to
zero.

(e)    With respect to any Distribution Date, any Fixed Rate Loan
Group Excess Cashflow and, in the case of clauses (1) and (2) below and in the
case of the payment of Unpaid Realized Loss Amounts pursuant to clause (3)
below, any Fixed Rate Loan Group Credit

125

<PAGE>

Comeback Excess Cashflow, shall be distributed to the Classes of Certificates
in the following order of priority, in each case first to the extent of the
remaining Fixed Rate Loan Group Credit Comeback Excess Cashflow, if
applicable, and second to the extent of the remaining Fixed Rate Loan Group
Excess Cashflow:

(1)    to the Holders of the Class or Classes of Class 1-AF
Certificates and Fixed Rate Subordinate Certificates then entitled to
receive distributions in respect of principal, in an amount equal to the
Extra Principal Distribution Amount for Loan Group 1, payable to such
Holders as part of the Principal Distribution Amount for Loan Group 1
pursuant to Section 4.04(c) above; provided, however, that Fixed Rate
Loan Group Credit Comeback Excess Cashflow (if any) shall only be
distributed pursuant to this clause if the Fixed Rate
Overcollateralization Target Amount has at any previous time been met;

(2)    concurrently, to the Holders of each Class of Class
1-AF Certificates, pro rata based on the Unpaid Realized Loss Amounts
for each such Class, in each case in an amount equal to the Unpaid
Realized Loss Amount for each such Class;

(3)    sequentially, to the Holders of the Class MF-1, Class
MF-2, Class MF-3, Class MF-4, Class MF-5, Class MF-6, Class MF-7, Class
MF-8 and Class BF Certificates, in that order, in each case, first in an
amount equal to any Interest Carry Forward Amount for such Class and
then in an amount equal to the Unpaid Realized Loss Amount for such
Class;

(4)    to the Carryover Reserve Fund and from the Carryover
Reserve Fund to the Holders of each Class of Class 1-AF Certificates and
Fixed Rate Subordinate Certificates, pro rata based on the Certificate
Principal Balances thereof, to the extent needed to pay any unpaid Net
Rate Carryover for each such Class; and then any Fixed Rate Loan Group
Page 130

PSA CWL 06-13.txt
Excess Cashflow remaining after such allocation to pay Net Rate
Carryover based on the Certificate Principal Balances of those
Certificates shall be distributed to each Class of Class 1-AF
Certificates and Fixed Rate Subordinate Certificates with respect to
which there remains any unpaid Net Rate Carryover, pro rata, based on
the amount of such unpaid Net Rate Carryover;

     (5)    to the Holders of the Class or Classes of Class AV
Certificates and Adjustable Rate Subordinate Certificates then entitled
to receive distributions in respect of principal, payable to such
Holders as part of the Principal Distribution Amount as described under
Section 4.04(d) above, in an amount equal to the Extra Principal
Distribution Amount for Loan Group 2 and Loan Group 3 not covered by the
Adjustable Rate Loan Group Excess Cashflow, the Adjustable Rate Loan
Group Credit Comeback Excess Cashflow or Net Swap Payments;

     (6)    concurrently, to the Holders of each Class of Class AV
Certificates, pro rata based on the Unpaid Realized Loss Amounts for
such Classes remaining undistributed after application of the Adjustable
Rate Loan Group Excess Cashflow, the Adjustable Rate Loan Group Credit
Comeback Excess Cashflow and Net Swap Payments, in each case in an
amount equal to the Unpaid Realized Loss Amount for each such Class
remaining undistributed after application of the Adjustable Rate Loan

126

&lt;PAGE&gt;

Group Excess Cashflow, the Adjustable Rate Loan Group Credit Comeback
Excess Cashflow and Net Swap Payments;

     (7)    sequentially, to the Holders of the Class MV-1, Class
MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class
MV-8, Class MV-9 and Class BV Certificates, in that order, in each case
in an amount equal to the Unpaid Realized Loss Amount for such Class
remaining undistributed after application of the Adjustable Rate Loan
Group Excess Cashflow, the Adjustable Rate Loan Group Credit Comeback
Excess Cashflow and Net Swap Payments;

     (8)    to the Carryover Reserve Fund, in an amount equal to
the Required Carryover Reserve Fund Deposit (after giving effect to
other deposits and withdrawals therefrom on such Distribution Date);

     (9)    to the Class CF Certificateholders, the Class CF
Distributable Amount for such Distribution Date; and

     (10)  to the Class A-R Certificates, any remaining amount.

    (f)    With respect to any Distribution Date, any Adjustable Rate
Loan Group Excess Cashflow and, in the case of clauses (1) and (2) below and
in the case of the payment of Unpaid Realized Loss Amounts pursuant to clause
(3) below, any Adjustable Rate Loan Group Credit Comeback Excess Cashflow,
shall be distributed to the Classes of Certificates in the following order of
priority, in each case first to the extent of the remaining Adjustable Rate
Loan Group Credit Comeback Excess Cashflow, if applicable, and second to the
extent of the remaining Adjustable Rate Loan Group Excess Cashflow:

     (1)    to the Holders of the Class or Classes of Class AV
Certificates and Adjustable Rate Subordinate Certificates then entitled
to receive distributions in respect of principal, in an aggregate amount
equal to the Extra Principal Distribution Amount for Loan Group 2 and
Loan Group 3, payable to such Holders of each such Class as part of the
Principal Distribution Amount for Loan Group 2 and Loan Group 3 pursuant

PSA CWL 06-13.txt
to Section 4.04(d) above;

(2)    concurrently, to the Holders of each Class of Class AV
Certificates, pro rata based on the Unpaid Realized Loss Amounts for
each such Class, in each case in an amount equal to the Unpaid Realized
Loss Amount for each such Class;

(3)    sequentially, to the Holders of the Class MV-1, Class
MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class
MV-8, Class MV-9 and Class BV Certificates, in that order, in each case
first in an amount equal to any Interest Carry Forward Amount for such
Class and then in an amount equal to the Unpaid Realized Loss Amount for
such Class;

(4)    to the Carryover Reserve Fund and from the Carryover
Reserve Fund to the Holders of each Class of Class AV Certificates and
Adjustable Rate Subordinate Certificates, pro rata based on the
Certificate Principal Balances thereof, to the extent needed to pay any
Net Rate Carryover for each such Class; provided that any

127

<PAGE>

Adjustable Rate Loan Group Excess Cashflow remaining after such
allocation to pay Net Rate Carryover based on the Certificate Principal
Balances of those Certificates shall be distributed to each Class of
Class AV Certificates and Adjustable Rate Subordinate Certificates with
respect to which there remains any unpaid Net Rate Carryover (after the
distribution based on Certificate Principal Balances), pro rata, based
on the amount of such unpaid Net Rate Carryover;

(5)    if the Fixed Rate Overcollateralization Target Amount
has at any previous time been met, to the Holders of the Class or
Classes of Class 1-AF Certificates and Fixed Rate Subordinate
Certificates then entitled to receive distributions in respect of
principal, payable to such Holders as part of the Principal Distribution
Amount pursuant to Section 4.04(c) above, in an amount equal to the
Extra Principal Distribution Amount for Loan Group 1 not covered by the
Fixed Rate Loan Group Excess Cashflow or Fixed Rate Loan Group Credit
Comeback Excess Cashflow;

(6)    concurrently, to the Holders of the Class 1-AF
Certificates, pro rata based on the Unpaid Realized Loss Amounts for
such Classes remaining undistributed after application of the Fixed Rate
Loan Group Excess Cashflow and Fixed Rate Loan Group Credit Comeback
Excess Cashflow, in each case in an amount equal to the Unpaid Realized
Loss Amount for such Class remaining undistributed after application of
the Fixed Rate Loan Group Excess Cashflow and Fixed Rate Loan Group
Credit Comeback Excess Cashflow;

(7)    sequentially, to the Holders of each Class of Class
MF-1, Class MF-2, Class MF-3, Class MF-4, Class MF-5, Class MF-6, Class
MF-7, Class MF-8 and Class BF Certificates, in that order, in each case
in an amount equal to the Unpaid Realized Loss Amount for each such
Class remaining undistributed after application of the Fixed Rate Loan
Group Excess Cashflow and Fixed Rate Loan Group Credit Comeback Excess
Cashflow;

(8)    to the Carryover Reserve Fund, in an amount equal to
the Required Carryover Reserve Fund Deposit (after giving effect to
other deposits and withdrawals therefrom on such Distribution Date);

PSA CWL 06-13.txt
          (9)   to the Swap Account, in an amount equal to any Swap
Termination Payment due to the Swap Counterparty as a result of a Swap
Counterparty Trigger Event;

          (10)  to the Class CV Certificateholders, the Class CV
Distributable Amount for such Distribution Date; and

          (11)  to the Class A-R Certificates, any remaining amount.

     (g)  [Reserved].

          (h)   On each Distribution Date on or prior to the Swap Contract
Termination Date, following the deposits to the Swap Account pursuant to
4.04(b)(i) and Section 4.09 and the distributions described under Sections
4.04(e)(1) through (4) and 4.04(f)(1) through (4), the

                              128

<PAGE>

Swap Trustee shall distribute amounts on deposit in the Swap Account in the
following amounts and order of priority:

          (1)   to the Swap Contract Administrator for payment to the
Swap Counterparty, any Net Swap Payment payable to the Swap Counterparty
with respect to such Distribution Date;

          (2)   to the Swap Contract Administrator for payment to the
Swap Counterparty, any Swap Termination Payment (other than a Swap
Termination Payment due to a Swap Counterparty Trigger Event) payable to
the Swap Counterparty with respect to such Distribution Date;

          (3)   concurrently to the Holders of each Class of Class AV
Certificates, any remaining Current Interest and Interest Carry Forward
Amount, pro rata based on their respective entitlements;

          (4)   sequentially, to the Holders of the Class MV-1, Class
MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class
MV-8, Class MV-9 and Class BV Certificates, in that order, in each case
in an amount equal to any remaining Current Interest and Interest Carry
Forward Amount for each such Class;

          (5)   to the Holders of the Class or Classes of Class AV
Certificates and Adjustable Rate Subordinate Certificates then entitled
to receive distributions in respect of principal, in an aggregate amount
equal to the Adjustable Rate Overcollateralization Deficiency Amount
remaining unpaid following the distributions described under Section
4.04(f), payable to such Holders of each such Class in the same manner
in which the Extra Principal Distribution Amount in respect of Loan
Group 2 and Loan Group 3 would be distributed to such Classes as
described under Section 4.04(f);

          (6)   to the Holders of each Class of Class AV Certificates
and Adjustable Rate Subordinate Certificates, to the extent needed to
pay any remaining Net Rate Carryover for each such Class, pro rata,
based on the amount of such remaining Net Rate Carryover;

          (7)   concurrently, to the Holders of each Class of Class AV
Certificates, pro rata, based on the remaining Unpaid Realized Loss
Amounts for such Classes, in each case in an amount equal to the
remaining Unpaid Realized Loss Amount for each such Class; and

          (8)   sequentially, to the Holders of the Class MV-1, Class
                          Page 133

PSA_CWL 06-13.txt
MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6, Class MV-7, Class
MV-8, Class MV-9 and Class BV Certificates, in that order, in each case
in an amount equal to the remaining Unpaid Realized Loss Amount for each
such Class.

On each Distribution Date on or prior to the Swap Contract
Termination Date, following the distributions described under Sections
4.04(e)(5) through (10) and 4.04(f)(5) through (8) and following the deposit
to the Swap Account pursuant to Section 4.04(f)(9), the Swap Trustee shall
distribute amounts on deposit in the Swap Account to the Swap Contract

129

<PAGE>

Administrator for payment to the Swap Counterparty, any Swap Termination
Payment due to a Swap Counterparty Trigger Event payable to the Swap
Counterparty with respect to such Distribution Date.

(i)   To the extent that a Class of Interest Bearing Certificates
receives interest in excess of the applicable Net Rate Cap, such interest is
paid pursuant to Section 4.04(e) and/or 4.04(f), such interest shall be deemed
to have been paid to the Carryover Reserve Fund and then paid by the Carryover
Reserve Fund to those Certificateholders, and such interest is paid pursuant
to Section 4.04(h), such interest shall be deemed to have been paid to the
Swap Account and then paid by the Swap Account to those Certificateholders.

(j)   On each Distribution Date, all Prepayment Charges (including
amounts deposited in connection with the full or partial waiver of such
Prepayment Charges pursuant to Section 3.18) with respect to Loan Group 1
shall be allocated to the Class PF Certificates. On each Distribution Date,
all Prepayment Charges (including amounts deposited in connection with the
full or partial waiver of such Prepayment Charges pursuant to Section 3.18)
with respect to Loan Group 2 and Loan Group 3 shall be allocated to the Class
PV Certificates. On the Class PF Principal Distribution Date, the Trustee
shall make the $100.00 distribution to the Class PF Certificates as specified
in Section 3.08. On the Class PV Principal Distribution Date, the Trustee
shall make the $100.00 distribution to the Class PV Certificates as specified
in Section 3.08.

(k)   On each Distribution Date, the Trustee shall allocate any
Applied Realized Loss Amount for Loan Group 1, first, to reduce the
Certificate Principal Balances of the Class BF, Class MF-8, Class MF-7, Class
MF-6, Class MF-5, Class MF-4, Class MF-3, Class MF-2 and Class MF-1
Certificates, sequentially, in that order, in each case until the Certificate
Principal Balance thereof is reduced to zero and second, to reduce the
Certificate Principal Balances of the Class 1-AF Certificates, on a pro rata
basis according to their respective Certificate Principal Balances, until the
Certificate Principal Balances of such Classes have been reduced to zero.

On each Distribution Date, the Trustee shall allocate any Applied
Realized Loss Amount for Loan Group 2 and Loan Group 3, to reduce the
Certificate Principal Balances of the Class BV, Class MV-9, Class MV-8, Class
MV-7, Class MV-6, Class MV-5, Class MV-4, Class MV-3, Class MV-2 and Class
MV-1 Certificates, sequentially, in that order, in each case until the
Certificate Principal Balance thereof is reduced to zero. After the
Certificate Principal Balances of the Adjustable Rate Subordinate Certificates
have been reduced to zero, (i) the Trustee shall allocate any Applied Realized
Loss Amount for Loan Group 2 to reduce the Certificate Principal Balance of
the Class 2-AV Certificates, until the Certificate Principal Balance thereof
is reduced to zero, and (ii) the Trustee shall allocate any Applied Realized
Loss Amount for Loan Group 3 to reduce the Certificate Principal Balances of
the Class 3-AV Certificates, on a pro rata basis according to their respective

PSA CWL 06-13.txt
Certificate Principal Balances, until the Certificate Principal Balances of
such Classes have been reduced to zero.

(l)   On each Distribution Date, the Trustee shall allocate the
amount of the Subsequent Recoveries for Loan Group 1, if any, first to
increase the Certificate Principal Balances of the Class 1-AF Certificates to
which Applied Realized Loss Amounts have been

130

<PAGE>

previously allocated, on a pro rata basis according to their respective
Certificate Principal Balances and in each case by not more than the amount of
the Unpaid Realized Loss Amount of such Class, and then to increase the
Certificate Principal Balance of the Fixed Rate Subordinate Certificates to
which Applied Realized Loss Amounts have been previously allocated,
sequentially, to the Class MF-1, Class MF-2, Class MF-3, Class MF-4, Class
MF-5, Class MF-6, Class MF-7, Class MF-8 and Class BF Certificates, in that
order, in each case by not more than the amount of the Unpaid Realized Loss
Amount of such Class.

On each Distribution Date, the Trustee shall allocate the amount
of the Subsequent Recoveries for Loan Group 2 and Loan Group 3, if any, first
to increase the Certificate Principal Balances of the related Class AV
Certificates to which Applied Realized Loss Amounts have been previously
allocated, on a pro rata basis according to their respective Certificate
Principal Balances and in each case by not more than the amount of the Unpaid
Realized Loss Amount of such Class, and then to increase the Certificate
Principal Balance of the Adjustable Rate Subordinate Certificates to which
Applied Realized Loss Amounts have been previously allocated, sequentially, to
the Class MV-1, Class MV-2, Class MV-3, Class MV-4, Class MV-5, Class MV-6,
Class MV-7, Class MV-8, Class MV-9 and Class BV Certificates, in that order,
in each case by not more than the amount of the Unpaid Realized Loss Amount of
such Class.

Holders of Certificates to which any Subsequent Recoveries have
been allocated shall not be entitled to any payment in respect of Current
Interest on the amount of such increases for any Accrual Period preceding the
Distribution Date on which such increase occurs.

(m)   Subject to Section 9.02 hereof respecting the final
distribution, on each Distribution Date the Trustee shall make distributions
to each Certificateholder of record on the preceding Record Date either by
wire transfer in immediately available funds to the account of such Holder at
a bank or other entity having appropriate facilities therefor, if (i) such
Holder has so notified the Trustee at least five Business Days prior to the
related Record Date and (ii) such Holder shall hold Regular Certificates with
an aggregate initial Certificate Principal Balance of not less than $1,000,000
or evidencing a Percentage Interest aggregating 10% or more with respect to
such Class or, if not, by check mailed by first class mail to such
Certificateholder at the address of such Holder appearing in the Certificate
Register. Notwithstanding the foregoing, but subject to Section 9.02 hereof
respecting the final distribution, distributions with respect to Certificates
registered in the name of a Depository shall be made to such Depository in
immediately available funds.

On or before 5:00 p.m. Pacific time on the fifth Business Day
following each Determination Date (but in no event later than 5:00 p.m.
Pacific time on the third Business Day before the related Distribution Date),
the Master Servicer shall deliver a report to the Trustee (in the form of a
computer readable magnetic tape or by such other means as the Master Servicer
and the Trustee may agree from time to time) containing such data and

PSA CWL 06-13.txt
information as agreed to by the Master Servicer and the Trustee (including, without limitation, the actual mortgage rate for each Credit Comeback Loan) such as to permit the Trustee to prepare the Monthly Statement and make the required distributions for the related Distribution Date (the "Remittance Report"). The Trustee shall not be responsible to recompute, recalculate or verify information provided to

131

<PAGE>

it by the Master Servicer and shall be permitted to conclusively rely on any information provided to it by the Master Servicer.

Section 4.05   Monthly Statements to Certificateholders.

(a)   Concurrently with each distribution on a Distribution Date, the Trustee will forward by mail to each Rating Agency and make available to Certificateholders on the Trustee's website (http://www.bnyinvestorreporting.com) a statement generally setting forth the information contained in Exhibit W.

(b)   The Trustee's responsibility for disbursing the above information to the Certificateholders is limited to the availability, timeliness and accuracy of the information derived from the Master Servicer. The Trustee shall send a copy of each statement provided pursuant to this Section 4.05 to each Rating Agency and the NIM Insurer. The Trustee may make the above information available to Certificateholders via the Trustee's website at http://www.bnyinvestorreporting.com.

(c)   Within a reasonable period of time after the end of each calendar year, the Trustee shall cause to be furnished to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information regarding (i) the amount of distributions to that Certificateholder allocable to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein and (B) the aggregate of all scheduled payments of principal included therein, (ii) the amount of distributions to that Certificateholder allocable to interest and (iii) the related amount of the Servicing Fees paid to or retained by the Master Servicer, in each case aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee pursuant to any requirements of the Code as from time to time in effect.

(d)   Upon filing with the Internal Revenue Service, the Trustee shall furnish to the Holders of the Class A-R Certificates the Form 1066 and each Form 1066Q and shall respond promptly to written requests made not more frequently than quarterly by any Holder of Class A-R Certificates with respect to the following matters:

(1)   The original projected principal and interest cash flows on the Closing Date on each related Class of regular and residual interests created hereunder and on the Mortgage Loans, based on the Prepayment Assumption;

(2)   The projected remaining principal and interest cash flows as of the end of any calendar quarter with respect to each related Class of regular and residual interests created hereunder and the Mortgage Loans, based on the Prepayment Assumption;

(3)   The applicable Prepayment Assumption and any interest rate assumptions used in determining the projected principal and
Page 136

PSA CWL 06-13.txt
interest cash flows described above;

132

&lt;PAGE&gt;

(4)   The original issue discount (or, in the case of the
Mortgage Loans, market discount) or premium accrued or amortized through
the end of such calendar quarter with respect to each related Class of
regular or residual interests created hereunder and to the Mortgage
Loans, together with each constant yield to maturity used in computing
the same;

(5)   The treatment of losses realized with respect to the
Mortgage Loans or the regular interests created hereunder, including the
timing and amount of any cancellation of indebtedness income of the
related REMIC with respect to such regular interests or bad debt
deductions claimed with respect to the Mortgage Loans;

(6)   The amount and timing of any non-interest expenses of
the related REMIC; and

(7)   Any taxes (including penalties and interest) imposed
on the related REMIC, including, without limitation, taxes on
"prohibited transactions," "contributions" or "net income from
foreclosure property" or state or local income or franchise taxes.

The information pursuant to clauses (1), (2), (3) and (4) above
shall be provided by the Depositor pursuant to Section 8.11.

Section 4.06   [Reserved].

Section 4.07   Carryover Reserve Fund.

(a)   On the Closing Date, the Trustee shall establish and maintain
in its name, in trust for the benefit of the Holders of the Certificates, the
Carryover Reserve Fund and shall deposit $1,000 therein. The Carryover Reserve
Fund shall be an Eligible Account, and funds on deposit therein shall be held
separate and apart from, and shall not be commingled with, any other moneys,
including without limitation, other moneys held by the Trustee pursuant to
this Agreement.

(b)   The Trustee shall make withdrawals from the Carryover Reserve
Fund to make distributions in respect of Net Rate Carryover as to the extent
required by Section 4.04.

(c)   [reserved].

(d)   (1) Funds in the Carryover Reserve Fund in respect of the
Required Carryover Reserve Fund Deposit may be invested in Permitted
Investments at the written direction of the Majority Holder of the Class CF
Certificates, which Permitted Investments shall mature not later than the
Business Day immediately preceding the first Distribution Date that follows
the date of such investment (except that if such Permitted Investment is an
obligation of the institution that maintains the Carryover Reserve Fund, then
such Permitted Investment shall mature not later than such Distribution Date)
and shall not be sold or disposed of prior to maturity. All such Permitted
Investments shall be made in the name of the Trustee, for the benefit of the
Certificateholders. In the absence of such written direction, all funds in the
Carryover Reserve Fund in respect of the Required Carryover Reserve Fund
Deposit shall be invested by the Trustee in The Bank of New York cash
reserves. Any net investment earnings
Page 137

PSA CWL 06-13.txt

133

<PAGE>

on such amounts shall be payable pro rata to the Holders of the Class CF Certificates in accordance with their Percentage Interests. Any losses incurred in the Carryover Reserve Fund in respect of any such investments shall be charged against amounts on deposit in the Carryover Reserve Fund (or such investments) immediately as realized.

(2) The Trustee shall not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Carryover Reserve Fund and made in accordance with this Section 4.07. The Carryover Reserve Fund shall not constitute an asset of any REMIC created hereunder. The Class CF and Class CV Certificates shall evidence ownership of the Carryover Reserve Fund for federal tax purposes.

Section 4.08    Credit Comeback Excess Account.

(a) On the Closing Date, the Trustee shall establish and maintain in its name, in trust for the benefit of the Certificateholders, the Credit Comeback Excess Account. The Credit Comeback Excess Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including without limitation, other moneys held by the Trustee pursuant to this Agreement.

(b) On each Distribution Date, the Trustee shall deposit all Credit Comeback Excess Amounts in the Credit Comeback Excess Account. The Trustee shall make withdrawals from the Credit Comeback Excess Account to make distributions as and to the extent required by Section 4.04.

(c) Funds in the Credit Comeback Excess Account with respect to Loan Group 1 may be invested in Permitted Investments at the written direction of the Majority Holder of the Class CF Certificates (voting as a single Class) and Funds in the Credit Comeback Excess Account with respect to Loan Group 2 and Loan Group 3 may be invested in Permitted Investments at the written direction of the Majority Holder of the Class CV Certificates (voting as a single Class), which Permitted Investments shall mature not later than the Business Day immediately preceding the first Distribution Date that follows the date of such investment (except that if such Permitted Investment is an obligation of the institution that maintains the Credit Comeback Excess Account, then such Permitted Investment shall mature not later than such Distribution Date) and shall not be sold or disposed of prior to maturity. All such Permitted Investments shall be made in the name of the Trustee, for the benefit of the Certificateholders. In the absence of such written direction, all funds in the Credit Comeback Excess Account shall be invested by the Trustee in The Bank of New York cash reserves. Any net investment earnings on amounts in the Credit Comeback Excess Account with respect to Loan Group 1 shall be payable pro rata to the Holders of the Class CF Certificates in accordance with their Percentage Interests and any net investment earnings on amounts in the Credit Comeback Excess Account with respect to Loan Group 2 and Loan Group 3 shall be payable pro rata to the Holders of the Class CV Certificates in accordance with their Percentage Interests. Any losses incurred in the Credit Comeback Excess Account in respect of any such investments shall be charged against amounts on deposit in the Credit Comeback Excess Account (or such investments) immediately as realized.

134

PSA CWL 06-13.txt

&lt;PAGE&gt;

       (d)   The Trustee shall not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Credit Comeback Excess Account and made in accordance with this Section 4.08. The Credit Comeback Excess Account shall not constitute an asset of any REMIC created hereunder. The Class CF and Class CV Certificates shall evidence ownership of so much of the Credit Comeback Excess Account as is attributable to Fixed Rate Loan Group Credit Comeback Excess Cashflow and Adjustable Rate Loan Group Credit Comeback Excess Cashflow, respectively, for federal tax purposes.

135

&lt;PAGE&gt;

       Section 4.09    Swap Trust and Swap Account.

       On the Closing Date, there is hereby established a separate trust (the "Swap Trust"), the assets of which shall consist of the Trustee's rights and obligations under the Swap Contract Administration Agreement. The Swap Trust shall be maintained by the Swap Trustee, who initially, shall be the Trustee. The Swap Trustee shall hold the assets of the Swap Trust in trust for the benefit of the Holders of the Swap Certificates and the Swap Counterparty. No later than the Closing Date, the Swap Trustee shall establish and maintain a separate, segregated trust account to be held in the Swap Trust, titled, "Swap Account, The Bank of New York, as Swap Trustee, in trust for the Swap Counterparty and the registered holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-10." Such account shall be an Eligible Account and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee held pursuant to this Agreement. Amounts therein shall be held uninvested. Funds on deposit in the Swap Account shall be distributed in the amounts and in the order of priority described under Section 4.04(h). For federal income tax purposes, the Swap Trust, including the Swap Account, shall be owned by the Class CV Certificates.

       On each Distribution Date, the Trustee shall make a deposit to the Swap Account pursuant to Section 4.04(b)(i), and to the extent that the amount of such deposit is insufficient to pay any Net Swap Payment and/or Swap Termination Payment (other than a Swap Termination Payment due to a Swap Counterparty Trigger Event) due to the Swap Counterparty with respect to such Distribution Date, the Trustee shall withdraw, out of amounts on deposit in the Distribution Account in respect of the Principal Remittance Amount for Loan Group 2 and Loan Group 3, pro rata on the basis of those respective Principal Remittance Amounts, such additional amount as is necessary to cover the remaining portion of any such Net Swap Payment and/or Swap Termination Payment (other than a Swap Termination Payment due to a Swap Counterparty Trigger Event) due to the Swap Counterparty with respect to such Distribution Date.

ARTICLE V.
THE CERTIFICATES

       Section 5.01    The Certificates.

       The Certificates shall be substantially in the forms attached hereto as Exhibits A-1 through A-30, Exhibit B, Exhibit C, Exhibit D and Exhibit E. The Certificates shall be issuable in registered form, in the minimum dollar denominations, integral dollar multiples in excess thereof and aggregate dollar denominations as set forth in the following table:

PSA CWL 06-13.txt

```
<TABLE>
<CAPTION>
```

| in | Original Certificate Class Principal Balance | Minimum Denomination | Integral Multiples in Excess of Minimum |
|---|---|---|---|
| ---------------------------- | ---------------------------- ---------------------------- | ---------------------------- ---------------------------- | |
| `<S>` | `<C>` | `<C>` | `<C>` |
| | 1-AF-1 $56,658,000 | $20,000 | $1 |
| | 1-AF-2 $11,210,000 | $20,000 | $1 |
| | 1-AF-3 $33,323,000 | $20,000 | $1 |
| | 1-AF-4 $8,849,000 | $20,000 | $1 |
| | 1-AF-5 $13,040,000 | $20,000 | $1 |

136

```
<PAGE>
```

| in | Original Certificate Class Principal Balance | Minimum Denomination | Integral Multiples in Excess of Minimum |
|---|---|---|---|
| ---------------------------- | ---------------------------- ---------------------------- | ---------------------------- ---------------------------- | |
| | 1-AF-6 $17,000,000 | $20,000 | $1 |
| | MF-1 $5,270,000 | $20,000 | $1 |
| | MF-2 $4,760,000 | $20,000 | $1 |
| | MF-3 $2,890,000 | $20,000 | $1 |
| | MF-4 $2,550,000 | $20,000 | $1 |
| | MF-5 $2,465,000 | $20,000 | $1 |
| | MF-6 $2,295,000 | $20,000 | $1 |
| | MF-7 $2,125,000 | $20,000 | $1 |
| | MF-8 $1,700,000 | $20,000 | $1 |
| | BF $1,700,000 | $20,000 | $1 |
| | 2-AV $118,696,000 | $20,000 | $1 |
| | 3-AV-1 $106,235,000 | $20,000 | $1 |
| | 3-AV-2 $26,699,000 | $20,000 | $1 |
| | 3-AV-3 $68,697,000 | $20,000 | $1 |
| | 3-AV-4 $24,533,000 | $20,000 | $1 |
| | MV-1 | $20,000 | $1 |

PSA CWL 06-13.txt

| | | |
|---|---|---|
| $15,910,000 | | |
| MV-2 | $20,000 | $1 |
| $14,190,000 | | |
| MV-3 | $20,000 | $1 |
| $8,600,000 | | |
| MV-4 | $20,000 | $1 |
| $7,740,000 | | |
| MV-5 | $20,000 | $1 |
| $7,095,000 | | |
| MV-6 | $20,000 | $1 |
| $6,665,000 | | |
| MV-7 | $20,000 | $1 |
| $6,450,000 | | |
| MV-8 | $20,000 | $1 |
| $4,515,000 | | |
| MV-9 | $20,000 | $1 |
| $3,655,000 | | |
| BV | $100,000 | $1 |
| $4,085,000 | | |
| A-R | $99.95(1) | N/A |
| $100 | | |
| CF | N/A | N/A |
| N/A | | |
| CV | N/A | N/A |
| N/A | | |
| PF | N/A | N/A |
| $100 | | |
| PV | N/A | N/A |
| $100 | | |

</TABLE>

(1)   The Tax Matters Person Certificate may be issued in a denomination of
      $0.05.


        The Certificates shall be executed by manual or facsimile
signature on behalf of the Trustee by an authorized officer. Certificates
bearing the manual or facsimile signatures of individuals who were, at the
time when such signatures were affixed, authorized to sign on behalf of the
Trustee shall bind the Trustee, notwithstanding that such individuals or any
of them have ceased to be so authorized prior to the authentication and
delivery of such Certificates or did not hold such offices at the date of such
authentication and delivery. No Certificate shall be entitled to any benefit
under this Agreement, or be valid for any purpose, unless there appears on
such Certificate a certificate of authentication substantially in the form set
forth as attached hereto executed by the Trustee by manual signature, and such
certificate of authentication upon any Certificate shall be conclusive
evidence, and the only evidence, that such Certificate has been duly
authenticated and delivered hereunder. All Certificates shall be dated the
date of their authentication. On the Closing Date, the Trustee shall
authenticate the Certificates to be issued at the written direction of the
Depositor, or any affiliate thereof.


                                    137

<PAGE>

        The Depositor shall provide, or cause to be provided, to the
Trustee on a continuous basis, an adequate inventory of Certificates to
facilitate transfers.

              Section 5.02   Certificate Register; Registration of Transfer and
                             Exchange of Certificates.

PSA CWL 06-13.txt

(a)   The Trustee shall maintain a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of Transfers and exchanges of Certificates as herein provided. Upon surrender for registration of Transfer of any Certificate, the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of the same Class and of like aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Trustee. Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate, and deliver the Certificates that the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of Transfer or exchange shall be accompanied by a written instrument of Transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of Transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any Transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of Transfer or exchange shall be canceled and subsequently destroyed by the Trustee in accordance with the Trustee's customary procedures.

(b)   No Transfer of a Private Certificate shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under the Securities Act and such state securities laws. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such state securities laws, in order to assure compliance with the Securities Act and such state securities laws, the Certificateholder desiring to effect such Transfer and such Certificateholder's prospective transferee shall (except in connection with any transfer of a Private Certificate to an affiliate of the Depositor (either directly or through a nominee) in connection with the initial issuance of the Certificates) each certify to the Trustee in writing the facts surrounding the Transfer in substantially the form set forth in Exhibit J-2 (a "Transferor Certificate") and (i) deliver a letter in substantially the form of either Exhibit K (in the case of the Class PF, Class PV, Class CF and Class CV Certificates only) (the "Investment Letter") or Exhibit L (in the case of any Private Certificate) (the "Rule 144A Letter") or (ii) there shall be delivered to the Trustee at the expense of the Certificateholder desiring to effect such transfer an Opinion of Counsel that such Transfer may be made pursuant to an exemption from

138

<PAGE>

the Securities Act; provided, however, that in the case of the delivery of an Investment Letter in connection with the transfer of any Class C or Class P Certificate to a transferee that is formed with the purpose of issuing notes backed by such Class C or Class P Certificate, as the case may be, clause (b) and (c) of the form of Investment Letter shall not be applicable and shall be deleted by such transferee. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans

PSA CWL 06-13.txt
and such other information as shall be necessary to satisfy the condition to
eligibility set forth in Rule 144A(d)(4) for transfer of any such Certificate
without registration thereof under the Securities Act pursuant to the
registration exemption provided by Rule 144A. The Trustee and the Master
Servicer shall cooperate with the Depositor in providing the Rule 144A
information referenced in the preceding sentence, including providing to the
Depositor such information regarding the Certificates, the Mortgage Loans and
other matters regarding the Trust Fund as the Depositor shall reasonably
request to meet its obligation under the preceding sentence. Each Holder of a
Private Certificate desiring to effect such Transfer shall, and does hereby
agree to, indemnify the Trustee, the Depositor, the Trust Fund, each Seller,
the Master Servicer and the NIM Insurer against any liability that may result
if the Transfer is not so exempt or is not made in accordance with such
federal and state laws.

        No Transfer of an ERISA-Restricted Certificate (other than a
transfer of an ERISA-Restricted Certificate to an affiliate of the Depositor
(either directly or through a nominee) in connection with the initial issuance
of the Certificates) shall be made unless the Trustee shall have received
either (i) a representation from the transferee of such Certificate acceptable
to and in form and substance satisfactory to the Trustee (in the event such
Certificate is a Private Certificate, such requirement is satisfied only by
the Trustee's receipt of a representation letter from the transferee
substantially in the form of Exhibit K or Exhibit L, or in the event such
Certificate is a Residual Certificate, such requirement is satisfied only by
the Trustee's receipt of a representation letter from the transferee
substantially in the form of Exhibit I), to the effect that (x) such
transferee is not a Plan, or (y) in the case of an ERISA-Restricted
Certificate that has been the subject of an ERISA-Qualifying Underwriting, a
representation that the transferee is an insurance company which is purchasing
such Certificate with funds contained in an "insurance company general
account" (as such term is defined in section V(e) of Prohibited Transaction
Class Exemption 95-60 ("PTCE 95-60")) and that the purchase and holding of
such Certificate satisfy the requirements for exemptive relief under Sections
I and III of PTCE 95-60 or (ii) in the case of any ERISA-Restricted
Certificate presented for registration in the name of an employee benefit plan
or arrangement subject to ERISA, or a plan or arrangement subject to Section
4975 of the Code (or comparable provisions of any subsequent enactments), or a
trustee of any such plan or arrangement or any other person acting on behalf
of any such plan or arrangement, an Opinion of Counsel satisfactory to the
Trustee, addressed to the Trustee and the Master Servicer, to the effect that
the purchase or holding of such ERISA-Restricted Certificate will not result
in a non-exempt prohibited transaction under ERISA or the Code and will not
subject the Trustee or the Master Servicer to any obligation in addition to
those expressly undertaken in this Agreement, which Opinion of Counsel shall
not be an expense of the Trustee, the Master Servicer, or the Trust Fund. For
purposes of the preceding sentence, one of such representations, as
appropriate, shall be deemed to have been made to the Trustee by the
transferee's acceptance of an ERISA-Restricted Certificate (or the acceptance
by a Certificate Owner of the beneficial interest in any such Class of
ERISA-Restricted Certificates) unless the Trustee shall have received from the
transferee an Opinion of Counsel as described in clause (ii)

                                      139

<PAGE>

or a representation letter acceptable in form and substance to the Trustee.
Notwithstanding anything else to the contrary herein, any purported transfer
of an ERISA-Restricted Certificate to or on behalf of an employee benefit plan
subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code
without the delivery to the Trustee of an Opinion of Counsel satisfactory to
the Trustee meeting the requirements of clause (i) of the first sentence of

PSA_CWL 06-13.txt

this paragraph as described above shall be void and of no effect. The Trustee shall be under no liability to any Person for any registration of transfer of any ERISA-Restricted Certificate that is in fact not permitted by this Section 5.02(b) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Trustee, with respect to the transfer of such Classes of Certificates, required delivery of such certificates and other documentation or evidence as are expressly required by the terms of this Agreement and examined such certificates and other documentation or evidence to determine compliance as to form with the express requirements hereof. The Trustee shall be entitled, but not obligated, to recover from any Holder of any ERISA-Restricted Certificate that was in fact an employee benefit plan or arrangement subject to Section 406 of ERISA or a plan or arrangement subject to Section 4975 of the Code or a Person acting on behalf of any such plan or arrangement at the time it became a Holder or, at such subsequent time as it became such a plan or arrangement or Person acting on behalf of such a plan or arrangement, all payments made on such ERISA-Restricted Certificate at and after either such time. Any such payments so recovered by the Trustee shall be paid and delivered by the Trustee to the last preceding Holder of such Certificate that is not such a plan or arrangement or Person acting on behalf of a plan or arrangement.

          Until the Swap Trust terminates, no transfer of a Swap Certificate (other than a transfer of a Swap Certificate to an affiliate of the Depositor (either directly or through a nominee) in connection with the initial issuance of the Certificates) shall be made unless the Trustee shall have received either (i) a representation from the transferee of such Swap Certificate acceptable to and in form and substance satisfactory to the Trustee to the effect that such transferee is not a Plan, or (ii) a representation that the purchase and holding of the Swap Certificate satisfies the requirements for exemptive relief under PTCE 84-14, PTCE 90-1, PTCE 91-38, PTCE 95-60, PTCE 96-23 or a similar exemption. In the event that such representation letter is not delivered, one of the foregoing representations, as appropriate, shall be deemed to have been made by the transferee's (including an initial acquiror's) acceptance of the Swap Certificate. In the event that such representation is violated, such transfer or acquisition shall be void and of no effect. A transferee of a Swap Certificate that is also an ERISA-Restricted Certificate will have satisfied the requirements of this paragraph if it satisfies the requirements of clause (i)(x) or (i)(y) of the first sentence of the preceding paragraph.

          (c)     Each Person who has or who acquires any Ownership Interest in a Class A-R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Class A-R Certificate are expressly subject to the following provisions:

               (1)     Each Person holding or acquiring any Ownership Interest in a Class A-R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

140

<PAGE>

               (2)     Except in connection with (i) the registration of the Tax Matters Person Certificate in the name of the Trustee or (ii) any registration in the name of, or transfer of a Class A-R Certificate to, an affiliate of the Depositor (either directly or through a nominee) in connection with the initial issuance of the Certificates, no Ownership Interest in a Class A-R Certificate may be registered or transferred,

PSA CWL 06-13.txt

and the Trustee shall not register the Transfer of any Class A-R
Certificate, unless the Trustee shall have been furnished with a
certificate (a "Transferor Certificate") of the transferor in the form
attached hereto as Exhibit J-1 and an affidavit (a "Transfer Affidavit")
of the initial owner or the proposed transferee in the form attached
hereto as Exhibit I.

      (3)   Each Person holding or acquiring any Ownership
Interest in a Class A-R Certificate shall agree (A) to obtain a Transfer
Affidavit from any other Person to whom such Person attempts to Transfer
its Ownership Interest in a Class A-R Certificate, (B) to obtain a
Transfer Affidavit from any Person for whom such Person is acting as
nominee, trustee or agent in connection with any Transfer of a Class A-R
Certificate and (C) not to Transfer its Ownership Interest in a Class
A-R Certificate, or to cause the Transfer of an Ownership Interest in a
Class A-R Certificate to any other Person, if it has actual knowledge
that such Person is not a Permitted Transferee or that such Transfer
Affidavit is false.

      (4)   Any attempted or purported Transfer of any Ownership
Interest in a Class A-R Certificate in violation of the provisions of
this Section 5.02(c) shall be absolutely null and void and shall vest no
rights in the purported Transferee. If any purported transferee shall
become a Holder of a Class A-R Certificate in violation of the
provisions of this Section 5.02(c), then the last preceding Permitted
Transferee shall be restored to all rights as Holder thereof retroactive
to the date of registration of Transfer of such Class A-R Certificate.
The Trustee shall be under no liability to any Person for any
registration of Transfer of a Class A-R Certificate that is in fact not
permitted by Section 5.02(b) and this Section 5.02(c) or for making any
payments due on such Certificate to the Holder thereof or taking any
other action with respect to such Holder under the provisions of this
Agreement so long as the Transfer was registered after receipt of the
related Transfer Affidavit and Transferor Certificate. The Trustee shall
be entitled but not obligated to recover from any Holder of a Class A-R
Certificate that was in fact not a Permitted Transferee at the time it
became a Holder or, at such subsequent time as it became other than a
Permitted Transferee, all payments made on such Class A-R Certificate at
and after either such time. Any such payments so recovered by the
Trustee shall be paid and delivered by the Trustee to the last preceding
Permitted Transferee of such Certificate.

      (5)   The Master Servicer shall use its best efforts to make
available, upon receipt of written request from the Trustee, all
information necessary to compute any tax imposed under section 860E(e)
of the Code as a result of a Transfer of an Ownership Interest in a
Class A-R Certificate to any Holder who is not a Permitted Transferee.

      The restrictions on Transfers of a Class A-R Certificate set forth
in this Section 5.02(c) shall cease to apply (and the applicable portions of
the legend on a Class A-R Certificate

141

<PAGE>

may be deleted) with respect to Transfers occurring after delivery to the
Trustee of an Opinion of Counsel, which Opinion of Counsel shall not be an
expense of the Trustee, any Seller or the Master Servicer, to the effect that
the elimination of such restrictions will not cause any REMIC formed hereunder
to fail to qualify as a REMIC at any time that the Certificates are
outstanding or result in the imposition of any tax on the Trust Fund, a
Certificateholder or another Person. Each Person holding or acquiring any

Page 145

PSA CWL 06-13.txt
Ownership Interest in a Class A-R Certificate, by acceptance of its Ownership
Interest, shall be deemed to consent to any amendment of this Agreement that,
based on an Opinion of Counsel furnished to the Trustee, is reasonably
necessary (a) to ensure that the record ownership of, or any beneficial
interest in, a Class A-R Certificate is not transferred, directly or
indirectly, to a Person that is not a Permitted Transferee and (b) to provide
for a means to compel the Transfer of a Class A-R Certificate that is held by
a Person that is not a Permitted Transferee to a Holder that is a Permitted
Transferee.

         (d)    The preparation and delivery of all affidavits, certifications
and opinions referred to above in this Section 5.02 shall not be an expense of
the Trust Fund, the Trustee, the Depositor, any Seller or the Master Servicer.

         Section 5.03    Mutilated, Destroyed, Lost or Stolen Certificates.

         If (a) any mutilated Certificate is surrendered to the Trustee, or
the Trustee receives evidence to its satisfaction of the destruction, loss or
theft of any Certificate and of the ownership thereof and (b) there is
delivered to the Master Servicer and the Trustee such security or indemnity as
may be required by them to save each of them harmless, then, in the absence of
notice to the Trustee that such Certificate has been acquired by a bona fide
purchaser, the Trustee shall execute, authenticate and deliver, in exchange
for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a
new Certificate of like Class, tenor and Percentage Interest. In connection
with the issuance of any new Certificate under this Section 5.03, the Trustee
may require the payment of a sum sufficient to cover any tax or other
governmental charge that may be imposed in relation thereto and any other
expenses (including the fees and expenses of the Trustee) connected therewith.
Any replacement Certificate issued pursuant to this Section 5.03 shall
constitute complete and indefeasible evidence of ownership in the Trust Fund,
as if originally issued, whether or not the lost, stolen or destroyed
Certificate shall be found at any time. All Certificates surrendered to the
Trustee under the terms of this Section 5.03 shall be canceled and destroyed
by the Trustee in accordance with its standard procedures without liability on
its part.

         Section 5.04    Persons Deemed Owners.

         The Master Servicer, the Trustee, the NIM Insurer and any agent of
the Master Servicer, the Trustee, the NIM Insurer may treat the person in
whose name any Certificate is registered as the owner of such Certificate for
the purpose of receiving distributions as provided in this Agreement and for
all other purposes whatsoever, and none of the Master Servicer, the Trustee or
the NIM Insurer or any agent of the Master Servicer, the Trustee or the NIM
Insurer shall be affected by any notice to the contrary.

                                      142

<PAGE>

         Section 5.05    Access to List of Certificateholders' Names and
                         Addresses.

         If three or more Certificateholders or Certificate Owners (a)
request such information in writing from the Trustee, (b) state that such
Certificateholders or Certificate Owners desire to communicate with other
Certificateholders or Certificate Owners with respect to their rights under
this Agreement or under the Certificates and (c) provide a copy of the
communication that such Certificateholders or Certificate Owners propose to
transmit or if the Depositor or Master Servicer shall request such information
in writing from the Trustee, then the Trustee shall, within ten Business Days

PSA CWL 06-13.txt

after the receipt of such request, provide the Depositor, the Master Servicer or such Certificateholders or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of the Trust Fund held by the Trustee, if any. The Depositor and every Certificateholder or Certificate Owner, by receiving and holding a Certificate, agree that the Trustee shall not be held accountable by reason of the disclosure of any such information as to the list of the Certificateholders hereunder, regardless of the source from which such information was derived.

     Section 5.06    Book-Entry Certificates.

     The Book-Entry Certificates, upon original issuance, shall be issued in the form of one typewritten Certificate (or more than one, if required by the Depository) for each Class of such Certificates, to be delivered to the Depository by or on behalf of the Depositor. Such Certificates shall initially be registered on the Certificate Register in the name of the Depository or its nominee, and no Certificate Owner of such Certificates will receive a definitive certificate representing such Certificate Owner's interest in such Certificates, except as provided in Section 5.08. Unless and until definitive, fully registered Certificates ("Definitive Certificates") have been issued to the Certificate Owners of such Certificates pursuant to Section 5.08:

     (a)    the provisions of this Section shall be in full force and effect;

     (b)    the Depositor, the Sellers, the Master Servicer and the Trustee may deal with the Depository and the Depository Participants for all purposes (including the making of distributions) as the authorized representative of the respective Certificate Owners of such Certificates;

     (c)    registration of the Book-Entry Certificates may not be transferred by the Trustee except to another Depository;

     (d)    the rights of the respective Certificate Owners of such Certificates shall be exercised only through the Depository and the Depository Participants and shall be limited to those established by law and agreements between the Owners of such Certificates and the Depository and/or the Depository Participants. Pursuant to the Depository Agreement, unless and until Definitive Certificates are issued pursuant to Section 5.08, the Depository will make book-entry transfers among the Depository Participants and receive and transmit distributions of principal and interest on the related Certificates to such Depository Participants;

     (e)    the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants;

143

&lt;PAGE&gt;

     (f)    the Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants; and

     (g)    to the extent the provisions of this Section conflict with any other provisions of this Agreement, the provisions of this Section shall control.

     For purposes of any provision of this Agreement requiring or permitting actions with the consent of, or at the direction of, Certificateholders evidencing a specified percentage of the aggregate unpaid

PSA CWL 06-13.txt

principal amount of any Class of Certificates, such direction or consent may be given by Certificate Owners (acting through the Depository and the Depository Participants) owning Book-Entry Certificates evidencing the requisite percentage of principal amount of such Class of Certificates.

          Section 5.07   Notices to Depository.

          Whenever any notice or other communication is required to be given to Certificateholders of any Class to which Book-Entry Certificates have been issued, unless and until Definitive Certificates shall have been issued to the related Certificate Owners, the Trustee shall give all such notices and communications to the Depository.

          Section 5.08   Definitive Certificates.

          If, after Book-Entry Certificates have been issued with respect to any Certificates, (a) the Depositor advises the Trustee that the Depository is no longer willing or able to discharge properly its responsibilities under the Depository Agreement with respect to such Certificates and the Trustee or the Depositor is unable to locate a qualified successor or (b) after the occurrence and continuation of an Event of Default, Certificate Owners of such Book-Entry Certificates having not less than 51% of the Voting Rights evidenced by any Class of Book-Entry Certificates advise the Trustee and the Depository in writing through the Depository Participants that the continuation of a book-entry system with respect to Certificates of such Class through the Depository (or its successor) is no longer in the best interests of the Certificate Owners of such Class, then the Trustee shall notify all Certificate Owners of such Certificates, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners of such Class requesting the same. The Depositor shall provide the Trustee with an adequate inventory of Certificates to facilitate the issuance and transfer of Definitive Certificates. Upon surrender to the Trustee of any such Certificates by the Depository, accompanied by registration instructions from the Depository for registration, the Trustee shall authenticate and deliver such Definitive Certificates. Neither the Depositor nor the Trustee shall be liable for any delay in delivery of such instructions and each may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of such Definitive Certificates, all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates and the Trustee shall recognize the Holders of such Definitive Certificates as Certificateholders hereunder.


                              144

<PAGE>

          Section 5.09   Maintenance of Office or Agency.

          The Trustee will maintain or cause to be maintained at its expense an office or offices or agency or agencies in New York City where Certificates may be surrendered for registration of transfer or exchange. The Trustee initially designates its offices at 101 Barclay Street, New York, New York 10286, Attention: Corporate Trust MBS Administration, as offices for such purposes. The Trustee will give prompt written notice to the Certificateholders of any change in such location of any such office or agency.

                         ARTICLE VI.
          THE DEPOSITOR, THE MASTER SERVICER AND THE SELLERS

                         Page 148

PSA CWL 06-13.txt
         Section 6.01     Respective Liabilities of the Depositor, the Master
                          Servicer and the Sellers.

         The Depositor, the Master Servicer and each Seller shall each be
liable in accordance herewith only to the extent of the obligations
specifically and respectively imposed upon and undertaken by them herein.

         Section 6.02     Merger or Consolidation of the Depositor, the Master
                          Servicer or the Sellers.

         The Depositor will keep in full effect its existence, rights and
franchises as a corporation under the laws of the United States or under the
laws of one of the states thereof and will each obtain and preserve its
qualification to do business as a foreign corporation in each jurisdiction in
which such qualification is or shall be necessary to protect the validity and
enforceability of this Agreement, or any of the Mortgage Loans and to perform
its duties under this Agreement. The Master Servicer will keep in effect its
existence, rights and franchises as a limited partnership under the laws of
the United States or under the laws of one of the states thereof and will
obtain and preserve its qualification or registration to do business as a
foreign partnership in each jurisdiction in which such qualification or
registration is or shall be necessary to protect the validity and
enforceability of this Agreement or any of the Mortgage Loans and to perform
its duties under this Agreement.

         Any Person into which the Depositor, the Master Servicer or any
Seller may be merged or consolidated, or any Person resulting from any merger
or consolidation to which the Depositor, the Master Servicer or any Seller
shall be a party, or any person succeeding to the business of the Depositor,
the Master Servicer or any Seller, shall be the successor of the Depositor,
the Master Servicer or such Seller, as the case may be, hereunder, without the
execution or filing of any paper or any further act on the part of any of the
parties hereto, anything herein to the contrary notwithstanding; provided that
the successor or surviving Person to the Master Servicer shall be qualified to
service mortgage loans on behalf of Fannie Mae and Freddie Mac.

         As a condition to the effectiveness of any merger or
consolidation, at least 15 calendar days prior to the effective date of any
merger or consolidation of the Master Servicer, the Master Servicer shall
provide (x) written notice to the Depositor of any successor pursuant to this
Section and (y) in writing and in form and substance reasonably satisfactory
to the

                                      145

<PAGE>

Depositor, all information reasonably requested by the Depositor in order to
comply with its reporting obligation under Item 6.02 of Form 8-K with respect
to a replacement Master Servicer.

         Section 6.03     Limitation on Liability of the Depositor, the
                          Sellers, the Master Servicer, the NIM Insurer and
                          Others.

         None of the Depositor, the Sellers, the NIM Insurer or the Master
Servicer or any of the directors, officers, employees or agents of the
Depositor, the Sellers, the NIM Insurer or the Master Servicer shall be under
any liability to the Trustee (except as provided in Section 8.05), the Trust
Fund or the Certificateholders for any action taken or for refraining from the
taking of any action in good faith pursuant to this Agreement, or for errors
in judgment; provided that this provision shall not protect the Depositor, the
Sellers, the Master Servicer or any such Person against any breach of
                                 Page 149

PSA CWL 06-13.txt
representations or warranties made by it herein or protect the Depositor, the
Sellers, the Master Servicer or any such Person from any liability that would
otherwise be imposed by reasons of willful misfeasance, bad faith or gross
negligence in the performance of duties or by reason of reckless disregard of
obligations and duties hereunder. The Depositor, the Sellers, the NIM Insurer,
the Master Servicer and any director, officer, employee or agent of the
Depositor, the Sellers, the NIM Insurer or the Master Servicer may rely in
good faith on any document of any kind prima facie properly executed and
submitted by any Person respecting any matters arising hereunder. The
Depositor, the Sellers, the NIM Insurer, the Master Servicer and any director,
officer, employee or agent of the Depositor, the Sellers, the NIM Insurer or
the Master Servicer shall be indemnified by the Trust Fund and held harmless
against any loss, liability or expense incurred in connection with any audit,
controversy or judicial proceeding relating to a governmental taxing authority
or any legal action relating to this Agreement or the Certificates, other than
any loss, liability or expense related to any specific Mortgage Loan or
Mortgage Loans (except as any such loss, liability or expense shall be
otherwise reimbursable pursuant to this Agreement) and any loss, liability or
expense incurred by reason of willful misfeasance, bad faith or gross
negligence in the performance of duties hereunder or by reason of reckless
disregard of obligations and duties hereunder. None of the Depositor, the
Sellers, the NIM Insurer or the Master Servicer shall be under any obligation
to appear in, prosecute or defend any legal action that is not incidental to
its respective duties hereunder and that in its opinion may involve it in any
expense or liability; provided that any of the Depositor, the Sellers, the NIM
Insurer or the Master Servicer may, in its discretion undertake any such
action that it may deem necessary or desirable in respect of this Agreement
and the rights and duties of the parties hereto and interests of the Trustee
and the Certificateholders hereunder. In such event, the legal expenses and
costs of such action and any liability resulting therefrom shall be, expenses,
costs and liabilities of the Trust Fund, and the Depositor, the Sellers, the
NIM Insurer and the Master Servicer shall be entitled to be reimbursed
therefor out of the Certificate Account as provided by Section 3.08 hereof.

          Section 6.04    Limitation on Resignation of Master Servicer.

          The Master Servicer shall not resign from the obligations and
duties hereby imposed on it except (i) upon determination that its duties
hereunder are no longer permissible under applicable law or (ii) upon
appointment of a successor servicer that is reasonably acceptable to the
Trustee and the NIM Insurer and the written confirmation from each Rating
Agency (which confirmation shall be furnished to the Depositor, the Trustee
and the NIM

                                    146

<PAGE>

Insurer) that such resignation will not cause such Rating Agency to reduce the
then-current rating of the Certificates. Any such determination pursuant to
clause (i) of the preceding sentence permitting the resignation of the Master
Servicer shall be evidenced by an Opinion of Counsel to such effect delivered
to the Trustee. No resignation of the Master Servicer shall become effective
until the Trustee shall have assumed the Master Servicer's responsibilities,
duties, liabilities (other than those liabilities arising prior to the
appointment of such successor) and obligations under this Agreement and the
Depositor shall have received the information described in the following
sentence. As a condition to the effectiveness of any such resignation, at
least 15 calendar days prior to the effective date of such resignation, the
Master Servicer shall provide (x) written notice to the Depositor of any
successor pursuant to this Section and (y) in writing and in form and
substance reasonably satisfactory to the Depositor, all information reasonably
requested by the Depositor in order to comply with its reporting obligation
                              Page 150

PSA CWL 06-13.txt
under Item 6.02 of Form 8-K with respect to the resignation of the Master
Servicer.

        Section 6.05    Errors and Omissions Insurance; Fidelity Bonds.

        The Master Servicer shall, for so long as it acts as servicer
under this Agreement, obtain and maintain in force (a) a policy or policies of
insurance covering errors and omissions in the performance of its obligations
as servicer hereunder, and (b) a fidelity bond in respect of its officers,
employees and agents. Each such policy or policies and bond shall, together,
comply with the requirements from time to time of Fannie Mae and Freddie Mac
for persons performing servicing for mortgage loans purchased by Fannie Mae
and Freddie Mac. In the event that any such policy or bond ceases to be in
effect, the Master Servicer shall use its reasonable best efforts to obtain a
comparable replacement policy or bond from an insurer or issuer, meeting the
requirements set forth above as of the date of such replacement.

        The Master Servicer shall provide the Trustee and the NIM Insurer
(upon such party's reasonable request) with copies of any such insurance
policies and fidelity bond. The Master Servicer shall be deemed to have
complied with this provision if an Affiliate of the Master Servicer has such
errors and omissions and fidelity bond coverage and, by the terms of such
insurance policy or fidelity bond, the coverage afforded thereunder extends to
the Master Servicer.

                        ARTICLE VII.
            DEFAULT; TERMINATION OF MASTER SERVICER

        Section 7.01    Events of Default.

        "Event of Default," wherever used herein, means any one of the
following events:

            (1)    any failure by the Master Servicer to deposit in the
        Certificate Account or the Distribution Account or remit to the Trustee
        any payment (excluding a payment required to be made under Section 4.01
        hereof) required to be made under the terms of this Agreement, which
        failure shall continue unremedied for five calendar days and, with
        respect to a payment required to be made under Section 4.01(b) or (c)
        hereof, for one Business Day, after the date on which written notice of
        such failure shall have been given to the Master Servicer by the
        Trustee, the NIM Insurer or the Depositor, or to

                            147

<PAGE>

        the Trustee, the NIM Insurer and the Master Servicer by the Holders of
        Certificates evidencing not less than 25% of the Voting Rights; or

            (2)    any failure by the Master Servicer to observe or
        perform in any material respect any other of the covenants or agreements
        on the part of the Master Servicer contained in this Agreement (except
        with respect to a failure related to a Limited Exchange Act Reporting
        Obligation) or any representation or warranty shall prove to be untrue,
        which failure or breach shall continue unremedied for a period of 60
        days after the date on which written notice of such failure shall have
        been given to the Master Servicer by the Trustee, the NIM Insurer or the
        Depositor, or to the Trustee by the Holders of Certificates evidencing
        not less than 25% of the Voting Rights; provided, that the sixty-day
        cure period shall not apply to the initial delivery of the Mortgage File
        for Delay Delivery Mortgage Loans or the failure to repurchase or
        substitute in lieu thereof; or
                        Page 151

PSA CWL 06-13.txt

(3)   a decree or order of a court or agency or supervisory
authority having jurisdiction in the premises for the appointment of a
receiver or liquidator in any insolvency, readjustment of debt,
marshalling of assets and liabilities or similar proceedings, or for the
winding-up or liquidation of its affairs, shall have been entered
against the Master Servicer and such decree or order shall have remained
in force undischarged or unstayed for a period of 60 consecutive days;
or

(4)   the Master Servicer shall consent to the appointment
of a receiver or liquidator in any insolvency, readjustment of debt,
marshalling of assets and liabilities or similar proceedings of or
relating to the Master Servicer or all or substantially all of the
property of the Master Servicer; or

(5)   the Master Servicer shall admit in writing its
inability to pay its debts generally as they become due, file a petition
to take advantage of, or commence a voluntary case under, any applicable
insolvency or reorganization statute, make an assignment for the benefit
of its creditors, or voluntarily suspend payment of its obligations; or

(6)   the Master Servicer shall fail to reimburse in full
the Trustee not later than 6:00 p.m. (New York time) on the Business Day
following the related Distribution Date for any Advance made by the
Trustee pursuant to Section 4.01(d) together with accrued and unpaid
interest.

If an Event of Default shall occur, then, and in each and every
such case, so long as such Event of Default shall not have been remedied, the
Trustee shall, but only at the direction of either the NIM Insurer or the
Holders of Certificates evidencing not less than 25% of the Voting Rights, by
notice in writing to the Master Servicer (with a copy to each Rating Agency
and the Depositor), terminate all of the rights and obligations of the Master
Servicer under this Agreement and in and to the Mortgage Loans and the
proceeds thereof, other than its rights as a Certificateholder hereunder. In
addition, if during the period that the Depositor is required to file Exchange
Act Reports with respect to the Trust Fund, the Master Servicer shall fail to
observe or perform any of the obligations that constitute a Limited Exchange
Act Reporting Obligation or

148

<PAGE>

the obligations set forth in Section 3.17(a) or Section 11.07(a)(1) and (2),
and such failure continues for the lesser of 10 calendar days or such period
in which the applicable Exchange Act Report can be filed timely (without
taking into account any extensions), so long as such failure shall not have
been remedied, the Trustee shall, but only at the direction of the Depositor,
terminate all of the rights and obligations of the Master Servicer under this
Agreement and in and to the Mortgage Loans and the proceeds thereof, other
than its rights as a Certificateholder hereunder. The Depositor shall not be
entitled to terminate the rights and obligations of the Master Servicer if a
failure of the Master Servicer to identify a Subcontractor "participating in
the servicing function" within the meaning of Item 1122 of Regulation AB was
attributable solely to the role or functions of such Subcontractor with
respect to mortgage loans other than the Mortgage Loans.

On or after the receipt by the Master Servicer of such written
notice, all authority and power of the Master Servicer hereunder, whether with
respect to the Mortgage Loans or otherwise, shall pass to and be vested in the
Trustee. The Trustee shall thereupon make any Advance described in Section
Page 152

PSA CWL 06-13.txt
4.01 hereof subject to Section 3.04 hereof. The Trustee is hereby authorized
and empowered to execute and deliver, on behalf of the Master Servicer, as
attorney-in-fact or otherwise, any and all documents and other instruments,
and to do or accomplish all other acts or things necessary or appropriate to
effect the purposes of such notice of termination, whether to complete the
transfer and endorsement or assignment of the Mortgage Loans and related
documents, or otherwise. Unless expressly provided in such written notice, no
such termination shall affect any obligation of the Master Servicer to pay
amounts owed pursuant to Article VIII. The Master Servicer agrees to cooperate
with the Trustee in effecting the termination of the Master Servicer's
responsibilities and rights hereunder, including, without limitation, the
transfer to the Trustee of all cash amounts which shall at the time be
credited to the Certificate Account, or thereafter be received with respect to
the Mortgage Loans. The Trustee shall promptly notify the Rating Agencies and
the Depositor of the occurrence of an Event of Default.

         Notwithstanding any termination of the activities of a Master
Servicer hereunder, such Master Servicer shall be entitled to receive, out of
any late collection of a Scheduled Payment on a Mortgage Loan that was due
prior to the notice terminating such Master Servicer's rights and obligations
as Master Servicer hereunder and received after such notice, that portion
thereof to which such Master Servicer would have been entitled pursuant to
Sections 3.08(a)(i) through (viii), and any other amounts payable to such
Master Servicer hereunder the entitlement to which arose prior to the
termination of its activities hereunder.

         If the Master Servicer is terminated, the Trustee shall provide
the Depositor in writing and in form and substance reasonably satisfactory to
the Depositor, all information reasonably requested by the Depositor in order
to comply with its reporting obligation under Item 6.02 of Form 8-K with
respect to a successor master servicer in the event the Trustee should succeed
to the duties of the Master Servicer as set forth herein.

         Section 7.02    Trustee to Act; Appointment of Successor.

         On and after the time the Master Servicer receives a notice of
termination pursuant to Section 7.01 hereof, the Trustee shall, to the extent
provided in Section 3.04, be the

                                    149

<PAGE>

successor to the Master Servicer in its capacity as servicer under this
Agreement and the transactions set forth or provided for herein and shall be
subject to all the responsibilities, duties and liabilities relating thereto
placed on the Master Servicer by the terms and provisions hereof and
applicable law including the obligation to make advances pursuant to Section
4.01. As compensation therefor, the Trustee shall be entitled to all fees,
costs and expenses relating to the Mortgage Loans that the Master Servicer
would have been entitled to if the Master Servicer had continued to act
hereunder. Notwithstanding the foregoing, if the Trustee has become the
successor to the Master Servicer in accordance with Section 7.01 hereof, the
Trustee may, if it shall be unwilling to so act, or shall, if it is prohibited
by applicable law from making Advances pursuant to Section 4.01 hereof or if
it is otherwise unable to so act, (i) appoint any established mortgage loan
servicing institution reasonably acceptable to the NIM Insurer (as evidenced
by the prior written consent of the NIM Insurer), or (ii) if it is unable for
60 days to appoint a successor servicer reasonably acceptable to the NIM
Insurer, petition a court of competent jurisdiction to appoint any established
mortgage loan servicing institution, the appointment of which does not
adversely affect the then-current rating of the Certificates and the NIM
Insurer guaranteed notes (without giving any effect to any policy or guaranty
                              Page 153

PSA CWL 06-13.txt
provided by the NIM Insurer) by each Rating Agency as the successor to the
Master Servicer hereunder in the assumption of all or any part of the
responsibilities, duties or liabilities of the Master Servicer hereunder. Any
successor Master Servicer shall be an institution that is a Fannie Mae and
Freddie Mac approved seller/servicer in good standing, that has a net worth of
at least $15,000,000 and that is willing to service the Mortgage Loans and
executes and delivers to the Depositor and the Trustee an agreement accepting
such delegation and assignment, that contains an assumption by such Person of
the rights, powers, duties, responsibilities, obligations and liabilities of
the Master Servicer (other than liabilities and indemnities of the Master
Servicer under Section 6.03 hereof incurred prior to termination of the Master
Servicer under Section 7.01), with like effect as if originally named as a
party to this Agreement; and provided further that each Rating Agency
acknowledges that its rating of the Certificates in effect immediately prior
to such assignment and delegation will not be qualified or reduced as a result
of such assignment and delegation. No appointment of a successor to the Master
Servicer hereunder shall be effective until (i) the Trustee shall have
consented thereto, (ii) written notice of such proposed appointment shall have
been provided by the Trustee to each Certificateholder and (iii) at least 15
calendar days prior to the effective date of such appointment, (x) the Trustee
shall provide written notice to the Depositor of such successor pursuant to
this Section 7.02 and (y) such successor Master Servicer shall provide to the
Depositor in writing and in form and substance reasonably satisfactory to the
Depositor, all information reasonably requested by the Depositor in order to
comply with its reporting obligation under Item 6.02 of Form 8-K with respect
to a replacement master servicer. The Trustee shall not resign as servicer
until a successor servicer has been appointed and has accepted such
appointment. Pending appointment of a successor to the Master Servicer
hereunder, the Trustee, unless the Trustee is prohibited by law from so
acting, shall, subject to Section 3.04 hereof, act in such capacity as herein
above provided. In connection with such appointment and assumption, the
Trustee may make such arrangements for the compensation of such successor out
of payments on Mortgage Loans as it and such successor shall agree; provided
that no such compensation shall be in excess of that permitted the Master
Servicer hereunder. The Trustee and such successor shall take such action,
consistent with this Agreement, as shall be necessary to effectuate any such
succession. Neither the Trustee nor any other successor servicer shall be
deemed to be in default hereunder by reason

150

<PAGE>

of any failure to make, or any delay in making, any distribution hereunder or
any portion thereof or any failure to perform, or any delay in performing, any
duties or responsibilities hereunder, in either case caused by the failure of
the Master Servicer to deliver or provide, or any delay in delivering or
providing, any cash, information, documents or records to it.

        Any successor to the Master Servicer as servicer shall give notice
to the NIM Insurer and the Mortgagors of such change of servicer and shall,
during the term of its service as servicer maintain in force the policy or
policies that the Master Servicer is required to maintain pursuant to Section
6.05.

        In connection with the termination or resignation of the Master
Servicer hereunder, either (i) the successor Master Servicer, including the
Trustee if the Trustee is acting as successor Master Servicer, shall represent
and warrant that it is a member of MERS in good standing and shall agree to
comply in all material respects with the rules and procedures of MERS in
connection with the servicing of the Mortgage Loans that are registered with
MERS, or (ii) the predecessor Master Servicer shall cooperate with the
successor Master Servicer in causing MERS to execute and deliver an assignment

PSA CWL 06-13.txt
of Mortgage in recordable form to transfer the Mortgage from MERS to the
Trustee and to execute and deliver such other notices, documents and other
instruments as may be necessary or desirable to effect a transfer of such
Mortgage Loan or servicing of such Mortgage Loan on the MERS(R) System to the
successor Master Servicer. The predecessor Master Servicer shall file or cause
to be filed any such assignment in the appropriate recording office. The
successor Master Servicer shall cause such assignment to be delivered to the
Trustee promptly upon receipt of the original with evidence of recording
thereon or a copy certified by the public recording office in which such
assignment was recorded.

          Section 7.03    Notification to Certificateholders.

          (a)    Upon any termination of or appointment of a successor to the
Master Servicer, the Trustee shall give prompt written notice thereof to
Certificateholders and to each Rating Agency.

          (b)    Within 60 days after the occurrence of any Event of Default,
the Trustee shall transmit by mail to all Certificateholders notice of each
such Event of Default hereunder known to the Trustee, unless such Event of
Default shall have been cured or waived.

                          ARTICLE VIII.
                      CONCERNING THE TRUSTEE

          Section 8.01    Duties of Trustee.

          The Trustee, prior to the occurrence of an Event of Default and
after the curing of all Events of Default that may have occurred, shall
undertake to perform such duties and only such duties as are specifically set
forth in this Agreement. In case an Event of Default has occurred and remains
uncured, the Trustee shall exercise such of the rights and powers vested in it
by this Agreement, and use the same degree of care and skill in their exercise
as a prudent person would exercise or use under the circumstances in the
conduct of such person's own affairs.


                                 151

<PAGE>

          The Trustee, upon receipt of all resolutions, certificates,
statements, opinions, reports, documents, orders or other instruments
furnished to the Trustee that are specifically required to be furnished
pursuant to any provision of this Agreement shall examine them to determine
whether they conform to the requirements of this Agreement, to the extent
provided in this Agreement. If any such instrument is found not to conform to
the requirements of this Agreement in a material manner, the Trustee shall
take action as it deems appropriate to have the instrument corrected.

          No provision of this Agreement shall be construed to relieve the
Trustee from liability for its own grossly negligent action, its own gross
negligent failure to act or its own misconduct, its grossly negligent failure
to perform its obligations in compliance with this Agreement, or any liability
that would be imposed by reason of its willful misfeasance or bad faith;
provided that:

          (1)    prior to the occurrence of an Event of Default, and
     after the curing of all such Events of Default that may have occurred,
     the duties and obligations of the Trustee shall be determined solely by
     the express provisions of this Agreement, the Trustee shall not be
     liable, individually or as Trustee, except for the performance of such
     duties and obligations as are specifically set forth in this Agreement,
                              Page 155

PSA CWL 06-13.txt

no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement that it reasonably believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(2)    the Trustee shall not be liable, individually or as Trustee, for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless the Trustee was grossly negligent or acted in bad faith or with willful misfeasance;

(3)    the Trustee shall not be liable, individually or as Trustee, with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Holders of each Class of Certificates evidencing not less than 25% of the Voting Rights of such Class relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement; and

(4)    without in any way limiting the provisions of this Section 8.01 or Section 8.02 hereof, the Trustee shall be entitled to rely conclusively on the information delivered to it by the Master Servicer in a Trustee Advance Notice in determining whether or not it is required to make an Advance under Section 4.01(d), shall have no responsibility to ascertain or confirm any information contained in any Trustee Advance Notice, and shall have no obligation to make any Advance under Section 4.01(d) in the absence of a Trustee Advance Notice or actual knowledge by a Responsible Officer that (A) a required Advance was not made and (B) such required Advance was not a Nonrecoverable Advance.

152

<PAGE>

Section 8.02    Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(1)    the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(2)    the Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(3)    the Trustee shall not be liable, individually or as Trustee, for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(4)    prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default that may have occurred, the Trustee shall not be bound to make any investigation into

PSA CWL 06-13.txt
the facts or matters stated in any resolution, certificate, statement,
instrument, opinion, report, notice, request, consent, order, approval,
bond or other paper or document, unless requested in writing so to do by
the NIM Insurer or the Holders of each Class of Certificates evidencing
not less than 25% of the Voting Rights of such Class; provided, however,
that if the payment within a reasonable time to the Trustee of the
costs, expenses or liabilities likely to be incurred by it in the making
of such investigation is, in the opinion of the Trustee not reasonably
assured to the Trustee by the NIM Insurer or such Certificateholders,
the Trustee may require reasonable indemnity against such expense, or
liability from the NIM Insurer or such Certificateholders as a condition
to taking any such action;

(5)   the Trustee may execute any of the trusts or powers
hereunder or perform any duties hereunder either directly or by or
through agents, accountants or attorneys;

(6)   the Trustee shall not be required to expend its own
funds or otherwise incur any financial liability in the performance of
any of its duties hereunder if it shall have reasonable grounds for
believing that repayment of such funds or adequate indemnity against
such liability is not assured to it;

(7)   the Trustee shall not be liable, individually or as
Trustee, for any loss on any investment of funds pursuant to this
Agreement (other than as issuer of the investment security);

(8)   the Trustee shall not be deemed to have knowledge of
an Event of Default until a Responsible Officer of the Trustee shall
have received written notice thereof; and

153

<PAGE>

(9)   the Trustee shall be under no obligation to exercise
any of the trusts or powers vested in it by this Agreement or to make
any investigation of matters arising hereunder or to institute, conduct
or defend any litigation hereunder or in relation hereto at the request,
order or direction of the NIM Insurer or any of the Certificateholders,
pursuant to the provisions of this Agreement, unless the NIM Insurer or
such Certificateholders, as applicable, shall have offered to the
Trustee reasonable security or indemnity against the costs, expenses and
liabilities that may be incurred therein or thereby.

(b)   All rights of action under this Agreement or under any of the
Certificates, enforceable by the Trustee, may be enforced by the Trustee
without the possession of any of the Certificates, or the production thereof
at the trial or other proceeding relating thereto, and any such suit, action
or proceeding instituted by the Trustee shall be brought in its name for the
benefit of all the Holders of the Certificates, subject to the provisions of
this Agreement.

The Depositor hereby directs the Trustee to execute, deliver and perform
its obligations under the Swap Contract Administration Agreement (in its
capacity as Swap Trustee). The Sellers, the Depositor, the Master Servicer and
the Holders of the Swap Certificates by their acceptance of such Certificates
acknowledge and agree that the Trustee shall execute, deliver and perform its
obligations under the Swap Contract Administration Agreement and shall do so
solely in its capacity as Swap Trustee, as the case may be, and not in its
individual capacity. Every provision of this Agreement relating to the conduct
or affecting the liability of or affording protection to the Trustee shall

PSA CWL 06-13.txt

apply to the Trustee's execution of the Swap Contract Administration Agreement in its capacity as Swap Trustee, and the performance of its duties and satisfaction of its obligations thereunder.

Section 8.03    Trustee Not Liable for Mortgage Loans.

The recitals contained herein shall be taken as the statements of the Depositor or the Master Servicer, as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of any Mortgage Loan or related document or of MERS or the MERS(R) System other than with respect to the Trustee's execution and authentication of the Certificates. The Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Certificate Account by the Depositor or the Master Servicer.

Section 8.04    Trustee May Own Certificates.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights as it would have if it were not the Trustee.

Section 8.05    Master Servicer to Pay Trustee's Fees and Expenses.

The Master Servicer covenants and agrees to pay or reimburse the Trustee, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Trustee on behalf of the Trust Fund in accordance with any of the provisions of this Agreement

154

<PAGE>

(including, without limitation: (A) the reasonable compensation and the expenses and disbursements of its counsel, but only for representation of the Trustee acting in its capacity as Trustee hereunder and (B) to the extent that the Trustee must engage persons not regularly in its employ to perform acts or services on behalf of the Trust Fund, which acts or services are not in the ordinary course of the duties of a trustee, paying agent or certificate registrar, in the absence of a breach or default by any party hereto, the reasonable compensation, expenses and disbursements of such persons, except any such expense, disbursement or advance as may arise from its negligence, bad faith or willful misconduct). The Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Master Servicer and held harmless against any loss, liability or expense (i) incurred in connection with any legal action relating to this Agreement or the Certificates, or in connection with the performance of any of the Trustee's duties hereunder, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder or by reason of reckless disregard of the Trustee's obligations and duties hereunder or (ii) resulting from any error in any tax or information return prepared by the Master Servicer. Such indemnity shall survive the termination of this Agreement or the resignation or removal of the Trustee hereunder.

Section 8.06    Eligibility Requirements for Trustee.

The Trustee hereunder shall, at all times, be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000,

PSA CWL 06-13.txt
subject to supervision or examination by federal or state authority and with a
credit rating that would not cause any of the Rating Agencies to reduce their
respective ratings of any Class of Certificates below the ratings issued on
the Closing Date (or having provided such security from time to time as is
sufficient to avoid such reduction). If such corporation or association
publishes reports of condition at least annually, pursuant to law or to the
requirements of the aforesaid supervising or examining authority, then for the
purposes of this Section 8.06 the combined capital and surplus of such
corporation or association shall be deemed to be its combined capital and
surplus as set forth in its most recent report of condition so published. In
case at any time the Trustee shall cease to be eligible in accordance with the
provisions of this Section 8.06, the Trustee shall resign immediately in the
manner and with the effect specified in Section 8.07 hereof. The corporation
or national banking association serving as Trustee may have normal banking and
trust relationships with the Depositor, the Sellers and the Master Servicer
and their respective affiliates; provided that such corporation cannot be an
affiliate of the Master Servicer other than the Trustee in its role as
successor to the Master Servicer.

          Section 8.07    Resignation and Removal of Trustee.

          The Trustee may at any time resign and be discharged from the
trusts hereby created by (1) giving written notice of resignation to the
Depositor and the Master Servicer and by mailing notice of resignation by
first class mail, postage prepaid, to the Certificateholders at their
addresses appearing on the Certificate Register and each Rating Agency, not
less than 60 days before the date specified in such notice when, subject to
Section 8.08, such resignation is to take effect, and (2) acceptance of
appointment by a successor trustee in accordance with Section


                                      155

<PAGE>

8.08 and meeting the qualifications set forth in Section 8.06. If no successor
trustee shall have been so appointed and have accepted appointment within 30
days after the giving of such notice or resignation, the resigning Trustee may
petition any court of competent jurisdiction for the appointment of a
successor trustee.

          As a condition to the effectiveness of any such resignation, at
least 15 calendar days prior to the effective date of such resignation, the
Trustee shall provide (x) written notice to the Depositor of any successor
pursuant to this Section and (y) in writing and in form and substance
reasonably satisfactory to the Depositor, all information reasonably requested
by the Depositor in order to comply with its reporting obligation under Item
6.02 of Form 8-K with respect to the resignation of the Trustee.

          If at any time (i) the Trustee shall cease to be eligible in
accordance with the provisions of Section 8.06 hereof and shall fail to resign
after written request thereto by the NIM Insurer or the Depositor, (ii) the
Trustee shall become incapable of acting, or shall be adjudged as bankrupt or
insolvent, or a receiver of the Trustee or of its property shall be appointed,
or any public officer shall take charge or control of the Trustee or of its
property or affairs for the purpose of rehabilitation, conservation or
liquidation, (iii)(A) a tax is imposed with respect to the Trust Fund by any
state in which the Trustee or the Trust Fund is located, (B) the imposition of
such tax would be avoided by the appointment of a different trustee and (C)
the Trustee fails to indemnify the Trust Fund against such tax, or (iv) during
the period which the Depositor is required to file Exchange Act Reports with
respect to the Trust Fund, the Trustee fails to comply with its obligations
under the last sentence of Section 7.01, the preceding paragraph, Section 8.09
or Article XI and such failure is not remedied within the lesser of 10
                                 Page 159

PSA CWL 06-13.txt

calendar days or such period in which the applicable Exchange Act Report can be filed timely (without taking into account any extensions), then, in the case of clauses (i) through (iii), the Depositor, the NIM Insurer or the Master Servicer, or in the case of clause (iv), the Depositor, may remove the Trustee and appoint a successor trustee, reasonably acceptable to the NIM Insurer, by written instrument, in triplicate, one copy of which instrument shall be delivered to the Trustee, one copy of which shall be delivered to the Master Servicer and one copy of which shall be delivered to the successor trustee.

The Holders evidencing at least 51% of the Voting Rights of each Class of Certificates may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered by the successor Trustee to the Master Servicer one complete set to the Trustee so removed, one complete set to the successor so appointed and one complete set to the Depositor, together with a written description of the basis for such removal. Notice of any removal of the Trustee shall be given to each Rating Agency by the successor Trustee.

Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 8.07 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08 hereof.

156

<PAGE>

Section 8.08    Successor Trustee.

Any successor trustee appointed as provided in Section 8.07 hereof shall execute, acknowledge and deliver to the Depositor, its predecessor trustee and the Master Servicer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. In addition, if the Swap Contract is still outstanding, the Person appointed as successor trustee shall execute, acknowledge and deliver to the predecessor trustee, CHL and the Master Servicer an instrument accepting the appointment as successor Swap Contract Administrator under the Swap Contract Administration Agreement.

No successor trustee shall accept appointment as provided in this Section 8.08 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06 hereof, is reasonably acceptable to the NIM Insurer and its appointment shall not adversely affect the then-current ratings of the Certificates and it has provided to the Depositor in writing and in form and substance reasonably satisfactory to the Depositor, all information reasonably requested by the Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to a replacement Trustee. Upon acceptance of appointment by a successor trustee as provided in this Section 8.08, the Depositor shall mail notice of the succession of such trustee hereunder to the NIM Insurer and all Holders of Certificates. If the Depositor fails to mail such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

Section 8.09    Merger or Consolidation of Trustee.

Any corporation into which the Trustee may be merged or converted
Page 160

PSA CWL 06-13.txt
or with which it may be consolidated or any corporation resulting from any
merger, conversion or consolidation to which the Trustee shall be a party, or
any corporation succeeding to substantially all of the corporate trust
business of the Trustee, shall be the successor of the Trustee hereunder,
provided that such corporation shall be eligible under the provisions of
Section 8.06 hereof without the execution or filing of any paper or further
act on the part of any of the parties hereto, anything herein to the contrary
notwithstanding.

        As a condition to the effectiveness of any merger or
consolidation, at least 15 calendar days prior to the effective date of any
merger or consolidation of the Trustee, the Trustee shall provide (x) written
notice to the Depositor of any successor pursuant to this Section and (y) in
writing and in form and substance reasonably satisfactory to the Depositor,
all information reasonably requested by the Depositor in order to comply with
its reporting obligation under Item 6.02 of Form 8-K with respect to a
replacement Trustee.

        Section 8.10   Appointment of Co-Trustee or Separate Trustee.

        Notwithstanding any other provisions of this Agreement, at any
time, for the purpose of meeting any legal requirements of any jurisdiction in
which any part of the Trust

                                   157

<PAGE>

Fund or property securing any Mortgage Note may at the time be located, the
Master Servicer and the Trustee acting jointly shall have the power and shall
execute and deliver all instruments to appoint one or more Persons approved by
the Trustee and reasonably acceptable to the NIM Insurer to act as co-trustee
or co-trustees jointly with the Trustee, or separate trustee or separate
trustees, of all or any part of the Trust Fund, and to vest in such Person or
Persons, in such capacity and for the benefit of the Certificateholders, such
title to the Trust Fund or any part thereof, whichever is applicable, and,
subject to the other provisions of this Section 8.10, such powers, duties,
obligations, rights and trusts as the Master Servicer and the Trustee may
consider necessary or desirable. If the Master Servicer shall not have joined
in such appointment, or the NIM Insurer shall not have approved such
appointment, within 15 days after receipt by it of a request to do so, or in
the case an Event of Default shall have occurred and be continuing, the
Trustee shall have the power to make such appointment. No co-trustee or
separate trustee hereunder shall be required to meet the terms of eligibility
as a successor trustee under Section 8.06 and no notice to Certificateholders
of the appointment of any co-trustee or separate trustee shall be required
under Section 8.08.

        Every separate trustee and co-trustee shall, to the extent
permitted by law, be appointed and act subject to the following provisions and
conditions:

                (1)   All rights, powers, duties and obligations conferred
        or imposed upon the Trustee, except for the obligation of the Trustee
        under this Agreement to advance funds on behalf of the Master Servicer,
        shall be conferred or imposed upon and exercised or performed by the
        Trustee and such separate trustee or co-trustee jointly (it being
        understood that such separate trustee or co-trustee is not authorized to
        act separately without the Trustee joining in such act), except to the
        extent that under any law of any jurisdiction in which any particular
        act or acts are to be performed (whether as Trustee hereunder or as
        successor to the Master Servicer hereunder), the Trustee shall be
        incompetent or unqualified to perform such act or acts, in which event
                                Page 161

PSA CWL 06-13.txt

such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(2)   No trustee hereunder shall be held personally liable by reason of any act or omission of any other trustee hereunder; and

(3)   The Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the

158

<PAGE>

Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11   Tax Matters.

It is intended that the Trust Fund shall constitute, and that the affairs of the Trust Fund shall be conducted so that each REMIC created pursuant to the Preliminary Statement qualifies as, a "real estate mortgage investment conduit" as defined in and in accordance with the REMIC Provisions. In furtherance of such intention, the Trustee covenants and agrees that it shall act as agent (and the Trustee is hereby appointed to act as agent) on behalf of the Trust Fund and that in such capacity it shall: (a) prepare and file, or cause to be prepared and filed, in a timely manner, a U.S. Real Estate Mortgage Investment Conduit Income Tax Returns (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to each REMIC created hereunder containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish or cause to be furnished to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby; (b) within thirty days of the Closing Date, furnish or cause to be furnished to the Internal Revenue Service, on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the person that the Holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such Form, and update

PSA CWL 06-13.txt
such information at the time or times in the manner required by the Code for
the Trust Fund; (c) make or cause to be made elections, on behalf of each
REMIC created hereunder to be treated as a REMIC on the federal tax return of
each such REMIC for its first taxable year (and, if necessary, under
applicable state law); (d) prepare and forward, or cause to be prepared and
forwarded, to the Certificateholders and to the Internal Revenue Service and,
if necessary, state tax authorities, all information returns and reports as
and when required to be provided to them in accordance with the REMIC
Provisions, including without limitation, the calculation of any original
issue discount using the Prepayment Assumption; (e) provide information
necessary for the computation of tax imposed on the transfer of a Class A-R
Certificate to a Person that is not a Permitted Transferee, or an agent
(including a broker, nominee or other middleman) of a Non-Permitted
Transferee, or a pass-through entity in which a Non-Permitted Transferee is
the record holder of an interest (the reasonable cost of computing and
furnishing such information may be charged to the Person liable for such tax);
(f) to the extent that they are under its control conduct the affairs of the
Trust Fund at all times that any Certificates are outstanding so as to
maintain the status of each REMIC created hereunder as a REMIC under the REMIC
Provisions; (g) not knowingly or intentionally take any action or omit to take
any action that would cause the termination of the REMIC status of any REMIC
created hereunder; (h) pay, from the sources specified in the third paragraph
of

159

<PAGE>

this Section 8.11, the amount of any federal, state and local taxes, including
prohibited transaction taxes as described below, imposed on any REMIC created
hereunder prior to the termination of the Trust Fund when and as the same
shall be due and payable (but such obligation shall not prevent the Trustee or
any other appropriate Person from contesting any such tax in appropriate
proceedings and shall not prevent the Trustee from withholding payment of such
tax, if permitted by law, pending the outcome of such proceedings); (i) sign
or cause to be signed federal, state or local income tax or information
returns; (j) maintain records relating to each REMIC created hereunder,
including but not limited to the income, expenses, assets and liabilities of
each such REMIC, and the fair market value and adjusted basis of the Trust
Fund property determined at such intervals as may be required by the Code, as
may be necessary to prepare the foregoing returns, schedules, statements or
information; and (k) as and when necessary and appropriate, represent the
Trust Fund in any administrative or judicial proceedings relating to an
examination or audit by any governmental taxing authority, request an
administrative adjustment as to any taxable year of any REMIC created
hereunder, enter into settlement agreements with any governmental taxing
agency, extend any statute of limitations relating to any tax item of the
Trust Fund, and otherwise act on behalf of any REMIC created hereunder in
relation to any tax matter involving any such REMIC.

                In order to enable the Trustee to perform its duties as set forth
herein, the Depositor shall provide, or cause to be provided, to the Trustee
within ten days after the Closing Date all information or data that the
Trustee requests in writing and determines to be relevant for tax purposes to
the valuations and offering prices of the Certificates, including, without
limitation, the price, yield, prepayment assumption and projected cash flows
of the Certificates and the Mortgage Loans (and, to the extent not part of the
aforementioned, the information referred to in paragraphs (1), (2), (3) and
(4) of Section 4.05(d)). Thereafter, the Depositor shall provide to the
Trustee promptly upon written request therefor, any such additional
information or data that the Trustee may, from time to time, request in order
to enable the Trustee to perform its duties as set forth herein. The Depositor
hereby indemnifies the Trustee for any losses, liabilities, damages, claims or

PSA CWL 06-13.txt
expenses of the Trustee arising from any errors or miscalculations of the
Trustee that result from any failure of the Depositor to provide, or to cause
to be provided, accurate information or data to the Trustee on a timely basis.

        In the event that any tax is imposed on "prohibited transactions"
of the Trust Fund as defined in section 860F(a)(2) of the Code, on the "net
income from foreclosure property" of the Trust Fund as defined in section
860G(c) of the Code, on any contribution to the Trust Fund after the startup
day pursuant to section 860G(d) of the Code, or any other tax is imposed,
including, without limitation, any federal, state or local tax or minimum tax
imposed upon the Trust Fund pursuant to sections 23153 and 24872 of the
California Revenue and Taxation Code if not paid as otherwise provided for
herein, such tax shall be paid by (i) the Trustee, if any such other tax
arises out of or results from a breach by the Trustee of any of its
obligations under this Agreement, (ii) (x) the Master Servicer, in the case of
any such minimum tax, and (y) any party hereto (other than the Trustee) to the
extent any such other tax arises out of or results from a breach by such other
party of any of its obligations under this Agreement or (iii) in all other
cases, or in the event that any liable party here fails to honor its
obligations under the preceding clauses (i) or (ii), any such tax will be paid
first with amounts otherwise to be distributed to the Class A-R
Certificateholders, and second with amounts otherwise to be distributed to all
other Certificateholders in the same manner as if such tax were a Realized
Loss that occurred ratably

                                     160

<PAGE>

within each Loan Group. Notwithstanding anything to the contrary contained
herein, to the extent that such tax is payable by the Class A-R Certificates,
the Trustee is hereby authorized to retain on any Distribution Date, from the
Holders of the Class A-R Certificates (and, if necessary, second, from the
Holders of all other Certificates in the priority specified in the preceding
sentence), funds otherwise distributable to such Holders in an amount
sufficient to pay such tax. The Trustee agrees to promptly notify in writing
the party liable for any such tax of the amount thereof and the due date for
the payment thereof.

        The Trustee shall treat the Carryover Reserve Fund and the Swap
Trust, including the Swap Account, as outside reserve funds within the meaning
of Treasury Regulation 1.860G-2(h), neither of which is an asset of any REMIC
created hereunder. The Carryover Reserve Fund shall be treated as owned by the
Class CF and Class CV Certificateholders and the Swap Trust, including the
Swap Account shall be treated as owned by the Class CV Certificateholders. The
rights of the Holders of each Class of Certificates (other than the Class P
and Class A-R Certificates) to receive payments from, and the deemed
obligations of such Holders to make payments to, the Carryover Reserve Fund or
the Swap Trust, including the Swap Account, shall be treated as rights and
obligations with respect to notional principal contracts written by (i) the
Holders of the Class CF and Class CV Certificates in respect of any Net Rate
Carryover distributed pursuant to Sections 4.04(e)(4) and 4.04(f)(4), and
(iii) the Swap Counterparty in respect of any Net Rate Carryover funded by the
Swap Contract and in respect of any residual payments from such Swap Contract
received by the Class CV Certificates. Thus, the Certificates (other than the
Class P and Class A-R Certificates), shall be treated as representing
ownership of Master REMIC regular interests coupled with contractual rights
and obligations within the meaning of Treasury Regulation 1.860G-2(i). For
purposes of determining the issue price of the various Master REMIC regular
interests, the Trustee shall assume that the Swap Contract has a value of
$1,125,000. Any differences in the distributions to a Certificate holder
(positive or negative) that would result from the application of the Strip
REMIC Cap rather than the applicable Net Rate Cap shall be treated by the
                                  Page 164

PSA CWL 06-13.txt
Trustee as reconciled among the Certificates by swap payments made pursuant to notional principal contracts entered into among the Certificateholders.

        The Trustee shall treat the entitlement to Credit Comeback Excess Amounts as owned by the Holders of the related Class of Class C Certificates and not as an asset of, or interest in, any REMIC created hereunder. Further, the Trustee shall treat any payments of Credit Comeback Excess Amounts to Persons other than the Holders of a Class of Class C Certificates as payments made by the Holders of the related Class of Class C Certificates pursuant to a credit enhancement contract under Treasury Regulation 1.860G-2(c). The Trustee shall also treat any amount payable to a Class C Certificate with respect to an STR-F-Accrual or STR-CV-OC Interest as deposited into the Carryover Reserve Fund. To the extent the amount payable with respect to the Swap Contract exceeds the amount payable with respect to the Class C Certificates, the Trustee, for federal income tax purposes, shall treat such excess as Realized Losses from Mortgage Loans and to the extent such Realized Losses (if they had occurred) would be allocated to a Certificateholder, the Trustee shall treat such amount as first payable to the Certificateholder as principal and as then payable by the Certificateholder with respect to a notional principal contract.


                                      161
<PAGE>

        Section 8.12    Access to Records of the Trustee.

        The Trustee shall afford the Sellers, the Depositor, the Master Servicer, the NIM Insurer and each Certificate Owner upon reasonable notice during normal business hours access to all records maintained by the Trustee in respect of its duties under this Agreement and access to officers of the Trustee responsible for performing its duties. Upon request, the Trustee shall furnish the Depositor, the Master Servicer, the NIM Insurer and any requesting Certificate Owner with its most recent financial statements. The Trustee shall cooperate fully with the Sellers, the Master Servicer, the Depositor, the NIM Insurer and the Certificate Owner for review and copying any books, documents, or records requested with respect to the Trustee's duties under this Agreement. The Sellers, the Depositor, the Master Servicer and the Certificate Owner shall not have any responsibility or liability for any action for failure to act by the Trustee and are not obligated to supervise the performance of the Trustee under this Agreement or otherwise.

        Section 8.13    Suits for Enforcement.

        If an Event of Default or other material default by the Master Servicer or the Depositor under this Agreement occurs and is continuing, at the direction of the Certificateholders holding not less than 51% of the Voting Rights or the NIM Insurer, the Trustee shall proceed to protect and enforce its rights and the rights of the Certificateholders or the NIM Insurer under this Agreement by a suit, action, or proceeding in equity or at law or otherwise, whether for the specific performance of any covenant or agreement contained in this Agreement or in aid of the execution of any power granted in this Agreement or for the enforcement of any other legal, equitable, or other remedy, as the Trustee, being advised by counsel, and subject to the foregoing, shall deem most effectual to protect and enforce any of the rights of the Trustee, the NIM Insurer and the Certificateholders.

                              ARTICLE IX.
                              TERMINATION

        Section 9.01    Termination upon Liquidation or Repurchase of all
                        Mortgage Loans.
                              Page 165

PSA CWL 06-13.txt

Subject to Section 9.03, the Trust Fund shall terminate and the obligations and responsibilities of the Depositor, the Master Servicer, the Sellers and the Trustee created hereby shall terminate upon the earlier of (a) the purchase by the Master Servicer or NIM Insurer (the party exercising such purchase option, the "Terminator") of all of the Mortgage Loans (and REO Properties) remaining in the Trust Fund at the price equal to the sum of (i) 100% of the Stated Principal Balance of each Mortgage Loan in the Trust Fund (other than in respect of an REO Property), (ii) accrued interest thereon at the applicable Mortgage Rate (or, if such repurchase is effected by the Master Servicer, at the applicable Net Mortgage Rate), (iii) the appraised value of any REO Property in the Trust Fund (up to the Stated Principal Balance of the related Mortgage Loan), such appraisal to be conducted by an appraiser mutually agreed upon by the Terminator and the Trustee, (iv) any remaining unpaid costs and damages incurred by the Trust Fund that arises out of an actual violation of any predatory or abusive lending law or regulation and (v) if the Terminator is the NIM Insurer, any unreimbursed Servicing Advances, and the principal portion of any unreimbursed Advances, made on the Mortgage Loans prior to the exercise of

162

<PAGE>

such repurchase and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and the disposition of all REO Property and (ii) the distribution to related Certificateholders of all amounts required to be distributed to them pursuant to this Agreement, as applicable. In no event shall the trusts created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James's, living on the date hereof and (ii) the Latest Possible Maturity Date.

The right to purchase all Mortgage Loans and REO Properties by the Terminator pursuant to clause (a) of the immediately preceding paragraph shall be conditioned upon (1) the Stated Principal Balance of the Mortgage Loans, at the time of any such repurchase, aggregating ten percent (10%) or less of the sum of the aggregate Cut-off Date Principal Balance of the Initial Mortgage Loans and the Pre-Funded Amount, and (2) unless the NIM Insurer otherwise consents, the purchase price for such Mortgage Loans and REO Properties shall result in a final distribution on any NIM Insurer guaranteed notes that is sufficient (x) to pay such notes in full and (y) to pay any amounts due and payable to the NIM Insurer pursuant to the indenture related to such notes.

The NIM Insurer's right to purchase all Mortgage Loans and REO Properties shall be further conditioned upon the written consent of the Master Servicer.

The Swap Trust shall terminate on the earliest of (i) the Swap Contract Termination Date, (ii) the reduction of the aggregate Certificate Principal Balance of the Swap Certificates to zero and (iii) the termination of this Agreement.

Section 9.02    Final Distribution on the Certificates.

If on any Determination Date, (i) the Master Servicer determines that there are no Outstanding Mortgage Loans and no other funds or assets in the Trust Fund other than the funds in the Certificate Account, the Master Servicer shall direct the Trustee to send a final distribution notice promptly to each related Certificateholder or (ii) the Trustee determines that a Class of Certificates shall be retired after a final distribution on such Class, the Trustee shall notify the related Certificateholders within five (5) Business

Page 166

PSA CWL 06-13.txt
Days after such Determination Date that the final distribution in retirement
of such Class of Certificates is scheduled to be made on the immediately
following Distribution Date. Any final distribution made pursuant to the
immediately preceding sentence will be made only upon presentation and
surrender of the related Certificates at the Corporate Trust Office of the
Trustee. If the Terminator elects to terminate pursuant to clause (a) of
Section 9.01, at least 20 days prior to the date notice is to be mailed to the
affected Certificateholders, such electing party shall notify the Depositor
and the Trustee of the date such electing party intends to terminate and of
the applicable repurchase price of the related Mortgage Loans and REO
Properties.

        Notice of any termination, specifying the Distribution Date on
which related Certificateholders may surrender their Certificates for payment
of the final distribution and cancellation, shall be given promptly by the
Trustee by letter to related Certificateholders mailed not earlier than the
10th day and no later than the 15th day of the month immediately preceding the
month of such final distribution. Any such notice shall specify (a) the
Distribution Date upon


                                     163

<PAGE>

which final distribution on related Certificates will be made upon
presentation and surrender of such Certificates at the office therein
designated, (b) the amount of such final distribution, (c) the location of the
office or agency at which such presentation and surrender must be made, and
(d) that the Record Date otherwise applicable to such Distribution Date is not
applicable, distributions being made only upon presentation and surrender of
such Certificates at the office therein specified. The Terminator will give
such notice to each Rating Agency at the time such notice is given to the
affected Certificateholders.

        In the event such notice is given, the Master Servicer shall cause
all funds in the Certificate Account to be remitted to the Trustee for deposit
in the Distribution Account on the Business Day prior to the applicable
Distribution Date in an amount equal to the final distribution in respect of
the Certificates. Upon such final deposit and the receipt by the Trustee of a
Request for File Release therefor, the Trustee shall promptly release to the
Master Servicer the Mortgage Files for the Mortgage Loans.

        Upon presentation and surrender of the Certificates, the Trustee
shall cause to be distributed to Certificateholders of each affected Class the
amounts allocable to such Certificates held in the Distribution Account (and,
if applicable, the Carryover Reserve Fund) in the order and priority set forth
in Section 4.04 hereof on the final Distribution Date and in proportion to
their respective Percentage Interests. Notwithstanding the reduction of the
Certificate Principal Balance of any Class of Certificates to zero, such Class
will be outstanding hereunder (solely for the purpose of receiving
distributions (if any) to which it may be entitled pursuant to the terms of
this Agreement and not for any other purpose) until the termination of the
respective obligations and responsibilities of the Depositor, each Seller, the
Master Servicer and the Trustee hereunder in accordance with Article IX.

        In the event that any affected Certificateholders shall not
surrender related Certificates for cancellation within six months after the
date specified in the above mentioned written notice, the Trustee shall give a
second written notice to the remaining Certificateholders to surrender their
related Certificates for cancellation and receive the final distribution with
respect thereto. If within six months after the second notice all the
applicable Certificates shall not have been surrendered for cancellation, the
Trustee may take appropriate steps, or may appoint an agent to take
                                 Page 167

PSA CWL 06-13.txt
appropriate steps, to contact the remaining Certificateholders concerning
surrender of their Certificates, and the cost thereof shall be paid out of the
funds and other assets that remain a part of the Trust Fund. If within one
year after the second notice all related Certificates shall not have been
surrendered for cancellation, the Class A-R Certificates shall be entitled to
all unclaimed funds and other assets that remain subject hereto.


164

<PAGE>

         Section 9.03    Additional Termination Requirements.

         (a)    In the event the Terminator exercises its purchase option, the
Trust Fund shall be terminated in accordance with the following additional
requirements, unless the Trustee has been supplied with an Opinion of Counsel,
at the expense of the Terminator, to the effect that the failure of the Trust
Fund to comply with the requirements of this Section 9.03 will not (i) result
in the imposition of taxes on "prohibited transactions" of a REMIC, or (ii)
cause any REMIC created hereunder to fail to qualify as a REMIC at any time
that any Certificates are outstanding:

         (1)    The Master Servicer shall establish a 90-day
liquidation period and notify the Trustee thereof, which shall in turn specify
the first day of such period in a statement attached to the Trust Fund's final
Tax Return pursuant to Treasury Regulation Section 1.860F-1. The Master
Servicer shall prepare a plan of complete liquidation and shall otherwise
satisfy all the requirements of a qualified liquidation under Section 860F of
the Code and any regulations thereunder, as evidenced by an Opinion of Counsel
delivered to the Trustee and the Depositor obtained at the expense of the
Terminator;

         (2)    During such 90-day liquidation period, and at or prior
to the time of making the final payment on the Certificates, the Master
Servicer as agent of the Trustee shall sell all of the assets of the Trust
Fund to the Terminator for cash; and

         (3)    At the time of the making of the final payment on the
Certificates, the Trustee shall distribute or credit, or cause to be
distributed or credited, to the Class A-R Certificateholders all cash on hand
(other than cash retained to meet claims) related to such Class of
Certificates, and the Trust Fund shall terminate at that time.

         (b)    By their acceptance of the Certificates, the Holders thereof
hereby authorize the Master Servicer to specify the 90-day liquidation period
for the Trust Fund, which authorization shall be binding upon all successor
Certificateholders. The Trustee shall attach a statement to the final federal
income tax return for each of any REMIC created hereunder stating that
pursuant to Treasury Regulation Section 1.860F-1, the first day of the 90-day
liquidation period for each the REMIC was the date on which the Trustee sold
the assets of the Trust Fund to the Terminator.

         (c)    The Trustee as agent for each REMIC created hereunder hereby
agrees to adopt and sign such a plan of complete liquidation upon the written
request of the Master Servicer, and the receipt of the Opinion of Counsel
referred to in Section 9.03(a)(1), and together with the Holders of the Class
A-R Certificates agree to take such other action in connection therewith as
may be reasonably requested by the Terminator.


165

PSA CWL 06-13.txt

<PAGE>

ARTICLE X.

MISCELLANEOUS PROVISIONS

Section 10.01  Amendment.

This Agreement may be amended from time to time by the Depositor, the Master Servicer, the Sellers and the Trustee with the consent of the NIM Insurer, without the consent of any of the Certificateholders (i) to cure any ambiguity, (ii) to correct or supplement any provisions herein, (iii) to conform this Agreement to the Prospectus Supplement or the Prospectus, (iv) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement to comply with any rules or regulations promulgated by the Securities and Exchange Commission from time to time, or (v) to make such other provisions with respect to matters or questions arising under this Agreement, as shall not be inconsistent with any other provisions herein if such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder; provided that any such amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders and no such Opinion of Counsel shall be required if the Person requesting such amendment obtains a letter from each Rating Agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates, it being understood and agreed that any such letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating. Any amendment described above made solely to conform this Agreement to the Prospectus or the Prospectus Supplement shall be deemed not to adversely affect in any material respect the interests of the Certificateholders. Notwithstanding the foregoing, no amendment that significantly changes the permitted activities of the trust created by this Agreement may be made without the consent of Certificateholders representing not less than 51% of the Voting Rights of each Class of Certificates affected by such amendment. Each party to this Agreement hereby agrees that it will cooperate with each other party in amending this Agreement pursuant to clause (iv) above.

The Trustee, the Depositor, the Master Servicer and the Sellers with the consent of the NIM Insurer may also at any time and from time to time amend this Agreement, without the consent of the Certificateholders, to modify, eliminate or add to any of its provisions to such extent as shall be necessary or appropriate to maintain the qualification of the Trust Fund as a REMIC under the Code or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund at any time prior to the final redemption of the Certificates, provided that the Trustee has been provided an Opinion of Counsel, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee, to the effect that such action is necessary or appropriate to maintain such qualification or to avoid or minimize the risk of the imposition of such a tax.

This Agreement may also be amended from time to time by the Depositor, the Master Servicer, the Sellers and the Trustee with the consent of the NIM Insurer and the Holders of each Class of Certificates affected thereby evidencing not less than 51% of the Voting Rights of such Class for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of

166

PSA CWL 06-13.txt

<PAGE>

the Holders of Certificates; provided that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner other than as described in (i), without the consent of the Holders of Certificates of such Class evidencing 66% or more of the Voting Rights of such Class, or (iii) reduce the aforesaid percentages of Certificates the Holders of which are required to consent to any such amendment without the consent of the Holders of all such Certificates then outstanding.

Notwithstanding any contrary provision of this Agreement, no amendment shall adversely affect in any material respect the Swap Counterparty without at least ten Business Days' prior notice to the Swap Counterparty and without the prior written consent of the Swap Counterparty, which consent shall not be unreasonably withheld. CHL shall provide the Swap Counterparty with prior written notice of any proposed material amendment of this Agreement.

Notwithstanding any contrary provision of this Agreement, the Trustee and the NIM Insurer shall not consent to any amendment to this Agreement unless each shall have first received an Opinion of Counsel satisfactory to the Trustee and the NIM Insurer, which opinion shall be an expense of the party requesting such amendment but in any case shall not be an expense of the Trustee or the NIM Insurer, to the effect that such amendment will not cause the imposition of any tax on the Trust Fund or the Certificateholders or cause any REMIC formed hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding.

Promptly after the execution of any amendment to this Agreement, the Trustee shall furnish written notification of the substance of such amendment to the Swap Counterparty, to each Certificateholder (if the consent of Certificateholders is required) and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel, reasonably satisfactory to the Trustee and the NIM Insurer that (i) such amendment is permitted and is not prohibited by this Agreement and that all requirements for amending this Agreement have been complied with; and (ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder or (B) the conclusion set forth in the immediately preceding clause (A) is not required to be reached pursuant to this Section 10.01.

Section 10.02   Recordation of Agreement; Counterparts.

This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the

167

<PAGE>

properties subject to the Mortgages are situated, and in any other appropriate

PSA CWL 06-13.txt
public recording office or elsewhere, such recordation to be effected by the
Master Servicer at its expense.

For the purpose of facilitating the recordation of this Agreement
as herein provided and for other purposes, this Agreement may be executed
simultaneously in any number of counterparts, each of which counterparts shall
be deemed to be an original, and such counterparts shall constitute but one
and the same instrument.

Section 10.03  Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED
BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE
AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND
REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED
IN ACCORDANCE WITH SUCH LAWS.

Section 10.04  Intention of Parties.

(a)   It is the express intent of the parties hereto that the
conveyance of the Mortgage Notes, Mortgages, assignments of Mortgages, title
insurance policies and any modifications, extensions and/or assumption
agreements and private mortgage insurance policies relating to the Mortgage
Loans by the Depositor to the Trustee be, and be construed as, an absolute
sale thereof to the Trustee. It is, further, not the intention of the parties
that such conveyance be deemed a pledge thereof by the Depositor to the
Trustee. However, in the event that, notwithstanding the intent of the
parties, such assets are held to be the property of the Depositor, or if for
any other reason this Agreement or any Subsequent Transfer Agreement is held
or deemed to create a security interest in such assets, then (i) this
Agreement shall be deemed to be a security agreement (within the meaning of
the Uniform Commercial Code of the State of New York) with respect to all such
assets and security interests and (ii) the conveyance provided for in this
Agreement and any Subsequent Transfer Agreement shall be deemed to be an
assignment and a grant pursuant to the terms of this Agreement by the
Depositor to the Trustee, for the benefit of the Certificateholders and the
Swap Counterparty, of a security interest in all of the assets that constitute
the Trust Fund, whether now owned or hereafter acquired.

The Depositor for the benefit of the Certificateholders, the NIM
Insurer and the Swap Counterparty shall, to the extent consistent with this
Agreement, take such actions as may be necessary to ensure that, if this
Agreement were deemed to create a security interest in the assets of the Trust
Fund, such security interest would be deemed to be a perfected security
interest of first priority under applicable law and will be maintained as such
throughout the term of the Agreement. The Depositor shall arrange for filing
any Uniform Commercial Code Continuation statements in connection with any
security interest granted or assigned to the Trustee for the benefit of the
Certificateholders and the Swap Counterparty.

(b)   The Depositor hereby represents that:

(i)   This Agreement creates a valid and continuing security
interest (as defined in the Uniform Commercial Code as enacted in
the State of New York

168

<PAGE>

(the "NY UCC")) in the Mortgage Notes in favor of the Trustee,
which security interest is prior to all other liens, and is
enforceable as such as against creditors of and purchasers from
Page 171

PSA CWL 06-13.txt
the Depositor.

        (ii)   The Mortgage Notes constitute "instruments" within the
meaning of the NY UCC.

        (iii) Immediately prior to the assignment of each Mortgage
Loan to the Trustee, the Depositor owns and has good and
marketable title to such Mortgage Loan free and clear of any lien,
claim or encumbrance of any Person.

        (iv)   The Depositor has received all consents and approvals
required by the terms of the Mortgage Loans to the sale of the
Mortgage Loans hereunder to the Trustee.

        (v)    All original executed copies of each Mortgage Note
that are required to be delivered to the Trustee pursuant to
Section 2.01 have been delivered to the Trustee.

        (vi)   Other than the security interest granted to the
Trustee pursuant to this Agreement, the Depositor has not pledged,
assigned, sold, granted a security interest in, or otherwise
conveyed any of the Mortgage Loans. The Depositor has not
authorized the filing of and is not aware of any financing
statements against the Depositor that include a description of
collateral covering the Mortgage Loans other than any financing
statement relating to the security interest granted to the Trustee
hereunder or that has been terminated. The Depositor is not aware
of any judgment or tax lien filings against the Depositor.

        (c)    The Master Servicer shall take such action as is reasonably
necessary to maintain the perfection and priority of the security interest of
the Trustee in the Mortgage Loans; provided, however, that the obligation to
deliver the Mortgage File to the Trustee pursuant to Section 2.01 shall be
solely the Depositor's obligation and the Master Servicer shall not be
responsible for the safekeeping of the Mortgage Files by the Trustee.

        (d)    It is understood and agreed that the representations and
warranties set forth in subsection (b) above shall survive delivery of the
Mortgage Files to the Trustee. Upon discovery by the Depositor or the Trustee
of a breach of any of the foregoing representations and warranties set forth
in subsection (b) above, which breach materially and adversely affects the
interest of the Certificateholders, the party discovering such breach shall
give prompt written notice to the others and to each Rating Agency.

        Section 10.05  Notices.

        (a)    The Trustee shall use its best efforts to promptly provide
notice to each Rating Agency and the Swap Counterparty with respect to each of
the following of which it has actual knowledge:

        (1)    Any material change or amendment to this Agreement;

                                    169
<PAGE>

        (2)    The occurrence of any Event of Default that has not
been cured;

        (3)    The resignation or termination of the Master Servicer
or the Trustee and the appointment of any successor;

PSA CWL 06-13.txt

      (4)   The repurchase or substitution of Mortgage Loans pursuant to Sections 2.02, 2.03, 2.04 and 3.12; and

      (5)   The final payment to Certificateholders.

      (b)   In addition, the Trustee shall promptly furnish to each Rating Agency copies of the following:

      (1)   Each report to Certificateholders described in Section 4.05;

      (2)   Each annual statement as to compliance described in Section 3.17; and

      (3)   Each annual independent public accountants' servicing report described in Section 11.07.

      (c)   All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when sent by facsimile transmission, first class mail or delivered to (i) in the case of the Depositor, CWABS, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4053, Attention: David A. Spector, or such other address as may be hereafter furnished to the Sellers, the Master Servicer and the Trustee by the Depositor in writing; (ii) in the case of CHL, Countrywide Home Loans, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number (818) 225-4053, Attention: David A. Spector, or such other address as may be hereafter furnished to the Depositor, the Master Servicer and the Trustee by the Sellers in writing; (iii) in the case of Park Monaco, Park Monaco Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number (818) 225-4028, Attention: Paul Liu, or such other address as may be hereafter furnished to the Depositor, the Master Servicer and the Trustee by the Sellers in writing; (iv) in the case of Park Sienna, Park Sienna LLC, 4500 Park Granada, Calabasas, California 91302, facsimile number (818) 225-4028, Attention: Paul Liu, or such other address as may be hereafter furnished to the Depositor, the Master Servicer and the Trustee by the Sellers in writing; (v) in the case of the Master Servicer, Countrywide Home Loans Servicing LP, 7105 Corporate Drive, Plano, Texas 75024, facsimile number (805) 520-5623, Attention: Mark Wong or such other address as may be hereafter furnished to the Depositor, the Sellers and the Trustee by the Master Servicer in writing; (vi) in the case of the Trustee, The Bank of New York, 101 Barclay Street, New York, New York 10286, Attention: Corporate Trust MBS Administration, CWABS, Series 2006-10, or such other address as the Trustee may hereafter furnish to the parties hereto; (vii) in the case of the of the Rating Agencies, (x) Moody's Investors Service, Inc., Attention: ABS Monitoring Department, 99 Church Street, Sixth Floor, New York, New York 10007, and (y) Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Attention: Mortgage Surveillance Group, 55 Water Street, 41st Floor, New York, New York 10041; and (viii) in the case of the Swap Counterparty, Bank Bear Stearns Financial Products Inc., 383 Madison Avenue, New York, New York 10179 Attention: DPC Manager, or such other address as may

170

<PAGE>

be hereafter furnished by the Swap Counterparty. Notices to Certificateholders shall be deemed given when mailed, first postage prepaid, to their respective addresses appearing in the Certificate Register.

      Section 10.06  Severability of Provisions.

      If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then

PSA CWL 06-13.txt
such covenants, agreements, provisions or terms shall be deemed severable from
the remaining covenants, agreements, provisions or terms of this Agreement and
shall in no way affect the validity or enforceability of the other provisions
of this Agreement or of the Certificates or the rights of the Holders thereof.

        Section 10.07  Assignment.

        Notwithstanding anything to the contrary contained herein, except
as provided pursuant to Section 6.02, this Agreement may not be assigned by
the Master Servicer without the prior written consent of the Trustee and the
Depositor.

        Section 10.08  Limitation on Rights of Certificateholders.

        The death or incapacity of any Certificateholder shall not operate
to terminate this Agreement or the Trust Fund, nor entitle such
Certificateholder's legal representative or heirs to claim an accounting or to
take any action or commence any proceeding in any court for a petition or
winding up of the Trust Fund, or otherwise affect the rights, obligations and
liabilities of the parties hereto or any of them.

        No Certificateholder shall have any right to vote (except as
provided herein) or in any manner otherwise control the operation and
management of the Trust Fund, or the obligations of the parties hereto, nor
shall anything herein set forth or contained in the terms of the Certificates
be construed so as to constitute the Certificateholders from time to time as
partners or members of an association; nor shall any Certificateholder be
under any liability to any third party by reason of any action taken by the
parties to this Agreement pursuant to any provision hereof.

        No Certificateholder shall have any right by virtue or by availing
itself of any provisions of this Agreement to institute any suit, action or
proceeding in equity or at law upon or under or with respect to this
Agreement, unless such Holder previously shall have given to the Trustee a
written notice of an Event of Default and of the continuance thereof, as
hereinbefore provided, the Holders of Certificates evidencing not less than
25% of the Voting Rights shall also have made written request to the Trustee
to institute such action, suit or proceeding in its own name as Trustee
hereunder and shall have offered to the Trustee such reasonable indemnity as
it may require against the costs, expenses, and liabilities to be incurred
therein or thereby, and the Trustee, for 60 days after its receipt of such
notice, request and offer of indemnity shall have neglected or refused to
institute any such action, suit or proceeding; it being understood and
intended, and being expressly covenanted by each Certificateholder with every
other Certificateholder and the Trustee, that no one or more Holders of
Certificates shall have any right in any manner whatever by virtue or by
availing itself or themselves of any provisions of this Agreement to affect,
disturb or prejudice the rights of the Holders of any other of the

                                    171

<PAGE>

Certificates, or to obtain or seek to obtain priority over or preference to
any other such Holder or to enforce any right under this Agreement, except in
the manner herein provided and for the common benefit of all
Certificateholders. For the protection and enforcement of the provisions of
this Section 10.08, each and every Certificateholder and the Trustee shall be
entitled to such relief as can be given either at law or in equity.

        Section 10.09  Inspection and Audit Rights.

        The Master Servicer agrees that, on reasonable prior notice, it
                                 Page 174

PSA CWL 06-13.txt
will permit any representative of the Depositor, any Seller, the NIM Insurer
or the Trustee during the Master Servicer's normal business hours, to examine
all the books of account, records, reports and other papers of the Master
Servicer relating to the Mortgage Loans, to make copies and extracts
therefrom, to cause such books to be audited by independent certified public
accountants selected by the Depositor, a Seller, the NIM Insurer or the
Trustee and to discuss its affairs, finances and accounts relating to the
Mortgage Loans with its officers, employees and independent public accountants
(and by this provision the Master Servicer hereby authorizes such accountants
to discuss with such representative such affairs, finances and accounts), all
at such reasonable times and as often as may be reasonably requested. Any
out-of-pocket expense incident to the exercise by the Depositor, any Seller,
the NIM Insurer or the Trustee of any right under this Section 10.09 shall be
borne by the party requesting such inspection; all other such expenses shall
be borne by the Master Servicer.

        Section 10.10  Certificates Nonassessable and Fully Paid.

        It is the intention of the Depositor that Certificateholders shall
not be personally liable for obligations of the Trust Fund, that the interests
in the Trust Fund represented by the Certificates shall be nonassessable for
any reason whatsoever, and that the Certificates, upon due authentication
thereof by the Trustee pursuant to this Agreement, are and shall be deemed
fully paid.

        Section 10.11  Rights of NIM Insurer.

        (a)    The rights of the NIM Insurer under this Agreement shall exist
only so long as either:

                (1)    the notes certain payments on which are guaranteed by
        the NIM Insurer remain outstanding or

                (2)    the NIM Insurer is owed amounts paid by it with
        respect to that guaranty.

        (b)    The rights of the NIM Insurer under this Agreement are
exercisable by the NIM Insurer only so long as no default by the NIM Insurer
under its guaranty of certain payments under notes backed or secured by the
Class C or Class P Certificates has occurred and is continuing. If the NIM
Insurer is the subject of any insolvency proceeding, the rights of the NIM
Insurer under this Agreement will be exercisable by the NIM Insurer only so
long as:


                                      172

<PAGE>

                (1)    the obligations of the NIM Insurer under its guaranty
        of notes backed or secured by the Class C or Class P Certificates have
        not been disavowed and

                (2)    CHL and the Trustee have received reasonable
        assurances that the NIM Insurer will be able to satisfy its obligations
        under its guaranty of notes backed or secured by the Class C or Class P
        Certificates.

        (c)    The NIM Insurer is a third party beneficiary of this Agreement
to the same extent as if it were a party to this Agreement and may enforce any
of those rights under this Agreement.

        (d)    A copy of any documents of any nature required by this
                                   Page 175

PSA CWL 06-13.txt
Agreement to be delivered by the Trustee, or to the Trustee or the Rating
Agencies, shall in each case at the same time also be delivered to the NIM
Insurer. Any notices required to be given by the Trustee, or to the Trustee or
the Rating Agencies, shall in each case at the same time also be given to the
NIM Insurer. If the Trustee receives a notice or document that is required
hereunder to be delivered to the NIM Insurer, and if such notice or document
does not indicate that a copy thereof has been previously sent to the NIM
Insurer, the Trustee shall send the NIM Insurer a copy of such notice or
document. If such document is an Opinion of Counsel, the NIM Insurer shall be
an addressee thereof or such Opinion of Counsel shall contain language
permitting the NIM Insurer to rely thereon as if the NIM Insurer were an
addressee thereof.

          (e)    Anything in this Agreement that is conditioned on not
resulting in the downgrading or withdrawal of the ratings then assigned to the
Certificates by the Rating Agencies shall also be conditioned on not resulting
in the downgrading or withdrawal of the ratings then assigned by the Rating
Agencies to the notes backed or secured by the Class C or Class P Certificates
(without giving effect to any policy or guaranty provided by the NIM Insurer).

                         ARTICLE XI.
                     EXCHANGE ACT REPORTING

          Section 11.01  Filing Obligations.

          The Master Servicer, the Trustee and each Seller shall reasonably
cooperate with the Depositor in connection with the satisfaction of the
Depositor's reporting requirements under the Exchange Act with respect to the
Trust Fund. In addition to the information specified below, if so requested by
the Depositor for the purpose of satisfying its reporting obligation under the
Exchange Act, the Master Servicer, the Trustee and each Seller shall (and the
Master Servicer shall cause each Subservicer to) provide the Depositor with
(a) such information which is available to such Person without unreasonable
effort or expense and within such timeframe as may be reasonably requested by
the Depositor to comply with the Depositor's reporting obligations under the
Exchange Act and (b) to the extent such Person is a party (and the Depositor
is not a party) to any agreement or amendment required to be filed, copies of
such agreement or amendment in EDGAR-compatible form.

                                173
<PAGE>

          Section 11.02  Form 10-D Filings.

          (a)    In accordance with the Exchange Act, the Trustee shall prepare
for filing and file within 15 days after each Distribution Date (subject to
permitted extensions under the Exchange Act) with the Commission with respect
to the Trust Fund, a Form 10-D with copies of the Monthly Statement and, to
the extent delivered to the Trustee, no later than 10 days following the
Distribution Date, such other information identified by the Depositor or the
Master Servicer, in writing, to be filed with the Commission (such other
information, the "Additional Designated Information"). If the Depositor or
Master Servicer directs that any Additional Designated Information is to be
filed with any Form 10-D, the Depositor or Master Servicer, as the case may
be, shall specify the Item on Form 10-D to which such information is
responsive and, with respect to any Exhibit to be filed on Form 10-D, the
Exhibit number. Any information to be filed on Form 10-D shall be delivered to
the Trustee in EDGAR-compatible form or as otherwise agreed upon by the
Trustee and the Depositor or the Master Servicer, as the case may be, at the
Depositor's expense, and any necessary conversion to EDGAR-compatible format
will be at the Depositor's expense. At the reasonable request of, and in
                           Page 176

PSA CWL 06-13.txt
accordance with the reasonable directions of, the Depositor or the Master
Servicer, subject to the two preceding sentences, the Trustee shall prepare
for filing and file an amendment to any Form 10-D previously filed with the
Commission with respect to the Trust Fund. The Master Servicer shall sign the
Form 10-D filed on behalf of the Trust Fund.

          (b)   No later than each Distribution Date, each of the Master
Servicer and the Trustee shall notify (and the Master Servicer shall cause any
Subservicer to notify) the Depositor and the Master Servicer of any Form 10-D
Disclosure Item, together with a description of any such Form 10-D Disclosure
Item in form and substance reasonably acceptable to the Depositor. In addition
to such information as the Master Servicer and the Trustee are obligated to
provide pursuant to other provisions of this Agreement, if so requested by the
Depositor, each of the Master Servicer and the Trustee shall provide such
information which is available to the Master Servicer and the Trustee, as
applicable, without unreasonable effort or expense regarding the performance
or servicing of the Mortgage Loans (in the case of the Trustee, based on the
information provided by the Master Servicer) as is reasonably required to
facilitate preparation of distribution reports in accordance with Item 1121 of
Regulation AB. Such information shall be provided concurrently with the
Remittance Reports in the case of the Master Servicer and the Monthly
Statement in the case of the Trustee, commencing with the first such report
due not less than five Business Days following such request.

          (c)   The Trustee shall not have any responsibility to file any
items (other than those generated by it) that have not been received in a
format suitable (or readily convertible into a format suitable) for electronic
filing via the EDGAR system and shall not have any responsibility to convert
any such items to such format (other than those items generated by it or that
are readily convertible to such format). The Trustee shall have no liability
to the Certificateholders, the Trust Fund, the Master Servicer, the Depositor
or the NIM Insurer with respect to any failure to properly prepare or file any
of Form 10-D to the extent that such failure is not the result of any
negligence, bad faith or willful misconduct on its part.


                                    174

<PAGE>

          Section 11.03  Form 8-K Filings.

          The Master Servicer shall prepare and file on behalf of the Trust
Fund any Form 8-K required by the Exchange Act. Each Form 8-K must be signed
by the Master Servicer. Each of the Master Servicer (and the Master Servicer
shall cause any Subservicer to promptly notify) and the Trustee shall promptly
notify the Depositor and the Master Servicer (if the notifying party is not
the Master Servicer), but in no event later than one (1) Business Day after
its occurrence, of any Reportable Event of which it has actual knowledge. Each
Person shall be deemed to have actual knowledge of any such event to the
extent that it relates to such Person or any action or failure to act by such
Person. Concurrently with any Subsequent Transfer, CHL shall notify the
Depositor and the Master Servicer, if any material pool characteristic of the
actual asset pool at the time of issuance of the Certificates differs by 5% or
more (other than as a result of the pool assets converting into cash in
accordance with their terms) from the description of the asset pool in the
Prospectus Supplement.

          Section 11.04  Form 10-K Filings.

          Prior to March 30th of each year, commencing in 2007 (or such
earlier date as may be required by the Exchange Act), the Depositor shall
prepare and file on behalf of the Trust Fund a Form 10-K, in form and

PSA CWL 06-13.txt
substance as required by the Exchange Act. A senior officer in charge of the servicing function of the Master Servicer shall sign each Form 10-K filed on behalf of the Trust Fund. Such Form 10-K shall include as exhibits each (i) annual compliance statement described under Section 3.17, (ii) annual report on assessments of compliance with servicing criteria described under Section 11.07 and (iii) accountant's report described under Section 11.07. Each Form 10-K shall also include any Sarbanes-Oxley Certification required to be included therewith, as described in Section 11.05.

       If the Item 1119 Parties listed on Exhibit Z have changed since the Closing Date, no later than March 1 of each year, the Master Servicer shall provide each of the Master Servicer (and the Master Servicer shall provide any Subservicer) and the Trustee with an updated Exhibit Z setting forth the Item 1119 Parties. No later than March 15 of each year, commencing in 2007, the Master Servicer and the Trustee shall notify (and the Master Servicer shall cause any Subservicer to notify) the Depositor and the Master Servicer of any Form 10-K Disclosure Item, together with a description of any such Form 10-K Disclosure Item in form and substance reasonably acceptable to the Depositor. Additionally, each of the Master Servicer and the Trustee shall provide, and shall cause each Reporting Subcontractor retained by the Master Servicer or the Trustee, as applicable, and in the case of the Master Servicer shall cause each Subservicer, to provide, the following information no later than March 15 of each year in which a Form 10-K is required to be filed on behalf of the Trust Fund: (i) if such Person's report on assessment of compliance with servicing criteria described under Section 11.07 or related registered public accounting firm attestation report described under Section 11.07 identifies any material instance of noncompliance, notification of such instance of noncompliance and (ii) if any such Person's report on assessment of compliance with servicing criteria or related registered public accounting firm attestation report is not provided to be filed as an exhibit to such Form 10-K, information detailing the explanation why such report is not included.


                                   175

<PAGE>

       Section 11.05   Sarbanes-Oxley Certification.

       Each Form 10-K shall include a certification (the "Sarbanes-Oxley Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and the rules and regulations of the Commission promulgated thereunder (including any interpretations thereof by the Commission's staff)). No later than March 15 of each year, beginning in 2007, the Master Servicer and the Trustee shall (unless such person is the Certifying Person), and the Master Servicer shall cause each Subservicer and each Reporting Subcontractor and the Trustee shall cause each Reporting Subcontractor to, provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person") a certification (each, a "Performance Certification"), in the form attached hereto as Exhibit X-1 (in the case of a Subservicer or any Reporting Subcontractor of the Master Servicer or a Subservicer) and Exhibit X-2 (in the case of the Trustee or any Reporting Subcontractor of the Trustee), on which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely. The senior officer in charge of the servicing function of the Master Servicer shall serve as the Certifying Person on behalf of the Trust Fund. Neither the Master Servicer nor the Depositor will request delivery of a certification under this clause unless the Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to the Trust Fund. In the event that prior to the filing date of the Form 10-K in March of each year, the Trustee or the Depositor has actual knowledge of information material to the Sarbanes-Oxley

PSA CWL 06-13.txt
Certification, the Trustee or the Depositor, as the case may be, shall
promptly notify the Master Servicer and the Depositor. The respective parties
hereto agree to cooperate with all reasonable requests made by any Certifying
Person or Certification Party in connection with such Person's attempt to
conduct any due diligence that such Person reasonably believes to be
appropriate in order to allow it to deliver any Sarbanes-Oxley Certification
or portion thereof with respect to the Trust Fund.

       Section 11.06  Form 15 Filing.

       Prior to January 30 of the first year in which the Depositor is
able to do so under applicable law, the Depositor shall file a Form 15
relating to the automatic suspension of reporting in respect of the Trust Fund
under the Exchange Act.

       Section 11.07  Report on Assessment of Compliance and Attestation.

       (a)   On or before March 15 of each calendar year, commencing in
2007:

       (1)   Each of the Master Servicer and the Trustee shall
deliver to the Depositor and the Master Servicer a report (in form and
substance reasonably satisfactory to the Depositor) regarding the Master
Servicer's or the Trustee's, as applicable, assessment of compliance
with the Servicing Criteria during the immediately preceding calendar
year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and
Item 1122 of Regulation AB. Such report shall be signed by an authorized
officer of such Person and shall address each of the Servicing Criteria
specified on a certification substantially in the form of Exhibit W
hereto delivered to the Depositor concurrently with the execution of
this Agreement. To the extent any of the Servicing Criteria are not

176

&lt;PAGE&gt;

applicable to such Person, with respect to asset-backed securities
transactions taken as a whole involving such Person and that are backed
by the same asset type backing the Certificates, such report shall
include such a statement to that effect. The Depositor and the Master
Servicer, and each of their respective officers and directors shall be
entitled to rely on upon each such servicing criteria assessment.

       (2)   Each of the Master Servicer and the Trustee shall
deliver to the Depositor and the Master Servicer a report of a
registered public accounting firm reasonably acceptable to the Depositor
that attests to, and reports on, the assessment of compliance made by
Master Servicer or the Trustee, as applicable, and delivered pursuant to
the preceding paragraphs. Such attestation shall be in accordance with
Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act
and the Exchange Act, including, without limitation that in the event
that an overall opinion cannot be expressed, such registered public
accounting firm shall state in such report why it was unable to express
such an opinion. Such report must be available for general use and not
contain restricted use language. To the extent any of the Servicing
Criteria are not applicable to such Person, with respect to asset-backed
securities transactions taken as a whole involving such Person and that
are backed by the same asset type backing the Certificates, such report
shall include such a statement that that effect.

       (3)   The Master Servicer shall cause each Subservicer and
each Reporting Subcontractor to deliver to the Depositor an assessment
of compliance and accountant's attestation as and when provided in
Page 179

PSA CWL 06-13.txt
paragraphs (a) and (b) of this Section 11.07.

(4)   The Trustee shall cause each Reporting Subcontractor
to deliver to the Depositor and the Master Servicer an assessment of
compliance and accountant's attestation as and when provided in
paragraphs (a) and (b) of this Section.

(5)   The Master Servicer and the Trustee shall execute (and
the Master Servicer shall cause each Subservicer to execute, and the
Master Servicer and the Trustee shall cause each Reporting Subcontractor
to execute) a reliance certificate to enable the Certification Parties
to rely upon each (i) annual compliance statement provided pursuant to
Section 3.17, (ii) annual report on assessments of compliance with
servicing criteria provided pursuant to this Section 11.07 and (iii)
accountant's report provided pursuant to this Section 11.07 and shall
include a certification that each such annual compliance statement or
report discloses any deficiencies or defaults described to the
registered public accountants of such Person to enable such accountants
to render the certificates provided for in this Section 11.07.

(b)   In the event the Master Servicer, any Subservicer, the Trustee
or Reporting Subcontractor is terminated or resigns during the term of this
Agreement, such Person shall provide documents and information required by
this Section 11.07 with respect to the period of time it was subject to this
Agreement or provided services with respect to the Trust Fund, the
Certificates or the Mortgage Loans.

177

<PAGE>

(c)   Each assessment of compliance provided by a Subservicer
pursuant to Section 11.07(a)(3) shall address each of the Servicing Criteria
specified on a certification substantially in the form of Exhibit W hereto
delivered to the Depositor concurrently with the execution of this Agreement
or, in the case of a Subservicer subsequently appointed as such, on or prior
to the date of such appointment. An assessment of compliance provided by a
Subcontractor pursuant to Section 11.07(a)(3) or (4) need not address any
elements of the Servicing Criteria other than those specified by the Master
Servicer or the Trustee, as applicable, pursuant to Section 11.07(a)(1).

Section 11.08 Use of Subservicers and Subcontractors.

(a)   The Master Servicer shall cause any Subservicer used by the
Master Servicer (or by any Subservicer) for the benefit of the Depositor to
comply with the provisions of Section 3.17 and this Article XI to the same
extent as if such Subservicer were the Master Servicer (except with respect to
the Master Servicer's duties with respect to preparing and filing any Exchange
Act Reports or as the Certifying Person). The Master Servicer shall be
responsible for obtaining from each Subservicer and delivering to the
Depositor any servicer compliance statement required to be delivered by such
Subservicer under Section 3.17, any assessment of compliance and attestation
required to be delivered by such Subservicer under Section 11.07 and any
certification required to be delivered to the Certifying Person under Section
11.05 as and when required to be delivered. As a condition to the succession
to any Subservicer as subservicer under this Agreement by any Person (i) into
which such Subservicer may be merged or consolidated, or (ii) which may be
appointed as a successor to any Subservicer, the Master Servicer shall provide
to the Depositor, at least 15 calendar days prior to the effective date of
such succession or appointment, (x) written notice to the Depositor of such
succession or appointment and (y) in writing and in form and substance
reasonably satisfactory to the Depositor, all information reasonably requested

PSA CWL 06-13.txt
by the Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K.

(b)     It shall not be necessary for the Master Servicer, any Subservicer or the Trustee to seek the consent of the Depositor or any other party hereto to the utilization of any Subcontractor. The Master Servicer or the Trustee, as applicable, shall promptly upon request provide to the Depositor (or any designee of the Depositor, such as the Master Servicer or administrator) a written description (in form and substance satisfactory to the Depositor) of the role and function of each Subcontractor utilized by such Person (or in the case of the Master Servicer, any Subservicer), specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be a Reporting Subcontractor, the Master Servicer or the Trustee, as applicable, shall cause any such Subcontractor used by such Person (or in the case of the Master Servicer, any Subservicer) for the benefit of the Depositor to comply with the provisions of Sections 11.07 and 11.09 of this Agreement to the same extent as if such Subcontractor were the Master Servicer (except with respect to the Master Servicer's duties with respect to preparing and filing any Exchange Act

178

<PAGE>

Reports or as the Certifying Person) or the Trustee, as applicable. The Master Servicer or the Trustee, as applicable, shall be responsible for obtaining from each Subcontractor and delivering to the Depositor and the Master Servicer, any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 11.05 and Section 11.07, in each case as and when required to be delivered.

Section 11.09  Amendments.

In the event the parties to this Agreement desire to further clarify or amend any provision of this Article XI, this Agreement shall be amended to reflect the new agreement between the parties covering matters in this Article XI pursuant to Section 10.01, which amendment shall not require any Opinion of Counsel or Rating Agency confirmations or the consent of any Certificateholder or the NIM Insurer.

If, during the period that the Depositor is required to file Exchange Act Reports with respect to the Trust Fund, the Master Servicer is no longer an Affiliate of the Depositor, the Depositor shall assume the obligations and responsibilities of the Master Servicer in this Article XI with respect to the preparation and filing of the Exchange Act Reports and/or acting as the Certifying Person, if the Depositor has received indemnity from such successor Master Servicer satisfactory to the Depositor, and such Master Servicer has agreed to provide a Sarbanes-Oxley Certification to the Depositor substantially in the form of Exhibit AA and the certifications referred to in Section 11.07.

Section 11.10  Reconciliation of Accounts.

Any reconciliation of Accounts performed by any party hereto, or any Subservicer or Subcontractor shall be prepared no later than 45 calendar days after the bank statement cut-off date.

PSA CWL 06-13.txt

                                        179
<PAGE>

        IN WITNESS WHEREOF, the parties hereto have caused their names to
be signed hereto by their respective officers thereunto duly authorized as of
the day and year first above written.

                              CWABS, INC.,
                                as Depositor


                              By: /s/ Ruben Avilez
                                 ------------------------------------
                                 Name:     Ruben Avilez
                                 Title:    Vice President


                              COUNTRYWIDE HOME LOANS, INC.,
                                as a Seller


                              By: /s/ Ruben Avilez
                                 ------------------------------------
                                 Name:     Ruben Avilez
                                 Title:    Vice President


                              PARK MONACO INC.,
                                as a Seller


                              By: /s/ Ruben Avilez
                                 ------------------------------------
                                 Name:     Ruben Avilez
                                 Title:    Vice President



                              PARK SIENNA LLC,
                                as a Seller


                              By: /s/ Ruben Avilez
                                 ------------------------------------
                                 Name:     Ruben Avilez
                                 Title:    Assistant Vice President



<PAGE>

                              COUNTRYWIDE HOME LOANS SERVICING LP,
                                as Master Servicer

                              By: COUNTRYWIDE GP, INC.


                              Page 182

PSA CWL 06-13.txt

By: /s/ Ruben Avilez
------------------------------------
Name:    Ruben Avilez
Title:   Vice President


THE BANK OF NEW YORK,
as Trustee


By: /s/ Maria Tokarz
------------------------------------
Name:  Maria Tokarz
Title: Assistant Treasurer


THE BANK OF NEW YORK
(solely with respect to its obligations
under Section 4.01(d))



By: /s/ Paul Connolly
------------------------------------
Name:  Paul Connolly
Title: Vice President


<PAGE>

STATE OF CALIFORNIA        )
                           )     ss.:
COUNTY OF LOS ANGELES      )


        On this 28th day of June, 2006, before me, a notary public in and
for said State, appeared Darren Bigby, personally known to me on the basis of
satisfactory evidence to be a Senior Vice President of Countrywide Home Loans,
Inc., one of the corporations that executed the within instrument, and also
known to me to be the person who executed it on behalf of such corporation and
acknowledged to me that such corporation executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.


                              _____
                                       Notary Public


[Notarial Seal]




<PAGE>

STATE OF CALIFORNIA        )
                           )     ss.:
COUNTY OF LOS ANGELES      )

                              Page 183

PSA CWL 06-13.txt
          On this 28th day of June, 2006, before me, a notary public in and
for said State, appeared Darren Bigby, personally known to me on the basis of
satisfactory evidence to be a Senior Vice President of Countrywide GP, Inc.,
the parent company of Countrywide Home Loans Servicing LP, one of the
organizations that executed the within instrument, and also known to me to be
the person who executed it on behalf of such limited partnership and
acknowledged to me that such limited partnership executed the within
instrument.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                                    _____
                                              Notary Public


[Notarial Seal]




<PAGE>

STATE OF CALIFORNIA         )
                            )     ss.:
COUNTY OF LOS ANGELES       )

          On this ____ day of June, 2006, before me, a notary public in and
for said State, appeared Darren Bigby, personally known to me on the basis of
satisfactory evidence to be a Vice President of CWABS, Inc., one of the
corporations that executed the within instrument, and also known to me to be
the person who executed it on behalf of such corporation and acknowledged to
me that such corporation executed the within instrument.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                                    _____
                                              Notary Public


[Notarial Seal]




<PAGE>

STATE OF CALIFORNIA         )
                            )     ss.:
COUNTY OF LOS ANGELES       )

          On this ____ day of June, 2006, before me, a notary public in and
for said State, appeared Darren Bigby, personally known to me on the basis of
satisfactory evidence to be a Vice President of Park Monaco Inc., one of the
corporations that executed the within instrument, and also known to me to be
the person who executed it on behalf of such corporation and acknowledged to
                                Page 184

PSA CWL 06-13.txt
me that such corporation executed the within instrument.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                              _____
                                   Notary Public


[Notarial Seal]




<PAGE>

STATE OF CALIFORNIA         )
                            )    ss.:
COUNTY OF LOS ANGELES       )

          On this ____ day of June, 2006, before me, a notary public in and
for said State, appeared Darren Bigby, personally known to me on the basis of
satisfactory evidence to be an Assistant Vice President of Park Sienna LLC,
one of the entities that executed the within instrument, and also known to me
to be the person who executed it on behalf of such entity and acknowledged to
me that such entity executed the within instrument.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                              _____
                                   Notary Public


[Notarial Seal]




<PAGE>

STATE OF NEW YORK           )
                            )    ss.:
COUNTY OF NEW YORK          )

          On this ____ day of June, 2006 before me, a notary public in and
for said State, appeared _____, personally known to me on the
basis of satisfactory evidence to be a _____ of The Bank of New York, a
New York banking corporation that executed the within instrument, and also
known to me to be the person who executed it on behalf of such corporation,
and acknowledged to me that such corporation executed the within instrument.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                              _____
                                   Notary Public


[Notarial Seal]
                         Page 185

PSA CWL 06-13.txt

<PAGE>

STATE OF NEW YORK          )
                           )    ss.:
COUNTY OF NEW YORK         )

       On this ____ day of June, 2006 before me, a notary public in and
for said State, appeared _____, personally known to me on the basis
of satisfactory evidence to be a _____ of The Bank of New York, a New
York banking corporation that executed the within instrument, and also known
to me to be the person who executed it on behalf of such corporation, and
acknowledged to me that such corporation executed the within instrument.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

_____
                Notary Public

[Notarial Seal]

<PAGE>

                  Exhibits A-1
                  through A-30

       [Exhibits A-1 through A-30 are
    photocopies of such Certificates as delivered.]

    [See appropriate documents delivered at closing.]

              A-1

<PAGE>

                  Exhibit B

    Exhibit B-1 and Exhibit B-2 are photocopies
     of the Class PF and Class PV Certificates
           as delivered.

    [See appropriate documents delivered at closing.]

              B-1

<PAGE>

                  Exhibit C

    Exhibit C-1 and Exhibit C-2 are photocopies
     of the Class CF and Class CV Certificates
           as delivered.

Page 186

```
                         PSA CWL 06-13.txt
            [See appropriate documents delivered at closing.]



                                C-1

<PAGE>

                                                         Exhibit D

                      Exhibit D is a photocopy
                     of the Class A-R Certificate
                           as delivered.


            [See appropriate documents delivered at closing.]



                                D-1

<PAGE>

                                                         Exhibit E

                      Exhibit E is a photocopy
               of the Tax Matters Person Certificate
                           as delivered.

            [See appropriate documents delivered at closing.]



                                E-1

<PAGE>

                                                 Exhibit F-1 and F-2

            [Exhibit F-1 and F-2 are schedules of Mortgage Loans]

         [Delivered to Trustee at closing and on file with the Trustee.]



                                F-1

<PAGE>

                              EXHIBIT G-1

                 FORM OF INITIAL CERTIFICATION OF TRUSTEE


                                [Date]


[Depositor]

[Sellers]

[Master Servicer]
                              Page 187
```

PSA CWL 06-13.txt


                Re:   CWABS Asset-Backed Certificates, Series 2006-10
                      --------------------------------------------

Gentlemen:

            In accordance with Section 2.02 of the Pooling and Servicing
Agreement dated as of June 1, 2006 (the "Pooling and Servicing Agreement")
among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller,
Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home
Loans Servicing LP, as Master Servicer, and the undersigned, as Trustee, the
undersigned, as Trustee, hereby certifies that, as to each Mortgage Loan
listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in
full or listed in the attached list of exceptions) the Trustee has received:

            (i)    the original Mortgage Note, endorsed by manual or facsimile
signature in blank in the following form: "Pay to the order of _____,
without recourse", or, if the original Mortgage Note has been lost or
destroyed and not replaced, an original lost note affidavit, stating that the
original Mortgage Note was lost or destroyed, together with a copy of the
related Mortgage Note; and

            (ii)  a duly executed assignment of the Mortgage or a copy of such
assignment, in either case in the form permitted by Section 2.01 of the
Pooling and Servicing Agreement.

            Based on its review and examination and only as to the foregoing
documents, such documents appear regular on their face and related to such
Mortgage Loan.

            The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in the
Pooling and Servicing Agreement. The Trustee makes no representations as to:
(i) the validity, legality, sufficiency, enforceability or genuineness of any
of the documents contained in each Mortgage File of any of the Mortgage Loans
identified on the Mortgage Loan Schedule or (ii) the collectibility,
insurability, effectiveness or suitability of any such Mortgage Loan.


                              G-1-1

<PAGE>

            Capitalized words and phrases used herein shall have the
respective meanings assigned to them in the Pooling and Servicing Agreement.

                        The Bank of New York,
                            as Trustee


                        By:_____
                            Name:
                            Title:


                        G-1-2

<PAGE>

                        Page 188

PSA CWL 06-13.txt


EXHIBIT G-2

FORM OF INTERIM CERTIFICATION OF TRUSTEE

[Date]


[Depositor]

[Sellers]

[Master Servicer]


Re: CWABS Asset-Backed Certificates, Series 2006-10
------------------------------------------------

Gentlemen:

        In accordance with Section 2.02 of the Pooling and Servicing Agreement dated as of June 1, 2006 (the "Pooling and Servicing Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and the undersigned, as Trustee, the undersigned, as Trustee, hereby certifies that[, with respect to the Subsequent Mortgage Loans delivered in connection with the Subsequent Transfer Agreement, dated as of _____, 2005 (the "Subsequent Transfer Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller and The Bank of New York, as Trustee], except as listed in the following paragraph, as to each [Initial Mortgage Loan][Subsequent Mortgage Loan] listed in the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] (other than any [Mortgage Loan][Loan Number and Borrower Identification Mortgage Loan Schedule] paid in full or listed on the attached list of exceptions) the Trustee has received:

        (i) the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse", with all intervening endorsements that show a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note), or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note and all such intervening endorsements;

        (ii) the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage, with recording information, and in the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is a MERS Mortgage Loan, the original Mortgage or a copy of such Mortgage, with recording information, noting thereon the presence of the MIN of the [Initial Mortgage Loan][Subsequent Mortgage Loan] and language indicating that the [Initial Mortgage Loan][Subsequent Mortgage Loan] is a MOM Loan if the [Initial Mortgage

G-2-1

<PAGE>

PSA CWL 06-13.txt

Loan][Subsequent Mortgage Loan] is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

   (iii) the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to "Asset-Backed Certificates, Series 2006-10, CWABS, Inc., by The Bank of New York, a New York banking corporation, as trustee under the Pooling and Servicing Agreement dated as of June 1, 2006, without recourse" or a copy of such assignment, with recording information (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

   (iv) the original recorded assignment or assignments of the Mortgage or a copy of such assignments, with recording information, together with all interim recorded assignments of such Mortgage or a copy of such assignments, with recording information (in each case noting the presence of a MIN in the case of each MERS Mortgage Loan);

   (v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

   (vi) the original or duplicate original lender's title policy or a copy of lender's title policy or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

   In the event that in connection with any [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan the applicable Seller cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by the applicable Seller, the applicable title company, escrow agent or attorney, or the originator of such [Initial Mortgage Loan][Subsequent Mortgage Loan], as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

   Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such [Initial Mortgage Loan][Subsequent Mortgage Loan], and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (ix) and (xvii) of the definition of the "Mortgage Loan Schedule" in Section 1.01 of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

   The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Pooling and Servicing Agreement. The Trustee makes no representations as to: (i) the validity, legality, sufficiency,

G-2-2

<PAGE>

PSA CWL 06-13.txt
enforceability or genuineness of any of the documents contained in each
Mortgage File of any of the [Initial Mortgage Loans][Subsequent Mortgage
Loans] identified on the [Mortgage Loan Schedule][Loan Number and Borrower
Identification Mortgage Loan Schedule] or (ii) the collectibility,
insurability, effectiveness or suitability of any such Mortgage Loan.


                              G-2-3


<PAGE>


              Capitalized words and phrases used herein shall have the
respective meanings assigned to them in the Pooling and Servicing Agreement.

                        The Bank of New York,
                           as Trustee


                  By:_____
                        Name:
                        Title:



                              G-2-4

<PAGE>



                           EXHIBIT G-3

                 FORM OF DELAY DELIVERY CERTIFICATION

                            [Date]


[Depositor]

[Sellers]

[Master Servicer]


              Re:  CWABS Asset-Backed Certificates, Series 2006-10
                   --------------------------------------------
Gentlemen:

              Reference is made to the Initial Certification of Trustee relating
to the above-referenced series, with the schedule of exceptions attached
thereto, delivered by the undersigned, as Trustee, on the Closing Date in
accordance with Section 2.02 of the Pooling and Servicing Agreement dated as
of June 1, 2006 (the "Pooling and Servicing Agreement") among CWABS, Inc., as
Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a
Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as
Master Servicer, and the undersigned, as Trustee. The undersigned hereby
certifies that [, with respect to the Subsequent Mortgage Loans delivered in
connection with the Subsequent Transfer Agreement, dated as of _____,
2005 (the "Subsequent Transfer Agreement") among CWABS, Inc., as Depositor,
Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park
                            Page 191

PSA CWL 06-13.txt

Sienna LLC, as a Seller and The Bank of New York, as Trustee,] as to each Delay Delivery Mortgage Loan listed on the Schedule A attached hereto (other than any [Initial Mortgage Loan][Subsequent Mortgage Loan] paid in full or listed on Schedule B attached hereto) it has received:

> (1) the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse", with all intervening endorsements that show a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note), or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note and all such intervening endorsements;

> (2) in the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to "Asset-Backed Certificates, Series 2006-10, CWABS, Inc., by The Bank of New York, a New York banking corporation, as trustee under the Pooling and Servicing Agreement dated as of June 1, 2006, without recourse" or a copy of such assignment, with recording information (each such

G-3-1

<PAGE>

assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates).

> Based on its review and examination and only as to the foregoing documents, such documents appear regular on their face and related to such Mortgage Loan.

> The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Pooling and Servicing Agreement. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the [Initial Mortgage Loans][Subsequent Mortgage Loans] identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectibility, insurability, effectiveness or suitability of any such [Initial Mortgage Loan][Subsequent Mortgage Loan].

> Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

The Bank of New York,
        as Trustee

By:_____
    Name:
    Title:

G-3-2

<PAGE>

PSA CWL 06-13.txt


EXHIBIT G-4

FORM OF INITIAL CERTIFICATION OF TRUSTEE
(SUBSEQUENT MORTGAGE LOANS)

[Date]


[Depositor]

[Sellers]

[Master Servicer]

Re:  CWABS Asset-Backed Certificates, Series 2006-10
     -----------------------------------------------

Gentlemen:

        In accordance with Section 2.02 of the Pooling and Servicing
Agreement dated as of June 1, 2006 (the "Pooling and Servicing Agreement")
among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller,
Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home
Loans Servicing LP, as Master Servicer, and the undersigned, as Trustee, the
undersigned hereby certifies that, as to each Subsequent Mortgage Loan listed
in the Loan Number and Borrower Identification Mortgage Loan Schedule (other
than any Subsequent Mortgage Loan paid in full or listed in the attached list
of exceptions) the Trustee has received:

        (1) the original Mortgage Note, endorsed by manual or facsimile
signature in blank in the following form: "Pay to the order of _____
without recourse", with all intervening endorsements that show a complete
chain of endorsement from the originator to the Person endorsing the Mortgage
Note (each such endorsement being sufficient to transfer all right, title and
interest of the party so endorsing, as noteholder or assignee thereof, in and
to that Mortgage Note), or, if the original Mortgage Note has been lost or
destroyed and not replaced, an original lost note affidavit, stating that the
original Mortgage Note was lost or destroyed, together with a copy of the
related Mortgage Note and all such intervening endorsements; and

        (2) a duly executed assignment of the Mortgage or a copy of such
assignment with recording information, in either case in the form permitted by
Section 2.01 of the Pooling and Servicing Agreement.

        Based on its review and examination and only as to the foregoing
documents, such documents appear regular on their face and related to such
Mortgage Loan.

        The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in the
Pooling and Servicing Agreement. The Trustee makes no representations as to:
(i) the validity, legality, sufficiency, enforceability or genuineness of any
of the documents contained in each Mortgage File of any of the Subsequent
Mortgage Loans identified on the Loan Number and Borrower Identification

G-4-1

PSA CWL 06-13.txt

Mortgage Loan Schedule or (ii) the collectibility, insurability, effectiveness or suitability of any such Subsequent Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

The Bank of New York,
as Trustee


By:_____
Name:
Title:


G-4-2


<PAGE>


EXHIBIT H

FORM OF FINAL CERTIFICATION OF TRUSTEE

[Date]


[Depositor]

[Master Servicer]

[Sellers]


Re: CWABS Asset-Backed Certificates, Series 2006-10
    ---------------------------------------------

Gentlemen:

In accordance with Section 2.02 of the Pooling and Servicing Agreement dated as of June 1, 2006 (the "Pooling and Servicing Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and the undersigned, as Trustee, the undersigned, as Trustee, hereby certifies that[, with respect to the Subsequent Mortgage Loans delivered in connection with the Subsequent Transfer Agreement, dated as of _____, 2005 (the "Subsequent Transfer Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller and The Bank of New York, as Trustee,] as to each [Initial Mortgage Loan][Subsequent Mortgage Loan] listed in the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] (other than any [Initial Mortgage Loan][Subsequent Mortgage Loan] paid in full or listed on the attached Document Exception Report) it has received:

(i) the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of
Page 194

PSA CWL 06-13.txt
_____ without recourse", with all intervening endorsements that show a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note), or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note and all such intervening endorsements;

        (ii) in the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage, with recording information, and in the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is a MERS Mortgage Loan, the original Mortgage or a copy of such Mortgage, with recording information, noting the presence of the MIN of the [Initial Mortgage Loan][Subsequent Mortgage Loan] and language indicating that the [Initial Mortgage Loan][Subsequent Mortgage Loan] is a MOM Loan if the [Initial Mortgage Loan][Subsequent

                                    H-1

<PAGE>


Mortgage Loan] is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

        (iii) in the case of each [Initial Mortgage Loan][Subsequent Mortgage Loan] that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to "Asset-Backed Certificates, Series 2006-10, CWABS, Inc., by The Bank of New York, a New York banking corporation, as trustee under the Pooling and Servicing Agreement dated as of June 1, 2006, without recourse" or a copy of such assignment, with recording information (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

        (iv) the original recorded assignment or assignments of the Mortgage or a copy of such assignments, with recording information, together with all interim recorded assignments of such Mortgage or a copy of such assignments, with recording information (in each case noting the presence of a MIN in the case of each MERS Mortgage Loan);

        (v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

        (vi) the original or duplicate original lender's title policy or a copy of lender's title policy or a printout of the electronic equivalent and all riders thereto or any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company.

        If the public recording office in which a Mortgage or assignment thereof is recorded has retained the original of such Mortgage or assignment, the Trustee has received, in lieu thereof, a copy of the original Mortgage or assignment so retained, with evidence of recording thereon, certified to be true and complete by such recording office.

        Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (ix) and (xvii) of the definition of the "Mortgage Loan

PSA CWL 06-13.txt
Schedule" in Section 1.01 of the Pooling and Servicing Agreement accurately
reflects information set forth in the Mortgage File.

          The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in the
Pooling and Servicing Agreement. The Trustee makes no representations as to:
(i) the validity, legality, sufficiency, enforceability or genuineness of any
of the documents contained in each Mortgage File of any of the [Initial
Mortgage Loans][Subsequent Mortgage Loans] identified on the [Mortgage Loan
Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or
(ii) the collectibility, insurability, effectiveness or suitability of any
such [Initial Mortgage Loan][Subsequent Mortgage Loan].

                              H-2

<PAGE>


          Capitalized words and phrases used herein shall have the
respective meanings assigned to them in the Pooling and Servicing Agreement.


                    The Bank of New York,
                       as Trustee



               By:_____
                    Name:
                    Title:


                              H-3

<PAGE>




                         EXHIBIT I

            TRANSFER AFFIDAVIT FOR THE CLASS A-R CERTIFICATES

STATE OF        )
                )       ss.:
COUNTY OF       )

          The undersigned, being first duly sworn, deposes and says as
follows:

          1. The undersigned is an officer of _____, the proposed
Transferee of an Ownership Interest in a Class A-R Certificate (the
"Certificate") issued pursuant to the Pooling and Servicing Agreement, dated
as of June 1, 2006 (the "Agreement"), by and among CWABS, Inc., as depositor
(the "Depositor"), Countrywide Home Loans, Inc., as a Seller, Park Monaco
Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans
Servicing LP, as Master Servicer, and The Bank of New York, as Trustee.
Capitalized terms used, but not defined herein or in Exhibit 1 hereto, shall
have the meanings ascribed to such terms in the Agreement. The Transferee has
authorized the undersigned to make this affidavit on behalf of the Transferee.

          2. The Transferee is not an employee benefit plan that is subject
to Title I of ERISA or to section 4975 of the Internal Revenue Code of 1986,

PSA CWL 06-13.txt
nor is it acting on behalf of or with plan assets of any such plan. The
Transferee is, as of the date hereof, and will be, as of the date of the
Transfer, a Permitted Transferee. The Transferee will endeavor to remain a
Permitted Transferee for so long as it retains its Ownership Interest in the
Certificate. The Transferee is acquiring its Ownership Interest in the
Certificate for its own account.

      3. The Transferee has been advised of, and understands that (i) a
tax will be imposed on Transfers of the Certificate to Persons that are not
Permitted Transferees; (ii) such tax will be imposed on the transferor, or, if
such Transfer is through an agent (which includes a broker, nominee or
middleman) for a Person that is not a Permitted Transferee, on the agent; and
(iii) the Person otherwise liable for the tax shall be relieved of liability
for the tax if the subsequent Transferee furnished to such Person an affidavit
that such subsequent Transferee is a Permitted Transferee and, at the time of
Transfer, such Person does not have actual knowledge that the affidavit is
false.

      4. The Transferee has been advised of, and understands that a tax
will be imposed on a "pass-through entity" holding the Certificate if at any
time during the taxable year of the pass-through entity a Person that is not a
Permitted Transferee is the record holder of an interest in such entity. The
Transferee understands that such tax will not be imposed for any period with
respect to which the record holder furnishes to the pass-through entity an
affidavit that such record holder is a Permitted Transferee and the
pass-through entity does not have actual knowledge that such affidavit is
false. (For this purpose, a "pass-through entity" includes a regulated
investment company, a real estate investment trust or common trust fund, a
partnership, trust or estate, and certain cooperatives and, except as may be
provided in Treasury Regulations, persons holding interests in pass-through
entities as a nominee for another Person.)

<div align="center">I-1-1</div>

<PAGE>


      5. The Transferee has reviewed the provisions of Section 5.02(c)
of the Agreement (attached hereto as Exhibit 2 and incorporated herein by
reference) and understands the legal consequences of the acquisition of an
Ownership Interest in the Certificate including, without limitation, the
restrictions on subsequent Transfers and the provisions regarding voiding the
Transfer and mandatory sales. The Transferee expressly agrees to be bound by
and to abide by the provisions of Section 5.02(c) of the Agreement and the
restrictions noted on the face of the Certificate. The Transferee understands
and agrees that any breach of any of the representations included herein shall
render the Transfer to the Transferee contemplated hereby null and void.

      6. The Transferee agrees to require a Transfer Affidavit from any
Person to whom the Transferee attempts to Transfer its Ownership Interest in
the Certificate, and in connection with any Transfer by a Person for whom the
Transferee is acting as nominee, trustee or agent, and the Transferee will not
Transfer its Ownership Interest or cause any Ownership Interest to be
Transferred to any Person that the Transferee knows is not a Permitted
Transferee. In connection with any such Transfer by the Transferee, the
Transferee agrees to deliver to the Trustee a certificate substantially in the
form set forth as Exhibit J-1 to the Agreement (a "Transferor Certificate") to
the effect that such Transferee has no actual knowledge that the Person to
which the Transfer is to be made is not a Permitted Transferee.

      7. The Transferee does not have the intention to impede the
assessment or collection of any tax legally required to be paid with respect
to the Class A-R Certificates.

<div align="center">Page 197</div>

PSA CWL 06-13.txt

8. The Transferee's taxpayer identification number is _____.

9. The Transferee is a U.S. Person as defined in Code section 7701(a)(30).

10. The Transferee is aware that the Class A-R Certificates may be "noneconomic residual interests" within the meaning of proposed Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax. In addition, as the holder of a noneconomic residual interest, the Transferee may incur tax liabilities in excess of any cash flows generated by the interest and the Transferee hereby represents that it intends to pay taxes associated with holding the residual interest as they become due.

11. The Transferee has provided financial statements or other financial information requested by the Transferor in connection with the transfer of the Class A-R Certificates to permit the Transferor to assess the financial capability of the Transferee to pay such taxes.

*       *       *

I-1-2

<PAGE>


IN WITNESS WHEREOF, the Transferee has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its duly authorized officer and its corporate seal to be hereunto affixed, duly attested, this ____ day of _____, 20__.

[NAME OF TRANSFEREE]


By:_____
   Name:
   Title:


[Corporate Seal]

ATTEST:

-------------------------
[Assistant] Secretary

Personally appeared before me the above-named _____, known or proved to me to be the same person who executed the foregoing instrument and to be the _____ of the Transferee, and acknowledged that he executed the same as his free act and deed and the free act and deed of the Transferee.

Subscribed and sworn before me this ____ day of _____, 20__.


---------------------------------------
NOTARY PUBLIC
My Commission expires the ___ day of
_____, 20__.

PSA CWL 06-13.txt

I-1-3

<PAGE>

Certain Definitions

        "Ownership Interest": As to any Certificate, any ownership
interest in such Certificate, including any interest in such Certificate as
the Holder thereof and any other interest therein, whether direct or indirect,
legal or beneficial.

        "Permitted Transferee": Any person other than (i) the United
States, any State or political subdivision thereof, or any agency or
instrumentality of any of the foregoing, (ii) a foreign government,
International Organization or any agency or instrumentality of either of the
foregoing, (iii) an organization (except certain farmers' cooperatives
described in section 521 of the Code) that is exempt from tax imposed by
Chapter 1 of the Code (including the tax imposed by section 511 of the Code on
unrelated business taxable income) on any excess inclusions (as defined in
section 860E(c)(1) of the Code) with respect to any Class A-R Certificate,
(iv) rural electric and telephone cooperatives described in section
1381(a)(2)(C) of the Code, (v) an "electing large partnership" as defined in
section 775 of the Code, (vi) a Person that is not a citizen or resident of
the United States, a corporation, partnership, or other entity (treated as a
corporation or a partnership for federal income tax purposes) created or
organized in or under the laws of the United States, any state thereof or the
District of Columbia, or an estate whose income from sources without the
United States is includible in gross income for United States federal income
tax purposes regardless of its connection with the conduct of a trade or
business within the United States, or a trust if a court within the United
States is able to exercise primary supervision over the administration of the
trust and one or more United States persons have authority to control all
substantial decisions of the trustor unless such Person has furnished the
transferor and the Trustee with a duly completed Internal Revenue Service Form
W-8ECI, and (vii) any other Person so designated by the Trustee based upon an
Opinion of Counsel that the Transfer of an Ownership Interest in a Class A-R
Certificate to such Person may cause any REMIC formed hereunder to fail to
qualify as a REMIC at any time that any Certificates are Outstanding. The
terms "United States," "State" and "International Organization" shall have the
meanings set forth in section 7701 of the Code or successor provisions. A
corporation will not be treated as an instrumentality of the United States or
of any State or political subdivision thereof for these purposes if all of its
activities are subject to tax and, with the exception of the Federal Home Loan
Mortgage Corporation, a majority of its board of directors is not selected by
such government unit.

        "Person": Any individual, corporation, limited liability company,
partnership, joint venture, bank, joint stock company, trust (including any
beneficiary thereof), unincorporated organization or government or any agency
or political subdivision thereof.

        "Transfer": Any direct or indirect transfer or sale of any
Ownership Interest in a Certificate, including the acquisition of a
Certificate by the Depositor.

        "Transferee": Any Person who is acquiring by Transfer any
Ownership Interest in a Certificate.

I-1-4

PSA CWL 06-13.txt

<PAGE>

Section 5.02(c) of the Agreement

(c) Each Person who has or who acquires any Ownership Interest in
a Class A-R Certificate shall be deemed by the acceptance or acquisition of
such Ownership Interest to have agreed to be bound by the following
provisions, and the rights of each Person acquiring any Ownership Interest in
a Class A-R Certificate are expressly subject to the following provisions:

(1) Each Person holding or acquiring any Ownership Interest in
a Class A-R Certificate shall be a Permitted Transferee and shall
promptly notify the Trustee of any change or impending change in its
status as a Permitted Transferee.

(2) Except in connection with (i) the registration of the Tax
Matters Person Certificate in the name of the Trustee or (ii) any
registration in the name of, or transfer of a Class A-R Certificate
to, an affiliate of the Depositor (either directly or through a
nominee) in connection with the initial issuance of the
Certificates, no Ownership Interest in a Class A-R Certificate may
be registered on the Closing Date or thereafter transferred, and the
Trustee shall not register the Transfer of any Class A-R Certificate
unless, the Trustee shall have been furnished with an affidavit (a
"Transfer Affidavit") of the initial owner or the proposed
transferee in the form attached hereto as Exhibit I.

(3) Each Person holding or acquiring any Ownership Interest in
a Class A-R Certificate shall agree (A) to obtain a Transfer
Affidavit from any other Person to whom such Person attempts to
Transfer its Ownership Interest in a Class A-R Certificate, (B) to
obtain a Transfer Affidavit from any Person for whom such Person is
acting as nominee, trustee or agent in connection with any Transfer
of a Class A-R Certificate and (C) not to Transfer its Ownership
Interest in a Class A-R Certificate, or to cause the Transfer of an
Ownership Interest in a Class A-R Certificate to any other Person,
if it has actual knowledge that such Person is not a Permitted
Transferee.

(4) Any attempted or purported Transfer of any Ownership
Interest in a Class A-R Certificate in violation of the provisions
of this Section 5.02(c) shall be absolutely null and void and shall
vest no rights in the purported Transferee. If any purported
transferee shall become a Holder of a Class A-R Certificate in
violation of the provisions of this Section 5.02(c), then the last
preceding Permitted Transferee shall be restored to all rights as
Holder thereof retroactive to the date of registration of Transfer
of such Class A-R Certificate. The Trustee shall be under no
liability to any Person for any registration of Transfer of a Class
A-R Certificate that is in fact not permitted by Section 5.02(b) and
this Section 5.02(c) or for making any payments due on such
Certificate to the Holder thereof or taking any other action with
respect to such Holder under the provisions of this Agreement so
long as the Transfer was registered after receipt of the related
Transfer Affidavit and Transferor Certificate. The Trustee shall be
entitled but not obligated to recover from any Holder of a Class A-R
Certificate that was in fact not a Permitted Transferee at the time
it became a Holder or, at such subsequent time as it became other
than a Permitted Transferee, all payments made on such Class A-R
Certificate at and after either such time. Any such payments so
recovered by the Trustee shall be paid and delivered by the Trustee
to the last preceding Permitted Transferee of such Certificate.
Page 200

PSA CWL 06-13.txt

I-1-5

<PAGE>

   (5) The Master Servicer shall use its best efforts to make
available, upon receipt of written request from the Trustee, all
information necessary to compute any tax imposed under section
860E(e) of the Code as a result of a Transfer of an Ownership
Interest in a Class A-R Certificate to any Holder who is not a
Permitted Transferee.

   The restrictions on Transfers of a Class A-R Certificate set forth
in this section 5.02(c) shall cease to apply (and the applicable portions of
the legend on a Class A-R Certificate may be deleted) with respect to
Transfers occurring after delivery to the Trustee of an Opinion of Counsel,
which Opinion of Counsel shall not be an expense of the Trustee, the Sellers
or the Master Servicer to the effect that the elimination of such restrictions
will not cause any constituent REMIC of any REMIC formed hereunder to fail to
qualify as a REMIC at any time that the Certificates are outstanding or result
in the imposition of any tax on the Trust Fund, a Certificateholder or another
Person. Each Person holding or acquiring any ownership Interest in a Class A-R
Certificate hereby consents to any amendment of this Agreement that, based on
an Opinion of Counsel furnished to the Trustee, is reasonably necessary (a) to
ensure that the record ownership of, or any beneficial interest in, a Class
A-R Certificate is not transferred, directly or indirectly, to a Person that
is not a Permitted Transferee and (b) to provide for a means to compel the
Transfer of a Class A-R Certificate that is held by a Person that is not a
Permitted Transferee to a Holder that is a Permitted Transferee.

I-1-6

<PAGE>

EXHIBIT J-1

FORM OF TRANSFEROR CERTIFICATE FOR CLASS A-R CERTIFICATES

   Date:

CWABS, Inc.
as Depositor
4500 Park Granada
Calabasas, California  91302

The Bank of New York
as Trustee
101 Barclay Street
New York, New York  10286

    Re: CWABS, Inc. Asset Backed
      Certificates, Series 2006-10
      --------------------------

Ladies and Gentlemen:

   In connection with our disposition of the Class A-R Certificates,
Page 201

PSA CWL 06-13.txt
we certify that we have no knowledge that the Transferee is not a Permitted
Transferee. All capitalized terms used herein but not defined herein shall
have the meanings assigned to them in the Pooling and Servicing Agreement
dated as of June 1, 2006, among CWABS, Inc., as Depositor, Countrywide Home
Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a
Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and The Bank
of New York, as Trustee.

                              Very truly yours,


                              -------------------------------------
                              Name of Transferor

                              By: _____
                              Name:
                              Title:


                         J-1-1

<PAGE>



                         EXHIBIT J-2

                 FORM OF TRANSFEROR CERTIFICATE FOR
                        PRIVATE CERTIFICATES

                         Date:


CWABS, Inc.,
    as Depositor
4500 Park Granada
Calabasas, California 91302

The Bank of New York,
    as Trustee
101 Barclay Street
New York, New York  10286


          Re:   CWABS, Inc. Asset-Backed Certificates,
                Series 2006-10, Class [    ]


Ladies and Gentlemen:

          In connection with our disposition of the above-captioned
Certificates we certify that (a) we understand that the Certificates have not
been registered under the Securities Act of 1933, as amended (the "Act"), and
are being disposed by us in a transaction that is exempt from the registration
requirements of the Act, (b) we have not offered or sold any Certificates to,
or solicited offers to buy any Certificates from, any person, or otherwise
approached or negotiated with any person with respect thereto, in a manner
that would be deemed, or taken any other action which would result in, a
violation of Section 5 of the Act. All capitalized terms used herein but not
defined herein shall have the meanings assigned to them in the Pooling and

PSA CWL 06-13.txt
Servicing Agreement dated as of June 1, 2006, among CWABS, Inc., as Depositor,
Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park
Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master
Servicer, and The Bank of New York, as Trustee.

                                        Very truly yours,


                                        ----------------------------------
                                        Name of Transferor


                                        By: _____
                                        Name:
                                        Title:

                        J-2-1


<PAGE>


                              EXHIBIT K

                  FORM OF INVESTMENT LETTER (NON-RULE 144A)

                              Date:


CWABS, Inc.,
     as Depositor
4500 Park Granada
Calabasas, California 91302

The Bank of New York,
     as Trustee
101 Barclay St., 8W
New York, New York  10286


             Re:   CWABS, Inc. Asset-Backed Certificates,
                   Series 2006-10, Class [    ]


Ladies and Gentlemen:

         In connection with our acquisition of the above-captioned
Certificates we certify that (a) we understand that the Certificates are not
being registered under the Securities Act of 1933, as amended (the "Act"), or
any state securities laws and are being transferred to us in a transaction
that is exempt from the registration requirements of the Act and any such
laws, (b) we are an "accredited investor," as defined in Regulation D under
the Act, and have such knowledge and experience in financial and business
matters that we are capable of evaluating the merits and risks of investments
in the Certificates, (c) we have had the opportunity to ask questions of and
receive answers from the Depositor concerning the purchase of the Certificates
and all matters relating thereto or any additional information deemed
necessary to our decision to purchase the Certificates, (d) either (i) we are
not an employee benefit plan that is subject to the Employee Retirement Income
Security Act of 1974, as amended, or a plan or arrangement that is subject to
Section 4975 of the Internal Revenue Code of 1986, as amended, nor are we
acting on behalf of any such plan or arrangement, or using the assets of any
such plan or arrangement to effect such acquisition or (ii) if the
Page 203

PSA_CWL 06-13.txt
Certificates have been the subject of an ERISA-Qualifying Underwriting, we are
an insurance company which is purchasing such Certificates with funds
contained in an "insurance company general account" (as such term is defined
in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE
95-60")) and the purchase and holding of such Certificates are covered under
Sections I and III of PTCE 95-60, (e) we are acquiring the Certificates for
investment for our own account and not with a view to any distribution of such
Certificates (but without prejudice to our right at all times to sell or
otherwise dispose of the Certificates in accordance with clause (g) below),
(f) we have not offered or sold any Certificates to, or solicited offers to
buy any Certificates from, any person, or otherwise approached or negotiated
with any person with respect thereto, or taken any other action which would
result in a violation of Section 5 of the Act, and (g) we will not sell,
transfer or otherwise dispose of any

                                   K-1

<PAGE>


Certificates unless (1) such sale, transfer or other disposition is made
pursuant to an effective registration statement under the Act or is exempt
from such registration requirements, and if requested, we will at our expense
provide an opinion of counsel satisfactory to the addressees of this
Certificate that such sale, transfer or other disposition may be made pursuant
to an exemption from the Act, (2) the purchaser or transferee of such
Certificate has executed and delivered to you a certificate to substantially
the same effect as this certificate, and (3) the purchaser or transferee has
otherwise complied with any conditions for transfer set forth in the Pooling
and Servicing Agreement.

          All capitalized terms used herein but not defined herein shall
have the meanings assigned to them in the Pooling and Servicing Agreement
dated as of June 1, 2006, among CWABS, Inc., as Depositor, Countrywide Home
Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a
Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and The Bank
of New York, as Trustee.

                              Very truly yours,

                              -------------------------------------
                              Name of Transferee

                              By: _____
                                      Authorized Officer


                                   K-2

<PAGE>



                              EXHIBIT L

                         FORM OF RULE 144A LETTER

                              Date:


CWABS, Inc.,
   as Depositor
4500 Park Granada
                              Page 204

PSA CWL 06-13.txt

Calabasas, California 91302

The Bank of New York,
     as Trustee
101 Barclay Street
New York, New York  10286

                    Re:    CWABS, Inc. Asset-Backed Certificates,
                           Series 2006-10, Class [    ]

Ladies and Gentlemen:

          In connection with our acquisition of the above-captioned
Certificates we certify that (a) we understand that the Certificates are not
being registered under the Securities Act of 1933, as amended (the "Act"), or
any state securities laws and are being transferred to us in a transaction
that is exempt from the registration requirements of the Act and any such
laws, (b) we have such knowledge and experience in financial and business
matters that we are capable of evaluating the merits and risks of investments
in the Certificates, (c) we have had the opportunity to ask questions of and
receive answers from the Depositor concerning the purchase of the Certificates
and all matters relating thereto or any additional information deemed
necessary to our decision to purchase the Certificates, (d) either (i) we are
not an employee benefit plan that is subject to the Employee Retirement Income
Security Act of 1974, as amended, or a plan or arrangement that is subject to
Section 4975 of the Internal Revenue Code of 1986, as amended, nor are we
acting on behalf of any such plan or arrangement, or using the assets of any
such plan or arrangement to effect such acquisition or (ii) if the
Certificates have been the subject of an ERISA-Qualifying Underwriting, we are
an insurance company which is purchasing such Certificates with funds
contained in an "insurance company general account" (as such term is defined
in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE
95-60")) and the purchase and holding of such Certificates are covered under
Sections I and III of PTCE 95-60, (e) we have not, nor has anyone acting on
our behalf offered, transferred, pledged, sold or otherwise disposed of the
Certificates, any interest in the Certificates or any other similar security
to, or solicited any offer to buy or accept a transfer, pledge or other
disposition of the

                                    L-1

<PAGE>


Certificates, any interest in the Certificates or any other similar security
from, or otherwise approached or negotiated with respect to the Certificates,
any interest in the Certificates or any other similar security with, any
person in any manner, or made any general solicitation by means of general
advertising or in any other manner, or taken any other action, that would
constitute a distribution of the Certificates under the Securities Act or that
would render the disposition of the Certificates a violation of Section 5 of
the Securities Act or require registration pursuant thereto, nor will act, nor
has authorized or will authorize any person to act, in such manner with
respect to the Certificates, (f) we are a "qualified institutional buyer" as
that term is defined in Rule 144A under the Securities Act and have completed
either of the forms of certification to that effect attached hereto as Annex 1
or Annex 2. We are aware that the sale to us is being made in reliance on Rule
144A. We are acquiring the Certificates for our own account or for resale
pursuant to Rule 144A and further, understand that such Certificates may be
resold, pledged or transferred only (i) to a person reasonably believed to be
a qualified institutional buyer that purchases for its own account or for the
account of a qualified institutional buyer to whom notice is given that the
resale, pledge or transfer is being made in reliance on Rule 144A, or (ii)

PSA CWL 06-13.txt
pursuant to another exemption from registration under the Securities Act.

        All capitalized terms used herein but not defined herein shall
have the meanings assigned to them in the Pooling and Servicing Agreement
dated as of June 1, 2006, among CWABS, Inc., as Depositor, Countrywide Home
Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a
Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and The Bank
of New York, as Trustee.

                                    Very truly yours,

                                    ---------------------------------
                                    Name of Transferee

                                    By: _____
                                            Authorized Officer


                                    L-2
<PAGE>


                                                    ANNEX 1 TO EXHIBIT L
                                                    --------------------
        QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

        [For Transferees Other Than Registered Investment Companies]

        The undersigned (the "Buyer") hereby certifies as follows to the
parties listed in the Rule 144A Transferee Certificate to which this
certification relates with respect to the Certificates described therein:

                    As indicated below, the undersigned is the
        President, Chief Financial Officer, Senior Vice President or other
        executive officer of the Buyer.

                    In connection with purchases by the Buyer, the
        Buyer is a "qualified institutional buyer" as that term is defined in
        Rule 144A under the Securities Act of 1933, as amended ("Rule 144A")
        because (i) the Buyer owned and/or invested on a discretionary basis
        either at least $100,000,000 in securities or, if Buyer is a dealer,
        Buyer must own and/or invest on a discretionary basis at least
        $10,000,000 in securities (except for the excluded securities
        referred to below) as of the end of the Buyer's most recent fiscal
        year (such amount being calculated in accordance with Rule 144A and
        (ii) the Buyer satisfies the criteria in the category marked below.

        ____        Corporation, etc. The Buyer is a corporation (other than a
                    bank, savings and loan association or similar institution),
                    Massachusetts or similar business trust, partnership, or
                    charitable organization described in Section 501(c)(3) of
                    the Internal Revenue Code of 1986, as amended.

        ____        Bank. The Buyer (a) is a national bank or banking
                    institution organized under the laws of any State, territory
                    or the District of Columbia, the business of which is
                    substantially confined to banking and is supervised by the
                    State or territorial banking commission or similar official
                    or is a foreign bank or equivalent institution, and (b) has
                    an audited net worth of at least $25,000,000 as demonstrated
                    in its latest annual financial statements, a copy of which
                                    Page 206

PSA CWL 06-13.txt

is attached hereto.

____      Savings and Loan. The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

____      Broker-dealer.  The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

<div align="center">L-3</div>

<PAGE>

____      Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State, territory or the District of Columbia.

____      State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

____      ERISA Plan.  The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

____      Investment Advisor.  The Buyer is an investment advisor registered under the Investment Advisors Act of 1940.

____      Small Business Investment Company.  Buyer is a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

____      Business Development Company.  Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940.

       The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iv) bank deposit notes and certificates of deposit, (v) loan participations, (vi) repurchase agreements, (vii) securities owned but subject to a repurchase agreement and (viii) currency, interest rate and commodity swaps.

       For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph, except (i) where the Buyer reports its securities holdings in its financial statements on the basis of their market value, and

PSA CWL 06-13.txt
(ii) no current information with respect to the cost of those
securities has been published. If clause (ii) in the preceding
sentence applies, the securities may be valued at market. Further, in
determining such aggregate amount, the Buyer may have included
securities owned by subsidiaries of the Buyer, but only if such
subsidiaries are consolidated with the Buyer in its financial
statements prepared in accordance with generally accepted accounting
principles and if the investments of such subsidiaries are managed
under the Buyer's direction. However, such securities were not
included if the Buyer is a majority-owned, consolidated subsidiary of
another enterprise and the Buyer is not itself a reporting company
under the Securities Exchange Act of 1934, as amended.

          The Buyer acknowledges that it is familiar with
Rule 144A and understands that the seller to it and other parties
related to the Certificates are relying and

                              L-4

<PAGE>


will continue to rely on the statements made herein because one or
more sales to the Buyer may be in reliance on Rule 144A.

          Until the date of purchase of the Rule 144A
Securities, the Buyer will notify each of the parties to which this
certification is made of any changes in the information and
conclusions herein. Until such notice is given, the Buyer's purchase
of the Certificates will constitute a reaffirmation of this
certification as of the date of such purchase. In addition, if the
Buyer is a bank or savings and loan is provided above, the Buyer
agrees that it will furnish to such parties updated annual financial
statements promptly after they become available.

                    ------------------------------------
                    Print Name of Buyer

          By:_____
              Name:
              Title:

          Date:_____

                              L-5

<PAGE>

                                   ANNEX 2 TO EXHIBIT L
                                   --------------------

     QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A
     -------------------------------------------------------

     [For Transferees That are Registered Investment Companies]

The undersigned (the "Buyer") hereby certifies as follows to the parties
listed in the Rule 144A Transferee Certificate to which this certification
                              Page 208

PSA CWL 06-13.txt
relates with respect to the Certificates described therein:

       1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933, as amended ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

In    connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, as amended and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used, except (i) where the Buyer or the Buyer's Family of Investment Companies reports its securities holdings in its financial statements on the basis of their market value, and (ii) no current information with respect to the cost of those securities has been published. If clause (ii) in the preceding sentence applies, the securities may be valued at market.

____    The Buyer owned $    in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

____    The Buyer is part of a Family of Investment Companies which owned in the aggregate $ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

The term "Family of Investment Companies" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase

L-6

<PAGE>

agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

The Buyer is familiar with Rule 144A and under-stands that the parties listed in the Rule 144A Transferee Certificate to which this certification relates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A. In addition, the Buyer will only purchase for the Buyer's own account.

PSA CWL 06-13.txt
Until the date of purchase of the Certificates, the undersigned will
notify the parties listed in the Rule 144A Transferee Certificate to
which this certification relates of any changes in the information
and conclusions herein. Until such notice is given, the Buyer's
purchase of the Certificates will constitute a reaffirmation of this
certification by the undersigned as of the date of such purchase.

_____
Print Name of Buyer or Adviser


By: _____
Name:
Title:


                    IF AN ADVISER:


_____
Print Name of Buyer


Date:_____


                         L-7
<PAGE>



                    EXHIBIT M

          FORM OF REQUEST FOR DOCUMENT RELEASE

Loan Information

       Name of Mortgagor:    _____


       Master Servicer
       Loan No.:             _____

Trustee

       Name:                 _____

       Address:              _____

                             _____

       Trustee
       Mortgage File No.:    _____

       The undersigned Master Servicer hereby acknowledges that it has
received from _____, as Trustee for the
Holders of Asset-Backed Certificates, Series 2006-10, the documents referred
to below (the "Documents"). All capitalized terms not otherwise defined in
this Request for Document Release shall have the meanings given them in the
Pooling and Servicing Agreement dated as of June 1, 2006 (the "Pooling and
Servicing Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans,

PSA CWL 06-13.txt

Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and The Bank of New York, as Trustee.

( ) Mortgage Note dated _____, ____, in the original principal sum of $_____, made by _____, payable to, or endorsed to the order of, the Trustee.

( ) Mortgage recorded on _____ as instrument no. _____ in the County Recorder's Office of the County of _____, State of _____ in book/reel/docket _____ of official records at page/image _____.

( ) Deed of Trust recorded on _____ as instrument no. _____ in the County Recorder's Office of the County of _____, State of _____ in book/reel/docket _____ of official records at page/image _____.

( ) Assignment of Mortgage or Deed of Trust to the Trustee, recorded on _____ as instrument no. _____ in the County Recorder's Office of

M-1

<PAGE>

the County of _____, State of _____ in book/reel/docket _____ of official records at page/image _____.

( ) Other documents, including any amendments, assignments or other assumptions of the Mortgage Note or Mortgage.

( ) _____

( ) _____

( ) _____

( ) _____

The undersigned Master Servicer hereby acknowledges and agrees as follows:

(1) The Master Servicer shall hold and retain possession of the Documents in trust for the benefit of the Trust Fund, solely for the purposes provided in the Pooling and Servicing Agreement.

(2) The Master Servicer shall not cause or knowingly permit the Documents to become subject to, or encumbered by, any claim, liens, security interest, charges, writs of attachment or other impositions nor shall the Master Servicer assert or seek to assert any claims or rights of setoff to or against the Documents or any proceeds thereof.

(3) The Master Servicer shall return each and every Document previously requested from the Mortgage File to the Trustee when the need therefor no longer exists, unless the Mortgage Loan relating to the Documents has been liquidated and the proceeds thereof have been remitted to the Certificate Account and except as expressly provided in the Pooling and Servicing Agreement.

(4) The Documents and any proceeds thereof, including any proceeds of proceeds, coming into the possession or control of the Master Servicer

PSA CWL 06-13.txt
shall at all times be earmarked for the account of the Trust Fund, and
the Master Servicer shall keep the Documents and any proceeds separate
and distinct from all other property in the Master Servicer's possession,
custody or control.

[Master Servicer]

By _____

Its _____

Date: _____, ____

M-2

<PAGE>

EXHIBIT N

FORM OF REQUEST FOR FILE RELEASE

OFFICER'S CERTIFICATE AND TRUST RECEIPT
ASSET-BACKED CERTIFICATES,
Series 2006-10

_____ HEREBY CERTIFIES THAT HE/SHE IS AN
OFFICER OF THE MASTER SERVICER, HOLDING THE OFFICE SET FORTH BENEATH HIS/HER
SIGNATURE, AND HEREBY FURTHER CERTIFIES AS FOLLOWS:

WITH RESPECT TO THE MORTGAGE LOANS, AS THE TERM IS DEFINED IN THE POOLING AND
SERVICING AGREEMENT DESCRIBED IN THE ATTACHED SCHEDULE:

[ALL PAYMENTS OF PRINCIPAL AND INTEREST HAVE BEEN MADE.] [THE PURCHASE PRICE
FOR SUCH MORTGAGE LOANS HAS BEEN PAID.] [THE MORTGAGE LOANS HAVE BEEN
LIQUIDATED AND THE RELATED [INSURANCE PROCEEDS] [LIQUIDATION PROCEEDS] HAVE
BEEN DEPOSITED PURSUANT TO SECTION 3.13 OF THE POOLING AND SERVICING
AGREEMENT.] [A REPLACEMENT MORTGAGE LOAN HAS BEEN DELIVERED TO THE TRUSTEE IN
THE MANNER AND OTHERWISE IN ACCORDANCE WITH THE CONDITIONS SET FORTH IN
SECTIONS 2.02 AND 2.03 OF THE POOLING AND SERVICING AGREEMENT.]

LOAN NUMBER:_____            BORROWER'S NAME:_____

COUNTY:_____

[For Substitution or Repurchase Only: The Master Servicer certifies that [an]
[no] opinion is required by Section 2.05 [and is attached hereto].]

I HEREBY CERTIFY THAT ALL AMOUNTS RECEIVED IN CONNECTION WITH SUCH PAYMENTS,
THAT ARE REQUIRED TO BE DEPOSITED IN THE CERTIFICATE ACCOUNT PURSUANT TO
SECTION 3.05 OF THE POOLING AND SERVICING AGREEMENT, HAVE BEEN OR WILL BE
CREDITED.

_____                          _____
                                       DATED:_____

PSA CWL 06-13.txt

/ /                                             VICE PRESIDENT
/ /                                             ASSISTANT VICE PRESIDENT


                              N-1

<PAGE>



                                                     Exhibit O

                      Exhibit O is a photocopy
                   of the Depository Agreement
                          as delivered.

           [See appropriate documents delivered at closing.]


                              O-1

<PAGE>



                            EXHIBIT P

                FORM OF SUBSEQUENT TRANSFER AGREEMENT

        SUBSEQUENT TRANSFER AGREEMENT, dated as of _____, 200[_] (this
"Subsequent Transfer Agreement"), among CWABS, INC., a Delaware corporation,
as depositor (the "Depositor"), COUNTRYWIDE HOME LOANS, INC., a New York
corporation, in its capacity as a seller under the Pooling and Servicing
Agreement referred to below ("CHL"), PARK MONACO INC., a Delaware corporation,
in its capacity as a seller under the Pooling and Servicing Agreement ("Park
Monaco"), PARK SIENNA LLC, a Delaware limited liability company, in its
capacity as a seller under the Pooling and Servicing Agreement ("Park Sienna"
and, together with CHL and Park Monaco, the "Sellers") and The Bank of New
York, a New York banking corporation, as trustee (the "Trustee");

        WHEREAS, the Depositor, CHL, Park Monaco, Park Sienna, the Trustee
and Countrywide Home Loans Servicing LP, as Master Servicer, have entered in
the Pooling and Servicing Agreement, dated as of June 1, 2006 (the "Pooling
and Servicing Agreement"), relating to the CWABS, Inc. Asset-Backed
Certificates, Series 2006-10 (capitalized terms not otherwise defined herein
are used as defined in the Pooling and Servicing Agreement);

        WHEREAS, Section 2.01(b) of the Pooling and Servicing Agreement
provides for the parties hereto to enter into this Subsequent Transfer
Agreement in accordance with the terms and conditions of the Pooling and
Servicing Agreement;

        NOW, THEREFORE, in consideration of the premises and for other good
and valuable consideration the receipt and adequacy of which are hereby
acknowledged the parties hereto agree as follows:

        (a) The "Subsequent Transfer Date" with respect to this Subsequent
Transfer Agreement shall be _____ __, 200[_].

        (b) The "Subsequent Transfer Date Purchase Amount" with respect to
this Subsequent Transfer Agreement shall be $_____.

        (c) The Subsequent Mortgage Loans conveyed on the Subsequent Transfer
                              Page 213

PSA CWL 06-13.txt
Date shall be subject to the terms and conditions of the Pooling and Servicing
Agreement.

     (d) Annex I hereto sets forth a list of the Mortgage Loans which are
Delay Delivery Mortgage Loans.

     (e) In case any provision of this Subsequent Transfer Agreement shall
be invalid, illegal or unenforceable, the validity, legality and
enforceability of the remaining provisions or obligations shall not in any way
be affected or impaired thereby.

     (f) In the event of any conflict between the provisions of this
Subsequent Transfer Agreement and the Pooling and Servicing Agreement, the
provisions of the Pooling and Servicing Agreement shall prevail.

<center>P-1</center>

&lt;PAGE&gt;


     (g) This Subsequent Transfer Agreement shall be governed by, and
shall be construed and enforced in accordance with the laws of the State of
New York.

     (h) The Subsequent Transfer Agreement may be executed in one or more
counterparts, each of which so executed and delivered shall be deemed an
original, but all such counterparts together shall constitute but one and the
same instrument.

<center>P-2</center>

&lt;PAGE&gt;


     IN WITNESS WHEREOF, the parties to this Subsequent Transfer Agreement
have caused their names to be signed hereto by their respective officers
thereunto duly authorized as of the day and year first above written.


               CWABS, INC.,
               as Depositor


               By: _____
                    Name:
                    Title:


               COUNTRYWIDE HOME LOANS, INC.,
               as a Seller


               By: _____
                    Name:
                    Title:


               PARK MONACO INC.,
                as a Seller

<center>Page 214</center>

PSA CWL 06-13.txt

By: _____
    Name:
    Title:


PARK SIENNA LLC,
  as a Seller

By: _____
    Name:
    Title:


P-3

<PAGE>


THE BANK OF NEW YORK,
  not in its individual capacity,
  but solely as Trustee

By: _____
    Name:
    Title:


P-4

<PAGE>


Annex I

Mortgage Loans for which All or a Portion of a Related
Mortgage File is not Delivered to the Trustee
on or prior to the Subsequent Transfer Date

P-5

<PAGE>


EXHIBIT Q

RESERVED

Page 215

```
                        PSA CWL 06-13.txt
                             Q-1-1


<PAGE>



                            EXHIBIT R

                            [RESERVED]


                               A-1
<PAGE>



                           EXHIBIT S-1

                            [RESERVED]


                             S-1-1
<PAGE>



                           EXHIBIT S-2

                            [RESERVED]


                             S-2-1
<PAGE>



                            EXHIBIT T


         OFFICER'S CERTIFICATE WITH RESPECT TO PREPAYMENTS


                    ASSET-BACKED CERTIFICATES,
                         Series 2006-10

                           [Date]

Via Facsimile

The Bank of New York,
         as Trustee
101 Barclay Street
New York, New York  10286


Dear Sir or Madam:
                           Page 216
```

PSA_CWL 06-13.txt

      Reference is made to the Pooling and Servicing Agreement, dated as of June 1, 2006, (the "Pooling and Servicing Agreement") among CWABS, Inc., as Depositor, Countrywide Home Loans, Inc., as a Seller, Park Monaco Inc., as a Seller, Park Sienna LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer, and The Bank of New York, as Trustee. Capitalized terms used herein shall have the meanings ascribed to such terms in the Pooling and Servicing Agreement.

      _____ hereby certifies that he/she is a Servicing Officer, holding the office set forth beneath his/her name and hereby further certifies as follows:

      With respect to the Distribution Date in _____ 20[ ] and each Mortgage Loan set forth in the attached schedule:

      1. A Principal Prepayment in full or in part was received during the related Prepayment Period;

      2. Any Prepayment Charge due under the terms of the Mortgage Note with respect to such Principal Prepayment was or was not, as indicated on the attached schedule using "Yes" or "No", received from the Mortgagor and deposited in the Certificate Account;

      3. As to each Mortgage Loan set forth on the attached schedule for which all or part of the Prepayment Charge required in connection with the Principal Prepayment was waived by the Master Servicer, such waiver was, as indicated on the attached schedule, based upon:

      (i) the Master Servicer's determination that such waiver would maximize recovery of Liquidation Proceeds for such Mortgage Loan, taking into account the value of such Prepayment Charge, or

T-1

<PAGE>

      (ii)(A) the enforceability thereof is limited (1) by bankruptcy, insolvency, moratorium, receivership, or other similar law relating to creditors' rights generally or (2) due to acceleration in connection with a foreclosure or other involuntary payment, or (B) the enforceability is otherwise limited or prohibited by applicable law; and

      4. We certify that all amounts due in connection with the waiver of a Prepayment Charge inconsistent with clause 3 above which are required to be deposited by the Master Servicer pursuant to Section 3.18 of the Pooling and Servicing Agreement, have been or will be so deposited.

                    COUNTRYWIDE HOME LOANS, INC.,
                    as Master Servicer

T-2

<PAGE>

SCHEDULE OF MORTGAGE LOANS FOR WHICH A PREPAYMENT WAS RECEIVED
DURING THE RELATED PREPAYMENT PERIOD

Page 217

```
                          PSA CWL 06-13.txt
----------------------------------------------------------------------
Loan Number            Clause 2:  Yes/No       Clause 3:  (i) or (ii)
----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------
```

T-3

<PAGE>


EXHIBIT U

FORM OF SWAP CONTRACT

[See appropriate documents delivered at closing.]


U-1

<PAGE>

EXHIBIT V-1

FORM OF SWAP CONTRACT ASSIGNMENT AGREEMENT


[See document delivered at closing.]


V-1-1

<PAGE>

EXHIBIT V-2

FORM OF SWAP CONTRACT ADMINISTRATION AGREEMENT


[See document delivered at closing.]


V-2-1

PSA CWL 06-13.txt

&lt;PAGE&gt;

EXHIBIT W

FORM OF MONTHLY STATEMENT

W-1

&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;

THE
Distribution Date:  __/__/__
BANK OF
NEW
YORK

101 Barclay St., 8W                                      CWABS, Inc.
New York, NY  10286                        CWABS Asset-Backed Certificates
Trust 200_-_
                                              Series 200_-_

&lt;S&gt;          &lt;C&gt;
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]

&lt;/TABLE&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;

                              Certificateholder Monthly Distribution
Summary
-------------------------------------------------------------------------
----------------------------------
                                  Certificate
                           Class      Rate        Beginning      Pass
Through    Principal     Interest
  Class      Cusip      Description     Type        Balance      Rate (%)
    Distribution  Distribution
  &lt;S&gt;         &lt;C&gt;         &lt;C&gt;          &lt;C&gt;         &lt;C&gt;          &lt;C&gt;
   &lt;C&gt;          &lt;C&gt;
-------------------------------------------------------------------------
----------------------------------

Page 219

```
                              PSA CWL 06-13.txt
--------------------------------------------------------------------------------
----------------------------------------

--------------------------------------------------------------------------------
-----------------------------------------
Totals
--------------------------------------------------------------------------------
----------------------------------------

<CAPTION>
----------------------------------------------------------------------
                                                 Cumulative
    Total              Current                     Realized
 Distribution    Realized Losses     Ending Balance    Losses
<C>              <C>                 <C>               <C>
----------------------------------------------------------------------




----------------------------------------------------------------

----------------------------------------------------------------
</TABLE>


<TABLE>
<CAPTION>



             THE
             Distribution Date:   __/__/__
            BANK OF
             NEW
             YORK

101 Barclay St., 8W                              CWABS, Inc.
New York, NY  10286               CWABS Asset-Backed Certificates
Trust 200_-_
                                          Series 200_-_

<S>            <C>
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]

</TABLE>

<TABLE>
<CAPTION>


                                     Principal Distribution Detail
--------------------------------------------------------------------------------
```

```
                              PSA CWL 06-13.txt
---------------------------------
                                  Original          Beginning          Scheduled
Principal   Net Principal
  Class       Cusip          Certificate Balance Certificate Balance
Distribution   Distribution
------------------------------------------------------------------------------
---------------------------------
   <S>          <C>            <C>                <C>                <C>
               <C>




------------------------------------------------------------------------------
---------------------------------




------------------------------------------------------------------------------
---------------------------------
Totals
------------------------------------------------------------------------------
---------------------------------


<CAPTION>


-----------------------------------------------------------------
Current Realized   Ending Certificate   Ending Certificate
    Losses               Balance              Factor
-----------------------------------------------------------------
<C>                <C>                  <C>




-----------------------------------------------------------------

-----------------------------------------------------------------
</TABLE>
                                                    W-3

<PAGE>


<TABLE>
<CAPTION>


            THE
              Distribution Date:  __/__/__
            BANK OF
                              Page 221
```

```
                                    PSA CWL 06-13.txt
                    NEW
                    YORK

101 Barclay St., 8W                                    CWABS, Inc.
New York, NY  10286                         CWABS Asset-Backed Certificates
Trust 200_-_
                                                    Series 200_-_

<S>              <C>
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]

</TABLE>

<TABLE>
<CAPTION>

                                                  Interest Distribution Detail
------------------------------------------------------------------------------
-------------------------------------
                    Beginning                                      Interest
         Total          Net Rate                      Current      Carryforward
         Certificate        Pass Through
         Interest           Carryover
    Class    Balance          Rate (%)              Interest       Amount
         Due          Paid
------------------------------------------------------------------------------
-------------------------------------

    <S>      <C>      <C>        <C>                  <C>          <C>
       <C>            <C>




------------------------------------------------------------------------------
-------------------------------------




------------------------------------------------------------------------------
-------------------------------------
Totals
------------------------------------------------------------------------------
-------------------------------------

<CAPTION>
--------------------------------------------------
                  Interest          Net Rate
Interest       Carryforward        Carryover
  Paid          After Dist.        After Dist.
--------------------------------------------------
<C>            <C>                <C>
```

```
                        PSA CWL 06-13.txt
--------------------------------------------------------------------------------
--------------------------------------
--------------------------------------------------------------------------------
--------------------------------------

</TABLE>
                                                    W-4

<PAGE>


<TABLE>
<CAPTION>


            THE
            Distribution Date:  __/__/__
         BANK OF
            NEW
           YORK

101 Barclay St., 8W                                      CWABS, Inc.
New York, NY  10286                      CWABS Asset-Backed Certificates
Trust 200_-_
                                             Series 200_-_

<S>          <C>
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]

</TABLE>


<TABLE>
<CAPTION>
                                        Current Payment Information
                                            Factors per $1,000
--------------------------------------------------------------------------------
--------------------------------------
                                     Original          Beginning
                                    Certificate        Certificate

    Principal           Interest
 Class               Cusip
    Distribution         Distribution      Balance             Balance
--------------------------------------------------------------------------------
--------------------------------------
    <S>                  <C>              <C>                 <C>
     <C>                  <C>



--------------------------------------------------------------------------------
--------------------------------------
```

Page 223

PSA CWL 06-13.txt

```
--------------------------------------------------------------------------
--------------------------------------------
Totals
--------------------------------------------------------------------------
--------------------------------------------

<CAPTION>

-----------------------------------------------
        Ending                    Pass
      Certificate               Through
       Balance                  Rate (%)
-----------------------------------------------
        <C>                       <C>




-----------------------------------------------

-----------------------------------------------

</TABLE>
```

                                                    W-5

```
<PAGE>


<TABLE>
<CAPTION>

            THE
          BANK OF
           NEW
           YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                          CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:     [_____]
             [_____]
Associate:   [_____]
             [_____]


Pool Level Data
<S>                                         <C>
                            <C>
Distribution Date
```

                              Page 224

```
                              PSA CWL 06-13.txt
                              __/__/____
Cut-off Date
                              __/__/__
Record Date
                              __/__/__
Determination Date
                              __/__/__
LIBOR Determination Date
                              __/__/__
Accrual Period 30/360                      Begin
                              __/__/__
                                           End
                              __/__/__
Number of Days in 30/360 Accrual Period
                              __

Accrual Period Actual Days                 Begin
                              __/__/__
                                           End
                              __/__/__
Number of Days in Actual Accrual Period
                              __


-----------------------------------------------------------------------------
-----------------------------------------------
                                    Additional Interest Rate Details
-----------------------------------------------------------------------------
-----------------------------------------------

              Libor Rate
              [_____] Net Rate Cap
              [_____] Net Rate Cap
              [_____] Net Rate Cap


-----------------------------------------------------------------------------
-----------------------------------------------
                                    Prefunding Detail
-----------------------------------------------------------------------------
-----------------------------------------------

                                                        Group [_]
       Group [_]                          Total

              Target Funding Balance
              Initial Funded Balance
              Initial Unfunded Balance

              Initial Unfunded Amounts are passed through as Principal.


</TABLE>
                                                   W-6
<PAGE>


<TABLE>
<CAPTION>
                              Page 225
```

PSA CWL 06-13.txt

```
          THE
          BANK OF
          NEW
          YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                    CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]
```

    Original Mortgage Details

```
-------------------------------------------------------------------------------
---------------------------------------------
    <S>                                                            <C>
    <C>                      <C>
                                                            Group [_]
    Group [_]
    Original Aggregate Loan Count
    Original Stated Principal Balance
    Original Weighted Average Mortgage Rate
    Original Weighted Average Net Mortgage Rate
    Original Weighted Average Remaining Term


-------------------------------------------------------------------------------
---------------------------------------------
                            Collateral Detail
-------------------------------------------------------------------------------
---------------------------------------------

                                                            Group [_]
    Group [_]              Total
    Cut-Off Date Balance of Pool

    Beginning Aggregate Loan Count
    Loans Paid Off or otherwise removed
    pursuant to the PSA
    Ending Aggregate Loan Count

    Beginning Pool Stated Principal Balance
    Scheduled Principal
    Unscheduled Principal
    Realized Principal Losses
    Ending Pool Stated Principal Balance

    Beginning Weighted Average Mortgage Rate
    Beginning Weighted Average Net Mortgage Rate

    Beginning Weighted Average Remaining Term to Maturity
    Ending Weighted Average Remaining Term to Maturity
```

                            W-7

                        Page 226

PSA CWL 06-13.txt

```
</TABLE>


<PAGE>




<TABLE>
<CAPTION>


          THE
        BANK OF
          NEW
         YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                        CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]




------------------------------------------------------------------------------
-----------------------------------------
                                                                 Servicer
Remittance Summary
------------------------------------------------------------------------------
-----------------------------------------
<S> <C>                                           <C>
<C>                             <C>
    Interest Remittance Amount

                                                  Group [_]
Group [_]                       Total

    Scheduled Interest less Servicing Fees
    Compensating Interest
    Liquidation Interest Proceeds
    Less:  Non-Recoverable Interest Advances
    Total Interest Remittance Amount

    Principal Remittance Amount

                                                  Group [_]
Group [_]                       Total

    Scheduled Principal
    Curtailment Principal
    Paid in Full Principal
    Repurchased Principal
    Liquidation Principal
```

Page 227

PSA CWL 06-13.txt
    Substitution Shortfall Principal
    Subsequent Recoveries
    Less:  Non-Recoverable Principal Advances
    relating to  Principal
    Total Principal Remittance Amount

    Total Principal and Interest Remittance


</TABLE>

                                                           W-8
<PAGE>


<TABLE>
<CAPTION>

          THE
        BANK OF
          NEW
         YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                        CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]


--------------------------------------------------------------------------------
-------------------------------------------------
                                            Distributable Amounts
--------------------------------------------------------------------------------
-------------------------------------------------
<S>    <C>                                                 <C>
          <C>                   <C>

    Principal Distribution Amount

                                                    Group [_]
        Group [_]          Total

    Principal Remittance Amount
    Extra Principal Distribution Amount
    Transfer from Prefunding Account Month 1
    Principal Distribution Amount

    Interest Funds

                                                    Group [_]
        Group [_]          Total

    Interest Remittance
    Less:  Trustee Fee
    Interest Funds
                        Page 228

PSA CWL 06-13.txt

```
--------------------------------------------------------------------------------
-------------------------------------------------
                                                     Servicer Advances
--------------------------------------------------------------------------------
-------------------------------------------------
```

                                                            Group [_]

           Group [_]           Total

       Principal Advances
       Interest Advances
       Reimbursement for Principal & Interest
       Advances
       Reimbursement for Nonrecoverable Advances
       Total Advances


</TABLE>


                                                     W-9
    <PAGE>



<TABLE>
<CAPTION>

           THE
           BANK OF
           NEW
           YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                              CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:        [_____]
                [_____]
Associate:      [_____]
                [_____]



```
--------------------------------------------------------------------------------
-------------------------------------------------
                                                     Fees of the Trust
--------------------------------------------------------------------------------
-------------------------------------------------
```
<S>     <C>
        <C>                      <C>                             <C>
                                                            Group [_]
           Group [_]           Total
       Gross Master Servicing Fee
       Net Master Servicing Fee
       Trustee Fee
       Total Net Loan Fees

                            Page 229

                              PSA CWL 06-13.txt

--------------------------------------------------------------------------------
------------------------------------------------
                                            Mortgage Prepayment Details
--------------------------------------------------------------------------------
------------------------------------------------

                                                              Group [_]

           Group [_]          Total

       Principal Balance of Loans Paid in Full
       Prepayment Interest Excess
       Prepayment Interest Shortfall
       Compensating Interest
       Non-Supported Prepayment Interest Shortfall
       Prepayment Charges
       CPR %
       SMM %


--------------------------------------------------------------------------------
------------------------------------------------
                                            Loan Substitution
--------------------------------------------------------------------------------
------------------------------------------------

                                                              Group [_]

           Group [_]          Total

       Aggregate Stated of Principal Balances Removed
       Aggregate Stated of Principal Balance Added
       Aggregate Principal Substitution Shortfall Amount


   </TABLE>


                                                    W-10

   <PAGE>


   <TABLE>
   <CAPTION>

              THE
            BANK OF
              NEW
             YORK

   101 Barclay St., 8W
   CWABS, Inc.
   New York, NY  10286                                        CWABS
   Asset-Backed Certificates Trust 200_-_

   Series 200_-_
   Officer:       [_____]
                  [_____]
   Associate:     [_____]
                  [_____]


                              Page 230

PSA CWL 06-13.txt

```
--------------------------------------------------------------------------------
--------------------------------------------------
                                           Trust Accounts
--------------------------------------------------------------------------------
--------------------------------------------------
<S>              <C>                                               <C>
       <C>                   <C>
                 Certificate Account

                                                               Group
[_]              Group [_]        Total
                 Beginning Balance

Deposits                 Principal Remittance
                         Interest Remittance
                         Prepayment Charges
                         Total Deposits

Withdrawals              To the Master Servicer, any unpaid or unreimbursed
                         Amounts To the Seller, any unpaid or unreimbursed
                         Amounts To the Depositor, any unpaid or reimbursed
                         Amounts To Terminate the Account To the Distribution
                         Account

                         Ending  Balance

                         Distribution Account

                         Beginning Balance

Deposits                 From the Certificate Account
                         Investment Income
                         Total Deposit

Withdrawals              To the trustee, the Trustee Fee
                         Payment of Prepayment Penalties to P Classes
                         Principal and Interest Payments
                         To Terminate the Distribution Account
                         Total Withdrawals

                         Ending Balance

</TABLE>
                                                       W-11

<PAGE>



<TABLE>
<CAPTION>
           THE
         BANK OF
          NEW
          YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                      CWABS
Asset-Backed Certificates Trust 200_-_
```
                         Page 231

PSA CWL 06-13.txt

```
Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]
```

                    Carryover Reserve Account

                    Beginning Balance

```
<S>                 <C>
Deposits            [Class [__] Corridor Contract]
                    [_____] Excess Cashflow, to pay shortfalls
                    [_____] Excess Cashflow, to pay shortfalls

Withdrawals         [From [__] Corridor, to the [__] Class]
                    [From [__] Corridor, to the [__] Class]
                    [Reinvestment Income from [__] Corridor, to Class [__]

                    Ending Balance

                    NRC Payments to Classes are Detailed in the Interest
                    Summary

                    Principal Reserve Account

Deposits            Beginning Principal Reserve Balance
                    Deposits

Withdrawals         To Classes [__], [__], & AR
                    Ending Principal Reserve Balance

</TABLE>
```

                                                        W-12

`<PAGE>`

```
<TABLE>
<CAPTION>

        THE
      BANK OF
        NEW
       YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                     CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]
```

PSA CWL 06-13.txt

```
<S>                     <C>
                        Credit Comeback Excess Account

Deposits                Beginning Balance
                        Credit Comeback Excess Amount

Withdrawals             To the [__] Classes
                        To the [__] Class, to restore Overcollateralization
                        To the [__] Classes, to cover Unpaid Realized Losses
                        To the [__] Class, interest income and leftover amounts Ending
Balance

                        Supplemental Prefunding Account

                        Beginning Balance
                        Deposits
                        Withdrawals
                        Ending Balance
</TABLE>
```

                                                            W-13

```
<PAGE>

<TABLE>
<CAPTION>


--------------------------------------------------------------------------------
----------------------------------------------
                                                      Loan Status
--------------------------------------------------------------------------------
----------------------------------------------

          Delinquency Information

--------------------------------------------------------------------------------
----------------------------------------------
                              30-59 Days
  60-89 Days
                   Count          Count %        Balance       Balance %       Count
Count %         Balance        Balance %        Count
--------------------------------------------------------------------------------
----------------------------------------------
    <S>            <C>            <C>            <C>           <C>             <C>             <C>
          <C>            <C>            <C>
   Group [_]
   Group [_]

     Total


--------------------------------------------------------------------------------
----------------------------------------------

<CAPTION>

----------------------------------------
         90+ Days
   Count %       Balance        Balance %
----------------------------------------
    <C>            <C>            <C>
                         Page 233
```

PSA CWL 06-13.txt

```
----------------------------------------
</TABLE>


<TABLE>
<CAPTION>

--------------------------------------------------------------------------------
----------------------------------------------
                              Foreclosure
  Bankruptcy
                  Count          Count %       Balance       Balance %        Count
Count %        Balance       Balance %       Count
--------------------------------------------------------------------------------
----------------------------------------------
   <S>          <C>            <C>            <C>           <C>             <C>            <C>
          <C>            <C>            <C>
   Group [_]
   Group [_]

    Total

--------------------------------------------------------------------------------
--------------------------------------------------
```

```
----------------------------------------
          REO
  Count %        Balance       Balance %
----------------------------------------
```

```
</TABLE>
```
                                                          W-14


```
<PAGE>


<TABLE>
<CAPTION>

           THE
         BANK OF
           NEW
          YORK
```

```
                                    PSA CWL 06-13.txt
101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                                    CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]




     --------------------------------------------------------------------------
     --------------------------------------------
                                                Realized Loss Detail
     --------------------------------------------------------------------------
     --------------------------------------------
                                                        Group [_]

        Group [_]                       Total

          Current Period Realized Losses
          Cumulative Realized Losses
          Total Liquidated Loan Balance
          Total Liquidated Proceeds
          Subsequent Recoveries

          <S>                    <C>                       <C>
<C>                    <C>
          Group              Loan ID                   Liquidation Balance
Liquidation Proceeds       Realized Loss

        Group [_]

        Group [_]


     </TABLE>
                                                        W-15

     <PAGE>

     <TABLE>
     <CAPTION>

             THE
           BANK OF
             NEW
            YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                                    CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
                           Page 235
```

PSA CWL 06-13.txt

[_____]


Overcollateralization Details

                                                                    Group [_]

        Group [_]              Total

     <S>                                                            <C>
          <C>                  <C>
     OC Amount Beginning
     OC Floor
     OC Target Amount
     OC Deficiency Amount Beginning
     Excess Cashflow
     Credit Comeback Excess Cashflow
     Extra Principal Distribution Amount
     OC Amount Ending
     OC Deficiency Amount Ending
     Ending Group Certificate Balances

     Trigger Events

                                                                    Group [_]

        Group [_]

     Rolling Sixty-Day Delinq Rate
     Passing Delinquency Test?
     Cumulative Loss Rate
     Passing Cumulative Loss Test?
     Trigger Event
     Stepdown Date


</TABLE>
                                                        W-16

<PAGE>


<TABLE>
<CAPTION>

          THE
          BANK OF
          NEW
          YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                     CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:          [_____]
                  [_____]
Associate:        [_____]
                  [_____]


        Subordination

                    Page 236

```
                                    PSA CWL 06-13.txt
            Credit Support
Original                Current
            --------------
--------                --------
      <S>                                                            <C>
            <C>

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]
      Class [__] Percentage

      Class [__]


</TABLE>


                                                          W-17


<PAGE>


<TABLE>
<CAPTION>

            THE
          BANK OF
            NEW
            YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                      CWABS
```

```
                          PSA CWL 06-13.txt
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]


       Credit Support
Original              Current
       --------------
--------              --------
     <S>                                                          <C>
            <C>



       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage

       Class [__]
       Class [__] Percentage
</TABLE>
                                                    W-18

<PAGE>


<TABLE>
<CAPTION>

          THE
        BANK OF
          NEW
          YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                      CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
```
                          Page 238

```
                              PSA CWL 06-13.txt
                  [_____]
Associate:        [_____]
                  [_____]


                                                          Group [_]
------------------------------------------------------------------------------
--------------------------------------------------
                                                      Number
Percent         Principal                Percent
                                      Update Face      of Items       of
Items           Balance           of Balance
------------------------------------------------------------------------------
--------------------------------------------------
<S>                             <C>                    <C>           <C>       <C>
          <C>                   <C>
                                 0.00    -        25,000.00
                            25,000.00    -        50,000.00
                            50,000.00    -        75,000.00
                            75,000.00    -       100,000.00
                           100,000.00    -       125,000.00
                           125,000.00    -       150,000.00
                           150,000.00    -       175,000.00
                           175,000.00    -       200,000.00
                           200,000.00    -       225,000.00
                           225,000.00    -       250,000.00
                           250,000.00    -       275,000.00
                           275,000.00    -       300,000.00
                           300,000.00    -       325,000.00
                           325,000.00    -       350,000.00
                           350,000.00    -       375,000.00
                           375,000.00    -       400,000.00
                           400,000.00    -       425,000.00
                           425,000.00    -       450,000.00
                           450,000.00    -       475,000.00
                           475,000.00    -       500,000.00
                           500,000.00    -       525,000.00
                           525,000.00    -       550,000.00
                           550,000.00    -       575,000.00
                           575,000.00    -       600,000.00
                           600,000.00    -       625,000.00
                           625,000.00    -       650,000.00
                           650,000.00    -       675,000.00
                           675,000.00    -       700,000.00
                           700,000.00    -       725,000.00
                           725,000.00    -       750,000.00
                           750,000.00    -       775,000.00
                           775,000.00    -       800,000.00
                                    >            800,000.00
------------------------------------------------------------------------------
--------------------------------------------------
                                      Wgt Ave / Total:
------------------------------------------------------------------------------
--------------------------------------------------
                                                      W-19

</TABLE>


<PAGE>
                              Page 239
```

PSA CWL 06-13.txt

```
<TABLE>
<CAPTION>


          THE
          BANK OF
          NEW
          YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                              CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]
```

|  |  |  | Group [_] |  |
|---|---|---|---|---|
|  |  |  | Number |  |
| Percent | Principal | Percent | | |
| | | Update Face | of Items | of |
| Items | Balance | of Balance | | |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| | `<C>` | `<C>` | | |
| | 0.00 | – | 25,000.00 | |
| | 25,000.00 | – | 50,000.00 | |
| | 50,000.00 | – | 75,000.00 | |
| | 75,000.00 | – | 100,000.00 | |
| | 100,000.00 | – | 125,000.00 | |
| | 125,000.00 | – | 150,000.00 | |
| | 150,000.00 | – | 175,000.00 | |
| | 175,000.00 | – | 200,000.00 | |
| | 200,000.00 | – | 225,000.00 | |
| | 225,000.00 | – | 250,000.00 | |
| | 250,000.00 | – | 275,000.00 | |
| | 275,000.00 | – | 300,000.00 | |
| | 300,000.00 | – | 325,000.00 | |
| | 325,000.00 | – | 350,000.00 | |
| | 350,000.00 | – | 375,000.00 | |
| | 375,000.00 | – | 400,000.00 | |
| | 400,000.00 | – | 425,000.00 | |
| | 425,000.00 | – | 450,000.00 | |
| | 450,000.00 | – | 475,000.00 | |
| | 475,000.00 | – | 500,000.00 | |
| | 500,000.00 | – | 525,000.00 | |
| | 525,000.00 | – | 550,000.00 | |
| | 550,000.00 | – | 575,000.00 | |
| | 575,000.00 | – | 600,000.00 | |
| | 600,000.00 | – | 625,000.00 | |
| | 625,000.00 | – | 650,000.00 | |
| | 650,000.00 | – | 675,000.00 | |

```
                          PSA CWL 06-13.txt
                    675,000.00     -         700,000.00
                    700,000.00     -         725,000.00
                    725,000.00     -         750,000.00
                    750,000.00     -         775,000.00
                    775,000.00     -         800,000.00
                             >                800,000.00
----------------------------------------------------------------------------
----------------------------------------------
                             Wgt Ave / Total:
----------------------------------------------------------------------------
-------------------------------------------
```

</TABLE>

                                                          W-20


<PAGE>

<TABLE>
<CAPTION>

                  THE
                BANK OF
                  NEW
                  YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                          CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]


                                               Group [_]
----------------------------------------------------------------------------
-----------------------------------------------
                                               Number
Percent        Principal          Percent
                                  Issuance Coupon          of Items      of
Items          Balance            of Balance
----------------------------------------------------------------------------
-------------------------------------------
<S>                               <C>                      <C>          <C>
<C>            <C>                 <C>
                                   < =   -         5.0
                                  5.0    -         5.5
                                  5.5    -         6.0
                                  6.0    -         6.5
                                  6.5    -         7.0
                                  7.0    -         7.5
                                  7.5    -         8.0
                                  8.0    -         8.5
                                  8.5    -         9.0
                                  9.0    -         9.5
                                  9.5    -         10.0
                                  10.0   -         10.5
                              Page 241

```
                          PSA CWL 06-13.txt
                     10.5     -                 11.0
                     11.0     -                 11.5
                     11.5     -                 12.0
                     12.0     -                 12.5
                      >                         12.5
-------------------------------------------------------------------------------
-----------------------------------------------
                              Wgt Ave / Total:
-------------------------------------------------------------------------------
-----------------------------------------------


</TABLE>


<PAGE>


<TABLE>
<CAPTION>


              THE
           BANK OF
             NEW
             YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                         CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:       [_____]
               [_____]
Associate:     [_____]
               [_____]



                                              Group [_]
-------------------------------------------------------------------------------
-----------------------------------------------
                                        Number
Percent         Principal           Percent
                                  Issuance Coupon            of Items      of
Items           Balance           of Balance
-------------------------------------------------------------------------------
-----------------------------------------------
<S>                               <C>                       <C>            <C>
<C>             <C>                   <C>
                     < =                          5.0
                     5.0     -                    5.5
                     5.5     -                    6.0
                     6.0     -                    6.5
                     6.5     -                    7.0
                     7.0     -                    7.5
                     7.5     -                    8.0
                     8.0     -                    8.5
                     8.5     -                    9.0
                     9.0     -                    9.5
                     9.5     -                   10.0
                    10.0     -                   10.5
                          Page 242
```

```
                          PSA CWL 06-13.txt
                      10.5      -                11.0
                      11.0      -                11.5
                      11.5      -                12.0
                      12.0      -                12.5
                        >                        12.5
--------------------------------------------------------------------------
-----------------------------------------------
                               Wgt Ave / Total:
--------------------------------------------------------------------------
-----------------------------------------------
```

</TABLE>

                                                    W-22

<PAGE>


<TABLE>
<CAPTION>

            THE
          BANK OF
            NEW
            YORK

101 Barclay St., 8W
CWABS, Inc.
New York, NY  10286                                          CWABS
Asset-Backed Certificates Trust 200_-_

Series 200_-_
Officer:      [_____]
              [_____]
Associate:    [_____]
              [_____]



                                                    Group [_]
--------------------------------------------------------------------------
-----------------------------------------------
                                            Number
Percent        Principal          Percent
                                  Update Term        of Items      of
Items        Balance            of Balance
--------------------------------------------------------------------------
-----------------------------------------------
<S>                              <C>                <C>           <C>
<C>          <C>                  <C>
                              < =                    120
                              120     -              180
                              180     -              300
                              300     -              360
                                >                    360
--------------------------------------------------------------------------
-----------------------------------------------
                               Wgt Ave / Total:
--------------------------------------------------------------------------
-----------------------------------------------

                            Page 243
```

```
                          PSA CWL 06-13.txt

                                            Group [_]

-------------------------------------------------------------------------
-------------------------------------------------
                                     Number
Percent      Principal        Percent
                              Update Term            of Items      of
Items        Balance          of Balance
-------------------------------------------------------------------------
-------------------------------------------------
                              < =   -        120
                              120   -        180
                              180   -        300
                              300   -        360
                               >             360
-------------------------------------------------------------------------
-------------------------------------------------
                                     Wgt Ave / Total:
-------------------------------------------------------------------------
-------------------------------------------------
</TABLE>
                                            W-23
<PAGE>



                          EXHIBIT X-1

              FORM OF PERFORMANCE CERTIFICATION
                        (Subservicer)

                  On file with the Trustee.


                            X-1-1
<PAGE>




                          EXHIBIT X-2

              FORM OF PERFORMANCE CERTIFICATION
                          (Trustee)

                  On file with the Trustee.

                            X-2-1
<PAGE>




                          EXHIBIT Y

                           FORM OF
           SERVICING CRITERIA TO BE ADDRESSED IN
            ASSESSMENT OF COMPLIANCE STATEMENT
                          Page 244
```

PSA CWL 06-13.txt

    The assessment of compliance to be delivered by [the Master Servicer]
[Trustee] [Name of Subservicer] shall address, at a minimum, the criteria
identified as below as "Applicable Servicing Criteria":

<TABLE>
<CAPTION>

--------------------------------------------------------------------------------
----------------------------
                                    Servicing Criteria
        Applicable Servicing

            Criteria
--------------------------------------------------------------------------------
----------------------------
    Reference                                          Criteria
--------------------------------------------------------------------------------
----------------------------
                                General Servicing Considerations
<S>                     <C>
        <C>
---------------------
----------------------
                        Policies and procedures are instituted to monitor any
                        performance or other triggers and events of default in
1122(d)(1)(i)           accordance with the transaction agreements.
--------------------
----------------------
                        If any material servicing activities are outsourced to
                        third parties, policies and procedures are instituted to
                        monitor the third party's performance and compliance with
1122(d)(1)(ii)          such servicing activities.
--------------------
----------------------
                        Any requirements in the transaction agreements to
                        maintain a back-up servicer for the mortgage loans are
1122(d)(1)(iii)         maintained.
--------------------
----------------------
                        A fidelity bond and errors and omissions policy is in
                        effect on the party participating in the servicing
                        function throughout the reporting period in the amount of
                        coverage required by and otherwise in accordance with the
1122(d)(1)(iv)          terms of the transaction agreements.
--------------------
----------------------
                                Cash Collection and Administration
--------------------
----------------------
                        Payments on mortgage loans are deposited into the
                        appropriate custodial bank accounts and related bank
                        clearing accounts no more than two business days
                        following receipt, or such other number of days specified
1122(d)(2)(i)           in the transaction agreements.
--------------------
----------------------
                        Disbursements made via wire transfer on behalf of an
                        obligor or to an investor are made only by authorized
1122(d)(2)(ii)          personnel.
--------------------
----------------------
                        Advances of funds or guarantees regarding collections,
                                    Page 245

PSA CWL 06-13.txt

```
                        cash flows or distributions, and any interest or other
                        fees charged for such advances, are made, reviewed and
1122(d)(2)(iii)         approved as specified in the transaction agreements.
--------------------
        ---------------------
                        The related accounts for the transaction, such as cash
                        reserve accounts or accounts established as a form of
                        overcollateralization, are separately maintained (e.g.,
                        with respect to commingling of cash) as set forth in the
                        transaction
1122(d)(2)(iv)          agreements.
--------------------
        ---------------------
                        Each custodial account is maintained at a federally
                        insured depository institution as set forth in the
                        transaction agreements. For purposes of this criterion,
                        "federally insured depository institution" with respect
                        to a foreign financial institution means a foreign
                        financial institution that meets the requirements of Rule
1122(d)(2)(v)           13k-1(b)(1) of the Securities Exchange Act.
--------------------
        ---------------------
                        Unissued checks are safeguarded so as to prevent
1122(d)(2)(vi)          unauthorized access.
--------------------
        ---------------------


--------------------------------------------------------------------------------
----------------------------
</TABLE>
                                        Y-1

<PAGE>

<TABLE>
<CAPTION>

--------------------------------------------------------------------------------
----------------------------
                                   Servicing Criteria
        Applicable Servicing

            Criteria
--------------------------------------------------------------------------------
----------------------------
        Reference                                       Criteria
--------------------------------------------------------------------------------
----------------------------
<S>                     <C>
        <C>
--------------------
        ---------------------
                        Reconciliations are prepared on a monthly basis for all
                        asset-backed securities related bank accounts, including
                        custodial accounts and related bank clearing accounts.
                        These reconciliations are (A) mathematically accurate;
                        (B) prepared within 30 calendar days after the bank
                        statement cutoff date, or such other number of days
                        specified in the transaction agreements; (C) reviewed and
                        approved by someone other than the person who prepared
                        the reconciliation; and (D) contain explanations for
                        reconciling items. These reconciling items are resolved
```

PSA CWL 06-13.txt
```
                        within 90 calendar days of their original identification,
                        or such other number of days specified in the transaction
1122(d)(2)(vii)         agreements.
--------------------
        --------------------
                                    Investor Remittances and Reporting
--------------------
        --------------------
                        Reports to investors, including those to be filed with the
                        Commission, are maintained in accordance with the transaction
                        agreements and applicable Commission requirements.
Specifically,
                        such reports (A) are prepared in accordance with timeframes and
                        other terms set forth in the transaction agreements; (B)
provide
                        information calculated in accordance with the terms specified
in
                        the transaction agreements; (C) are filed with the Commission
as
                        required by its rules and regulations; and (D) agree with
                        investors' or the trustee's records as to the total unpaid
                        principal balance and number of mortgage loans serviced by the
1122(d)(3)(i)           Servicer.
--------------------
        --------------------
                        Amounts due to investors are allocated and remitted in
                        accordance with timeframes, distribution priority and
1122(d)(3)(ii)          other terms set forth in the transaction agreements.
--------------------
        --------------------
                        Disbursements made to an investor are posted within two
                        business days to the Servicer's investor records, or such
                        other number of
1122(d)(3)(iii)         days specified in the transaction agreements.
--------------------
        --------------------
                        Amounts remitted to investors per the investor reports
                        agree with cancelled checks, or other form of payment, or
                        custodial bank
1122(d)(3)(iv)          statements.
--------------------
        --------------------
                                    Pool Asset Administration
--------------------
        --------------------
                        Collateral or security on mortgage loans is maintained as
                        required by the transaction agreements or related
1122(d)(4)(i)           mortgage loan documents.
--------------------
        --------------------
                        Mortgage loan and related documents are safeguarded as required
by
1122(d)(4)(ii)          the transaction agreements
--------------------
        --------------------
                        Any additions, removals or substitutions to the asset
                        pool are made, reviewed and approved in accordance with
                        any conditions or requirements in the transaction
1122(d)(4)(iii)         agreements.
--------------------
        --------------------
                        Payments on mortgage loans, including any payoffs, made
                        in accordance with the related mortgage loan documents
                                    Page 247
```

PSA CWL 06-13.txt

are posted to the Servicer's obligor records maintained
no more than two business days after receipt, or such
other number of days specified in the transaction
agreements, and allocated to principal, interest or other
items (e.g., escrow) in accordance with the related
1122(d)(4)(iv)           mortgage loan documents.
-------------------
       ---------------------

The Servicer's records regarding the mortgage loans agree
with the Servicer's records with respect to an obligor's
1122(d)(4)(v)            unpaid principal balance.
-------------------
       ---------------------

Changes with respect to the terms or status of an
obligor's mortgage loans (e.g., loan modifications or
re-agings) are made, reviewed and approved by authorized
personnel in accordance with the transaction agreements
1122(d)(4)(vi)          and related pool asset documents.
-------------------
       ---------------------

Loss mitigation or recovery actions (e.g., forbearance
plans, modifications and deeds in lieu of foreclosure,
foreclosures and repossessions, as applicable) are
initiated, conducted and concluded in accordance with the
timeframes or other requirements established by the
1122(d)(4)(vii)         transaction agreements.
-------------------
       ---------------------

--------------------------------------------------------------------------------
-----------------------------
</TABLE>

                                        Y-2

<PAGE>

<TABLE>
<CAPTION>

--------------------------------------------------------------------------------
-----------------------------
                              Servicing Criteria
     Applicable Servicing

          Criteria
--------------------------------------------------------------------------------
-----------------------------
     Reference                                      Criteria
--------------------------------------------------------------------------------
-----------------------------
<S>                    <C>
     <C>

-------------------
       ---------------------
                        Records documenting collection efforts are maintained during
the
                        period a mortgage loan is delinquent in accordance with the
                        transaction agreements. Such records are maintained on at least
a
                        monthly basis, or such other period specified in the
transaction
                                        Page 248

PSA CWL 06-13.txt

agreements, and describe the entity's activities in monitoring
delinquent mortgage loans including, for example, phone calls,
letters and payment rescheduling plans in cases where
delinquency
1122(d)(4)(viii)      is deemed temporary (e.g., illness or unemployment).
--------------------
       --------------------
                     Adjustments to interest rates or rates of return for
                     mortgage loans with variable rates are computed based on
1122(d)(4)(ix)       the related mortgage loan documents.
--------------------
       --------------------
                     Regarding any funds held in trust for an obligor (such as
                     escrow accounts): (A) such funds are analyzed, in
                     accordance with the obligor's mortgage loan documents, on
                     at least an annual basis, or such other period specified
                     in the transaction agreements; (B) interest on such funds
                     is paid, or credited, to obligors in accordance with
                     applicable mortgage loan documents and state laws; and
                     (C) such funds are returned to the obligor within 30
                     calendar days of full repayment of the related mortgage
                     loans, or such other number of days specified in the
1122(d)(4)(x)        transaction agreements.
--------------------
       --------------------
                     Payments made on behalf of an obligor (such as tax or
                     insurance payments) are made on or before the related
                     penalty or expiration dates, as indicated on the
                     appropriate bills or notices for such payments, provided
                     that such support has been received by the servicer at
                     least 30 calendar days prior to these dates, or such
                     other number of days specified in the transaction
1122(d)(4)(xi)       agreements.
--------------------
       --------------------
                     Any late payment penalties in connection with any payment
                     to be made on behalf of an obligor are paid from the
                     servicer's funds and not charged to the obligor, unless
                     the late payment was due to the obligor's error or
1122(d)(4)(xii)      omission.
--------------------
       --------------------
                     Disbursements made on behalf of an obligor are posted
                     within two business days to the obligor's records
                     maintained by the servicer, or such other number of days
                     specified in the transaction
1122(d)(4)(xiii)     agreements.
--------------------
       --------------------
                     Delinquencies, charge-offs and uncollectible accounts are
                     recognized and recorded in accordance with the
1122(d)(4)(xiv)      transaction agreements.
--------------------
       --------------------
                     Any external enhancement or other support, identified in
                     Item 1114(a)(1) through (3) or Item 1115 of Regulation
                     AB, is maintained
1122(d)(4)(xv)       as set forth in the transaction agreements.
--------------------
       --------------------

--------------------------------------------------------------------------------
--------------------------------
                             Page 249

PSA CWL 06-13.txt

</TABLE>

```
                                 [NAME OF MASTER SERVICER]
                                 [NAME OF TRUSTEE]
                                 [NAME OF SUBSERVICER]


                                 Date:    _____


                                 By:  _____
                                 Name:
                                 Title:
```

Y-3

<PAGE>


EXHIBIT Z

[FORM OF] LIST OF ITEM 1119 PARTIES

ASSET BACKED CERTIFICATES,
Series 200_-__

[Date]

--------------------------------------------------------------------------------
Party                               Contact Information
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

Z-1

<PAGE>

PSA CWL 06-13.txt

EXHIBIT AA

FORM OF
SARBANES-OXLEY CERTIFICATION
(Replacement Master Servicer)

(On file with the Trustee)

AA-1

<PAGE>

S-2-1

<PAGE>

SCHEDULE I

PREPAYMENT CHARGE SCHEDULE AND PREPAYMENT CHARGE SUMMARY

[Delivered to Trustee at closing and on file with the Trustee.]

S-I-1

<PAGE>

SCHEDULE II

COLLATERAL SCHEDULE

<TABLE>
<CAPTION>

| Characteristic | Applicable Section | Loan Group 1 |
|---|---|---|
| Loan Group 2      Loan Group 3 | | |
| <S> | <C> | <C> |
|   <C>          <C> | | |
| Single-Family Detached Dwellings | 2.03(b)(32) | 77.23% |
| 73.51%          70.87% | | |
| Two- to Four-Family Dwellings | 2.03(b)(32) | 3.57% |
| 3.09%            1.91% | | |

Page 251

PSA CWL 06-13.txt

| | | |
|---|---|---|
| Low-Rise Condominium Units<br>9.10%          7.86% | 2.03(b)(32) | 3.36% |
| High-Rise Condominium Units<br>0.47%          0.18% | 2.03(b)(32) | 0.18% |
| Manufactured Housing<br>0.00%          0.53% | 2.03(b)(32) | 0.10% |
| PUDs<br>13.83          18.64% | 2.03(b)(32) | 15.55% |
| Earliest Origination Date<br>1/6/2006          12/30/2005 | 2.03(b)(33) | 6/19/2006 |
| Prepayment Penalty<br>62.84%          70.94% | 2.03(b)(35) | 73.72% |
| Investor Properties<br>5.61%          2.90% | 2.03(b)(36) | 2.40% |
| Primary Residences<br>92.75%          96.72% | 2.03(b)(36) | 97.23% |
| Lowest Current Mortgage Rate<br>5.500%          6.000% | 2.03(b)(48) | 5.500% |
| Highest Current Mortgage Rate<br>13.125%          14.500% | 2.03(b)(48) | 13.100% |
| Weighted Average Current Mortgage Rate<br>8.558%          8.643% | 2.03(b)(48) | 7.701% |
| Lowest Gross Margin<br>2.250%          4.500% | 2.03(b)(51) | N/A |
| Highest Gross Margin<br>11.600%          12.450% | 2.03(b)(51) | N/A |
| Weighted Average Gross Margin<br>7.207%          7.477% | 2.03(b)(51) | N/A |
| Date on or before which each Initial Mortgage<br>Loan has a Due Date<br>8/1/2006          8/1/2006 | 2.03(b)(52) | 8/1/2006 |

PSA CWL 06-13.txt

```
</TABLE>


<TABLE>
<CAPTION>

--------------------------------------------------------------------------------
-----------------------------------
  Adjustment Date        Applicable        Adjustable Rate Mortgage    Two-Year Hybrid
    Three-Year           Five-Year

                                             Loans (other than
                                          Two-Year, Three-Year and
                                          Five-Year Hybrid Mortgage

Hybrid Mortgage           Hybrid
                          Section                                       Mortgage Loans
    Loans            Mortgage Loans           Loans)
--------------------------------------------------------------------------------
-----------------------------------
   Latest Next
Adjustment Date        2.03(b)(34)                12/1/2006               7/1/2008
   7/1/2009            6/1/2011
<S>                       <C>                      <C>                     <C>
   <C>                    <C>
--------------------------------------------------------------------------------
-----------------------------------

</TABLE>
```

S-II-1

```
</TEXT>
</DOCUMENT>
```