FILED: NEW YORK COUNTY CLERK 06/29/2011

YSCEF DOC. NO. 1    Case 8:11-cv-01630-EAK-MAP    Document 31-3    Filed 03/30/12    Page 1 of 30 PageID 2970    RECEIVED NYSCEF: 06/29/201

# EXHIBIT A

# EXHIBIT A

**CWALT**

| | | | |
|---|---|---|---|
| CWALT 2004-10CB | CWALT 2005-22T1 | CWALT 2005-76 | CWALT 2006-40T1 |
| CWALT 2004-12CB | CWALT 2005-23CB | CWALT 2005-77T1 | CWALT 2006-41CB |
| CWALT 2004-13CB | CWALT 2005-24 | CWALT 2005-79CB | CWALT 2006-42 |
| CWALT 2004-14T2 | CWALT 2005-25T1 | CWALT 2005-7CB | CWALT 2006-43CB |
| CWALT 2004-15 | CWALT 2005-26CB | CWALT 2005-80CB | CWALT 2006-45T1 |
| CWALT 2004-16CB | CWALT 2005-27 | CWALT 2005-81 | CWALT 2006-46 |
| CWALT 2004-17CB | CWALT 2005-28CB | CWALT 2005-82 | CWALT 2006-4CB |
| CWALT 2004-18CB | CWALT 2005-29CB | CWALT 2005-83CB | CWALT 2006-5T2 |
| CWALT 2004-20T1 | CWALT 2005-30CB | CWALT 2005-84 | CWALT 2006-6CB |
| CWALT 2004-22CB | CWALT 2005-31 | CWALT 2005-85CB | CWALT 2006-7CB |
| CWALT 2004-24CB | CWALT 2005-32T1 | CWALT 2005-86CB | CWALT 2006-8T1 |
| CWALT 2004-25CB | CWALT 2005-33CB | CWALT 2005-9CB | CWALT 2006-9T1 |
| CWALT 2004-26T1 | CWALT 2005-34CB | CWALT 2005-AR1 | CWALT 2006-HY10 |
| CWALT 2004-27CB | CWALT 2005-35CB | CWALT 2005-IM1 | CWALT 2006-HY11 |
| CWALT 2004-28CB | CWALT 2005-36 | CWALT 2005-J1 | CWALT 2006-HY12 |
| CWALT 2004-29CB | CWALT 2005-37T1 | CWALT 2005-J10 | CWALT 2006-HY13 |
| CWALT 2004-2CB | CWALT 2005-38 | CWALT 2005-J11 | CWALT 2006-HY3 |
| CWALT 2004-30CB | CWALT 2005-3CB | CWALT 2005-J12 | CWALT 2006-J1 |
| CWALT 2004-32CB | CWALT 2005-4 | CWALT 2005-J13 | CWALT 2006-J2 |
| CWALT 2004-33 | CWALT 2005-40CB | CWALT 2005-J14 | CWALT 2006-J3 |
| CWALT 2004-34T1 | CWALT 2005-41 | CWALT 2005-J2 | CWALT 2006-J4 |
| CWALT 2004-35T2 | CWALT 2005-42CB | CWALT 2005-J3 | CWALT 2006-J5 |
| CWALT 2004-36CB | CWALT 2005-43 | CWALT 2005-J4 | CWALT 2006-J6 |
| CWALT 2004-3T1 | CWALT 2005-44 | CWALT 2005-J5 | CWALT 2006-J7 |
| CWALT 2004-4CB | CWALT 2005-45 | CWALT 2005-J6 | CWALT 2006-J8 |
| CWALT 2004-5CB | CWALT 2005-46CB | CWALT 2005-J7 | CWALT 2006-OA1 |
| CWALT 2004-6CB | CWALT 2005-47CB | CWALT 2005-J8 | CWALT 2006-OA10 |
| CWALT 2004-7T1 | CWALT 2005-48T1 | CWALT 2005-J9 | CWALT 2006-OA11 |
| CWALT 2004-8CB | CWALT 2005-49CB | CWALT 2006-11CB | CWALT 2006-OA12 |
| CWALT 2004-9T1 | CWALT 2005-50CB | CWALT 2006-12CB | CWALT 2006-OA14 |
| CWALT 2004-J10 | CWALT 2005-51 | CWALT 2006-13T1 | CWALT 2006-OA16 |
| CWALT 2004-J11 | CWALT 2005-52CB | CWALT 2006-14CB | CWALT 2006-OA17 |
| CWALT 2004-J12 | CWALT 2005-53T2 | CWALT 2006-15CB | CWALT 2006-OA18 |
| CWALT 2004-J13 | CWALT 2005-54CB | CWALT 2006-16CB | CWALT 2006-OA19 |
| CWALT 2004-J2 | CWALT 2005-55CB | CWALT 2006-17T1 | CWALT 2006-OA2 |
| CWALT 2004-J3 | CWALT 2005-56 | CWALT 2006-18CB | CWALT 2006-OA21 |
| CWALT 2004-J4 | CWALT 2005-57CB | CWALT 2006-19CB | CWALT 2006-OA22 |
| CWALT 2004-J5 | CWALT 2005-58 | CWALT 2006-20CB | CWALT 2006-OA3 |
| CWALT 2004-J6 | CWALT 2005-59 | CWALT 2006-21CB | CWALT 2006-OA6 |
| CWALT 2004-J7 | CWALT 2005-60T1 | CWALT 2006-23CB | CWALT 2006-OA7 |
| CWALT 2004-J8 | CWALT 2005-61 | CWALT 2006-24CB | CWALT 2006-OA8 |
| CWALT 2004-J9 | CWALT 2005-62 | CWALT 2006-25CB | CWALT 2006-OA9 |
| CWALT 2005-10CB | CWALT 2005-63 | CWALT 2006-26CB | CWALT 2006-OC1 |
| CWALT 2005-11CB | CWALT 2005-64CB | CWALT 2006-27CB | CWALT 2006-OC10 |
| CWALT 2005-13CB | CWALT 2005-65CB | CWALT 2006-28CB | CWALT 2006-OC11 |
| CWALT 2005-14 | CWALT 2005-66 | CWALT 2006-29T1 | CWALT 2006-OC2 |
| CWALT 2005-16 | CWALT 2005-67CB | CWALT 2006-2CB | CWALT 2006-OC3 |
| CWALT 2005-17 | CWALT 2005-69 | CWALT 2006-30T1 | CWALT 2006-OC4 |
| CWALT 2005-18CB | CWALT 2005-6CB | CWALT 2006-31CB | CWALT 2006-OC5 |
| CWALT 2005-19CB | CWALT 2005-70CB | CWALT 2006-32CB | CWALT 2006-OC6 |
| CWALT 2005-1CB | CWALT 2005-71 | CWALT 2006-33CB | CWALT 2006-OC7 |
| CWALT 2005-2 | CWALT 2005-72 | CWALT 2006-34 | CWALT 2006-OC8 |
| CWALT 2005-20CB | CWALT 2005-73CB | CWALT 2006-35CB | CWALT 2006-OC9 |
| CWALT 2005-21CB | CWALT 2005-74T1 | CWALT 2006-36T2 | CWALT 2007-10CB |
| | CWALT 2005-75CB | CWALT 2006-39CB | CWALT 2007-11T1 |

# EXHIBIT A

| | | | |
|---|---|---|---|
| CWALT 2007-12T1 | CWHL 2004-16 | CWHL 2005-29 | CWHL 2007-14 |
| CWALT 2007-13 | CWHL 2004-18 | CWHL 2005-3 | CWHL 2007-15 |
| CWALT 2007-14T2 | CWHL 2004-19 | CWHL 2005-30 | CWHL 2007-16 |
| CWALT 2007-15CB | CWHL 2004-2 | CWHL 2005-31 | CWHL 2007-17 |
| CWALT 2007-16CB | CWHL 2004-20 | CWHL 2005-5 | CWHL 2007-18 |
| CWALT 2007-17CB | CWHL 2004-21 | CWHL 2005-6 | CWHL 2007-19 |
| CWALT 2007-18CB | CWHL 2004-22 | CWHL 2005-7 | CWHL 2007-2 |
| CWALT 2007-19 | CWHL 2004-23 | CWHL 2005-9 | CWHL 2007-20 |
| CWALT 2007-1T1 | CWHL 2004-24 | CWHL 2005-HYB10 | CWHL 2007-21 |
| CWALT 2007-20 | CWHL 2004-25 | CWHL 2005-HYB1 | CWHL 2007-3 |
| CWALT 2007-21CB | CWHL 2004-29 | CWHL 2005-HYB2 | CWHL 2007-4 |
| CWALT 2007-22 | CWHL 2004-3 | CWHL 2005-HYB3 | CWHL 2007-5 |
| CWALT 2007-23CB | CWHL 2004-4 | CWHL 2005-HYB4 | CWHL 2007-6 |
| CWALT 2007-24 | CWHL 2004-5 | CWHL 2005-HYB5 | CWHL 2007-7 |
| CWALT 2007-25 | CWHL 2004-6 | CWHL 2005-HYB6 | CWHL 2007-8 |
| CWALT 2007-2CB | CWHL 2004-7 | CWHL 2005-HYB7 | CWHL 2007-9 |
| CWALT 2007-3T1 | CWHL 2004-8 | CWHL 2005-HYB8 | CWHL 2007-HY1 |
| CWALT 2007-4CB | CWHL 2004-9 | CWHL 2005-J1 | CWHL 2007-HY3 |
| CWALT 2007-5CB | CWHL 2004-HYB1 | CWHL 2005-J2 | CWHL 2007-HY4 |
| CWALT 2007-6 | CWHL 2004-HYB2 | CWHL 2005-J3 | CWHL 2007-HY5 |
| CWALT 2007-7T2 | CWHL 2004-HYB3 | CWHL 2005-J4 | CWHL 2007-HY6 |
| CWALT 2007-8CB | CWHL 2004-HYB4 | CWHL 2006-1 | CWHL 2007-HY7 |
| CWALT 2007-9T1 | CWHL 2004-HYB5 | CWHL 2006-10 | CWHL 2007-HYB1 |
| CWALT 2007-AL1 | CWHL 2004-HYB6 | CWHL 2006-11 | CWHL 2007-HYB2 |
| CWALT 2007-HY2 | CWHL 2004-HYB7 | CWHL 2006-12 | CWHL 2007-J1 |
| CWALT 2007-HY3 | CWHL 2004-HYB8 | CWHL 2006-13 | CWHL 2007-J2 |
| CWALT 2007-HY4 | CWHL 2004-HYB9 | CWHL 2006-14 | CWHL 2007-J3 |
| CWALT 2007-HY6 | CWHL 2004-J2 | CWHL 2006-15 | CWHL 2008-1 |
| CWALT 2007-HY7C | CWHL 2004-J3 | CWHL 2006-16 | **CWL** |
| CWALT 2007-HY8C | CWHL 2004-J4 | CWHL 2006-17 | CWL 2004-1 |
| CWALT 2007-HY9 | CWHL 2004-J5 | CWHL 2006-18 | CWL 2004-10 |
| CWALT 2007-J1 | CWHL 2004-J6 | CWHL 2006-19 | CWL 2004-11 |
| CWALT 2007-J2 | CWHL 2004-J7 | CWHL 2006-20 | CWL 2004-12 |
| CWALT 2007-OA10 | CWHL 2004-J8 | CWHL 2006-21 | CWL 2004-13 |
| CWALT 2007-OA11 | CWHL 2004-J9 | CWHL 2006-3 | CWL 2004-14 |
| CWALT 2007-OA2 | CWHL 2005-1 | CWHL 2006-6 | CWL 2004-15 |
| CWALT 2007-OA3 | CWHL 2005-10 | CWHL 2006-8 | CWL 2004-2 |
| CWALT 2007-OA4 | CWHL 2005-11 | CWHL 2006-9 | CWL 2004-3 |
| CWALT 2007-OA6 | CWHL 2005-12 | CWHL 2006-HYB1 | CWL 2004-4 |
| CWALT 2007-OA7 | CWHL 2005-13 | CWHL 2006-HYB2 | CWL 2004-5 |
| CWALT 2007-OA8 | CWHL 2005-14 | CWHL 2006-HYB3 | CWL 2004-6 |
| CWALT 2007-OA9 | CWHL 2005-15 | CWHL 2006-HYB4 | CWL 2004-7 |
| CWALT 2007-OH1 | CWHL 2005-16 | CWHL 2006-HYB5 | CWL 2004-8 |
| CWALT 2007-OH2 | CWHL 2005-17 | CWHL 2006-J1 | CWL 2004-9 |
| CWALT 2007-OH3 | CWHL 2005-18 | CWHL 2006-J2 | CWL 2004-AB1 |
| **CWHEL** | CWHL 2005-2 | CWHL 2006-J3 | CWL 2004-AB2 |
| CWHEL 2006-A | CWHL 2005-20 | CWHL 2006-J4 | CWL 2004-BC2 |
| CWHEL 2007-G | CWHL 2005-21 | CWHL 2006-OA4 | CWL 2004-BC3 |
| **CWHL** | CWHL 2005-22 | CWHL 2006-OA5 | CWL 2004-BC4 |
| CWHL 2004-10 | CWHL 2005-23 | CWHL 2006-TM1 | CWL 2004-BC5 |
| CWHL 2004-11 | CWHL 2005-24 | CWHL 2007-1 | CWL 2004-ECC1 |
| CWHL 2004-12 | CWHL 2005-25 | CWHL 2007-10 | CWL 2004-ECC2 |
| CWHL 2004-13 | CWHL 2005-26 | CWHL 2007-11 | CWL 2004-S1 |
| CWHL 2004-14 | CWHL 2005-27 | CWHL 2007-12 | CWL 2004-SD2 |
| CWHL 2004-15 | CWHL 2005-28 | CWHL 2007-13 | CWL 2004-SD3 |

## EXHIBIT A

CWL 2004-SD4
CWL 2005-1
CWL 2005-10
CWL 2005-11
CWL 2005-12
CWL 2005-13
CWL 2005-14
CWL 2005-15
CWL 2005-16
CWL 2005-17
CWL 2005-2
CWL 2005-3
CWL 2005-4
CWL 2005-5
CWL 2005-6
CWL 2005-7
CWL 2005-8
CWL 2005-9
CWL 2005-AB1
CWL 2005-AB2
CWL 2005-AB3
CWL 2005-AB4
CWL 2005-AB5
CWL 2005-BC1
CWL 2005-BC2
CWL 2005-BC3
CWL 2005-BC4
CWL 2005-BC5
CWL 2005-HYB9
CWL 2005-IM1
CWL 2005-IM2
CWL 2005-IM3
CWL 2005-SD1
CWL 2005-SD2
CWL 2005-SD3
CWL 2006-1
CWL 2006-10
CWL 2006-11
CWL 2006-12
CWL 2006-13
CWL 2006-14
CWL 2006-15
CWL 2006-16
CWL 2006-17
CWL 2006-18
CWL 2006-19
CWL 2006-2
CWL 2006-20
CWL 2006-21
CWL 2006-22
CWL 2006-23
CWL 2006-24
CWL 2006-25
CWL 2006-26
CWL 2006-3

CWL 2006-4
CWL 2006-5
CWL 2006-6
CWL 2006-7
CWL 2006-8
CWL 2006-9
CWL 2006-ABC1
CWL 2006-BC1
CWL 2006-BC2
CWL 2006-BC3
CWL 2006-BC4
CWL 2006-BC5
CWL 2006-IM1
CWL 2006-QH1
CWL 2006-SD1
CWL 2006-SD2
CWL 2006-SD3
CWL 2006-SD4
CWL 2006-SPS1
CWL 2006-SPS2
CWL 2007-1
CWL 2007-10
CWL 2007-11
CWL 2007-12
CWL 2007-13
CWL 2007-2
CWL 2007-3
CWL 2007-4
CWL 2007-5
CWL 2007-6
CWL 2007-7
CWL 2007-8
CWL 2007-9
CWL 2007-BC1
CWL 2007-BC2
CWL 2007-BC3
CWL 2007-SD1
CWL 2007-SEA1
CWL 2007-SEA2

# EXHIBIT B

# SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by and among (i) The Bank of New York Mellon (f/k/a The Bank of New York) in its capacity as trustee or indenture trustee of certain mortgage-securitization trusts identified herein ("BNY Mellon" or the "Trustee"), and (ii) Bank of America Corporation ("BAC"), and BAC Home Loans Servicing, LP ("BAC HLS") (collectively, "Bank of America") and Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc. ("CHL") (collectively, "Countrywide").

WHEREAS, BNY Mellon is the trustee or indenture trustee for the trusts corresponding to the five hundred and thirty (530) residential mortgage-backed securitizations listed on Exhibit A hereto (the "Covered Trusts");

WHEREAS, Countrywide sold Mortgage Loans, which served as collateral for the Covered Trusts;

WHEREAS, the Trustee, CHL, and/or BAC HLS are parties to the Pooling and Servicing Agreements and in some cases Sale and Servicing Agreements and Indentures governing the Covered Trusts (as amended, modified, and supplemented from time-to-time, the "Governing Agreements"), and CHL, Countrywide Home Loans Servicing, LP, and/or BAC HLS has acted as Master Servicer for the Covered Trusts ("Master Servicer");

WHEREAS, certain significant holders of certificates or notes representing interests in certain of the Covered Trusts and investment managers of accounts holding such certificates or notes (the "Institutional Investors," as defined in more detail in the Institutional Investor Agreement) have entered into a separate Institutional Investor Agreement with the Trustee, Bank of America and Countrywide, the due execution of which is a condition to the effectiveness of this Settlement Agreement;

WHEREAS, allegations have been made of breaches of representations and warranties contained in the Governing Agreements with respect to the Covered Trusts (including alleged failure to comply with underwriting guidelines (including limitations on underwriting exceptions), to comply with required loan-to-value and debt-to-income ratios, to ensure appropriate appraisals of mortgaged properties, and to verify appropriate owner-occupancy

status) and of the repurchase provisions contained in the Governing Agreements;

WHEREAS, the Institutional Investors have sought to provide notice pursuant to certain of the Governing Agreements claiming failure by Bank of America and Countrywide, and affiliates, divisions, and subsidiaries thereof, to perform thereunder, and have alleged Mortgage Loan-servicing breaches and documentation defects against Bank of America and Countrywide, and affiliates, divisions, and subsidiaries thereof, and Bank of America and Countrywide dispute such allegations and waive no rights, and preserve all of their defenses, with respect to such allegations and putative notices;

WHEREAS, the Institutional Investors have asserted that Bank of America is liable for the obligations of Countrywide with respect to the Covered Trusts, and Bank of America disputes that contention and waives no rights, and preserves all of its defenses, with respect to such contention;

WHEREAS, the Institutional Investors formed a steering committee (comprised of BlackRock Financial Management, Inc., Pacific Investment Management Company LLC, certain ING companies, Metropolitan Life Insurance Company, and the Federal Home Loan Mortgage Corporation ("Freddie Mac"));

WHEREAS, the Trustee, Bank of America, Countrywide, and the Institutional Investors have engaged in arm's-length settlement negotiations that included the exchange of confidential materials;

WHEREAS, in the settlement negotiations, the Trustee received and evaluated information presented by Bank of America, Countrywide, and the Institutional Investors related to potential liabilities and defenses, and alleged damages, and has determined, in the exercise of its discretion as Trustee, that entry into this Settlement Agreement and the settlement contemplated thereby (the "Settlement") is within the Trustee's powers under the Governing Agreements and applicable law and in the best interests of and advantageous to the Covered Trusts; and

WHEREAS, as set forth below, the Settlement is subject to judicial approval, and, toward that end, the Trustee will commence in the Supreme Court of the State of New York, County of

New York (the "Settlement Court"), in its capacity as trustee or indenture trustee under the Governing Agreements, a proceeding under Article 77 of the New York Civil Practice Law and Rules (the "Article 77 Proceeding") and file a verified petition that seeks a final order and judgment that conforms in all material respects to the form attached as Exhibit B hereto (the "Final Order and Judgment").

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.      **Definitions**.  Any capitalized terms not defined herein shall have the definition given to them in the Governing Agreements.  As used in this Settlement Agreement, in addition to the terms otherwise defined herein or in the Governing Agreements, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement):

(a)      "Approval Date" shall mean the date upon which Final Court Approval, as defined in Paragraph 2, is obtained;

(b)      "Bank of America Parties" shall mean BAC and any of its past, present, or future, direct or indirect affiliates, parents, divisions, or subsidiaries (including BAC HLS and Bank of America, N.A.), and each of their respective past, present, or future, direct or indirect affiliates, parents, divisions, subsidiaries, general partners, limited partners, shareholders, officers, directors, trustees, members, employees, agents, servants, attorneys, accountants, insurers, co-insurers, and re-insurers, and the predecessors, successors, heirs, and assigns of each of the foregoing;

(c)      "BNY Mellon Parties" shall mean BNY Mellon and any of its past, present, or future, direct or indirect affiliates, parents, divisions, or subsidiaries, on behalf of themselves and each of their respective past, present, or future, direct or indirect affiliates, parents, divisions, subsidiaries, general partners, limited partners, officers, directors, trustees, co-trustees, members, employees, agents, servants, attorneys, accountants, insurers, co-insurers, and re-insurers, and the predecessors, successors, heirs, and assigns of the foregoing;

(d)      "Code" means the Internal Revenue Code of 1986, as amended;

- 3 -

(e)     "Countrywide Parties" shall mean CFC and any of its past, present, or future, direct or indirect affiliates, parents, divisions, or subsidiaries (including CHL, Countrywide Capital Markets, Countrywide Bank FSB, Countrywide Securities Corporation, Countrywide Home Loans Servicing, LP (now known as BAC Home Loans Servicing, LP), CWMBS, Inc., CWABS, Inc., CWALT, Inc., CWHEQ, Inc., Park Granada LLC, Park Monaco Inc., Countrywide LFT LLC, and Park Sienna LLC), and each of their respective past, present, or future, direct or indirect affiliates, parents, divisions, subsidiaries, general partners, limited partners, shareholders, officers, directors, trustees, members, employees, agents, servants, attorneys, accountants, insurers, co-insurers, and re-insurers, and the predecessors, successors, heirs, and assigns of the foregoing;

(f)     "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority);

(g)     "Investors" shall mean all certificateholders and noteholders in the Covered Trusts, and their successors in interest, assigns, and transferees;

(h)     "Law" shall mean collectively (whether now or hereafter enacted, promulgated, entered into, or agreed to) all laws (including common law), statutes, ordinances, codes, rules, regulations, directives, decrees, and orders, whether by consent or otherwise, of Governmental Authorities, or publicly-disclosed agreements between any Party and any Governmental Authority;

(i)     "Losses" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, assessments, demands, charges, fees, judgments, awards, disbursements and amounts paid in settlement, punitive damages, foreseeable and unforeseeable damages, incidental or

consequential damages, of whatever kind or nature (including attorneys' fees and other costs of defense and disbursements);

(j)      "Party" shall refer individually to each of the Trustee, Bank of America, and Countrywide, which shall collectively be the "Parties";

(k)      "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority;

(l)      "REMIC" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code;

(m)      "REMIC Provisions" shall mean the provisions of United States federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through Section 860G of the Code, and related provisions and regulations promulgated thereunder, as the foregoing may be in effect from time to time;

(n)      "Settlement Agreement" shall mean this settlement agreement, together with all of its Exhibits; and

(o)      "Signing Date" shall mean the date on which this Settlement Agreement is first executed by all of the Parties.  The Signing Date may also be referred to herein as the date of this Settlement Agreement.

## 2.    **Final Court Approval.**

(a)      <u>Requirement of Final Court Approval</u>.  Where provided for herein, the terms of this Settlement Agreement are subject to and conditioned upon "Final Court Approval."  Final Court Approval shall have occurred only after (i) the Article 77 Proceeding is commenced, (ii) notice of the Settlement and related matters is provided to the extent reasonably practicable to the Investors in a form and by a method approved by the Settlement Court, (iii) the Investors are given an opportunity to object and to make their views known to the Settlement Court in such manner as the Settlement Court may direct, (iv) the Trustee and any other supporter of the Settlement are given the opportunity to make their views known to the Settlement Court in such

manner as the Settlement Court may direct, (v) the Settlement Court enters in the Article 77 Proceeding (including in a subsequent proceeding following an appeal and remand) the Final Order and Judgment (provided that if the Settlement Court enters an order that does not conform in all material respects to the form of order attached as Exhibit B hereto, the Parties may, by the written agreement of all Parties, deem that order to be the Final Order and Judgment; and provided further that, if the Settlement Court modifies Subparagraphs 3(d)(i), (ii), or (iii) (in each case in a manner consistent with the Governing Agreements) that modification shall not be considered to be a material change to the form of order attached as Exhibit B hereto), and (vi) either the time for taking any appeal of the Final Order and Judgment has expired without such an appeal being filed or, if an appeal is taken, upon entry of an order affirming the Final Order and Judgment and when the applicable period for the appeal of such affirmance of the Final Order and Judgment has expired, or, if an appeal is taken from any decision affirming the Final Order and Judgment, upon entry of an order in such appeal finally affirming the Final Order and Judgment without right of further appeal or upon entry of any stipulation dismissing any such appeal with no right of further prosecution of the appeal (in all circumstances there being no possibility of such Final Order and Judgment being upset on appeal therefrom, or in any related appeal from an order of the Settlement Court in the Article 77 Proceeding, or in any other proceeding pending at the time when all other prerequisites for Final Court Approval are met that puts into issue the validity of the Settlement).   All Parties will use their reasonable best efforts to obtain Final Court Approval.

(b)     Effect of Failure to Obtain Final Court Approval.   If at any time Final Court Approval of the Settlement shall become legally impossible (including by reason of the denial of Final Court Approval by a court with no possibility of further appeal or proceedings that could result in Final Court Approval), the Settlement Agreement shall be null and void and have no further effect as to the Parties except as set forth in this Subparagraph 2(b) and other provisions not specifically provided for herein as being subject to or conditioned upon Final Court Approval.   In such event:  (i) except as provided in Paragraph 7, the Parties hereto shall be deemed to have reverted to their respective status as to all claims, positions, defenses, and responses as of the date a day prior to the Signing Date, and (ii) the provisions of Paragraph 20 shall apply, along with such other provisions hereof not specifically provided for as being subject to or conditioned upon Final Court Approval.   If Final Court Approval has not been obtained by

- 6 -

December 31, 2015, then Bank of America and Countrywide shall be permitted to withdraw from this Settlement Agreement and from the Settlement with like effect as if Final Court Approval had become legally impossible but only if the Trustee consents to such withdrawal in writing if in good faith it deems such withdrawal to be in the best interests of the Covered Trusts.

(c)     Preliminary Order.  As an initial step towards seeking Final Court Approval, as soon as is practicable after the Signing Date, the Trustee shall commence the Article 77 Proceeding and seek a preliminary order (the "Preliminary Order") to be entered by the Settlement Court providing for and/or requiring:   (i) a form and method of notice of the Settlement and related matters to Investors (in a form and by a method agreed to after consultation with the other Parties), (ii) a deadline for the filing of written objections to the Settlement and responses thereto, (iii) a hearing date at which the Settlement Court would consider whether to enter the Final Order and Judgment, (iv) a direction that all actions subsequently filed that contain claims that would be within the release and waiver provided for in Paragraph 9 should be assigned or transferred to the justice of the Settlement Court before whom the Article 77 Proceeding is pending, and (v) ordering that the Trustee may seek direction from the Settlement Court before taking any action in respect of a Covered Trust that relates to the subject matter of the Article 77 Proceeding.  At the same time as the Trustee seeks the Preliminary Order, it shall also file with the Settlement Court a petition stating its support for the Settlement Agreement.

(d)     Cost of Notice.  All costs related to the giving of notice of this Settlement and related matters as part of the Article 77 Proceeding shall be borne by Bank of America and/or Countrywide.

(e)     Federal Tax Ruling.  Final Court Approval shall be deemed not to have been obtained unless and until there has been received private letter ruling(s) applicable to all of the Covered Trusts from the Internal Revenue Service to the effect that:  (i) the execution of, and the transactions contemplated by, this Settlement Agreement, including (A) allocation of the Settlement Payment to a Covered Trust and the methodology for determining such allocation, (B) the receipt of the Settlement Payment by a Covered Trust, (C) the distribution of the Settlement Payment by a Covered Trust to any of its Investors and the methodology for

determining such distributions, and (D) any monthly Master Servicing Fee Adjustment received by or otherwise credited to such Covered Trust will not cause any portion of a Covered Trust for which a REMIC election has been made in accordance with the applicable Governing Agreement to fail to qualify at any time as a REMIC, and (ii) the receipt of the Settlement Payment by the Covered Trusts and the receipt or other credit of any monthly Master Servicing Fee Adjustment by the Covered Trusts will not cause, or result in, the imposition of any taxes on the Covered Trusts or on any portion of a Covered Trust for which a REMIC election has been made in accordance with the terms of the applicable Governing Agreement. The Trustee shall cause a request for such letter ruling(s) to be submitted to the Internal Revenue Service within thirty (30) days of the Signing Date, or, if the Internal Revenue Service is not amenable to receipt of the Trustee's request for rulings within this thirty day period, as promptly as practicable thereafter, and shall use reasonable best efforts to pursue such request; such request may not be abandoned without the consent (which shall not unreasonably be withheld) of Bank of America, Countrywide, and the Institutional Investors. Bank of America and Countrywide shall use their reasonable best efforts to assist in the Trustee's preparation and pursuit of the request for the rulings. In the event that the provisions of Subparagraph 3(d)(i), (ii), or (iii) of this Settlement Agreement are modified by the Settlement Court, the Trustee shall update its request to the Internal Revenue Service to take account of such modifications, and the requirements of this Subparagraph 2(e) necessary for there to be Final Court Approval shall be deemed not to have been satisfied until there has been received private letter ruling(s) applicable to the Covered Trusts that takes account of such modifications and otherwise meets the requirements of (i) and (ii) of this Subparagraph 2(e).

(f)     <u>State Tax Rulings or Opinions</u>. Final Court Approval shall be deemed not to have been obtained unless and until there has been received at the Trustee's request an opinion of Trustee tax counsel with respect to the States of New York and California, in each case, to the same legal effect as the requested rulings described in Subparagraph 2(e)(i) and (ii). The Trustee shall use reasonable best efforts to pursue such requests for opinions; any such requests may not be abandoned without the consent (which shall not unreasonably be withheld) of Bank of America, Countrywide, and the Institutional Investors. Bank of America and Countrywide shall use their reasonable best efforts to assist in the Trustee's preparation and pursuit of the foregoing requests. In the event that the provisions of Subparagraphs 3(d)(i), (ii), or (iii) of this Settlement

Agreement are modified by the Settlement Court, the Trustee shall update its requests for such opinions to take account of such modifications, and the requirements of this Subparagraph 2(f) necessary for there to be Final Court Approval shall be deemed not to have been satisfied until each of the opinions described in this Subparagraph 2(f) is received in a form that takes account of such modifications and otherwise meets the requirements of this Subparagraph 2(f).

(g)      The Parties may collectively agree, each acting in its sole discretion, to deem the requirements of Subparagraphs 2(e) ("Federal Tax Ruling") or 2(f) ("State Tax Rulings or Opinions") to have been met by the receipt of tax rulings or opinions, as the case may be, that are substantially in accord with the requirements of such Subparagraphs 2(e) or 2(f).

3.      **Settlement Amount**.

(a)      Settlement Payment. If and only if Final Court Approval is obtained, Bank of America and/or Countrywide shall pay or cause to be paid eight billion five hundred million dollars ($8,500,000,000.00) (the "Settlement Payment") within one-hundred and twenty (120) days of the Approval Date, in accordance with the following provisions.

(b)      Method of Payment. Each Covered Trust's Allocable Share of the Settlement Payment shall be wired to the Certificate Account or Collection Account for such Covered Trust by Bank of America as directed by the Trustee following determination of the Allocable Share of each Covered Trust pursuant to Subparagraph 3(c); provided, that if the Allocable Share of each Covered Trust has not been determined pursuant to Subparagraph 3(c) at the time at which the Settlement Payment is due pursuant to Subparagraph 3(a), the Settlement Payment shall be wired to a non-interest-bearing escrow account at BNY Mellon (the "Escrow Account") set up for the sole purpose of holding the Settlement Payment until the relevant Allocable Shares have been determined, at which time each Allocable Share of the Settlement Payment shall be wired from the Escrow Account to the Certificate Account or Collection Account for each applicable Covered Trust. The Parties undertake to use reasonable best efforts to enter into a reasonably satisfactory escrow agreement in the event that an Escrow Account is required, which shall include instructions regarding the payment of the Allocable Shares from the Escrow Account to the Covered Trusts by the Trustee. All of the Trustee's reasonable costs and expenses associated with performing its obligations under this Subparagraph 3(b) that exceed its ordinary costs and

expenses as Trustee shall be borne by Bank of America and/or Countrywide. If, after the Approval Date, all or any portion of the Settlement Payment is voided or rescinded for any reason, including as a preferential or fraudulent transfer (an "Avoided Payment"), that Avoided Payment shall be treated for purposes of this Paragraph 3 as though it were not made at all (provided that written notice has been given by the Trustee to Bank of America and Countrywide and Bank of America or Countrywide has not cured, made, or restored such payment within sixty (60) days). In the event of an Avoided Payment, the BNY Mellon Parties shall have no liability to any Person whatsoever for any Avoided Payment or any liability or losses relating thereto.

(c)     Allocation Formula. The Settlement Payment shall be allocated by the Trustee amongst the Covered Trusts. The Trustee shall retain a qualified financial advisor (the "Expert") to make any determinations and perform any calculations that are required in connection with the allocation of the Settlement Payment among the Covered Trusts. For avoidance of doubt, for purposes of this Subparagraph 3(c), the term "Covered Trust" shall include any Excluded Covered Trusts. To the extent that the collateral in any Covered Trust is divided by the Governing Agreements into groups of loans ("Loan Groups") so that ordinarily only certain classes of Investors benefit from the proceeds of particular Loan Groups, those Loan Groups shall be deemed to be separate Covered Trusts for purposes of the allocation and distribution methodologies set forth below. The Trustee shall instruct the Expert to apply the following allocation formula:

(i)     First, the Expert shall calculate the amount of net losses for each Covered Trust that have been or are estimated to be borne by that trust from its inception date to its expected date of termination as a percentage of the sum of the net losses that are estimated to be borne by all Covered Trusts from their inception dates to their expected dates of termination (such amount, the "Net Loss Percentage");

(ii)    Second, the Expert shall calculate the "Allocable Share" of the Settlement Payment for each Covered Trust by multiplying (A) the amount of the Settlement Payment by (B) the Net Loss Percentage for such Covered Trust, expressed as a decimal; provided that the Expert shall be entitled to make adjustments to the Allocable Share of each Covered Trust to

- 10 -

EXECUTION COPY

ensure that the effects of rounding do not cause the sum of the Allocable Shares for all Covered Trusts to exceed the applicable Settlement Payment;

(iii)     *Third*, if applicable, the Expert shall calculate the portion of the Allocable Share that relates to principal-only certificates or notes and the portion of the Allocable Share that relates to all other certificates or notes; and

(iv)     The Expert shall calculate the Allocable Share within ninety (90) days of the Approval Date.

(d)     <u>Distribution of the Allocable Shares; Increase of Balances</u>.

(i)     After the Allocable Share for each Covered Trust has been deposited into the Certificate Account or Collection Account for each Covered Trust, the Trustee shall distribute it to Investors in accordance with the distribution provisions of the Governing Agreements (taking into account the Expert's determination under Subparagraph 3(c)(iii)) as though it was a Subsequent Recovery available for distribution on that distribution date (provided that if the Governing Agreement for a particular Covered Trust does not include the term "Subsequent Recovery," the Allocable Share of such Covered Trust shall be distributed as though it was unscheduled principal available for distribution on that distribution date); provided, however, that the Master Servicer shall not be entitled to receive any portion of the Allocable Share distributed to any Covered Trust, it being understood that the Master Servicer's other entitlements to payments, and to reimbursement or recovery, including of Advances and Servicing Advances, under the terms of the Governing Agreements shall not be affected by this Settlement Agreement except as expressly provided in this Subparagraph 3(d)(i) and in Subparagraph 5(c)(iv).   To the extent that as a result of the distribution of the Allocable Share in a particular Covered Trust a principal payment would become payable to a class of REMIC residual interests, whether on the distribution of the Allocable Share or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Covered Trust, such payment shall be maintained in the distribution account and the Trustee shall distribute it on the next distribution date according to the provisions of this Subparagraph 3(d)(i).

- 11 -

(ii)     In addition, after the distribution of the Allocable Share to Investors pursuant to Subparagraph 3(d)(i), the Trustee will allocate the amount of the Allocable Share for that Covered Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable, of each class of Certificates or Notes (or Components thereof) (other than any class of REMIC residual interests) to which Realized Losses have been previously allocated, but in each case by not more than the amount of Realized Losses previously allocated to that class of Certificates or Notes (or Components thereof) pursuant to the Governing Agreements. For the avoidance of doubt, for Covered Trusts for which the Senior Credit Support Depletion Date shall have occurred prior to the allocation of the amount of the Allocable Share in accordance with the immediately preceding sentence, in no event shall the foregoing allocation be deemed to reverse the occurrence of the Senior Credit Support Depletion Date in such Covered Trusts.   Holders of such Certificates or Notes (or Components thereof) will not be entitled to any payment in respect of interest on the amount of such increases for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date.   Any such increase shall be applied pro rata to the Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance of each Certificate or Note of each class.   For the avoidance of doubt, this Subparagraph 3(d)(ii) is intended only to increase Class Certificate Balances, Component Balances, Component Principal Balances, and Note Principal Balances, as provided for herein, and shall not affect the distribution of the Settlement Payment provided for in Subparagraph 3(d)(i).

(iii)     In no event shall the deposit or distribution of any amount hereunder into any Covered Trust be deemed to reduce the collateral losses experienced by such Covered Trust.

(iv)     For any of the Covered Trusts in which there is a third-party guaranty or other financial guaranty provided for one or more tranches by an entity that has not previously released the right to seek repurchase of Mortgage Loans, notwithstanding anything else in this Settlement Agreement, Bank of America and Countrywide shall, up to the Approval Date, have the option to exclude such Covered Trust from the Settlement, unless and until an agreement is reached by Bank of America, Countrywide, and the third-party guarantor or financial-guaranty provider, pursuant to which the third-party guarantor or financial guaranty provider agrees not to make any

- 12 -

repurchase demands with relation to that Covered Trust.  In the event that a Covered Trust is excluded under this Subparagraph 3(d)(iv), it shall be treated in accordance with Subparagraph 4(a).

(v)     Nothing in Subparagraphs 3(d)(i), (ii), or (iii) is intended to or shall be construed to amend any Governing Agreements; a modification of Subparagraphs 3(d)(i), (ii), or (iii) (in each case in a manner consistent with the Governing Agreements) by the Settlement Court shall not constitute a material change to the terms of this Settlement Agreement.

(vi)    The Trustee shall administer the distribution of the Allocable Shares pursuant to this Settlement Agreement and the Governing Agreements.  Under no circumstances shall Bank of America or Countrywide have any liability to the Trustee, the Investors, the Covered Trusts, or any other Person in connection with such determination, administration, or distribution (including distribution within each Covered Trust) of the Allocable Shares, including under any indemnification obligation provided for in any Governing Agreement (including as clarified by the side-letter attached as Exhibit C to this Settlement Agreement).

(e)     Determinations by the Expert.  In the absence of bad faith or manifest error, the Expert's determinations and calculations in connection with the Allocable Share of each Covered Trust shall be treated as final and accepted by all Parties for purposes of Paragraph 3.

4.      **Effect of Exclusion of Trusts**.

(a)     Excluded Covered Trusts.  In the event that any Covered Trust is excluded from the Settlement (an "Excluded Covered Trust"), the Allocable Share that would otherwise become payable to that Excluded Covered Trust shall be paid to Bank of America (as a matter of convenience for allocation as between Bank of America and Countrywide as appropriate), and there shall be no obligation by any of the Bank of America Parties or the Countrywide Parties to make any payments or provide any of the benefits of the Settlement to such Excluded Covered Trust or to Investors therein, or to comply with any of the provisions of Paragraphs 5 or 6 (except as specifically provided therein) with respect to such Excluded Covered Trust.  The Trustee shall not be limited in the actions that it may take with respect to any Excluded Covered Trust (subject to the provisions of Paragraphs 17 and 20).

(b)     <u>Withdrawal From Settlement</u>.   In the event that one or more Covered Trusts, holding, in the aggregate, Mortgage Loans with unpaid principal balances as of the first Trustee report after the Signing Date aggregating in excess of a confidential percentage of the total unpaid principal balance of the Covered Trusts as of that date, such percentage having been provided to the Trustee by Bank of America and Countrywide prior to the execution of this Settlement Agreement, shall become Excluded Covered Trusts, Bank of America and Countrywide shall have the option, in their sole discretion, to withdraw from the Settlement with like effect as if Final Court Approval had become legally impossible.   For purposes of calculating the unpaid principal balance of Excluded Covered Trusts in connection with this Subparagraph 4(b), the unpaid principal balance of Covered Trusts that become Excluded Covered Trusts at the election of Bank of America or Countrywide pursuant to Subparagraph 3(d)(iv) shall not be included.

5.     <u>Servicing</u>.   The Master Servicer shall implement the following servicing improvements (the "Servicing Improvements").   Material compliance with the provisions of this Paragraph 5 shall satisfy the Master Servicer's obligation to service the Mortgage Loans prudently in accordance with the relevant provisions of the Governing Agreements:

(a)     <u>Subservicer Selection and Assignment</u>.   In conformity with the subservicing provisions of the Governing Agreements:

(i)     Within thirty (30) days of the Signing Date, the Institutional Investors and the Master Servicer shall agree on a list (the "Agreed List") of no fewer than eight and no more than ten subservicers  (each a "Subservicer" and together the "Subservicers") to service High Risk Loans (as defined in Subparagraph 5(b)) and submit the Agreed List to the Trustee for review.   If agreed by the Institutional Investors and the Master Servicer, the Master Servicer or an affiliate of the Master Servicer may serve as a Subservicer (in addition to the eight to ten to be otherwise agreed) and be included on the Agreed List.   Within forty-five (45) days of receipt of the Agreed List, the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may object to any of the Subservicers on the Agreed List or reduce the maximum number of Mortgage Loans from the Covered Trusts that any such Subservicer may service at any one time to less than

30,000; provided that the Trustee may object to a Subservicer, or reduce the maximum number of Mortgage Loans from the Covered Trusts that any such Subservicer may service at any one time, only on the grounds listed in Exhibit D hereto and none other. The Trustee shall act in good faith in its approval decisions and shall include in any decision to object to a particular Subservicer the grounds for such objection. In the absence of an objection by the Trustee, all of the Subservicers on the Agreed List shall be deemed to be approved. If the Trustee objects to one or more Subservicers, all of the Subservicers on the Agreed List as to which there has been no objection shall be deemed approved. The Subservicers approved, or deemed approved, by the Trustee shall make up the "Approved List."

(ii)     If the Trustee objects to a Subservicer on the Agreed List, or if a Subservicer on the Approved List at any time fails to meet, or ceases to meet, any of the qualifications described in Subparagraph 5(a)(iii), the Master Servicer shall remove such Subservicer from the Agreed List and/or the Approved List, as applicable, and may:  (A) propose to replace any such Subservicer with a new subservicer by written notice to the Trustee, subject to such new subservicer meeting the qualifications described in Subparagraph 5(a)(iii) or (B) if applicable, re-submit such Subservicer to the Trustee for approval, provided that the Master Servicer has a commercially reasonable basis for believing that the grounds for the Trustee's objection to the subservicer are no longer applicable. Within fourteen (14) days of receipt of such notice or re-submission, the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may object to the proposed subservicer or reduce the maximum number of Mortgage Loans from the Covered Trusts that such proposed subservicer may service at any one time to less than 30,000; provided that the Trustee may object to a proposed subservicer or reduce the maximum number of Mortgage Loans from the Covered Trusts only on the grounds listed in Exhibit D hereto and none other. In the absence of an objection, the proposed subservicer shall be deemed approved and included on the Approved List. If the Trustee objects to a proposed subservicer, the Master Servicer may propose another subservicer pursuant to the process set out above, which process may be repeated multiple times. If the Trustee, pursuant to this Subparagraph 5(a)(ii), reduces the maximum number of Mortgage Loans that a Subservicer may service at any one time to less than 30,000, the Master Servicer may request from time to time that the Trustee lift or revise any such reduction of the maximum number of Mortgage Loans that that Subservicer may service

- 15 -

(subject to the maximum of 30,000 outstanding Mortgage Loans at any one time established by this Paragraph 5), and the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may agree or disagree, provided that the Trustee shall make such decision only on the grounds listed in Exhibit D hereto and none other.   Nothing herein shall be construed as requiring the Master Servicer to obtain the Trustee's approval prior to terminating a Subservicer for cause.

(iii)   To qualify for the transfer of loans for subservicing, a Subservicer must: (1) possess and maintain all material state and local licenses and registrations and be qualified to do business in the relevant jurisdictions, (2) agree to comply, and comply, with any laws, regulations, orders, mandates, or rulings of any Governmental Authority and/or any agreement or settlement between the Master Servicer or any of the other Bank of America Parties with any Governmental Authority applicable to subservicing, (3) maintain sufficient capable staff and facilities located in the United States, agree to meet, and meet, specified service level and performance requirements, and meet reasonable financial criteria, (4) agree to indemnify and hold harmless the Master Servicer for any servicing failures or breaches committed by it, (5) be eligible to service in accordance with the Home Affordable Modification Program ("HAMP") either pursuant to a Servicer Participation Agreement or an Assignment and Assumption Agreement with the U.S. Department of Treasury, (6) meet, and otherwise be subject to, all relevant third-party provider requirements of the Office of the Comptroller of the Currency, (7) meet, and otherwise be subject to, the Master Servicer's vendor management policies, provided that such policies are of general application and do not address the specific requirements for performance under this Settlement Agreement, any agreement for the transfer of loans to subservicing, or any agreement for the sale of servicing rights, and (8) otherwise meet the requirements of the subservicing provisions of the Governing Agreements.   In determining whether a Subservicer meets the qualifications described in this Subparagraph 5(a)(iii), the Master Servicer shall act in good faith and shall use commercially reasonable standards. Notwithstanding any other provision of this Settlement Agreement, the Master Servicer shall have no obligation to, and shall not, enter into a subservicing contract with, or transfer any Mortgage Loan for subservicing to, any Subservicer that does not meet the qualifications described in this Subparagraph 5(a)(iii) at the relevant time.   Any Subservicer on the Approved

List that, at any time, does not meet the qualifications described in this Subparagraph 5(a)(iii) and that subsequently has a commercially reasonable basis for believing that it can meet the qualifications described in this Subparagraph 5(a)(iii), can request that the Master Servicer re-evaluate whether it meets the qualifications described in this Subparagraph 5(a)(iii), and if the Master Servicer determines that the Subservicer meets the qualifications described in this Subparagraph 5(a)(iii), such Subservicer shall be considered eligible for the transfer of High Risk Loans (subject to, if applicable, negotiation of a subservicing contract pursuant to Subparagraph 5(a)(iv)).

(iv)    Beginning on the date of the Trustee's approval (or deemed approval, as applicable) of at least four Subservicers, the Master Servicer shall negotiate a servicing contract that includes commercially reasonable terms (including without limitation the right to terminate the Subservicer for cause) and map the computer-transfer of Mortgage Loans with not less than one Subservicer per quarter until all of the Subservicers on the Approved List are operational. The terms on which the Subservicers are compensated shall be commercially reasonable pool-performance incentives and/or activity-based incentives substantially similar to, and not materially less favorable than, those set forth on Exhibit E hereto.  The servicing contract with each Subservicer shall prohibit the Subservicer from subcontracting the servicing, subservicing, selling the servicing rights, or otherwise transferring the servicing rights of any of the High Risk Loans to another party, provided that nothing herein shall be construed to limit the right of the Subservicers to engage third-party vendors or subcontractors to perform tasks that prudent mortgage banking institutions commonly engage third party vendors or subcontractors to perform with respect to mortgage loans and related property, including, but not limited to, tax monitoring, insurance monitoring, property inspection, reconveyance, services provided by licensed field agents, and brokering REO property ("Routinely Outsourced Tasks").

(v)    The Master Servicer will complete the contract negotiation and computer-transfer mapping for each Subservicer in a three-month time period running from the commencement of computer-transfer mapping with that Subservicer, provided, however, that the Master Servicer shall have no obligation to contract with any Subservicer that does not meet the qualifications described in Subparagraph 5(a)(iii) or on terms that are not commercially reasonable, and shall incur no liability whatsoever nor be subject to any other form of remedy if it cannot comply with

any provision of this Paragraph 5 because it is unable to contract with such a Subservicer on commercially reasonable terms (provided, however, that the other provisions of this Paragraph 5 shall remain in force).

(vi)     If the Master Servicer exceeds the three month time frame to complete the required computer mapping specified in Subparagraph 5(a)(v), the Master Servicer shall retain a competent third party, at its own expense, to complete the computer mapping as soon as reasonably practical (and shall have no other liability for exceeding the time frame provided that it retains such third party and proceeds diligently to complete the computer mapping).

(vii)     After at least one Subservicer is operational, the Master Servicer shall initiate the transfer of Mortgage Loans to at least one Subservicer per quarter; provided, however, that each Subservicer shall have no more than 30,000 outstanding Mortgage Loans from the Covered Trusts at any one time.   If each operational Subservicer has 30,000 outstanding Mortgage Loans from the Covered Trusts (or such lesser maximum number as the Trustee directs pursuant to Subparagraphs 5(a)(i) and (ii), as applicable), the Master Servicer shall have no obligation to transfer any Mortgage Loans until such time as an operational Subservicer has enough less than 30,000 outstanding Mortgage Loans from the Covered Trusts (or such lesser maximum number as the Trustee directs pursuant to Subparagraphs 5(a)(i) and (ii), as applicable) so as to make a transfer of Mortgage Loans commercially reasonable.

(viii)     Only one Subservicer shall be assigned to each Covered Trust.

(ix)     Any Mortgage Loan in subservicing for which twelve (12) consecutive timely payments have been made by or on behalf of the borrower shall be transferred back to the Master Servicer. The Master Servicer shall include a provision to this effect in the subservicing contract with each Subservicer.   This provision shall not apply to any Mortgage Loan for which the Master Servicer has sold the servicing rights.

(x)     All costs associated with implementation of these subservicing provisions shall be borne by the Master Servicer and/or the Subservicers, as applicable; provided, however, that the costs of the Subservicer compensation described in Subparagraph 5(a)(iv) and on Exhibit E hereto shall be borne by the Master Servicer. For the avoidance of doubt, if a Mortgage Loan is

transferred to subservicing, the Master Servicer shall retain all rights to receive payment for accrued but unpaid Master Servicing Fees and to be reimbursed for outstanding Advances at the same time and in the same manner as if the Master Servicer had retained the servicing function.

(xi)     Beginning on the date of the Trustee's approval or deemed approval of at least four Subservicers, the Master Servicer may, at its option, sell the servicing rights on High Risk Loans to any Subservicer on the Approved List, provided that:  (1) such sale complies with the applicable provisions of the applicable Governing Agreements; (2) the Subservicer possesses all material state and local licenses and registrations and is qualified to do business in the relevant jurisdictions; (3) the Subservicer maintains sufficient capable staff and facilities located in the United States, meets specified service level and performance requirements, and meets reasonable financial criteria; (4) the Subservicer complies with applicable laws, regulations, orders, mandates, or rulings of any Governmental Authority; (5) the Master Servicer ensures that the terms of the contract of sale include terms not materially less favorable than, similar to, and designed to substantially maintain the effect of, the commercially reasonable pool performance incentives and/or activity-based incentives set forth on Exhibit E hereto; (6) the total number of outstanding Mortgage Loans from the Covered Trusts serviced by any Subservicer, whether as a result of a sale of servicing rights or of a transfer to subservicing, shall not exceed 30,000 at any one time; (7) the Master Servicer covenants to provide Advance financing on commercially reasonable terms or otherwise guarantee such payment, if necessary to ensure the creditworthiness of the Subservicer in connection with Advances; (8) the Master Servicer ensures that the terms of the contract of sale prohibit the Subservicer from subcontracting the servicing, subservicing, selling the servicing rights, or otherwise transferring the servicing rights of any of the High Risk Loans to another party, provided that the Master Servicer is not required to restrict the Subservicer's ability to engage third-party vendors or subcontractors to perform Routinely Outsourced Tasks; (9) the Master Servicer shall enforce its rights under any contract of sale in good faith; (10) the Master Servicer ensures that the terms of the contract of sale include provisions similar to, and that are designed to substantially maintain the effect of, Subparagraphs 5(d) and 5(e); and (11) the Master Servicer obtains whatever powers of attorney may be necessary from the Trustee (which power of attorney shall not be unreasonably withheld) and the Subservicer so that the Master Servicer may cure document exceptions and comply with its obligations pursuant to Paragraph 6.  For the avoidance of doubt, (1) nothing in this

- 19 -

Settlement Agreement shall limit in any way the Master Servicer's rights, if any, under the Governing Agreements, to sell servicing rights on current Mortgage Loans; (2) the Master Servicer's sale of servicing rights in conformity with this Subparagraph 5(a)(xi) shall be the equivalent of transferring High Risk Loans to subservicing for the purposes of satisfying the obligation of the Master Servicer under this Paragraph 5 to transfer High Risk Loans; and (3) in any quarter in which the Master Servicer is obligated to transfer High Risk Loans to subservicing, the Master Servicer shall remain obligated to do so unless it sells servicing rights on High Risk Loans pursuant to this Subparagraph 5(a)(xi).

(xii)    Nothing in this Settlement Agreement shall limit in any way the Master Servicer's right to sell, transfer, or assign the servicing rights for the loans in the Covered Trusts, including High Risk Loans, to a bank affiliate of the Master Servicer reasonably expected to be capable of performing the obligations of the Master Servicer under this Settlement Agreement and the Governing Agreements, and the provisions of Subparagraph 5(a)(xi) shall not apply to such a sale, transfer, or assignment.  Upon the sale, transfer, or assignment of servicing rights for any loans in the Covered Trusts to such a bank affiliate of the Master Servicer, it shall be deemed to be a Master Servicer for purposes of this Settlement Agreement and all provisions of this Settlement Agreement applicable to the Master Servicer shall be fully applicable to it.

(b)    <u>Subservicing Implementation for High Risk Loans</u>.  Mortgage Loans in groups (i) through (v) below shall be termed "High Risk Loans" for the purposes of this Settlement Agreement.  High Risk Loans shall be transferred to subservicing in the following priority, provided that Mortgage Loans from groups (i), (ii), and (iii) below may be grouped together for transfer and treated as a single group for priority purposes:

(i)    Mortgage Loans that are 45+ days past due without right party contact (*i.e.*, the Master Servicer has not succeeded in speaking with the borrower about resolution of a delinquency);

(ii)    Mortgage Loans that are 60+ days past due and that have been delinquent more than once in any rolling twelve (12) month period;

(iii)    Mortgage Loans that are 90+ days past due and have not been in the foreclosure process for more than 90 days and that are not actively performing on trial modification or in the underwriting process of modification;

(iv)    Mortgage Loans in the foreclosure process that do not yet have a scheduled sale date; and

(v)    Mortgage Loans where the borrower has declared bankruptcy regardless of days past due.

(c)    <u>Servicing Improvements for Mortgage Loans *Not* in Subservicing</u>.  Beginning five (5) months after the Signing Date or on the Approval Date, whichever is later, the servicing improvements set forth below shall apply to all Mortgage Loans that are (i) ***not*** in subservicing pursuant to Subparagraphs 5(a) and 5(b) or (ii) for which the servicing rights have not been sold to a Subservicer; except that for Mortgage Loans secured by collateral in the state of Florida, the Industry Standard benchmark set forth in Subparagraph 5(c)(i)(B) and any associated Master Servicing Fee Adjustment shall not apply until the Approval Date or until twenty-four (24) months after the Signing Date, whichever is later; provided, however, that the Master Servicer shall have no liability under this Subparagraph 5(c) until such time as eight Subservicers have been approved or been deemed approved by the Trustee.

(i)    The Master Servicer shall, on a monthly basis, benchmark its performance against the following industry standards (the "Industry Standards").  For the avoidance of doubt, only one Industry Standard shall apply to each Mortgage Loan:

(A)    <u>First-lien Mortgage Loans Only</u>:  Delinquency status of borrower at time of referral to the Master Servicer's foreclosure process:  150 days.  This benchmark will exclude for each Mortgage Loan all time periods during which the borrower is in bankruptcy.

(B)    <u>First-lien Mortgage Loans Only</u>:  Time period between referral to the Master Servicer's foreclosure process and foreclosure sale or other liquidation event:  The relevant state timeline in the most current (as of the time of each calculation) FHFA referral to foreclosure timelines.  This benchmark will exclude for each Mortgage Loan all time periods during which

- 21 -

(a) the borrower is in bankruptcy or (b) the borrower is performing pursuant to HAMP or other loss mitigation efforts mandated by Law.

(C)     Second-lien Mortgage Loans Only:  Delinquency status of borrower at the time of reporting of charge-off to Trustee:  Standards in relevant Governing Agreement.

(ii)     The Master Servicer shall, once a month on the last business day of the month, send to the Trustee statistics for each Covered Trust comparing its performance for the prior month with respect to the Mortgage Loans in each Covered Trust to the Industry Standards (the "Monthly Statement").  The Trustee shall use reasonable commercial efforts to make such statement available on its Global Corporate Trust Investor Reporting website (https://www.gctinvestorreporting.bnymellon.com or any successor thereto) within five (5) business days of its receipt of such Monthly Statement.

(iii)     Once a month, in connection with the preparation of the Monthly Statement, the Master Servicer shall calculate for the prior month:  (a) a Compensatory Fee (as defined below) for each Mortgage Loan in each Covered Trust;  (b) a Loan Level Amount (as defined below) for each Mortgage Loan in each Covered Trust;  (c) whether there is a Master Servicing Fee Adjustment (as defined below) owed for each Covered Trust; and shall report to the Trustee as a line item on the Monthly Statement the Master Servicing Fee Adjustment, if any, for the relevant Covered Trust.  The "Compensatory Fee" for a Mortgage Loan shall be calculated by multiplying the coupon applicable to that Mortgage Loan times the unpaid principal balance for that Mortgage Loan, and dividing the product of those two numbers by twelve (12).  The "Loan Level Amount" for each Mortgage Loan shall be the amount equal to the applicable percentage in the applicable table below of the Compensatory Fee for such Mortgage Loan.  The "Master Servicing Fee Adjustment" for each Covered Trust shall be the greater of zero and the sum of all the Loan Level Amounts for all the Mortgage Loans in such Covered Trust for that month.

| Days Delinquent at Time of Referral to the Master Servicer's Foreclosure Process (First-lien Mortgage Loans only) | |
|---|---|
| *Day Variance to Industry Standard (150 days)* | *%* |
| Earlier than -60 | -50% |
| -60 to -30 | -20% |
| -30 to 0 | 0% |
| 0 to 15 | 0% |
| 15 to 30 | 0% |
| 30 to 60 | 40% |
| 60 to 90 | 60% |
| 90 to 120 | 80% |
| Over 120 | 100% |

| Days Between Referral to Foreclosure Process and Foreclosure Sale or Other Liquidation Event (First-lien Mortgage Loans only) | |
|---|---|
| *Day Variance to Relevant State's Timeline as set Forth in the FHFA Referral to Foreclosure Timelines* | *%* |
| Earlier than -120 | -50% |
| -120 to -90 | -40% |
| -90 to -60 | -30% |
| -60 to -30 | -20% |
| -30 to 0 | 0% |
| 0 to 15 | 0% |
| 15 to 30 | 0% |
| 30 to 60 | 20% |
| 60 to 90 | 30% |
| 90 to 120 | 40% |
| 120 to 150 | 50% |
| 150 to 180 | 60% |
| 180 to 210 | 80% |
| Over 210 | 100% |

- 23 -

| Days Delinquent at Time of Reporting of Charge Off (Second-lien Mortgage Loans only) | |
|---|---|
| *Day Variance to Standard in the Governing Agreement* | *%* |
| 0 to 30 | 0% |
| 30 to 60 | 40% |
| 60 to 90 | 60% |
| 90 to 120 | 80% |
| Over 120 | 100% |

(iv)     For each Covered Trust other than CWHEQ 2006-A and CWHEQ 2007-G, the Master Servicer shall, on a monthly basis, deduct the Master Servicing Fee Adjustment from unreimbursed Advances due to it.  For each of CWHEQ 2006-A and CWHEQ 2007-G, the Master Servicer shall, on a monthly basis, wire the Master Servicing Fee Adjustment to the Collection Account for the applicable Covered Trust and the Trustee shall distribute the Master Servicing Fee Adjustment in the same manner as is specified for an Allocable Share pursuant to Subparagraph 3(d)(i), provided, however, that the provisions of Subparagraph 3(d)(ii) shall not apply to Master Servicing Fee Adjustments.

(d)     <u>Loss Mitigation Requirements Applicable to All Loans</u>.  Beginning on the Signing Date, for each borrower with a Mortgage Loan in the Covered Trusts that is considered for modification programs, the Master Servicer and/or each of the Subservicers, as applicable, shall simultaneously evaluate the borrower's eligibility for all applicable modification programs in accordance with the factors set forth in Subparagraph 5(e) (including, as applicable, HAMP and proprietary modification programs, which programs may, pursuant to the Governing Agreements, include principal reductions), and shall render a decision within sixty (60) days of receiving all requested documents from the borrower; provided that nothing herein shall be deemed to create an obligation on the part of Master Servicer to offer any modification or loss mitigation strategy to any borrower.

(e)     <u>Loss Mitigation Considerations</u>.  In considering modifications and/or other loss mitigation strategies, including, without limitation, short sales and deeds in lieu of foreclosure, the Master Servicer and all Subservicers shall consider the following factors:  (a) the net present value of the Mortgage Loan at the time the modification and/or other loss mitigation strategy is

considered and whether the contemplated modification and/or other loss mitigation strategy would have a positive effect on the net present value of the Mortgage Loan as compared to foreclosure; (b) where loan performance is the goal, whether the modification and/or other loss mitigation strategy is reasonably likely to return the Mortgage Loan to permanently performing status; (c) whether the borrower has the ability to pay, but has defaulted strategically or is otherwise acting strategically; (d) reasonably available avenues of recovery of the full principal balance of the Mortgage Loan other than foreclosure or liquidation of the loan; (e) the requirements of the applicable Governing Agreement; (f) such other factors as would be deemed prudent in its judgment; and (g) all requirements imposed by applicable Law.  When the Master Servicer and/or Subservicer, in implementing a modification and/or other loss mitigation strategy (which may, pursuant to the Governing Agreements, include principal reductions), considers the factors set forth above, and/or acts in accordance with the policies or practices that the Master Servicer is then applying to its or any of its affiliates' "held for investment" portfolios, the Master Servicer shall be deemed to be in compliance with its obligation to service the Mortgage Loans prudently in keeping with the relevant servicing provisions of the relevant Governing Agreement and the requirements of this Subparagraph 5(e), the modification and/or other loss mitigation strategy so implemented shall be deemed to be permissible under the terms of the applicable Governing Agreement, and the judgments in applying such factors to a particular loan shall not be subject to challenge under the applicable Governing Agreement, this Settlement Agreement, or otherwise.  Notwithstanding anything else in this Subparagraph 5(e), no principal modification by the Master Servicer or any Subservicer shall reduce the principal amount due on any Mortgage Loan below the current market value of the property, as determined by a third-party broker price opinion, using a fair market value method, applying normal marketing time criteria and excluding REO or short sale comparative sales in the valuation calculation.

(f)     _Reporting and Attestation of Compliance with Servicing Improvements_. Beginning on the Approval Date, the Master Servicer shall:  (i) report monthly to the Trustee, for each Covered Trust, concerning its compliance with the Servicing Improvements required by this Settlement Agreement (the "Monthly Report"); and (ii) pay for an annual attestation report for the Covered Trusts as a group  (the "Attestation Report") to be completed no later than February 15 of each year that any Covered Trust holds Mortgage Loans (or owns real estate related to liquidated Mortgage Loans).  The Trustee shall use reasonable commercial efforts to make such

- 25 -