UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BANKERS INSURANCE COMPANY, et al.,

     Plaintiffs,

v.                                 Case No. 8:11-CV-01630-T-17

COUNTRYWIDE FINANCIAL CORP., et al.,

     Defendants.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND STAYING COUNTS I AND II.

     This cause is before the Court after Plaintiffs, Bankers Insurance Company et al. ("Bankers"), Amended Verified Certificateholder Derivative Complaint ("Amended Derivative Complaint") (Doc. 9) filed on December 19, 2011; the sole remaining Defendant, Bank of New York Mellon's ("BNYM"), Motion to Dismiss (Doc. 30) filed on March 29, 2012; Bankers', response thereto (Doc. 34) filed on April 19, 2012; and Bankers' Notice of Supplemental Authority (Doc. 42) filed on June 21, 2012. Defendant BNYM's Motion to Dismiss is **DENIED**, and Counts I and II are **STAYED** pending final disposition of *In Re the Application of the Bank of New York Mellon* (N.Y. Sup. Ct. No. 651786/2011).

## PROCEDURAL HISTORY

     On July 22, 2011, Bankers filed a Complaint, individually, against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Securities Corporation ("Countrywide Securities"), Countrywide Capital Markets, LLC ("Countrywide Capital"), Countrywide Home Loans, Inc. ("Countrywide Home"),

Countrywide Home Loans Servicing LP ("Countrywide Servicing"), CWABS, Inc.
("CWABS"), CWHEQ, Inc. ("CWHEQ") (collectively, "Countrywide," or "the
Countrywide Defendants"), and Bank of America Corp. ("Bank of America"), BAC
Home Loans Servicing, L.P. ("BAC Home"), NB Holdings Corp. ("NB Holdings")
(collectively, "Bank of America" or "Bank of America Defendants"). Doc. 1. Bankers
filed a Verified Certificateholder Derivative Complaint ("Derivative Complaint")
against BNYM on behalf of Alternative Loan Trust 2005-73CB, Alternative Loan
Trust 2005-J13, Alternative Loan Trust 2006-6CB, Alternative Loan Trust 2006-8TI,
Alternative Loan Trust 2007-21CB, CWABS Asset-Backed Certificates Trust 2005-
11, CWABS Asset-Backed Certificates Trust 2005-12, CWABS Asset-Backed
Certificates Trust 2005-16, CWABS Asset-Backed Certificates Trust 2006-11, and
CWMBS Mortgage Pass-Through Trust 2005-21 (collectively, the "Trusts"). Doc. 1.
On August 15, 2011, the United States Judicial Panel on Multidistrict Litigation
("MDL" Panel) ordered that Bankers' claims against Countrywide Defendants be
transferred to the United States District Court for the Central District of California.
Doc. 5. Additionally, the MDL Panel separated and remanded all claims against
BNYM so that only BNYM remains as a defendant before this Court at this time. Doc.
5.

        On December 19, 2011, Bankers filed an Amended Derivative Complaint on
behalf of the Trusts with two (2) Counts alleging breaches of fiduciary duties and
the third count alleging a breach of contract claim against BNYM. Doc. 9. BNYM
moved to dismiss all counts in the Amended Derivative Complaint on March 29,
2012. Doc. 30. On March 19, 2012, Bankers filed the Plaintiffs' Response in

Opposition to the Bank of New York Mellon's Motion to Dismiss. Doc. 34. On May 29, 2012, BNYM filed a memorandum supporting the motion to dismiss (Doc. 41), and Bankers subsequently filed a Notice of Supplemental Authority on June 21, 2012 (Doc. 42). Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as there is diversity among the parties and the amount in controversy exceeds $75,000.00.

<strong>FACTUAL BACKGROUND</strong>

I.     <u>Parties</u>

The Court accepts the following allegations, made by Bankers, as true for the purposes of resolving the current motion. Bankers is a corporation under, and subject to, the laws of the State of Florida and has a principal place of business in St. Petersburg, Florida. Doc. 9 ¶ 6. BNYM, whose principal place of business is New York, New York, served as the Trustee of the Trusts in this case for the Certificateholders. *Id.* at ¶ 10.

II.    <u>Bankers' Purchase of Countrywide Mortgage-Backed Securities and the Mortgage Securitizations</u>

Bankers purchased portions of twelve (12) tranches of the Certificates 2005-73CB 1A2, 2005-73CB 1A3, 2005-J13 1A4, 2006-6CB 1A2, 2006-8TI 1A4, 2007-21CB 1A5, 2005-11 AF3, 2005-12 2A4, 2005-13 3AV4, 2005-16 2AF3, 2006-11 1AF2, and 2005-21 A39 (the "Tranches"). Doc. 9 ¶ 38. A senior/subordinated structure was used by the Trusts such that each tranche receives the credit protection of the tranches subordinate to it, and junior tranches are also subordinate to the senior tranches with regard to payment of principal and interest. *Id.* at ¶ 39. Bankers purchased all senior Certificates and currently owns the aforementioned Tranches. *Id.*

3

Countrywide Home collateralized the Certificates with "sub-prime" residential real estate mortgages and sold the Certificates to CWALT, CWMBS, and CWABS. *Id.* at ¶ 40. Bankers, and other Certificateholders, purchased tranches issued by CWMBS, CWALT, and CWABS. *Id.* Countrywide Home (as the Seller), Countrywide Servicing (as the Master Servicer), CWALT, CWMBS, and CWABS (as Issuer and Depositor), and BNYM (as Trustee)) prepared, issued, and published Prospectuses (Exhibits 1–11) and Prospectus Supplements (Exhibits 12–22) to assist in the sale of the Certificates. *Id.* at ¶ 41–42.

Additionally, CWALT, CWMBS, and CWABS (1) entered Pooling Services Agreements ("PSA" or "PSAs") with Countrywide Home, Countrywide Servicing, and BNYM (Exhibits 23–33), (2) created Trusts through the PSAs to hold the Certificates for the Certificateholders, and BNYM, as Trustee, was to administer the Trusts, and (3) secured primary mortgage guaranty insurance ("PMI") policies, pursuant to the PSAs for loans that had a loan-to-value (LTV) ratio exceeding 80 percent (80%). *Id.* at ¶ 43. Bankers, as well as other Certificateholders, are third-party beneficiaries of the PSAs. *Id.* at 47. Countrywide Home provided additional assurances, which included that there were no material defaults, that each loan was underwritten in compliance with Countrywide's guidelines, and that no "fraud, error, misrepresentation, negligence, or similar occurrence" had taken place. *Id.* at ¶ 48(a–f). Countrywide Home agreed that upon the breach of any representation or warranty that materially or adversely affected the interests of Certificateholders, Countrywide Home would cure the breach, repurchase the loan, or substitute a replacement mortgage for the that loan. *Id.* at ¶ 44 (citing Exhibit 12 at S-33).

4

Additionally, Countrywide Servicing was obligated to enforce the terms of the

PSAs that required Countrywide to cure, repurchase, or substitute loans in the event

of a breach. *Id.* at ¶ 49 (citing Exhibit 23 at § 3.01). Countrywide Servicing was to

provide loan-level information on each of the loans to BNYM according to Schedule

VI of the PSAs. *Id.* at ¶ 54 (citing Exhibit 23 at S-VI-1). Using the information

provided by Countrywide Servicing, BNYM was to provide credit-rating agencies

with notice of any uncured default. *Id.* at ¶ 55 (citing Exhibit 23 at § 10.05). Bankers

alleges that Countrywide Home and Countrywide Servicing failed to cure or

repurchase loans in which a breach occurred. *Id.* at ¶¶ 57–58. Furthermore, Bankers

claims that a reduction of funds available to Certificateholders occurred when

Countrywide Servicing did not use reasonable efforts to foreclose on defaulted

mortgage loans and improperly charged the over-collateralized accounts for losses

when they should have been covered by PMI or tendered to Countrywide Home. *Id.*

at 59.

### III.    Allegations of Countrywide's Fraud

Bankers alleges a "massive fraud" by Countrywide Financial and certain officers

and affiliates against purchasers of MBSs. *Id.* at ¶ 12. Countrywide Financial made

representations regarding its supposed conservative mortgage underwriting

standards, appraisals of the mortgaged properties, adherence to its underwriting

guidelines and credit analysis, LTV ratios of the mortgages, and other facts that were

material to investment decisions. *Id.* at ¶ 14. Allegedly, Countrywide Financial

falsely represented that (1) the loans packaged into the Certificates were written in

compliance with Countrywide Financial's underwriting guidelines, (2) Countrywide

Financial evaluated borrowers' credit and ability to repay prior to approving any loan, (3) exceptions to Countrywide Financial's underwriting guidelines were only made when justified by "compensating factors," (4) almost every mortgaged property was independently appraised and conformed to acceptable standards and was the basis for the LTV ratio, (5) selected loans were not intended to adversely affect the interests of the Certificateholders, (6) the AAA or other investment-grade ratings of Certificates were accurate reflections of credit quality, and (7) the Certificates' issuing trusts possessed good title to the underlying mortgage loans. *Id.* at ¶ 16. Bankers claims that Countrywide Financial had no intention of complying with the representations and warranties made to investors. *Id.* at ¶ 28. Bankers asserts that, due to Countrywide Financial's deviation from its guidelines, loans were approved when loan applications were missing vital documents, an appraisal was invalid or incomplete, borrower fraud existed on the face of the application, or borrower income information did not meet Countrywide Financial's stated guidelines. *Id.* at 34.

## IV.    Conduct of BNYM

Bankers alleges that BNYM knew that Countrywide Servicing did not enforce Countrywide Home's obligations under the PSAs, did not use reasonable efforts to foreclose upon defaulted mortgage loans, and did not provide BNYM with complete information regarding the mortgage loans. *Id.* at ¶ 61. Bankers also claims that Countrywide Servicing responded to BNYM's demands with inaction that resulted in an Event of Default under § 7.01(ii) of the PSAs, or alternatively, if BNYM did not make demands, that BNYM failed to meet its duties to Certificateholders. *Id.* at ¶ 62.

BNYM knew from the PSAs that Countrywide Servicing had an obligation to protect the interests of the Trusts and that failure to meet such obligations would harm the Trusts. *Id.* at ¶ 63–64. Bankers alleges that BNYM failed to complete non-discretionary tasks of demanding that Countrywide Servicing comply with contractual servicing obligations, demanding that Countrywide Home repurchase loans, and requesting and providing information to Certificateholders that BNYM was able to request from Countrywide Servicing, which Countrywide Servicing was required to provide. *Id.* at ¶ 65.

Additionally, Bankers states that investors in the industry commonly rely on the credit-rating agencies ratings when making decisions about securities within their portfolios and that BNYM failed to notify the agencies when Certificates at issue had delinquencies and defaults, the PMI insurer declined to cover many mortgage loans because the loans had been procured through fraud, and that neither BNYM or Countrywide Servicing had enforced their rights against the PMI insurer for denying coverage of delinquent mortgages.*Id.* at ¶ 68. Bankers claims that as a result of this conduct, the Certificates suffered drastic downgrades in ratings from the credit-rating agencies. *Id.* at ¶ 70. According to Bankers, BNYM knew that the Certificate ratings were falsely maintained, that the underwriting and appraisal standards had been abandoned, and that Countrywide Servicing did not enforce the obligations of Countrywide Home. *Id.* at ¶ 71. Bankers contends that had the Certificates been downgraded earlier, and gradually, Bankers, and other Certificateholders, would have sold the Certificates before any further decrease in value. *Id.* at ¶ 70. Bankers alleges that BNYM breached its duties in failing to act in good faith and by not

exercising its rights under the PSAs to give notice to Countrywide Servicing of non-performance, and in the event of continued non-performance for sixty (60) days, failing to declare an Event of Default. *Id.* at ¶ 74.

With regard to the alleged default, Bankers states that a group of Certificateholders, holding at least 25% of the Voting Rights in Certificates issues by the 115 trusts, gave notice of Countrywide Servicing's failure to meet the covenants and agreements of the PSAs to Countrywide Servicing and BNYM. *Id.* at ¶ 76. The Notice listed a series of alleged failures that materially affected the rights of Certificateholders. *Id.* at ¶ 77. Bankers gave notice to Countrywide Servicing and BNYM that if each of the failures to perform continued for sixty (60) days beyond notification that each of the failures would be deemed an Event of Default under the PSAs. *Id.* at ¶ 78 (citing Exhibit 34). Bankers states that failures to perform continued for sixty (60) days beyond the date of notice, which created an Event of Default under the PSAs, and that BNYM had a duty to notify the Certificateholders of the Event of Default. *Id.* at ¶¶ 79–80.

### V.     The Article 77 Proceeding

BNYM announced on June 29, 2011, that it entered an $8.5 billion agreement ("Settlement Agreement") with Countrywide (and its successor by merger, Bank of America Corporation) to settle claims belonging to the 530 trusts for which BNYM serves as Trustee. *Id.* at ¶ 81. The 530 trusts at issue in the Settlement Agreement include the Certificates purchased by Bankers, and if the proposed Settlement Agreement is approved, would eliminate claims BNYM could bring against Countrywide, Bank of America, and their affiliates. *Id.* at ¶ 83. Bankers also claims

that the Settlement Agreement was "negotiated in secret without the knowledge or consent of Bankers." *Id.* Bankers states that the Settlement Agreement is not reasonable and BNYM has breached its duty to Certificateholders by entering the proposed Settlement Agreement. *Id.* at ¶ 85. Before June 29, 2011, BNYM had not notified Certificateholders or the credit-rating agencies of an Event of Default. *Id.* at ¶ 82. BNYM filed the Article 77 Proceeding to request approval of the potential settlement on the same day the settlement was announced. *Id.* at 81.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure Rule 8(a)(2) requires that a plaintiff's complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement of relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citations omitted).

Therefore, "to survive a motion to dismiss, a complaint must now contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). Courts must follow a two-step approach when considering a motion to dismiss: first, "eliminate any allegations in the complaint that are merely legal conclusions;" and second, "where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief.'" *Id.* at 1290 (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)). As such, the standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I.   Consideration of Matters outside of the Pleadings

Generally, in determining a motion to dismiss, the Court "do[es] not consider anything beyond the face of the complaint and the documents attached thereto." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007)(citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 2007). However, there is an exception to this rule when the "plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Id.* (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir. 1999); *Brooks*, 116 F.3d at 1368–1369). Further, the Court may consider a document outside the pleadings if it is "(1) central to the plaintiff's claims and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Human Servs.*, 693 F.3d 1371, 1379 (11th Cir. 2010)(quoting *SFM Holdings, Ltd. V. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). In such situations, the documents then become part of the pleadings. *Nichols v. John Hancock Life Ins. Co.*, 2009 WL 3019785 (N.D. Ala. Sept. 22, 2009). Additionally, "' a court may take notice of another court's order . . . for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the

litigation.'" *Gibbs v. U.S.*, 2012 WL 1093719 (M.D. Fla. Mar. 31, 2012)(quoting *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

Bankers' Amended Derivative Complaint (Doc. 9) attaches numerous exhibits including published prospectuses ("Prospectuses"; Exhibits 1–11) and prospectus supplements ("Prospectus Supplements"; Exhibits 12–22) regarding the sale of Certificates of the Trusts, and PSAs for the Trusts (Exhibits 23–33), which, as necessary, the Court will consider in deciding the motion to dismiss. *See Fin. Sec. Assur., Inc.*, 500 F.3d at 1284. Additionally, Bankers' response to BNYM's motion contains documents from the Article 77 Proceeding in New York which include: BNYM's "Memorandum of Law in Support of the Trustee's Motion Regarding the Standard of Review and Scope of Discovery" (Doc. 34-1), Bankers' "Notice of Intention to Appear and Object to Settlement" (Doc. 34-2), and a "Memorandum of Law in Support of Order to Show Cause Why the Court Should Not Convert this Special proceeding to a Plenary Action" (Doc. 34-3). The Court may consider these documents, not for the truth of the matter asserted, but to determine the representations and matters before the New York court in the Article 77 Proceeding. *See Gibbs*, 2012 WL 1093719 at *2.

## II.   Counts I and II are Stayed Pending a Decision in the Article 77 Proceeding

Count I of Bankers' Amended Derivative Complaint claims that BNYM breached its fiduciary duty to Bankers and other Certificateholders by not investigating Countrywide Servicing's non-performance of obligations under the PSAs, and by not making demands on Countrywide Servicing and suing if the demands remained unmet after having knowledge of a continuing Event of Default. Doc. 9 ¶¶ 98–100.

Count II of Bankers' Amended Derivative Complaint claims that BNYM breached its fiduciary duty to Bankers and other Certificateholders by failing to enter into a reasonable settlement agreement and not protecting the interests of Certificateholders. *Id.* at ¶111. Bankers claims that BNYM did not act in the interests of Certificateholders when it entered an agreement that would delay servicing improvements and curing of Countrywide Servicing's breaches of the PSAs, tie servicing improvements to judicial approval of the monetary aspect of the settlement, and, and if not approved, would allow BNYM and Countrywide Servicing to no longer be obligated to perform the servicing improvement obligations. *Id.* at ¶¶ 112–113. Bankers asserts that BNYM acted in its own interest rather than the best interest of the Certificateholders in a manner that would limit or eliminate liability to Certificateholders. *Id.* at 114.

BNYM alleges that the Court should dismiss Counts I and II of Bankers' Amended Derivative Complaint because the matters at issue are duplicative of those pending in the Article 77 Proceeding and the *Colorado River* abstention doctrine should apply. Doc. 30. Bankers disagrees and states that the *Colorado River* abstention doctrine is inapplicable in the current case. Doc. 34.

### A. The *Colorado River* Doctrine

The Supreme Court has stated that there is a "'virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them.'" *Rambaran v. Park Square Enters., Inc.*, 2008 WL 4371356, *2 (quoting *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976)). The doctrine provides that "'the pendency of an action in the state court is no bar to proceedings concerning the

12

same matter in the Federal court.'" *Colorado River*, 424 U.S. at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). However, the doctrine allows for abdication in "exceptional" circumstances. *Id.* at 813. The first step of the *Colorado River* analysis is determining whether the "'federal and state proceedings involve substantially the same parties and substantially the same issues.'" *Rambaran*, 2008 WL 4371356 at *2 (citing *Ambrosia Coal & Constr. Co. v. Pages Morales*, 368 F.3d 1320, 1330 (11th Cir. 2004)).

Then, if the actions involve substantially the same issues and parties, Eleventh Circuit courts must analyze the following six (6) factors to determine if abstention is allowable: "(1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, and (6) the adequacy of the state court to protect the parties' rights." *Id.* at *3. Additionally, the policy matters of "whether the later filed litigation is vexatious or reactive in nature," and "whether the concurrent cases involve a federal statute that evinces a policy favoring abstention" will also allow for a federal court to abstain. *Id.* Courts may also exercise discretion in deciding whether it is appropriate to stay a proceeding. *Id.* at *2.

### B. Counts I and II are Parallel to the Article 77 Proceeding

Proceedings are parallel when they "involve substantially the same parties and substantially the same issues." *Ambrosia Coal*, 368 F.3d at 1330. However, the question is "'not whether the suits are formally symmetrical, but whether there is a substantial likelihood that the [state court] litigation will dispose of all claims

13

presented in the federal case." *R.E. Loans, LLC v. Eagle Group Brokers, LLC*, 2009 WL 837668, *3 (N.D. Fla. Mar. 3, 2009)(quoting *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 592 (7th Cir. 2009)).

Substantially the same issues are involved in this case and the Article 77 Proceeding. Count I alleges that BNYM failed to investigate Countrywide Servicing's non-performance of obligations within the PSAs, failed to demand that Countrywide Serving enforce the obligations of Countrywide Home, and failed to sue if the demands remained unmet. Doc. 9 ¶¶ 98–100. BNYM seeks a result in the Article 77 Proceeding that BNYM "acted within the bounds of reasonable discretion," within its powers as Trustee, and in the best interests of the Trusts. Doc. 30 at 6, 9; Doc 31-2. Additionally, Count II alleges that BNYM breached its fiduciary duty by entering into an unreasonable and unfair agreement. Doc. 9 ¶111. Meanwhile, BNYM seeks judicial approval of the Settlement Agreement and acknowledgement that BNYM acted reasonably in its decision to enter the Settlement Agreement. Doc. 30 at 6. Therefore, the same factual and legal issues are involved in the Article 77 Proceeding and in Count II. Where Counts I and II, and the Article 77 Proceeding involve the validity of BNYM's actions as Trustee and entrance into the Settlement Agreement, the *Colorado River* doctrine is applicable. *Ambrosia Coal*, 368 F.3d at 1330–1331; *see Rambaran*, 2008 WL 4371356 at *3.

Substantially the same parties are involved in this case and the Article 77 Proceeding. BNYM initiated the Article 77 Proceeding in New York and is a defendant in the current case. Bankers has intervened in the Article 77 Proceeding (Doc. 34-2) and has filed the Complaint in the current case (Doc. 9). Although

Bankers asserts that it has merely "objected" as opposed to having "intervened," in the Article 77 Proceeding, at this time, there is no documentation that Bankers will not be allowed to participate in the Proceeding, which involves substantially the same issues. Additionally, the Second Circuit has already allowed other investors, who had similar claims and interests, to officially intervene in the Article 77 Proceeding. *See BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*, 673 F.3d 169, 174–175 (2d Cir. 2012). Additionally, cases need not "share *identical* parties, issues, and requests for relief." *Ambrosia Coal*, 368 F.3d at 1329.

### C. Exceptional Circumstances Exist to Warrant Staying Counts I and II

The next step in the *Colorado River* doctrine analysis is whether "exceptional circumstances" to support abstention exist. *Colorado River*, 424 U.S. at 813. The Eleventh Circuit notes six (6) factors to consider: "(1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, and (6) the adequacy of the state court to protect the parties' rights." *Rambaran*, 2008 WL 4371356 at *3. The Supreme Court notes that "[n]o one factor is necessarily determinative" and that "a carefully considered judgment taking into account both the obligations to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Colorado River*, 424 U.S. 818–819. The decision "'does not rest on a mechanical checklist but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moorer v. Demopolis Waterworks and Sewer Bd.*, 374 F.3d 994, 997

(11th Cir. 2004)(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983). The Court examines each of these six (6)factors.

### 1.  Whether One of the Courts has Assumed Jurisdiction over the Property

Counts I and II do not involve property, therefore, this factor is neutral and weighs against abstention.

### 2.  The Inconvenience of the Federal Forum

BNYM states that the federal forum is less convenient because this Court does not have New York's "specialized procedure for deciding cases of this nature." Doc. 30 at 11.  However, BNYM has not contested venue with regard to Count III, which BNYM would have to litigate in this Court. Therefore, this factor is neutral and weighs against abstention.

### 3.  The Potential for Piecemeal Litigation

As discussed previously, substantially the same matters are at issue in Counts I and II and the Article 77 Proceeding, and the parties simply seek opposite outcomes. Given that having the same factual claims in state and federal courts "causes unnecessary inconvenience and expense and raises a distinct danger of duplicative, piecemeal litigation," this factor weighs heavily in favor of abstention. *Rivera v. Healthcare Servs. Grp., Inc.*, 2010 WL 2553606, *2 (M.D. Fla. June 23, 2010).

### 4.  The Order in Which the Fora Obtained Jurisdiction

The Amended Derivative Complaint with the Counts at issue was filed on December 19, 2011, which is approximately six (6) months after BNYM initiated the Article 77 Proceeding on June 29, 2011. This Court did not have jurisdiction over Counts I and II until six (6) months after the initiation of the Article 77 Proceeding

and approximately four (4) months after Bankers filed its objection to the
Settlement Agreement in the Article 77 Proceeding on August 29, 2011. Therefore,
this factor weighs heavily in favor of abstention.

### 5.  Whether State or Federal Law Will be Applied

The parties do not contest that New York law is to be applied in this case, which
weighs in favor of abstention as opposed to situations in which federal law applies
and the factor is weighed against abstention. *See Lops v. Lops*, 140 F.3d 927, 943
(11th Cir. 1998).

### 6.  The Adequacy of the State Court to Protect the Parties' Rights

This factor weighs in favor of abstention. As previously discussed, Bankers has
objected in the Article 77 Proceeding with regard to the Settlement Agreement and
other beneficiaries have intervened in the proceeding with arguments substantially
similar to those of Bankers. *See BlackRock*, 673 F.3d at 174–175. In the event that
the Article 77 Proceeding does not resolve Counts I and II, Bankers may attempt to
raise outstanding issues with regard to Counts I and II after the Court lifts the stay.

### 7.  Policy Matters Regarding Whether the Later Filed Claim was Vexatious and Whether the Case Involves a Federal Statute Favoring Abstention

The Court does not have information by which it is able to determine that
Bankers' claims are "vexatious," nor is a federal statute involved. These policy
matters weigh against abstention.

### 8.  Conclusion

The above factors weigh in favor of abstention under the *Colorado River*
doctrine. Accordingly, "'a stay, not a dismissal, is the proper procedural mechanism
for a district court to employ when deferring to a parallel state-court proceeding" as

it "'protects the rights of all the parties without imposing any additional costs or burdens." *Moorer*, 374 F.3d at 998 (quoting *LaDuke v. Burlington N. R. Co.*, 879 F.2d 1556, 1561–1562 (7th Cir. 1989). Therefore, Counts I and II are stayed pending an outcome in the Article 77 Proceeding.

### III.   The Motion to Dismiss is Denied with Regard to Count III

Count III of Bankers' Amended Derivative Complaint alleges a breach of contract claim against BNYM under the obligations of the PSAs for failure to notify Certificateholders about an uncured Event of Default of which BNYM had actual knowledge. Doc. 9 ¶ 120. Section 7.01(ii) of the PSAs defines the Event of Default at issue as:

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates . . . .

PSA § 7.01(ii). Additionally, the PSAs provide that "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." *Id.* at § 8.02(viii). Bankers has pled that, "[o]n October 18, 2010, a group of [C]ertificateholders (the "Institutional Investors"), holding no less than 25% of the Voting Rights in [C]ertificates issued by 115 trusts, provided BNYM and Countrywide Servicing notice of Countrywide Servicing's failure to observe and perform in material res[p]ects, the covenants and agreements imposed on it by § 7.01(ii) of the PSAs." Doc. 9 ¶ 76. Bankers claims that BNYM and Countrywide Servicing materially affected the rights of Certificateholders

18

by failing and refusing to comply with §§ 2.03, 2.03(c), 3.01, 3.11, 3.11(a), and 3.14 of the PSAs. *Id.* at ¶ 77. Bankers notified BNYM and Countrywide Servicing that the aforementioned failures were in violation of § 3.01 of the PSAs, that failures were continuing, and if the failures continued for sixty (60) more days they would each constitute an Event of Default under § 7.01(ii) of the PSAs. *Id.* at 78. The Amended Derivative Complaint states that the failures continued for an additional sixty (60) days from the date of notice, thereby creating an Event of Default under § 7.01(ii) of the PSAs. *Id.* at 79.

BNYM claims that no Event of Default occurred because "the cure period tolled during the negotiations that ultimately produced the Settlement Agreement." Doc. 30 at 16. However, Bankers "need not anticipate affirmative defenses," but only "state facts sufficient to indicate that a cause of action exists." *Hammonds v. Buckeye Cellulose Corp.*, 285 So.2d 7, 11 (Fla. 1973). The allegations pled by Bankers are "'enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 555). Accordingly, it is

**ORDERED** that Defendant BNYM's Motion to Dismiss is **DENIED**, and Counts I and II are **STAYED** pending final disposition of the Article 77 Proceeding. The Court intends to proceed forward on Count III of the claim on the schedule already set forth unless the parties mutually agree to stay the entire case.

**DONE AND ORDERED** in Chambers at Tampa, Florida, this ⌐ day of July, 2012.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT COURT JUDGE

Copies to: All parties and counsel of record.